**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

MÁXIMA ACUÑA-ATALAYA;
DANIEL CHAUPE-ACUÑA;
JILDA CHAUPE-ACUÑA;
CARLOS CHAUPE-ACUÑA;
YSIDORA CHAUPE-ACUÑA, personally and
on behalf of her minor child M.S.C.C.;
ELIAS CHAVEZ-RODRIGUEZ, personally
and on behalf of his minor child M.S.C.C.;
M.S.C.C., a minor by his guardians YSIDORA
CHAUPE-ACUÑA and ELIAS CHAVEZ-
RODRIGUEZ;
MARIBEL HIL-BRIONES;

       *Plaintiffs,*

   v.

NEWMONT MINING CORPORATION,
NEWMONT SECOND CAPITAL
CORPORATION,
NEWMONT USA LIMITED., and
NEWMONT PERU LIMITED.
       *Defendants*

Civil Action No. _____.

**COMPLAINT FOR DAMAGES AND
EQUITABLE RELIEF**

**JURY TRIAL DEMANDED**

# TABLE OF CONTENTS

I.   NATURE OF THE ACTION............................................................................................1

II.  SUMMARY OF THE ACTION ......................................................................................1

III. JURISDICTION AND VENUE .......................................................................................5

IV. PARTIES .......................................................................................................................5

   A.  Plaintiffs .................................................................................................................5

   B.  Defendants .............................................................................................................6

   C.  Other Relevant Actors ...........................................................................................6

V.  STATEMENT OF FACTS .............................................................................................8

   A.  Overview.................................................................................................................8

   B.  Defendants' Operations in Cajamarca, Peru ...........................................................9

   C.  Since 2011, defendants have unleashed a campaign of threats, intimidation and aggression against Plaintiffs to forcibly evict them from their land so that the Conga Project can move forward. .....13

   D.  In addition to physical acts of intimidation and aggression, Defendants have also abused Peruvian judicial processes to harass Plaintiffs..............................................................................35

   E.  Defendants have initiated a bad faith effort to pressure Plaintiffs into relinquishing their land through attempted extortion and harassment. .......................................................38

   F.  The abuses against the Plaintiffs have been well-publicized and engendered national and international outcry. .......................................................................................41

   G.  Newmont's hand-picked consultant concluded that the Plaintiffs' human rights are at risk at Tragadero Grande. ...............................................................................42

VI. THE DEFENDANTS ARE RESPONSIBLE FOR THE ABUSES AGAINST PLAINTIFFS AND HAVE THE POWER AND ABILITY TO STOP THE INTIMIDATION AND HARASSMENT CAMPAIGN. ...............................................................................44

   A.  Defendants and their agents control and employ an array of security personnel, which they deploy to intimidate and harass Plaintiffs..................................................................44

     i.   Contracted Security Personnel...................................................................45

       a.   Securitas ...................................................................................46

       b.   Peruvian National Police (PNP) ................................................48

     ii.  Defendants exercise control over Minera Yanacocha's security personnel. .................50

   B.  Minera Yanacocha and Newmont Peru S.R.L. negligently and knowingly hired and retained security forces with poor human rights records. ...............................................52

   C.  Newmont Mining Corporation (NMC) has set up and controls a global enterprise through which

it controls and/or has the right to control Minera Yanacocha, Newmont Peru S.R.L.     and its
subsidiary defendants....................................................................................................................57

    i.   Defendant Newmont Mining Company sets up the Newmont Enterprise's human rights
policies, standards and procedures, including its security operations. ..............................58

    ii.   NMC enforces its sustainability framework and global polices and standards throughout    the
Newmont Enterprise through a global structure which is set and mainly controlled by NMC. 60

    iii.   NMC controls and/or has the ability to control the Enterprise's security operations, including
Minera Yanacocha's security operations. .......................................................................60

    iv.   NMC controls and/or has the ability to control the Enterprise, including Minera Yanacocha's
human rights policies and activities.................................................................................64

D.  NMC had knowledge of and is involved in and/or overseeing the Defendants' response to
Plaintiffs.....................................................................................................................65

E.  NMC has failed to end or remedy the abuses against Plaintiffs.........................................68

F.  Newmont USA controls and/or has the ability to control Minera Yanacocha's security operations.
......................................................................................................................................69

G.  Minera Yanacocha is Defendant NMC's agent and/or alter ego........................................70

H.  Minera Yanacocha is an agent and/or alter ego of Defendant Newmont USA Ltd for the
purposes of security matters. ..........................................................................................73

I.  Defendant Newmont Second Capital Corporation, Defendant Newmont USA Ltd., and
Newmont Peru S.R.L. are NMC's agents and/or alter egos; collectively all entities are a     single
enterprise. ....................................................................................................................74

J.  Newmont Peru Ltd. and Newmont Peru S.R.L. are effectively one entity ..........................76

K.  Newmont Second Capital Corporation is Liable for Minera Yanacocha's actions as a partner in
the Joint Venture............................................................................................................77

VII.   PLAINTIFFS ARE UNABLE TO OBTAIN JUSTICE IN PERU..............................................78

VIII. CAUSES OF ACTION............................................................................................................79

IX.   PRAYER FOR RELIEF..........................................................................................................89

## I.     NATURE OF THE ACTION

1.      The Plaintiffs, Máxima Acuña-Atalaya de Chaupe and her family, are indigenous subsistence farmers who reside in the rural highlands of Peru. They are members of the same family that has cultivated crops and raised livestock on a plot of land known as Tragadero Grande for over twenty years. But the Defendants, Newmont Mining Corporation and several of its subsidiaries, have attempted to forcibly oust Plaintiffs from their farm so that Defendants can expand their gold mining operations in Peru. Since August 2011, Defendants and their agents have used harassment and violence to try to evict Plaintiffs from Tragadero Grande, including physical attacks, threats of death or physical harm, infliction of emotional distress, invasion of privacy, theft and destruction of property, theft and injury to livestock, extortion, damaging public reputation, impeding farming operations and wrongful criminal complaints.

2.      Plaintiffs bring this Complaint for equitable relief and damages to remedy the injuries they have suffered and continue to suffer at the hands of Defendants and their agents, including private security personnel and the Peruvian National Police. Defendants' conduct has violated the statutes and common law of the various states of the United States, including Delaware and Nevada, and Peruvian law.

## II.     SUMMARY OF THE ACTION

3.      This case is about Newmont Mining Corporation and several of its subsidiaries instructing, authorizing, aiding and abetting, conspiring in and/or ratifying a violent harassment campaign against an indigenous farming family in the rural highlands of Cajamarca, Peru.

4.      This action is brought against Newmont Mining Corporation and three of its subsidiaries – Newmont USA Limited, Newmont Second Capital Corporation and Newmont Peru Limited – who together with Newmont Peru S.R.L. and Minera Yanacocha work together as a single

1

global enterprise controlled by Newmont Mining Corporation (the "Newmont Enterprise" or the "Enterprise").

5.      Since the early 1990s, Newmont Mining Corporation, through its subsidiary Newmont Second Capital Corporation, has been a majority owner of Minera Yanacocha, a Peruvian company that owns the largest open pit gold mine in South America: the Yanacocha mine in Cajamarca, Peru. And Newmont Mining Corporation seeks to expand its operations in Cajamarca through an even larger open pit gold and copper mine, the Conga Project. Because of the size and scale of its operations, the Newmont Enterprise has amassed tremendous power and influence in Peru.

6.      For roughly two decades, environmental and human rights defenders in Cajamarca have challenged Minera Yanacocha's mining practices, citing concerns about water contamination and the livelihoods and land rights of local farmers. These defenders have engaged in advocacy and peaceful protests to object to these harmful practices. The Newmont Enterprise's security personnel have responded to such efforts with violence and intimidation, targeting anyone who stands in their way until he or she backs down.

7.      The Plaintiffs, Máxima Acuña-Atalaya de Chaupe and her family, are among the many indigenous farmers in Cajamarca who have suffered abuses simply because they have chosen to continue farming their land, and have not backed down in the face of the Newmont Enterprise's harassment and threats.

8.      For over twenty years, Plaintiffs have lived and farmed on a parcel of land, Tragadero Grande, where the Newmont Enterprise wants to put the Conga Project. Plaintiffs' presence at Tragadero Grande prevents the Newmont Enterprise from having total control over the land where it wants to operate the Conga Project.

2

9.    The Newmont Enterprise and its security personnel have created and implemented an intimidation campaign against Plaintiffs to forcibly evict them from Tragadero Grande. And although Newmont Mining Corporation has recently suspended the Conga Project, the Enterprise continues to harass and intimidate the Chaupe family.

10.    Since August 2011, the Chaupe family has suffered various forms of abuse and harassment at the hands of the Newmont Enterprise and its security personnel. Security personnel from Minera Yanacocha, Newmont's joint venture in Peru, and/or the Newmont Enterprise have physically attacked, threatened, monitored and spied on, psychologically tormented the Plaintiffs. They have also destroyed Plaintiffs' property and possessions, and killed or attacked their pets and livestock. The Newmont Enterprise has also filed wrongful criminal complaints against Plaintiffs, and attempted to extort them. Plaintiffs have endured psychological trauma, physical pain and injuries, damage to their reputation and dignity and economic loss.

11.    All of these attacks against Plaintiffs occurred while Plaintiffs were at their farm or house at Tragadero Grande, or on roads and Newmont security checkpoints coming from or leaving their house.

12.    Newmont Mining Corporation – including its Board of Directors and Executive Leadership Team – as well as its co-defendants, knew or should have known about the harassment and intimidation campaign against Plaintiffs from the beginning. Newmont Mining Corporation and its co-defendants have aided and abetted, conspired in and ratified this conduct and are participating in the abuses and/or supervising them. They could have and should have prevented the intimidation and harassment campaign that has been ongoing for over six years, and hold the power to stop it.

13.    Through the Newmont Enterprise, the Defendants control Minera Yanacocha's security operations. Newmont Mining Corporation's global security program extends from

3

personnel on the ground in Cajamarca all the way to the highest levels of the corporation in the United States.

14.     Newmont Mining Corporation sets and controls Minera Yanacocha's human rights standards, and how it responds to allegations that its personnel committed human rights abuses.

15.     Newmont Mining Corporation's subsidiary, Newmont USA Limited, also holds the power to stop the attacks and intimidation against Plaintiffs. Newmont USA employs Newmont Mining Corporation's regional security director for the Americas – who heads security for South America. From his base in Nevada, he is heavily involved in the security matters on the ground at Minera Yanacocha's operation sites. He, too, holds the power to ensure that Minera Yanacocha security personnel leaves Plaintiffs alone.

16.     Newmont Mining Corporation also commissioned an "independent" fact finding mission with an organization that has a former Newmont Mining Corporation officer on the board, to investigate the situation of the Plaintiffs at Tragadero Grande. But even the mission's report acknowledged the Newmont Enterprise's wrongdoing, stating that Plaintiffs have "experienced attempts to forcefully evict them from Tragadero Grande." The Newmont Enterprise has "not discharged its responsibility to respect human rights."

17.     Accordingly, the Defendants, from the highest levels of leadership in Newmont Mining Corporation to its subsidiaries, have the ability to stop the attacks, harassment and intimidation against the Plaintiffs but have chosen not to do so. They have chosen to continue this campaign of abuse against a family that is only trying to peacefully farm its land.

18.     In other words, Newmont Mining Corporation, Newmont USA Limited and the other Defendants have the power to control and stop the attacks against the Plaintiffs. This case is about a U.S. corporation that authorized or ratified a violent campaign against Plaintiffs from the

United States – a family that simply wants to be left alone.

19.     If compensatory, remedial and preventive measures are not promptly taken,

Plaintiffs will be further injured and suffer more physical, psychological and economic harm.

### III.     JURISDICTION AND VENUE

20.     Subject matter jurisdiction exists under 28 U.S.C. § 1332(a)(2), as Plaintiffs are

citizens of a foreign state while the Defendants are citizens of the United States, and the amount in

controversy exceeds $75,000.

21.     This Court has personal jurisdiction over all Defendants because they are

incorporated in the State of Delaware.

22.     Venue is proper in this district pursuant to 28 U.S.C. §1391(b) because Defendants

are corporations incorporated in this district.

### IV.     PARTIES

#### A.  Plaintiffs

23.     Plaintiffs, members of the same farming family, are all citizens and residents of Peru.

For their entire lives, they have lived and farmed in the Cajamarca highlands of Peru.

24.     Plaintiffs bring this action for equitable relief and for damages on behalf of

themselves, to remedy the injuries to themselves and their property, and to prevent future harm

from occurring. Plaintiffs also bring this action on behalf of their minor children as noted below.

25.     Plaintiff Máxima Acuña-Atalaya has lived and farmed at the plot of land known as

Tragadero Grande continuously since 1994.

26.     Plaintiffs Daniel Chaupe-Acuña, Jilda Chaupe-Acuña, Carlos Chaupe-Acuña, and

Ysidora Chaupe-Acuña are Máxima's adult children. Daniel, Jilda, and Ysidora have accompanied

Máxima to, and farmed at, Tragadero Grande since 1994; Carlos has accompanied Máxima to, and

farmed at, Tragadero Grande since his birth in 1995.

27.     Plaintiff Elias Chavez-Rodriguez, who is Ysidora's common-law husband, has farmed at Tragadero Grande since 2010. In addition to their own claims, Elias and Ysidora also bring this action on behalf of their minor son, M.S.C.C, who has accompanied his parents while they farm at Tragadero Grande since his birth in 2015.

28.     Plaintiff Maribel Hil-Briones, who is Daniel's common-law wife, has farmed at Tragadero Grande since 2011.

**B. Defendants**

29.     The Defendants are Newmont Mining Corporation ("NMC") and three of its subsidiaries: Newmont USA Limited, Newmont Second Capital Corporation, and Newmont Peru Limited. NMC is directly, and indirectly through various wholly owned subsidiaries and divisions, engaged in the production of and exploration for gold and copper in the United States, Australia, Ghana, Peru, and Suriname. NMC is publicly traded on the New York Stock Exchange.

30.     All Defendants maintain their principal place of business at 6363 S. Fiddlers Green Circle, Greenwood Village, Colorado. Newmont USA also maintains an office in Nevada.

31.     All of the wrongful conduct described below was carried out by agents of the Defendants or, on information and belief, Defendants' agents instructed or authorized the perpetrators, directly or indirectly, to commit these acts and/or ratified their conduct. In the alternative, Defendants knew or should have known that their agents would engage in these acts, of this type against Plaintiffs, within the scope of their agency, and failed to take reasonable action to prevent the injuries.

**C. Other Relevant Actors**

32.     Minera Yanacocha S.R.L. is a joint venture between Newmont Second Capital,

which owns 51.35%, the Peruvian corporation Compania Minera Condesa S.A., which owns 43.65%, and the International Finance Corporation, the private-investment arm of the World Bank Group, which owns 5%.  Minera Yanacocha is engaged in copper and gold production in Peru; it owns the Yanacocha mine and has attempted to develop the Conga Project. Minera Yanacocha has an Executive Committee of six members, chaired by NMC's CEO, which, in addition to the company's manager, has broad authority to manage the company.

33.     Compañia de Mínas Buenaventura S.A.A. ("Buenaventura") is a Peruvian mining company that wholly owns Compania Minera Condesa.

34.     Newmont Peru S.R.L., a wholly-owned subsidiary of NMC, is the manager of Minera Yanacocha. As the manager, Newmont Peru S.R.L. is responsible for managing, conducting and controlling the day-to-day operations of Minera Yanacocha and keeping its Executive Committee informed of all operations. Newmont Peru S.R.L. has managed Minera Yanacocha since 1992.

35.     Both Newmont Peru S.R.L. and Minera Yanacocha are agents of, and controlled by, the Defendants.

36.     The Defendants, together with Newmont Peru S.R.L. and Minera Yanacocha, are jointly run as a single enterprise controlled by NMC (the "Newmont enterprise").

37.     Securitas AB is a Swedish private security company with operations in Peru that has provided security personnel to act as agents of Minera Yanacocha since 1993, and on information and belief continues to provide these services today. Securitas personnel have been present during many recent attacks against the Plaintiffs at Tragadero Grande.

38.     The Peruvian National Police ("PNP" or "police") provided security services as an agent of Minera Yanacocha from 2011-2016 through a Memorandum of Understanding (MOU). The MOU permitted Minera Yanacocha to receive security from three units of the PNP. From

7

2011-2016, PNP officers were present at and/or participated in many attacks against the Plaintiffs at Tragadero Grande.

## V.      STATEMENT OF FACTS

### A. Overview

39.      For decades, Plaintiff Máxima Acuña-Atalaya and her family have collectively lived and farmed on the parcel of land known as Tragadero Grande, in the Sorochuco District of the Cajamarca region of Peru. Plaintiffs are *campesino* subsistence farmers, who depend on Tragadero Grande for their sustenance and livelihoods. They have grown crops as their food source and to sell at local markets, and they have raised animals and livestock.

40.      At Tragadero Grande, Plaintiffs are particularly vulnerable to harm. Tragadero Grande is located in an isolated area between two plots of land owned by Minera Yanacocha. At their house, Plaintiffs do not have access to cell phone service or the internet. No matter which road Plaintiffs take to their house, they must pass a security checkpoint controlled by Minera Yanacocha. The closest location that offers medical services is roughly a seven-hour walk from Tragadero Grande.

41.      Beginning in 2011, Defendants and their agents began to willfully disturb the peace that Plaintiffs have enjoyed in their farming activities at Tragadero Grande.

42.      Defendants and security forces working on their behalf have orchestrated and executed a campaign of intimidation and harassment – including physical threats and injures – against Plaintiffs. On information and belief, Defendants have done so with the intent that Plaintiffs abandon their land and farming activities, so that Defendants can use Plaintiffs' land and construct facilities to support a large open pit goldmine known as the Conga Project. On information and belief, Defendants and their agents have engaged in these tactics for years.

8

43.     Defendants have enlisted their own employees as well as a host of other security forces to inflict harm on Plaintiffs and to send a message to other families and individuals living in the region: Defendants will use any means at their disposal to remove individuals and families who stand in their way. Defendants' security forces have included the PNP and Securitas. At Defendants' direction, and/or with Defendants' support, cooperation, supervision and financial assistance, these entities have carried out and continue to carry out acts of aggression and intimidation against Plaintiffs on a regular basis.

44.     Defendants and their agents' attacks have destroyed the peace Plaintiffs previously enjoyed for decades. They have caused and continue to cause Plaintiffs physical harm and severe mental distress and anguish. Defendants and their agents' attacks are relentless and systematic.

45.     The highest levels of NMC management here in the United States know of this ongoing intimidation campaign. NMC management controls security and has the authority to stop the ongoing abuses but has failed to do so. In fact, NCM is directly involved in handling the Newmont Enterprise's response to the ongoing allegations of abuse.

**B. Defendants' Operations in Cajamarca, Peru**

46.     The Cajamarca region of Peru is one of the poorest regions in the country. The vast majority of its residents are subsistence farmers and descendants of highlands indigenous groups, known as *campesinos*. They follow traditional farming practices that depend heavily upon the land and local water supply for their survival. Although Cajamarca's inhabitants are poor, the land below Cajamarca is rich in resources – including copper and gold.

47.     For the past four decades, international mining companies, including Defendants, have come to Cajamarca to extract its mineral wealth. On information and belief, Defendants have even grown their corporate family and increased their presence in the region so that they might

9

profit from Cajamarca's mineral resources.

48.     In 1992, Defendant Newmont Second Capital formed Minera Yanacocha as a joint

venture with the Peruvian corporation Compania Minera Condesa S.A., and a French government-

owned company, Bureau de Recherches Géologiques et Minières (BRGM). Since 1993, the

International Finance Corporation (IFC) has owned 5% of Minera Yanacocha through an equity

investment. Newmont and Buenaventura bought BRGM's share in 1998.

49.     Since 1993, Minera Yanacocha has owned and operated the Yanacocha mine in the

Carachugo area of Cajamarca, Peru. The Yanacocha's mine operations include four open-pit mines,

four leach pads where the company extracts gold from piles of rock by adding cyanide, and two

processing plants. Although Minera Yanacocha has lauded itself as following industry best practices

regarding cyanide use, individuals in Cajamarca have reported that the use of cyanide has

contaminated water sources.

50.     According to Minera Yanacocha and NMC, the Yanacocha mine is the largest gold

mine in South America. When Minera Yanacocha began operating, it was the largest foreign

investment in Peru, and was the first large foreign investment in the country since 1976. By 2000,

Minera Yanacocha was Latin America's largest gold producer. From 2011 until the present, Minera

Yanacocha's operations have accounted for, on average, 17% of Defendant NMC's sales and 16.8%

of its long-lived assets.

51.     Because of the size and scale of their operations and investments, Defendants have

amassed tremendous political power and influence in Peru.

52.     In 2005, Frontline produced a documentary called "The Curse of Inca Gold," which

investigated Defendants' attempts to improperly influence the Peruvian judiciary to rule in their

favor regarding a dispute about the Yanacocha mine. The documentary covered a Frontline reporter

10

who "traveled to the peaks of the Peruvian Andes to uncover the story of a secret battle for

Yanacocha, the world's richest gold mine. With undercover tapes and inside sources [the reporter]

revealed high-level political intrigue and attempts to influence Peru's Supreme Court to rule in favor

of an American company. The program investigates Newmont Mining of Denver, Colorado, the

company that won control of the Peruvian mine and has since become the world's most profitable

gold mining company with operations in Indonesia, Ghana, and Uzbekistan. Newmont publicly

pledges that it operates using U.S. environmental and ethical standards overseas even in countries

where corruption is the norm, but insiders say that just has not been true."

53.     In the late 1990s, the Peruvian government granted Minera Yanacocha an

exploration lease for the "expansion" of the Yanacocha mine: the Conga Mining Project. The Conga

Project would be located approximately 16 miles northeast of Yanacocha.

54.     If the Conga Project moves forward, the open pit gold and copper mine would

exploit two gold-copper deposits. It would operate for approximately nineteen years,  and, according

to Buenaventura, would "more than double Yanacocha's proven and probable reserves."

55.     Minera Yanacocha commissioned an environmental impact assessment (EIA) in

2007, which found that the Conga Project would destroy four mountain lakes – Perol, Mala, Azul

and Chica – and over a hundred hectares of wetlands. Local residents – including Plaintiffs – have

raised concerns that the Conga Project would threaten the water supply serving 210 communities in

the Huasmín, Sorochuco and La Encañada districts and Minera Yanacocha's plan to create an

artificial reservoir would not adequately replace a natural mountain lake's ecosystem, which acts as a

sponge and filters rainwater.

56.     Despite the findings in the EIA and broad community opposition to the proposed

project, the Peruvian government approved the expansion in 2010.  At the time of its approval, the

project was pegged as a US$4.8 billion project, which would have been Peru's largest-ever mining investment.

57.     Plaintiffs' land, Tragadero Grande, lies in the vicinity of the Conga Mine Project.

58.     In 2011, NMC's Board of Directors approved full funding for the Conga Project. When NMC announced approval it predicted that the project would bring: "6.1 million and 1.6 million ounces of gold in Reserves and Non-Reserve Mineralization ("NRM") attributable to Newmont, respectively,(1); 1.7 billion and 0.5 billion pounds of copper in Reserves and NRM attributable to Newmont, respectively; and potential to add as much as 50% of current gold and copper reserves over next 10 years."

59.     NMC also predicted "[a]nnual attributable production for the first five years of 300,000 to 350,000 ounces of gold and 80 to 120 million pounds of copper." NMC anticipated that production at the Conga Mine would begin in late 2014 to early 2015.

60.     The Conga Project, however, remains incomplete. In November 2011, in response to continued widespread community opposition and protests, the Peruvian government requested that the project be suspended and the EIA reviewed by independent experts. Accordingly, Newmont suspended the project on November 30, 2011.

61.     The project remains suspended today although Defendants have taken steps to move it forward. In June 2012, Minera Yanacocha announced it would move the project forward on a "water-first" approach focusing on construction of reservoirs, and in 2014, a Conga Restart Study identified and tested alternatives to advancing development of the project. According to Buenaventura "following this assessment, a new plan was developed to reduce spending to focus on only the most critical work – protecting people and assets, engaging with communities, and maintaining existing project infrastructure – while maintaining optionality."

62.     In 2015, NMC stated in its 10-K annual report that the project could not be developed for the foreseeable future due to the "current social and political environment," and removed Conga from its Reserves statement and reclassified the project as Mineralized Material. Further, NMC's most recent 10-K states that the "Company does not anticipate being able to develop Conga for at least the next five years," and has allocated its development capital to other projects.

63.     Although the Conga Project has not moved forward, Defendants have undertaken various efforts, including harming Plaintiffs, to secure Tragadero Grande. Tragadero Grande lies at the site of the Conga Project near the Azul mountain lake. Operating the Conga Project would require draining the pristine lake and using the land for waste disposal.

64.     Plaintiffs' possession of and farming activities at Tragadero Grande preclude Defendants from completely controlling the area that Defendants want for the Conga Project. Plaintiffs' possession also complicates Defendants' ability to sell the project site. On information and belief, Plaintiffs' possession of Tragadero Grande constitutes a major obstacle to the Conga Project and the Newmont Enterprise's realization of profit.

**C.  Since 2011, defendants have unleashed a campaign of threats, intimidation and aggression against Plaintiffs to forcibly evict them from their land so that the Conga Project can move forward.**

65.     In 1994, Plaintiff Máxima, along with her husband Jaime, purchased the right to possess Tragadero Grande, a parcel of twenty-five acres in Sorochuco, Cajamarca. They purchased this right from Jaime's uncle, Esteban Chaupe-Rodriguez. At the time, Tragadero Grande was part of the communal territory of the Sorochuco *campesino* community, which benefits from indigenous rights protection under Peruvian law. Due to the collective nature of land ownership within the Sorochuco community, Plaintiff Máxima and Jaime purchased possessory rights. Under this

arrangement, Máxima and Jaime acquired the right to sell or transfer their possessory rights. From the time Plaintiff Máxima and Jaime bought possessory rights to Tragadero Grande until the present, they have continuously lived and farmed there.

66.     In 1996, the Peruvian company Minas Conga, an agent of Defendants, began negotiating with members of the Sorochuco community to purchase land in the area for the Conga Mine Project. During these negotiations, leadership of the community only agreed to sell specific parcels of land in the region, and only after those with possessory rights agreed to the sale. Thus, the leadership organized community meetings for those who were interested in selling their possessory rights. Neither Plaintiff Máxima nor Jaime attended any of those meetings, and they never signed any document selling or transferring their possessory rights to Tragadero Grande. Nevertheless, Defendants falsely claim that Minas Conga entered a legitimate land-sale contract for 269.52 hectares in the region, including Tragadero Grande. In 2001, Minas Conga transferred its alleged right to the land in Sorochuco to Minera Yanacocha.

67.     Until the end of 2010, Plaintiffs lived peacefully at Tragadero Grande without incident. In late 2010, Plaintiff Máxima and her husband first encountered agents or employees of the Newmont Enterprise entering Tragadero Grande without their consent.  Defendants, together with or through their agents, destroyed Plaintiffs' property and their crops.

68.     In May 2011, Plaintiffs filed a criminal complaint against Minera Yanacocha for usurping Tragadero Grande.

69.     In July 2011, Defendant NMC's board approved funding for the Conga Mining Project, whose boundaries of operations would include Tragadero Grande.

70.     From August 2011 to the present, Defendants have orchestrated and implemented an intimidation campaign against the Plaintiffs, including physical attacks, to pressure them into

14

abandoning their home and farm at Tragadero Grande. Defendants have sent their own officers, employees, and personnel, as well as personnel from Securitas and members of the PNP, to threaten, intimidate and verbally and physically harass Plaintiffs.

71.     In August 2011, the Newmont Enterprise and its security personnel attempted to forcibly evict Plaintiffs from Tragadero Grande over the course of four days. During this time, Plaintiffs Máxima, Ysidora, Daniel, Carlos, Jilda, Maribel and Elias were at Tragadero Grande. On the first day of the attempted eviction, PNP monitored the activities of Plaintiffs, without their consent. Then, the PNP and employees of Minera Yanacocha entered Tragadero Grande without Plaintiffs' consent. An individual from Minera Yanacocha told Plaintiffs that Minera Yanacocha was there to evict them because Plaintiffs were on Minera Yanacocha property. Plaintiffs requested to see an official document with an eviction order, but Minera Yanacocha never produced one to the Plaintiffs.

72.     During the attempted eviction, Minera Yanacocha and/or the PNP burned the huts Plaintiffs were using and destroyed a house under construction by Plaintiffs. Minera Yanacocha and/or the PNP destroyed and removed the crops planted by Plaintiffs, and removed Plaintiffs' possessions from Tragadero Grande, including their clothing, furniture, food, farming tools and livestock.

73.     The PNP attacked Plaintiff Máxima by hitting her arms and legs with sticks and punching her body. During this attack, Plaintiff Jilda went to help Máxima but four PNP officers hit the back of Jilda's head with sticks. She lost consciousness.

74.     The PNP beat Ysidora on her shoulders and head with their sticks.

75.     The PNP also used their sticks to beat Elias on his arms, legs, back and ribs.

76.     The PNP also used their sticks to hit Carlos on the back of his neck and arms.

15

77.     The PNP also elbowed Daniel in his shoulders.

78.     The PNP also attacked Maribel with sticks.

79.     All Plaintiffs attacked by the PNP suffered pain and emotional distress because of the attacks, and Máxima and Jilda went to Cajamarca for medical treatment.

80.     On their way to seek treatment, Máxima and Jilda had to pass through Minera Yanacocha's security checkpoint on the San Nicolas highway. There, Minera Yanacocha, Securitas and the PNP detained them for roughly half an hour before they were allowed to pass.

81.     On information and belief, the PNP carried out these actions under its private security agreement with Minera Yanacocha. On information and belief, these injuries were inflicted with Defendants' knowledge and by agents under their control.

82.     Since at least 2011, Minera Yanacocha, Securitas and the PNP have consistently prevented the Plaintiffs and their guests from entering or leaving Tragadero Grande or detained them when they attempted to do so. Accessing Tragadero Grande requires passing security checkpoints controlled by Minera Yanacocha off the San Rafael, Agua Blanca, San Nicolas and Santa Rosa roads. Repeatedly from at least 2011 until the present, Minera Yanacocha, Securitas and the PNP have detained Plaintiffs and their visitors at these checkpoints for periods from half an hour to an entire day, despite Plaintiffs repeatedly stating that they reside in Tragadero Grande. This has caused Plaintiffs to suffer emotional distress.

83.     Additionally, Minera Yanacocha has impeded Plaintiffs and their guests from using public transportation to reach or leave Tragadero Grande. Securitas and Minera Yanacocha have threatened drivers of public transportation on at least three occasions since 2011, telling them that if they provide transportation to any Plaintiff, they will lose their jobs. As a result, Plaintiffs must rely on non-public transportation and experience difficulties in transporting their crops and artisanal

16

weavings to sell at local markets. This has limited Plaintiffs' ability to earn money, and they remain

indigent. On information and belief, Securitas carried out these actions as agents of Minera

Yanacocha. On information and belief, the restrictions on Plaintiffs' travel to and from Tragadero

Grande were carried out with Defendants' knowledge and by agents under their control.

84.     From roughly 2011 until 2017, Minera Yanacocha has operated radio and television

programs that falsely accuse Plaintiffs of trying to invade Minera Yanacocha's property and insult

them. These programs have harmed Plaintiffs' reputation in Cajamarca and have inhibited their

ability to find employment. For example, Plaintiff Elias operates a cattle business that has suffered

because of Minera Yanacocha's programs, which have accused him of being a bad caretaker and

landowner. Since 2011, potential customers have informed Elias that they do not want to do

business with him because of what they have heard about him through Minera Yanacocha's

programs, and his business has suffered. On information and belief, these accusations were made

with Defendants' knowledge and by agents under their control.

85.     Sometime in 2012, Securitas and the PNP entered Tragadero Grande without the

Plaintiffs' consent. They killed six of the sheep Plaintiffs kept roughly 100 meters from their house.

Plaintiffs relied on the sheep for sustenance and income, and thus lost their source of wool to

produce clothing and blankets for themselves and artisanal goods to sell at markets. As a result of

this incident, Plaintiffs lost income and suffered emotional distress. On information and belief,

Securitas and the PNP carried out these actions under their private security agreements with Minera

Yanacocha. On information and belief, the killing of Plaintiffs' sheep was carried out with

Defendants' knowledge and by agents under their control.

86.     Sometime in 2012, Minera Yanacocha entered Tragadero Grande without Plaintiffs'

consent. Minera Yanacocha destroyed Plaintiffs' outdoor latrine. Without the latrine, Plaintiffs have

17

had to rely on exposed outdoor space to perform bodily functions. As a result of this incident, Plaintiffs have no privacy and suffered emotional distress. On information and belief, the destruction of the latrine was carried out with Defendants' knowledge and by agents under their control.

87.     From around August 2012 until around February 2013, a bus with a Minera Yanacocha flag parked on the road next to Tragadero Grande. During this period, Minera Yanacocha shined lights in the direction of Plaintiffs' house without their consent, every day, throughout morning and night. Plaintiffs Máxima, Ysidora, Daniel, Carlos, Jilda, Maribel and Elias, suffered emotional distress from these lights because they felt constantly monitored and intimidated by the Defendants. On information and belief, the harassing shining of these lights in the direction of Plaintiffs' house was carried out with Defendants' knowledge and by agents under their control.

88.     Sometime in 2014, Minera Yanacocha entered Tragadero Grande without Plaintiffs' consent, and again destroyed Plaintiffs' outdoor latrine. Again, Plaintiffs suffered emotional distress, feeling that they had no privacy. On information and belief, the destruction of Plaintiffs' latrine was carried out with Defendants' knowledge and by agents under their control.

89.     On or around January 30, 2014, Plaintiff Máxima received a threatening call from an individual saying that she should leave Tragadero Grande or else she would die. On information and belief, the caller was affiliated with the Newmont Enterprise and/or its agents in Securitas or the PNP.

90.     Roughly two hours after the call, PNP officers entered Tragadero Grande without Plaintiffs' consent. At the time, Plaintiff Máxima was tending to Plaintiffs' crops near their house. The PNP said that they should not be cultivating crops because Tragadero Grande is not their property. Afterwards, when Máxima was inside the house, another group of PNP officers entered

18

the house without Plaintiffs' consent. The PNP officers told Máxima that she had to leave immediately.

91.      Máxima suffered emotional distress as a consequence of the death threat and the PNP entering their house and threatening her. On information and belief, the PNP carried out these actions under their private security agreements with Minera Yanacocha. On information and belief, these incidents were carried out with Defendants' knowledge and by agents under their control.

92.      Around February 2014, the PNP entered Tragadero Grande without Plaintiffs' consent. The PNP destroyed Plaintiffs' potato crops that were roughly 50-100 meters from their house. They threatened to kill Plaintiff Daniel like they would kill a guinea pig. Daniel suffered emotional distress and feared imminent bodily harm, or even death. Plaintiffs relied on the destroyed crops for sustenance and income, and thus lost a food source and crops to sell at markets. As a result, Plaintiffs suffered emotional distress. On information and belief, the PNP carried out these actions under their private security agreement with Minera Yanacocha. On information and belief, these actions were carried out with Defendants' knowledge and by agents under their control.

93.      Around April 2014, the PNP, Securitas and Minera Yanacocha entered Tragadero Grande without Plaintiffs' consent. Minera Yanacocha destroyed the structure of Plaintiffs' house while the PNP and Securitas guarded the Minera Yanacocha employees. Minera Yanacocha, Securitas and/or the PNP then yelled at Plaintiffs Máxima, Elias and Ysidora, telling them that they had to leave. Máxima, Elias and Ysidora suffered emotional distress as a result of the incident and feared that Minera Yanacocha, Securitas and the PNP would physically attack them. On information and belief, the PNP and Securitas carried out these actions under their private security agreements with Minera Yanacocha. On information and belief, these actions were carried out with Defendants' knowledge and by agents under their control.

19

94.     On or around May 6, 2014, Máxima traveled with three visitors to Tragadero Grande in a public van. En route, the PNP and Securitas stopped the van at the San Rafael highway security checkpoint which is controlled by Minera Yanacocha. The PNP and Securitas called Minera Yanacocha to report that Máxima was traveling with visitors, and Minera Yanacocha personnel arrived at the security checkpoint. They detained Máxima and her visitors, and the rest of the people in the van, for roughly three or four hours. During the detention, Máxima called her daughter and lawyers about the incident while the PNP, Securitas and Minera Yanacocha listened. Afterwards, the PNP, Securitas and/or Minera Yanacocha tried to pull off Máxima's clothes and yanked her arms in an effort to force her to exit the van. Afterwards, they permitted Máxima to leave and she traveled to Tragadero Grande while her visitors stayed at the checkpoint. On information and belief, Securitas and the PNP carried out these actions under their private security agreements with Minera Yanacocha. On information and belief, these actions were carried out with Defendants' knowledge and by agents under their control.

95.     On or around July 2, 2014, Plaintiffs Máxima, Maribel and Elias traveled to Tragadero Grande with visitors. En route, Securitas stopped their car at the Santa Rosa security checkpoint controlled by Minera Yanacocha. Securitas did not let the car pass. As a result, Máxima, Maribel, Elias and their visitors had to walk to Tragadero Grande. While they were walking, Securitas followed them in a truck. While the group was inside Plaintiffs' house, Securitas stayed on the nearby road and filmed the house all day. During this time, Plaintiffs suffered emotional distress from Securitas's surveillance. Hours later, Máxima, Maribel, Elias and their visitors left the house to go back to their car parked by the Santa Rosa security check point. Securitas followed them again and continued filming them. On information and belief, Securitas carried out these actions under their private security agreement with Minera Yanacocha. On information and belief, these actions

20

were carried out with Defendants' knowledge and by agents under their control.

96.      At the end of 2014 or the beginning of 2015, Minera Yanacocha entered Tragadero

Grande without Plaintiffs' consent. Minera Yanacocha stole Plaintiffs' guinea pigs and destroyed a

hut next to Plaintiffs' house. As a result of this incident, Plaintiffs suffered emotional distress. On

information and belief, these actions were carried out with Defendants' knowledge and by agents

under their control.

97.      Sometime in 2015, Securitas, Minera Yanacocha and locals from the region entered

Tragadero Grande without Plaintiffs' consent, holding rocks. They told Plaintiffs Máxima and

Daniel that they were on Minera Yanacocha's property. Securitas, Minera Yanacocha and/or the

locals threatened to harm Máxima and Daniel. Johny Mendoza from Securitas then threw a rock at

Máxima but she moved out of the way. As a result of the threats and Mendoza's attempt to physical

attack Máxima, Máxima and Daniel suffered emotional distress and feared imminent bodily harm.

On information and belief, Securitas carried out these actions under their private security agreement

with Minera Yanacocha. On information and belief, the locals from Chigur Mayo carried out these

actions as employees and/or agents of Minera Yanacocha. On information and belief, this incident

was carried out with Defendants' knowledge and by agents under their control.

98.      Sometime in 2015, Minera Yanacocha employees entered Plaintiffs' house at

Tragadero Grande without their consent. A man from Minera Yanacocha threatened Plaintiff

Máxima telling her that if she stayed at the house she was not going to live and that they would try

to find her when she left the house. As a result of this incident, Máxima suffered emotional distress

and feared imminent bodily harm or even death. On information and belief, these threats were

carried out with Defendants' knowledge and by agents under their control.

99.      Around January 2015, the PNP or Securitas entered Plaintiffs' house at Tragadero

21

Grande without their consent at least once. Plaintiff Máxima was at the house at the time and she feared that the PNP or Securitas would cause her imminent bodily harm, and she suffered emotional distress. On information and belief, Securitas or the PNP carried out these actions under their private security agreements with Minera Yanacocha. On information and belief, these actions were carried out with Defendants' knowledge and by agents under their control.

100.    Around February or March 2015, Minera Yanacocha entered Tragadero Grande without Plaintiffs' consent. Minera Yanacocha removed Plaintiffs' quinoa crops that Plaintiffs had cultivated roughly 50-100 meters from their house. Plaintiffs relied on the quinoa for sustenance and income, and thus lost a food source and crops to sell at markets. As a result of this incident, Plaintiffs suffered emotional distress. On information and belief, the crop destruction was carried out with Defendants' knowledge and by agents under their control.

101.    Around March 2015, Plaintiff Carlos was in the Sorochuco area on his way to Tragadero Grande when he encountered Minera Yanacocha and the PNP. Minera Yanacocha and/or the PNP threatened Carlos saying that they would kill his family and that they needed to disappear. Carlos suffered emotional distress and feared that he and his family would suffer imminent bodily harm, and death. On information and belief, the PNP carried out these actions under their private security agreements with Minera Yanacocha. On information and belief, these actions were carried out with Defendants' knowledge and by agents under their control.

102.    Another time, around March 2015, Minera Yanacocha and Securitas entered Tragadero Grande without Plaintiffs' consent. Minera Yanacocha erected posts to create a barrier between Tragadero Grande and Minera Yanacocha's property. When Plaintiffs Maribel and Daniel asked them why they were constructing the posts, Johny Rojas from Securitas threw a rock at Maribel that hit her abdomen. Maribel started to cry and Johny ordered everyone to leave. Maribel

was bruised and suffered pain for about a week. As a result of the incident, Maribel and Daniel suffered emotional distress. On information and belief, Securitas carried out these actions under their private security agreement with Minera Yanacocha. On information and belief, these actions were carried out with Defendants' knowledge and by agents under their control.

103.     Around April 2015, Plaintiff Maribel and a group of lawyers from Cajamarca, working for an organization representing the family, GRUFIDES, traveled to Tragadero Grande. En route, they arrived at Minera Yanacocha's security checkpoint on the Agua Blanca highway. Minera Yanacocha employees detained them there for the entire day. As a result of the incident, Maribel suffered emotional distress. On information and belief, these actions were carried out with Defendants' knowledge and by agents under their control.

104.     Around May 2015, the PNP entered Tragadero Grande without Plaintiffs' consent, along with approximately ten dogs. The dogs ate thirty rabbits that Plaintiffs were raising as livestock. Plaintiffs relied on the rabbits for sustenance and income, and thus lost a food source and livestock to sell at markets. As a result of the incident, Plaintiffs suffered emotional distress. On information and belief, the PNP carried out these actions under their private security agreement with Minera Yanacocha. On information and belief, these actions were carried out with Defendants' knowledge and by agents under their control.

105.     Around May 2015, Minera Yanacocha, Securitas and the PNP entered Tragadero Grande without Plaintiffs' consent. They took fifteen of Plaintiffs' guinea pigs that they had been raising next to their house. As a result of the incident, Plaintiffs suffered emotional distress as a result, and lost a source of food. On information and belief, the PNP and Securitas carried out these actions under their private security agreements with Minera Yanacocha. On information and belief, these actions were carried out with Defendants' knowledge and by agents under their control.

106.     On or around May 25, 2015, one of Plaintiffs' dogs was at Tragadero Grande next to the road closest to their house. Minera Yanacocha employees threw rocks at the dog; one rock hit the dog in the eye, blinding him in that eye.  As a result of the incident, Plaintiffs suffered emotional distress because their pet was harmed. On information and belief, these actions were carried out with Defendants' knowledge and by agents under their control.

107.     Around June 2015, Minera Yanacocha constructed an alpaca corral next to Tragadero Grande. From then until at least June 2017, Minera Yanacocha has shined lights at the corral towards Plaintiffs' house during the night without their consent. As a result, Plaintiffs have suffered emotional distress and feel constantly monitored by the Defendants. On information and belief, these actions were carried out with Defendants' knowledge and by agents under their control.

108.     On or around July 24, 2015, Minera Yanacocha entered Tragadero Grande without Plaintiffs' consent. Minera Yanacocha destroyed Plaintiffs' potato crops that Plaintiffs had cultivated roughly 50-100 meters from their house. Plaintiffs relied on the potatoes for sustenance and income, and thus lost a food source and crops to sell at markets. Plaintiffs also suffered emotional distress as a result of the incident. On information and belief, these actions were carried out with Defendants' knowledge and by agents under their control.

109.     Around August 2015, Minera Yanacocha and the PNP entered Tragadero Grande without Plaintiffs' consent. They began destroying a guinea pig shelter constructed by Plaintiffs. When Plaintiff Maribel went to them to ask why they were destroying the shelter, a Minera Yanacocha employee threw a rock at Maribel, hitting her in the back. She was bruised and in pain for roughly a week. Maribel additionally suffered emotional distress and trauma as a result of the incident. On information and belief, the PNP carried out these actions under their private security agreement with Minera Yanacocha. On information and belief, these actions were carried out with

24

Defendants' knowledge and by agents under their control.

110.    On or around August 12, 2015, Minera Yanacocha employees and members of the PNP entered Tragadero Grande without Plaintiffs' consent. Minera Yanacocha employees destroyed Plaintiffs' potato, oca and mashua crops. The PNP surrounded Plaintiff Daniel and a few of his friends, blocking their movement and threatening to beat them if they resisted. A Minera Yanacocha employee also threatened to attack Daniel when he was on the Santa Rosa highway. As a result of the incident, Daniel suffered emotional distress and feared bodily harm. On information and belief, the PNP carried out these actions under their private security agreement with Minera Yanacocha. On information and belief, these actions were carried out with Defendants' knowledge and by agents under their control.

111.    Around November 2015, agents of Minera Yanacocha entered Tragadero Grande without Plaintiffs' consent. They constructed an iron fence along the border of Tragadero Grande and Minera Yanacocha's property. As a result, Plaintiffs suffered emotional distress because they felt enclosed by the fence. On information and belief, these actions were carried out with Defendants' knowledge and by agents under their control.

112.    Throughout November 2015, Minera Yanacocha would stop by Plaintiffs' house a few times each day, and take photos of the house without Plaintiffs' consent. As a result, Plaintiffs Daniel and Maribel suffered emotional distress and felt constantly monitored by Minera Yanacocha. On information and belief, these actions were carried out with Defendants' knowledge and by agents under their control.

113.    Around December 2015, Minera Yanacocha constructed a tower in its alpaca corral next to Tragadero Grande. The tower is roughly 200 meters from Plaintiffs' house. Towards the top of the tower is a camera that has been pointed at Tragadero Grande without Plaintiffs' consent since

December 2015. As a result, Plaintiffs suffer emotional distress because they feel exposed and because Minera Yanacocha will know when they are alone at Tragadero Grande. Plaintiffs feel especially vulnerable because there have been no private bathrooms at Tragadero Grande since Minera Yanacocha destroyed Plaintiffs' outdoor latrines in 2012 and 2014. On information and belief, these actions were carried out with Defendants' knowledge and by agents under their control.

114. On or around January 17, 2016, Plaintiff Daniel was planting seeds alone at Tragadero Grande. Minera Yanacocha and the PNP entered Tragadero Grande without Plaintiffs' consent. The PNP formed a circle around Daniel, beat him on the chest and stomach with sticks, and pushed and shoved him. While this was happening, Minera Yanacocha employees destroyed Plaintiffs' crops. As a result of the incident, Daniel suffered emotional distress and pain. Plaintiffs relied on the destroyed crops for sustenance and income, and thus lost a food source and crops to sell at markets. As a result of the incident, Plaintiffs suffered emotional distress. On information and belief, the PNP carried out these actions under their private security agreement with Minera Yanacocha. On information and belief, these actions were carried out with Defendants' knowledge and by agents under their control.

115. On or around January 19, 2016, Minera Yanacocha flew a drone over Plaintiffs' house in Tragadero Grande without their consent. As a result of the incident, Plaintiffs suffered emotional distress and loss of their privacy. On information and belief, these actions were carried out with Defendants' knowledge and by agents under their control.

116. On or around January 30, 2016, a member of Minera Yanacocha or Securitas stabbed Plaintiffs' dog in the neck, while at or near Tragadero Grande. As a result of the incident, Plaintiffs suffered emotional distress. On information and belief, these actions were carried out with Defendants' knowledge and by agents under their control.

26

117.     On or around February 2, 2016, Minera Yanacocha employees and Securitas entered Tragadero Grande without Plaintiffs' consent. The Minera Yanacocha employees dug up and took Plaintiffs' potato crops. While this was occurring, Securitas formed a circle around Plaintiff Daniel. A Securitas employee threatened Daniel saying that first they went after his dog, next the Plaintiffs' potatoes and then they would go after Daniel. As a result of the incident, Daniel suffered emotional distress and feared imminent bodily harm. Plaintiffs relied on the destroyed potato crops for sustenance and income, and thus lost a food source and crops to sell at markets. As a result, Plaintiffs suffered emotional distress. On information and belief, Securitas carried out these actions under their private security agreement with Minera Yanacocha. On information and belief, these actions were carried out with Defendants' knowledge and by agents under their control.

118.     On or around February 5, 2016, Minera Yanacocha employees and their alpacas entered Tragadero Grande without Plaintiffs' consent. The alpacas grazed on Plaintiffs' crops without Plaintiffs' consent. Plaintiffs relied on the destroyed crops for sustenance and income, and thus lost a food source and crops to sell at markets. As a result of the incident, Plaintiffs suffered emotional distress. On information and belief, these actions were carried out with Defendants' knowledge and by agents under their control.

119.     On or around February 17, 2016, while Plaintiff Daniel was at Tragadero Grande, Minera Yanacocha employees took photos of him without his consent. As a result of the incident, Daniel suffered emotional distress and felt monitored by Minera Yanacocha. On information and belief, these actions were carried out with Defendants' knowledge and by agents under their control.

120.     In February 2016, Minera Yanacocha flew a drone over Plaintiffs' house in Tragadero Grande without their consent. As a result of the incident, Plaintiffs suffered emotional distress. On information and belief, these actions were carried out with Defendants' knowledge and

by agents under their control.

121.    Around March 2016, Minera Yanacocha employees, Securitas and unidentified men entered Tragadero Grande without Plaintiffs' consent. The unidentified men removed and destroyed Plaintiffs' potato crops under the orders of Minera Yanacocha employees. Securitas formed a line by the unidentified men. Plaintiff Daniel then went up a hill behind Plaintiffs' house. Securitas formed a circle around him and he put his hands up. A woman who identified herself as a Minera Yanacocha lawyer told Daniel that Tragadero Grande was Minera Yanacocha's property.  During the same incident, a group of men sprayed a line through Tragadero Grande dividing it in half. They said that half of the land belonged to Plaintiffs and the other half belonged to Minera Yanacocha. As a result of the incident, Daniel suffered emotional distress. Plaintiffs relied on the destroyed crops for sustenance and income, and thus lost a food source and crops to sell at markets. As a result of the incident, Plaintiffs suffered emotional distress. On information and belief, Securitas carried out these actions under their private security agreement with Minera Yanacocha. On information and belief, the unidentified men carried out these actions as employees and/or agents of Minera Yanacocha. On information and belief, these actions were carried out with Defendants' knowledge and by agents under their control.

122.    Another time, around March 2016, Minera Yanacocha, Securitas and the PNP entered Tragadero Grande without Plaintiffs' consent. They planted posts to change the boundary lines of Tragadero Grande roughly 30 meters from Plaintiffs' house. Plaintiffs Daniel and Maribel went outside from the house to see what was happening. When they encountered Minera Yanacocha, Securitas and the PNP, Johny Mendoza from Securitas threatened Daniel. He told Daniel that they would physically attack him at one of Minera Yanacocha's security checkpoints and that he would eventually have to go to jail. As a result of the incident, Daniel and Maribel suffered

emotional distress and feared that Daniel would suffer bodily harm. On information and belief, the PNP and Securitas carried out these actions under their private security agreements with Minera Yanacocha. On information and belief, these actions were carried out with Defendants' knowledge and by agents under their control.

123.    Around April 2016, Minera Yanacocha employees and their alpacas entered Tragadero Grande without Plaintiffs' consent. The alpacas grazed on the Plaintiffs' crops without their consent. Minera Yanacocha employees then took photos of Plaintiff Daniel. Later that day, Minera Yanacocha filed a criminal complaint against Daniel, falsely claiming that Daniel attacked the Minera Yanacocha employees. As a result of the incident, Daniel suffered emotional distress because of the unsubstantiated criminal complaint. Plaintiffs relied on the destroyed crops for sustenance and income, and thus lost a food source and crops to sell at markets. As a result of the incident, Plaintiffs suffered emotional distress. On information and belief, these actions were carried out with Defendants' knowledge and by agents under their control.

124.    Around May 2016, Maribel traveled with two lawyers from GRUFIDES, to Tragadero Grande. En route, they had to pass the Minera Yanacocha security checkpoint on the San Nicolas highway. There, Securitas detained them for roughly an hour even though Maribel explained that she lives there. Securitas did not let them pass, so they tried entering Tragadero Grande through Minera Yanacocha's security checkpoint on the Agua Blanca highway. There, Securitas detained them for roughly two hours. Securitas did not permit their car to pass so Maribel and the lawyers walked an hour and a half to Plaintiffs' house. As a result of the incident, Maribel suffered emotional distress. On information and belief, Securitas carried out these actions under their private security agreement with Minera Yanacocha. On information and belief, these actions were carried out with Defendants' knowledge and by agents under their control.

29

125.    On or around September 18, 2016, Minera Yanacocha employees, Securitas and unidentified men entered Tragadeo Grande without Plaintiffs' consent. The Securitas employees were armed and armored. Minera Yanacocha and the unidentified men destroyed Plaintiffs' potato crops, while Securitas blocked and detained Plaintiff Máxima and her husband. Afterwards, Securitas physically attacked Máxima. A Securitas employee hit Máxima's hand with the corner of his shield and she fell down. Later, Securitas seized and ripped her jacket and blouse, and threw them to the ground, almost disrobing Máxima. Securitas also beat Máxima on the neck, arms, breasts and head causing her to have bruises and scratches all over her body. They also took photos of Máxima when she was on the ground and exposed. Máxima felt pain all over her body and she could not move her injured hand. Afterwards, Minera Yanacocha, Securitas and the unidentified men left Tragadero Grande. Máxima and her husband could not get help because they ran out of credit on their cell phones. Hours later, Máxima went to a medical clinic in Cajamarca where she was hospitalized for three days.

126.    As a result of this incident, Máxima suffered bodily harm, invasion of privacy, emotional distress and feared that she would imminently be harmed or even killed. Additionally, Plaintiffs relied on the destroyed potatoes for sustenance and income, and thus lost a food source and crops to sell at markets. As a result of the incident, Plaintiffs suffered emotional distress. On information and belief, Securitas carried out these actions under their private security agreement with Minera Yanacocha. On information and belief, the unidentified men carried out these actions as employees and/or agents of Minera Yanacocha. On information and belief, these actions were carried out with Defendants' knowledge and by agents under their control.

127.    Around December 2016, Plaintiff Daniel was on his way to Tragadero Grande on his motorcycle. A truck operated by Minera Yanacocha purposely blocked his path and Daniel fell off

the side of the road with his motorcycle. He suffered cuts on his legs and his motorcycle was damaged. The next day, Securitas entered Tragadero Grande without Plaintiffs' consent. They destroyed Plaintiffs' possessions and threatened Daniel, saying that they were going to peel his skin like he is a guinea pig. As a result of the incident, Daniel suffered emotional distress and feared imminent bodily harm. On information and belief, Securitas carried out these actions under their private security agreement with Minera Yanacocha. On information and belief, these actions were carried out with Defendants' knowledge and by agents under their control.

128.  Since around December 2016, Minera Yanacocha employees and Securitas have taken photos of the Plaintiffs and their house almost every day when they are at Tragadero Grande. As a result, Plaintiffs suffer emotional distress because they feel exposed. Plaintiffs feel especially vulnerable because there have been no private bathrooms at Tragadero Grande since Minera Yanacocha destroyed Plaintiffs' outdoor latrines in 2012 and 2014. On information and belief, Securitas carried out these actions under their private security agreement with Minera Yanacocha. On information and belief, these actions were carried out with Defendants' knowledge and by agents under their control.

129.  Around February 2017, Plaintiff Carlos was on his way to Tragadero Grande. He arrived at the security checkpoint controlled by Minera Yanacocha on the Agua Blanca highway. Securitas asked him where he was from and then detained him for three hours. As a result of the incident, Carlos suffered emotional distress. On information and belief, Securitas carried out these actions under their private security agreement with Minera Yanacocha. On information and belief, these actions were carried out with Defendants' knowledge and by agents under their control.

130.  Another time, around February 2017, Minera Yanacocha and Securitas entered Tragadero Grande without Plaintiffs' consent. They destroyed Plaintiffs' potato crops. Plaintiffs

relied on the potato crops destroyed by Minera Yanacocha for sustenance and income, and thus lost a food source and crops to sell at markets. As a result of the incident, Plaintiffs suffered emotional distress. On information and belief, Securitas carried out these actions under their private security agreement with Minera Yanacocha. On information and belief, these actions were carried out with Defendants' knowledge and by agents under their control.

131.    Another time, around February 2017, Minera Yanacocha entered Tragadero Grande at various points over the course of two days, all without Plaintiffs' consent. During the first day, Minera Yanacocha employees came onto Plaintiffs' crop fields at Tragadero Grande, roughly 50-100 meters from their house. When Plaintiff Máxima went towards them, two employees from Minera Yanacocha began chasing her. She ran away and felt terrified that they would capture her and physically attack her. As a result of the incident, Máxima feared imminent bodily harm and suffered emotional distress. The second day, Minera Yanacocha destroyed various crops planted by Plaintiffs, including potatoes. Plaintiffs relied on the crops destroyed by Minera Yanacocha for sustenance and income, and thus lost a food source and crops to sell at markets. As a result of the incident, Plaintiffs suffered emotional distress. On information and belief, these actions were carried out with Defendants' knowledge and by agents under their control.

132.    Another time around February 2017, Plaintiff Daniel was driving his motorcycle to Tragadero Grande. He reached Minera Yanacocha's security checkpoint on the San Nicolas highway and Securitas would not let him pass. Securitas agents knocked him and his motorcycle to the ground. Daniel injured his knee and arm, and suffered pain and emotional distress. Securitas then detained Daniel for roughly four hours. During the detention, Minera Yanacocha entered Tragadero Grande without Plaintiffs' consent and destroyed their potato crops. Plaintiffs relied on the crops destroyed by Minera Yanacocha for sustenance and income, and thus lost a food source and crops

32

to sell at markets. As a result of the incident, Plaintiffs suffered emotional distress. On information and belief, Securitas carried out these actions under their private security agreement with Minera Yanacocha. On information and belief, these actions were carried out with Defendants' knowledge and by agents under their control.

133.    After this incident, Plaintiff Ysidora received a call from Daniel about the destruction of the potato crops. Ysidora left the town of Celendin, in Cajamarca, for Tragadero Grande, taking with her food for the Plaintiffs. She traveled in a public van on the Santa Rosa highway. At Minera Yanacocha's security checkpoint, Securitas ordered her to leave the van. After she complied, Securitas forcibly removed the food she was carrying on her back and pushed her. Ysidora almost fell to ground but was able to break her fall by grabbing a cement wall. Securitas then told her that she could not enter Tragadero Grande because her parents worked as farmers on Minera Yanacocha's property. They also told her that there was nothing for her there. Securitas then detained Ysidora for roughly two hours, and then she had to walk to Tragadero Grande. As a result of the incident, Ysidora suffered emotional distress, and feared imminent bodily harm when Securitas pushed her. On information and belief, Securitas carried out these actions under their private security agreement with Minera Yanacocha. On information and belief, these actions were carried out with Defendants' knowledge and by agents under their control.

134.    Around March 2017, Minera Yanacocha, using cameras, monitored Plaintiffs without their consent while they were at Tragadero Grande. Plaintiffs felt emotional distress because they were under surveillance and felt as if their privacy had been violated. On information and belief, these actions were carried out with Defendants' knowledge and by agents under their control.

135.    Around March 2017, Plaintiffs Maribel and Daniel traveled to Tragadero Grande. Securitas detained them for roughly two hours at Minera Yanacocha's San Nicolas highway

checkpoint. After they arrived at Tragadero Grande, Securitas repeatedly drove by Plaintiffs' house taking photos without Plaintiffs' consent over the course of roughly a month. When Maribel and Daniel left Tragadero Grande, Securitas detained them for roughly two hours at Minera Yanacocha's Santa Rosa highway checkpoint. As a result of the detentions and surveillance of Daniel and Maribel, they suffered emotional distress. On information and belief, Securitas carried out these actions under their private security agreement with Minera Yanacocha. On information and belief, these actions were carried out with Defendants' knowledge and by agents under their control.

136.    Around April 2017, Securitas took photos of Plaintiff Maribel without her consent when she was at Tragadero Grande. They also asked her for her identification. As a result of this incident, Maribel suffered emotional distress. On information and belief, Securitas carried out these actions under their private security agreement with Minera Yanacocha. On information and belief, these actions were carried out with Defendants' knowledge and by agents under their control.

137.    Around May 2017, Plaintiff Carlos was on his way to Tragadero Grande. When he arrived at the security checkpoint controlled by Minera Yanacocha on the Agua Blanca highway, Securitas detained him for roughly two hours. As a result of this incident, Carlos suffered emotional distress. On information and belief, Securitas carried out these actions under their private security agreement with Minera Yanacocha. On information and belief, these actions were carried out with Defendants' knowledge and by agents under their control.

138.    Around June 2017, Minera Yanacocha and Securitas entered Tragadero Grande without Plaintiffs' consent. They destroyed Plaintiffs' potato crops. Plaintiffs Elias and Daniel were inside their house when Minera Yanacocha and Securitas arrived. When they went outside, Securitas and/or Minera Yanacocha threatened them, saying that they were going to treat them badly like they did to the potatoes. As a result, Elias and Daniel suffered emotional distress and feared imminent

bodily harm. Plaintiffs relied on the potato crops destroyed by Minera Yanacocha for sustenance and income, and thus lost a food source and crops to sell at markets. As a result, Plaintiffs suffered further emotional distress. On information and belief, Securitas carried out these actions under their private security agreement with Minera Yanacocha. On information and belief, these actions were carried out with Defendants' knowledge and by agents under their control.

**D. In addition to physical acts of intimidation and aggression, Defendants have also abused Peruvian judicial processes to harass Plaintiffs.**

139.    In addition to physical acts of intimidation and aggression, Defendants have also abused Peruvian judicial processes to harass Plaintiffs and force them from their land. Defendants' campaign of intimidation and harassment against Plaintiffs has not stopped at verbal and physical abuse. Defendants have also filed a series of sham lawsuits against Plaintiffs to intimidate them into giving up their claim to their land. Worse still: on information and belief, Defendants have used improper means to influence Peruvian lower court level judges – whose decisions were later overturned on appeal.

140.    For example, after Defendants' agents attempted to forcibly evict Plaintiffs from their home through destruction and theft of property and physically attacking Plaintiffs in August 2011, Plaintiffs filed a criminal complaint against Minera Yanacocha to denounce the abuse. In response, Minera Yanacocha filed a sham criminal complaint against Plaintiffs Máxima, Ysidora, and Elias, as well as Máxima's husband Jaime, falsely accusing them of committing aggravated usurpation during the August 2011 incident. In this complaint Minera Yanacocha accused them of taking over Minera Yanacocha's property by attacking Minera Yanacocha employees.

141.    Although Minera Yanacocha's sham complaint against Plaintiffs gained some traction in the lower courts, two different appeals courts later threw the case out because there was no evidence.

35

142.    The first time occurred in August 2, 2013, when the appeals chamber for the higher-level court of Cajamarca, the Superior Court of Justice of Cajamarca, nullified the lower court's sentence against Plaintiffs. The appeals chamber concluded that the criminal court's sentence did not adequately demonstrate that Plaintiffs had committed violence against Minera Yanacocha in August 2011. The case was then sent back to the lower court for another hearing.

143.    A year later on August 5, 2014, a judge from the lower court again found the Plaintiffs guilty of aggravated usurpation. The judge issued a suspended prison sentence of 2 years and 8 months, and ordered Plaintiffs to pay 1500 Peruvian soles to Minera Yanacocha as civil compensation (about US$500).

144.    Plaintiffs appealed, arguing that the lower court was not impartial and the evidence failed to show that Plaintiffs used violence against Minera Yanacocha. The appeals chamber of the Superior Court of Justice of Cajamarca again found that there was not adequate proof and overturned the sentence in December 2014. The testimony provided by Minera Yanacocha was insufficient to show that Plaintiffs committed violence against or threatened Minera Yanacocha employees. As a result, the Superior Court nullified the guilty sentence against the Plaintiffs.

145.    That month, Minera Yanacocha filed an extraordinary appeal of the Superior Court of Justice of Cajamarca's December 2014 opinion. Minera Yanacocha argued that there was no legal basis for the Superior Court's conclusion in absolving the Plaintiffs from aggravated usurpation. The Peruvian Supreme Court in Lima agreed to consider the appeal. On May 3, 2017, the Supreme Court rejected Minera Yanacocha's appeal ruling in favor of the Plaintiffs and upholding the intermediate appellate court's finding.

146.    On information and belief, the Newmont Enterprise improperly influenced the lower Peruvian court to find the Plaintiffs guilty of committing aggravated usurpation in August

36

2011 even though there was no evidence that these incidents occurred. Irregularities in both trials at the lower court demonstrate this improper influence. During the first trial in November 2011, the local court did not permit Plaintiffs to make many arguments and present any evidence. At the end of the trial, before the judgment was issued, one of Minera Yanacocha's lawyers arrived and gave the judge a document. Around this time, the judge then gave the same document to Plaintiff Ysidora, which was the guilty sentence. After this announcement, the hearing ended and the court tape recorder was turned off.

147.    Shortly after the announcement, Plaintiff Máxima fainted from the shock of the announcement and was unresponsive for a period of time. The judge became frantic and claimed that she did not want to issue the ruling but had to do so because Minera Yanacocha threatened her superiors and were paying the prosecutor's office.

148.    During the second trial in 2014, Minera Yanacocha's lawyers made no closing arguments. When the lower court's conclusion finding Plaintiffs guilty of aggravated usurpation was issued in August 2014, Plaintiffs' counsel requested a copy of the opinion detailing the court's reasoning. The judge refused to give a copy. Eventually it was communicated to Plaintiffs' counsel that a copy of the opinion would not be ready until the following day. But a few hours later, Minera Yanacocha organized a press release explaining the judge's decision even though the opinion was unavailable. Even after the press release, Plaintiffs' counsel was unable to get a copy of the opinion that day. On information and belief, the Newmont Enterprise wrote the court's judgment.

149.    Throughout the trials, Plaintiffs incurred significant expenses and debts in order to meaningfully exercise their rights to a criminal defense. For each hearing, the Plaintiffs had to borrow money and sell their livestock to travel to the court in the town of Celendin and cover trial costs. These sham lawsuits against Plaintiffs have had their intended effect: they have disturbed and

37

unsettled the Plaintiffs and caused them severe physiological distress and trauma. During this time, Plaintiff Máxima developed a heart condition from the repeated stress.

150.    Even though the aggravated usurpation case concluded in Plaintiffs' favor in May 2017, Minera Yanacocha has filed other unsubstantiated criminal complaints against Plaintiffs Daniel and Carlos for crimes such as usurpation and attacking Minera Yanacocha employees. At least some of these complaints are still pending in Peru.

151.    The above actions were undertaken by the Newmont Enterprise. Minera Yanacocha's bylaws from 2003, which are still in force today, give both Newmont Peru S.R.L., as the manager, and Minera Yanacocha's Executive Committee broad authority to represent the company before any judicial authority. The participation of either or both the Executive Committee and Newmont Peru S.R.L. would have included the participation of NMC senior management.

**E.  Defendants have initiated a bad faith effort to pressure Plaintiffs into relinquishing their land through attempted extortion and harassment.**

152.    Since at least May 2016, the Newmont Enterprise has attempted to pressure Plaintiffs, indirectly or directly, into having a "dialogue."

153.    On several occasions, representatives of the Newmont Enterprise have initiated what they term a "dialogue" but which are actually threats to Plaintiffs that they will suffer dire consequences if they do not abandon their land.

154.    At the end of June 2016, NMC officer Javier Velarde called the father of Máxima's husband, Jaime. Velarde told the father that he wanted to talk about the Plaintiffs having a dialogue with Minera Yanacocha. Uncomfortable with communicating with Velarde, the father asked Jaime's brother to talk to Velarde instead.

155.    Jaime's brother called Velarde, who told him that Minera Yanacocha is concerned about its public image. According to Velarde, Minera Yanacocha wanted to have a dialogue with the

Plaintiffs. The brother explained how Minera Yanacocha employees and Securitas would not permit the Plaintiffs to travel to and from Tragadero Grande. Velarde responded that the Plaintiffs needed to register at the security checkpoints operated by Minera Yanacocha. Velarde threatened that the Plaintiffs should not resist a dialogue because Minera Yanacocha would win the aggravated usurpation case against Máxima, Ysidora and Daniel that it had originally filed in August 2011.

156.    After the call with Velarde, Jaime and his brother spoke. Jaime told his brother to relate that Plaintiffs could not pass a Minera Yanacocha security checkpoint. Jaime's brother then called Velarde saying that a dialogue is impossible if the Plaintiffs cannot enter Tragadero Grande.

157.    Three or four weeks later, Velarde called Jaime's brother again. Velarde said that Jaime's brother should coordinate with the Plaintiffs and their counsel to have a meeting with Minera Yanacocha about a dialogue. Velarde again threatened that the Plaintiffs should not resist a dialogue because Minera Yanacocha would win a criminal case against them.

158.    Upon learning about these communications between Jaime's brother and Javier Velarde, Plaintiffs felt that the Newmont Enterprise was trying to pressure them into a "dialogue" in order to gain possession of Tragadero Grande.

159.    Believing that these communications were inappropriate and a form of harassment, Plaintiffs, through their counsel in Cajamarca, shared their concerns with a third-party organization who communicated with Plaintiffs' counsel on behalf of a senior officer of NMC.

160.    On July 11, 2016, a representative from the third-party organization responded saying that he shared these concerns about Velarde's communications with NMC. NMC responded, through the organization, stating that from that point on, they would only communicate through Plaintiffs' counsel in Cajamarca.

161.    In spite of NMC's assurances, over the past year, Defendants have contacted

Plaintiffs directly about a dialogue various times outside the presence of their attorneys. Since around October 2016, Defendants have repeatedly pressured Plaintiff Máxima into signing a document relevant to a dialogue even though she is illiterate and was not in the presence of her attorneys.  Around October 2016, Hector Zegarra, a representative of Minera Yanacocha, contacted Plaintiff Máxima directly about having a dialogue.

162.    Defendants have contacted Plaintiff Ysidora at least three times about a dialogue. Around December 2016, Javier Velarde, along with Raul Farfan, Hector Zegarra, Carlos Mercado and Ricardo Lanta, who on information and belief are all employees of the Newmont Enterprise, went to Tragadero Grande to discuss a dialogue with Ysidora outside the presence of her attorneys.

163.    On December 23, 2016, the Plaintiffs, through undersigned counsel, wrote to Defendant NMC and proposed a good-faith dialogue in the presence of their attorneys. NMC never responded.

164.    Around February 2017, Raul Farfan called Ysidora, outside the presence of her attorneys, offering her son, Plaintiff M.S., a scholarship and Plaintiffs another parcel of land in exchange for Tragadero Grande.

165.    Around July 2017, Hector Zegarra and Carlos Mercado contacted Plaintiffs Máxima and Ysidora about entering a dialogue that would grant Tragadero Grande to Minera Yanacocha in exchange for scholarships for Plaintiff M.S. and his cousin, and Minera Yanacocha suspending all pending criminal complaints it has filed against Plaintiffs. They identified themselves to the Plaintiffs as part of Minera Yanacocha.

166.    From around June 2017 until August 2017, an employee from Minera Yanacocha has called Plaintiff Elias at least five times, outside the presence of his attorneys, stating that the company is seeking a dialogue. During each call, the Minera Yanacocha employee has told Elias that

if he does not participate in the dialogue he would lose money. Elias felt threatened by these phone calls and had to change his cell phone number to prevent future harassment from Minera Yanacocha.

167.     Minera Yanacocha also sought Elias at least three or four times in Cajamarca city during this period, again outside the presence of his attorneys. These unannounced visits intimidated Elias because he felt monitored by Minera Yanacocha.

168.     Overall, Plaintiffs feel threatened and harassed by Defendants' attempt to pressure them into a dialogue through unannounced calls and visits.

**F. The abuses against the Plaintiffs have been well-publicized and engendered national and international outcry.**

169.     Since the attacks began against Plaintiffs in August 2011, there has been much national and international attention in support of the Plaintiffs, and publicity about the abuses committed against them.

170.     Since that time, Defendants' attacks against the Plaintiffs have been documented in various Peruvian news outlets, including La Republica, RPP Noticias, El Comercio Perú, Perú 21 and Utero.Pe. Additionally, international news outlets including the Guardian, Mongabay, Telesur TV, BBC, Huffington Post, El País International and Reuters have documented Plaintiffs' injuries.

171.     In 2014, the Inter-American Commission on Human Rights (IACHR) granted Plaintiffs precautionary measures, urging the Peruvian authorities to protect them. Under the IACHR's rules, precautionary measures are issued only for "serious and urgent situations presenting a risk of irreparable harm to persons."

172.     In its decision, the Commission noted that Plaintiffs were at the center of "continuing acts of harassment and threats, with the presumptuous purpose of displacing them from the land where they live." The Commission also acknowledged reports of attacks against Plaintiffs

41

by members of the PNP in an effort to force them to leave Tragadero Grande. The Commission stated that the precautionary measures are necessary because "the members of Chaupe family would be the objects of continuous acts of harassment and threats, with the purpose of allegedly evicting them from the land where they live."

173.    Dating back to, at least, the August 2011 attack against Plaintiffs, Peruvian and regional organizations have also publicized and condemned the attacks on the Plaintiffs. These organizations include GRUFIDES and the Latin American Observatory for Mining Conflicts. Since that time the attacks have received additional coverage by international organizations as well, including Amnesty International and Frontline Defenders.

174.    Amnesty International and Frontline Defenders have created solidarity campaigns and action alerts for the Plaintiffs whenever an attack occurs at Tragadero Grande. Civil society organizations also attended NMC's Annual General Meeting in 2015 and 2017 to urge Defendants to cease terrorizing the Plaintiffs. Other organizations have sent letters to Newmont's leadership.

175.    In 2016, Máxima won the Goldman Environmental Prize. The prize "honors grassroots environmental heroes from the world's six inhabited continental regions."

176.    Even if any Defendant were not previously aware of the course of harassment and attacks against Plaintiffs, they have certainly been made aware through the media, advocacy organizations, and the Inter-American Commission. On information and belief, all Defendants know about the continuing pattern of attacks on Plaintiffs, and support these attacks either by failing to stop them despite having the power to do so, or through affirmatively supporting and directing the course of attacks.

### G. Newmont's hand-picked consultant concluded that the Plaintiffs' human rights are at risk at Tragadero Grande.

177.    In May 2015, Defendant NMC commissioned the non-profit RESOLVE to engage

42

in a fact-finding mission regarding Plaintiffs and the events at Tragadero Grande. Though the report is framed as an independent fact-finding mission, Newmont hired RESOLVE without any input from Plaintiffs, and NMC's former Chief Sustainability Officer is on the RESOLVE board.

178.    In September 2016, RESOLVE released its report. Despite the concerns over RESOLVE's impartiality, the report found that "the human rights of Plaintiffs have been at risk when they are at Tragadero Grande."

179.    The report further found that "all parties agree that the Chaupe family has experienced attempts to forcefully evict them from Tragadero Grande."  Specifically, the report states: "Minera Yanacocha confirms that its defense of possession actions included eviction attempts and removal of family assets."

180.    Other findings from the report include:

- The human rights of Plaintiffs have been at risk since 2011. After the initial incident, "the baseline conditions … should have triggered a precautionary approach. Plaintiffs are a *campesino* family with limited levels of education who rely significantly on subsistence farming and are located in an isolated and remote location, prone to harsh weather conditions. … it is problematic to forcefully evict this family, in the absence of dialogue, in the presence of private security and armed Police, and without the presence of a third party."

- "The company has not discharged its responsibility to respect human rights by conducting human rights due diligence reflecting the contextual and situational factors associated with this case."

- Newmont policies and international standards to which Newmont abides were not met in the response towards Plaintiffs. Adequate human rights due diligence was not carried out.

- The company failed to fulfill its commitments under the Voluntary Principles in regards to

43

their approach to Plaintiffs. Specifically the company failed to do "(i) a case-specific risk assessment to guide Police, security providers and the organization in the management of this case; (ii) a 'root-cause' analysis of the Tragadero Grande conflict; and (iii) a comprehensive investigation of security issues that are cause for concern." Moreover, Newmont's commitments to dialogue and dispute resolution were not fulfilled due to a "strategy that prioritized litigation over dialogue."

181.    Moreover, the report found that "at no point has Minera Yanacocha actively and systematically considered the economic, social and cultural rights of the family, such as those rights relating to livelihoods and an adequate standard of living." Additionally, the report notes that notwithstanding Newmont and Minera Yanacocha's "obligations under internal and international standards to consider the human rights dimension of this case . . . . the Mission did not sight evidence that Minera Yanacocha had sought to actively and systematically consider the potential adverse human rights impacts associated with the Chaupe case."

182.    In response to the report, NMC publicly stated that they will: "intensify efforts to hold a good-faith dialogue with Plaintiffs to resolve the land dispute;" "establish detailed action plans and accountability for implementation of improvement areas – regularly report on progress and implements; and "conduct monitoring/reporting of performance improvements." Yet, despite these public commitments, the attacks have continued.

## VI.    THE DEFENDANTS ARE RESPONSIBLE FOR THE ABUSES AGAINST PLAINTIFFS AND HAVE THE POWER AND ABILITY TO STOP THE INTIMIDATION AND HARASSMENT CAMPAIGN.

### A. Defendants and their agents control and employ an array of security personnel, which they deploy to intimidate and harass Plaintiffs.

183.    The Newmont Enterprise's security personnel, including the PNP and Securitas, as well as other contracted security personnel, have largely carried out the harassment and intimidation

44

campaign against Plaintiffs. When these security personnel are working pursuant to private security contracts with Minera Yanacocha, they are agents of the Newmont Enterprise. The Defendants directly control and have the right to control the activities of Securitas, members of the PNP and other contracted security personnel. On information and belief, the abuses against Plaintiffs have been committed by these forces pursuant to their scope of employment and in furtherance of the Newmont Enterprise's business interests.

184.    In September 2015, NMC publicly announced that Minera Yanacocha would no longer receive private security services from the PNP after January 2016. Since January 2016, Securitas and Minera Yanacocha employees have mainly perpetrated attacks against Plaintiffs.

### i.    Contracted Security Personnel

185.    Minera Yanacocha and the Conga Project have had a large contracted security force for many years.

186.    Contracted security personnel make up the vast majority of Minera Yanacocha and the Conga Project's security team on the ground. According to Buenaventura's 20-F filing with the Securities and Exchange Commission, in 2016 Minera Yanacocha had "a contracted security force of over 258 persons assigned to rotating shifts at its mines and the city of Cajamarca," and "the Conga project ha[d] a total of 83 contracted security personnel who were responsible for patrolling and providing security to project in rotating shifts."

187.    According to Buenaventura's 20-F filing for 2011, "Yanacocha ha[d] 57 security employees on its payroll, including 9 employees responsible for the security of the region as a whole. In addition, Yanacocha ha[d] a contracted security force of over 395 persons assigned to rotating shifts at its mine, its Lima offices, the city of Cajamarca and checkpoints along the road to the coast of Peru, residential areas in Cajamarca and the supervision of the security CCTV and alarm system.

The Conga project ha[d] a total of 189 security personnel responsible for patrolling the project, including Yanacocha's offices in the city of Cajamarca."

188.    During the harassment and intimidation campaign against Plaintiffs, Minera Yanacocha has had contracts with the private security company Securitas, two intelligence gathering companies, Bucranio and Andric, and the PNP.

### a. Securitas

189.    Starting in 1993, Minera Yanacocha has contracted security services from the Peruvian subsidiary of the Swedish private security company Securitas.

190.    From 1993-2007, Minera Yanacocha contracted security from a Peruvian security company, Forza, which was acquired by Securitas in 2007.

191.    During this period Securitas's duties include providing physical security, access control and patrolling services on the Conga mine site, and gathering intelligence by collecting documentation such as videos.

192.    On information and belief, Minera Yanacocha continues to contract security services from Securitas who continue to operate Minera Yanacocha's security checkpoints and patrol.

193.    The Newmont Enterprise has significant control over Securitas personnel.

194.    Under a recent four-year contract between Minera Yanacocha and Securitas, Securitas personnel were required to participate in Minera Yanacocha training programs and render services according to relatively detailed requirements and standards set out in the contract.

195.    Under the contract, Securitas personnel provided services under the direction of Minera Yanacocha's Security Representative, and were required to do so to the representative's complete satisfaction. Securitas could only perform security services approved by Minera Yanacocha.

46

196.     An annex to this contract outlined the type of functions approved by Minera

Yanacocha. Securitas's principal activities included: security for all Yanacocha installations,

personnel and property; support for effective monitoring; provision of emergency services as

needed; controlling who may enter and leave Minera Yanacocha's installations; monitoring areas

where Minera Yanacocha has influence; providing specific protection when Minera Yanacocha seeks

it; and controlling the flow of vehicles, interruptions and occurrences on routes that could affect the

activities of Minera Yanacocha. The contract expressly forbade Securitas from carrying out any other

type of function unless incorporated by an amendment to the contract. Should Securitas act

inconsistently with the pre-approved functions, it had the obligation to notify Minera Yanacocha in

writing.

197.     With respect to its role in controlling vehicles and traffic, the contract required

Securitas to carry out this function according to the specifications of Minera Yanacocha.

198.     In the event that Securitas provided its own equipment, the equipment had to be

deemed acceptable to Minera Yanacocha. Securitas had to provide a guarantee that the equipment

fulfilled the relevant criteria through a representative approved by Minera Yanacocha. Minera

Yanacocha had a right to confirm that the equipment conformed to its standards. Additionally the

Annex summarized the types of weapons, including lethal weapons that Securitas could use

depending on the security function.

199.     The contract instructed Securitas on loss prevention, environmental harm, drug and

alcohol use, and the internal regulation of personnel transport and emergency response. In order to

enter any installation of Minera Yanacocha, each Securitas employee could have been subjected to a

personal inspection and could have been required to provide biological samples for drug and alcohol

tests.

47

200.     The contract required Securitas to present a daily report of incidents at Yanacocha, as well as detailed reports about the operations in which all of the daily activities had to be described. Minera Yanacocha retained the right to remove Securitas employees at its sole discretion and Securitas required Minera Yanacocha's consent to hire subcontractors.

201.     The contract states that both "Newmont" and Minera Yanacocha had the right to conduct unannounced audits to ensure compliance with human rights and any other issue Minera Yanacocha determined to be relevant.

202.     Minera Yanacocha paid Securitas for all the costs necessary to execute its security services, including labor, vehicle and other costs. Securitas provided a monthly assessment of services rendered which is then reviewed and approved by Minera Yanacocha. Once Minera Yanacocha granted approval, Securitas provided a bill for payment. Further, Minera Yanacocha specified the type of health insurance to be provided, set requirements for hiring, and reserved the right to pay Securitas employees and withhold money from Securitas to cover those costs. Minera Yanacocha also provided Securitas personnel with infrastructure support at their stations, including an office, and equipment such as Plexiglas shields, equipment for filming and taking photographs, anti-riot equipment, communications equipment, gas for transportation, metal detectors and any other equipment deemed necessary for Securitas operations.

203.     On information and belief, Securitas and Minera Yanacocha have renewed their contract and it is currently in effect. On information and belief, the terms of this current contract are the same as the previous contract.

### b. Peruvian National Police (PNP)

204.     Minera Yanacocha also privately contracted the services of the PNP to provide security in and around the Conga Mine Project area.

205.     Minera Yanacocha had a Memorandum of Understanding (MOU) with the PNP until at least January 2016, when the government terminated the contract.

206.     The MOU permitted Minera Yanacocha to receive security from three units of the PNP, known as DIRTEPOL, DIVSEESP and DIROES.

207.     According to the MOU, the PNP provided security and protection to prevent crimes, neutralize risks against, and provide surveillance for Minera Yanacocha employees and installations, and contribute to the security of Cajamarca city and other areas that are within the influence of Minera Yanacocha's operations.

208.     According to the contract, the PNP would first provide off-duty officers who agreed to work for Minera Yanacocha, but when needed the PNP provided on-duty officers. Minera Yanacocha provided daily compensation (including special bonuses), housing, food, transportation and storage for their equipment. Minera Yanacocha provided the PNP with an insurance policy, which protected against death, permanent disability and medical treatment for injuries incurred on the job, and provided emergency medical care at its camps. Minera Yanacocha covered the costs of maintenance or repairs of arms, accessories, and uniforms that were property of the state and affected by work done for Minera Yanacocha.

209.     Pursuant to the contract, the PNP provided Minera Yanacocha information about the officers lending services forty-eight hours before their service began unless there was an emergency situation. Minera Yanacocha provided the PNP requests, in writing, for a certain number of officers needed for a specific security situation. Additionally, the contract designated an "official coordinator" for the PNP and Minera Yanacocha who could decide any other types of services that may be needed within the jurisdiction of one of the PNP units.

210.     As with Securitas, the PNP contract gave Minera Yanacocha extensive control over

49

the operations of the PNP. The contract stated Minera Yanacocha would coordinate to ensure that the PNP personnel had adequate training about the intersection of human rights and security. Further, Minera Yanacocha had the right to inspect PNP equipment whenever it found it necessary.

211.    The PNP were an integral part of the security plans for the Conga Mine Project and were included in the Conga project organizational chart for staffing and training.

### ii.    Defendants exercise control over Minera Yanacocha's security personnel.

212.    Minera Yanacocha's control over the contracted security personnel is jointly shared with Defendants, including NMC and Newmont USA, as well as Newmont Peru S.R.L..

213.    As manager of the mine, Newmont Peru S.R.L. manages, conducts and controls Minera Yanacocha's day-to-day operations. Under Minera Yanacocha's bylaws, amended in 2002, which are still in force today, Newmont Peru S.R.L. can "hire and remove workers . . . who may be necessary or convenient for the performance of the Company's operations, determining their retribution, informing the Partner's Meeting."

214.    On information and belief, Newmont Peru S.R.L. staff are part of the Newmont Enterprises regional South America team, which has responsibility for ensuring that the security operations, including the contractors, are implemented in manners consistent with NMC standards and policies. Moreover, pursuant to NMC's global security standard, Newmont's regional security team has the responsibility for managing private security contractors and had responsibility for the MOU with the PNP.

215.    NMC's then-Senior Vice President, South America Operations, Carlos Santa Cruz, signed the above referenced contracts with Securitas and the PNP. In 2003, Cruz declared in an affidavit to a U.S. district court that Newmont Peru Ltd. employed him through its Peruvian branch. The above-referenced contract with the PNP also designated Antonio Rios Pita, then the Newmont

Enterprise's regional security director for South America, as the coordinator for the relationship with the PNP working for Minera Yanacocha under the MOU.

216.    From at least October 2014, Newmont USA has played a significant role in the regional security duties for South America, including for Minera Yanacocha's operations in Peru, and employs the Security Director for the Americas. The Security Director for the Americas heads security for the Americas, and, on information and belief, the director's responsibilities include overseeing Minera Yanacocha's security personnel including the contracted security force.

217.    In many significant respects, contracted security personnel receive the same treatment as employees. They must follow NMC's Code of Conduct, and relevant standards, policies and guidelines, and must participate in relevant trainings on the policies and standards.

218.    On information and belief, at all times relevant to this complaint, when Securitas, PNP and other contracted security personnel were working pursuant to a contract with Minera Yanacocha they were acting under the direction and control of the Newmont Enterprise, and within the scope of and pursuant to their retention by Minera Yanacocha.

219.    On information and belief, in committing the tortious conduct alleged herein, Minera Yanacocha's security personnel were acting under the supervision of the Newmont Enterprise, or as it agents, and were acting within the course and scope of the security duties for which they were retained with the advance knowledge, acquiescence or subsequent ratification of the Newmont Enterprise. These security personnel were acting in furtherance of the Newmont Enterprise's financial and corporate interests.

220.    According to security plans for the Conga project, Minera Yanacocha requires all security contractors to be aligned with the Yanacocha security procedure. According to Conga's security plans, mine personnel supervise Security contractors, and in many respects contractors were

accounted for and treated in the same manner as Minera Yanacocha staff. As stated above, Securitas personnel act under the direction of Minera Yanacocha's Security Representative. In addition, according to one of the Conga Project's security plans from March 2011, the "Newmont Security Manager's" roles and responsibilities included "provid[ing] direct guide and oversight to all employees, contractors, ensuring proper works developing in accordance with established organizational information security policies and procedures." The Manager's role also included "plan[ning] and direct[ing] security personnel," and "supervis[ing] the current contractor service for security personnel."  The responsibilities of the "Investigations Technician" included "maintain[ing] permanent coordination with the police if required," and "Safety Training Company, Human Rights and the use of force personnel Securitas MYS.R.L. and the PNP, through induction and other presentations."

### B. Minera Yanacocha and Newmont Peru S.R.L. negligently and knowingly hired and retained security forces with poor human rights records.

221.    Defendants' agents, Minera Yanacocha and Newmont Peru S.R.L., hired and have retained members of the PNP and Securitas (including its predecessor, Forza), despite their poor human rights records. On information and belief, Defendants' agents hired and continued security contracts with these forces even after they knew that these forces were implicated in attacking *campesino* communities and protestors in Cajamarca. Defendant NMC and, on information and belief, Defendant Newmont USA had the ability to terminate, or instruct their agents to terminate, these contracts, but failed to do so. To the extent that the Newmont Enterprise did not affirmatively direct the abuses against Plaintiffs described above, the Defendants should have known that abuses of this type would occur.

222.    Prior to and throughout their tenure with the Newmont Enterprise, both the PNP and Securitas have been accused of committing human rights violations against the local *campesino*

population, and individuals seen as opposing the Yanacocha mine and Conga Project.

223.    In 2005, Forza personnel and the PNP, allegedly attacked and tortured *campesino* men and women who were protesting the $1.4 billion Rio Blanco copper mining project developed by Monterrico Metals MNA. According to the protestors, Forza and the PNP tear gassed protestors in their camp, and detained and tortured twenty-eight leaders; one of the leaders was tortured to death. A subsequent government investigation confirmed that many individuals were kidnapped and physically attacked after a protest. The government concluded that the PNP were responsible for torturing the protestors.

224.    The following year, in August 2006, *campesinos* organized a protest against Minera Yanacocha's operations in Cajamarca. The installations were located on *campesino* land, and the residents protested the harms to their homes and land. Between seventy-five and two hundred Forza personnel and officers from the PNP responded. After the security forces arrived, Forza or the PNP shot and killed an unarmed *campesino* man, Isidro Llanos Cavaría. On information and belief, the PNP acted under contract for Minera Yanacocha.

225.    These incidents led to a prosecutorial investigation regarding Cavaría's injuries. During the investigation, the prosecutor discovered that Forza kept a warehouse of illegal arms that were more advanced than the weapons used by the PNP.

226.     The investigation culminated in criminal charges filed against two officers from the PNP. The charged officers claimed that Minera Yanacocha ordered them to fire shots against the *campesino* protestors. In response, Defendant NMC issued a statement denying responsibility and accusing the PNP of the violence.

227.    In 2007, Forza conducted an unlawful surveillance operation known as "Operación Diablo," in which Forza targeted and spied on environmental activists in Cajamarca who were

53

critical of Minera Yanacocha's operations in the region. The main target of surveillance was the local non-governmental organization Grufides, which represents the Plaintiffs here in litigation in Peru involving Minera Yanacocha. During Operación Diablo, Forza and its co-conspirator, a private security company called Business Track, tracked Grufides employees, bugged their phones and issued death threats against them.

228.    After members of Grufides reported these unlawful surveillance activities, the PNP conducted an investigation. Although Forza denied involvement in Operación Diablo, documents seized from an organization associated with Forza during the investigation tied the surveillance to Forza leadership, including its operations manager, Aldo Schwarz.

229.    Once Forza's role in Operación Diablo became publicly known, international entities, including the United Nations (U.N.) and the Organization of American States, condemned these human rights violations. The chair of the U.N. working group on mercenaries and human rights stated: "We are worried about the involvement of security companies in cases of intimidation of defenders of environmental rights and in conflicts between the local population and mining companies." Grufides demanded that Defendant NMC recognize its role in the unlawful surveillance.

230.    In 2007, amidst allegations of human rights violations connected with the Yanacocha mine, and similar allegations taking place at other Newmont operations, NMC commissioned a "Community Relationship Review" (CRR). The report, released in March 2009, found that Yanacocha's security arrangements were concerning; security personnel were creating a culture of fear in the community.  The report noted that the "study team at Yanacocha emphasized that many stakeholders expressed fear of Newmont and its security personnel. This atmosphere of intimidation is highly damaging to both the community and the company."

231.    The CRR report included a separate report from the fact-finding mission that took place in Peru in October 2007. The report from this mission expressed concern over the Yanacocha mine's security arrangements with Forza, and NMC's response to allegations the security force committed human rights violations. The report states that deaths of community members and the monitoring activities "instilled fear in the rural population." Some interviewees refused to give their names due to fear of reprisal and the study suggested that "these may be the initial signs of a culture of fear and suspicion that is growing among the rural communities."

232.    The mission also found that "the company's public statement regarding the alleged monitoring activities of anti-mining activists is a disappointment to urban national stakeholders and has led to fear among rural and activist stakeholders that they will also be persecuted/monitored if they speak or act against the mine." With respect to the government's investigation into Operación Diablo, the study also noted "the case remains unresolved in the eyes of many of the external urban and national stakeholders who fear that the case will be closed with impunity. For rural stakeholders, this is further evidence that feeds their perception of the power that [Minera Yanacocha] and Forza have over the government, and a further display of the inequality between large mining companies and small rural companies."

233.    The concerns around Minera Yanacocha and NMC's security policies and the activities of its security personnel at the Yanacocha mine also garnered international attention. In 2007, Oxfam America raised the issue through the mediated dialogue process under the Voluntary Principles on Security and Human Rights. Through this process, NMC and Minera Yanacocha agreed to commission an independent review of its security policies, procedures, practices and programs, and hired Gino Costa to conduct an investigation and prepare a final report ("the Costa report").

234.    The Costa report found that the company did not have proper measures in place to investigate human rights violations and abusive use of force. The report recommended that Minera Yanacocha through its public service office, should keep a record on use of force and alleged human rights violations based on information by departments and the public. Other recommendations included: ensuring that officers used at the mine are properly selected and trained, and do not carry firearms; "make rigorous use of all command and control instruments which the company has in order to direct, supervise and evaluate the private security performance, for which conduct the company is responsible; adopt all measures considered necessary in order to guarantee that private security companies, including those that perform risk assessments, respect human rights especially communications confidentiality and personal and family privacy;" and require that private security companies provide information to assess the suitability of the personnel including police, judicial and criminal records on civilian personnel. Perhaps most significantly, the report recommended evaluating whether to terminate the contracts with the private security companies—Forza, and the two companies providing intelligence gathering, Explosupport and Andrick—in light of the public information and human rights track record of the companies, as well the negative impact on the companies' reputation and image.

235.    Later in 2007, Securitas purchased Forza. On information and belief, after the companies merged, Forza's leadership remained in Securitas with management roles.

236.    In 2011, Minera Yanacocha again faced allegations of human rights abuses by its security personnel. In addition to the allegations that arose from Plaintiffs in August 2011, protests against the Conga mine in November 2011 and July 2012 resulted in injuries and deaths of protesters by PNP.

237.    From November 28-29, 2011, protestors convened at the site of the proposed Conga

56

Project. A confrontation arose when the PNP fired teargas, warning shots, and pellets to push the protesters back down the road to their original protest camp. The confrontation escalated, and PNP began firing live ammunition. At least twenty-four civilians were injured.

238.     In July 2012, more large-scale protests against the proposed Conga project continued.  The PNP once again responded with force against the protestors, killing five people – including a minor – and injuring over thirty.

239.     Despite their knowledge of this history of alleged human rights abuses by mine security personnel, the investigations finding the PNP responsible for human rights abuses, the criminal and civil charges against the PNP, and their power and control over Minera Yanacocha and Newmont Peru S.R.L., Defendants did not properly investigate the abuses or terminate their contracts. They should have known that retaining Securitas and the PNP would lead to additional abuses.

### C. Newmont Mining Corporation (NMC) has set up and controls a global enterprise through which it controls and/or has the right to control Minera Yanacocha, Newmont Peru S.R.L. and its subsidiary defendants.

240.     NMC, its wholly owned subsidiaries and affiliated entities operate together as the Newmont Enterprise. As the head of the Enterprise, NMC controls, or has the ability to control, the harassment and intimidation campaign against Plaintiffs.

241.     NMC has global standards, policies and guidelines, including those on human rights and security, which all of its entities, including those it controls, must follow. NMC also sets out the procedures its entities must use to implement the policies. Ultimate responsibility for the Enterprise's performance in these areas rests with NMC.

242.     NMC is responsible for managing implementation of the standards, policies and guidelines throughout the Newmont Enterprise to ensure consistency. To do so, NMC has

57

established a tiered global implementation structure, with a corporate level, which includes the board

of directors, the executive management team and personnel from NMC's corporate office; a regional

level, which includes divisions set up for each operating region (North America, South America,

Africa, and Australia); and the local/site level, which includes personnel from the site/ project. Lines

of reporting and supervision within the Newmont Enterprise do not observe distinctions between

legal entities, with individuals from each tier reporting to or receiving reports from individuals in

another tier, even if they may be affiliated with a distinct entity. Through this tiered structure, NMC

maintains oversight and control over the entire enterprise.

243.    Ultimate responsibility for day-to-day management and upholding the sustainability

strategy lies with the executive leadership of NMC, according to Newmont's 2016 Sustainability

Report. Additionally, according to the same report, the Chief Executive Officer of the Corporation

"holds ultimate responsibility for Newmont's social, economic and environmental performance,"

and visits each region at least once during the year.

244.    Through its global enterprise, NMC is and has been controlling, directing,

supporting and/or has the right to control and direct the intimidation campaign against Plaintiffs.

NMC exercises this control by setting the policies and procedures that should have been followed by

the Enterprise in their interactions with Plaintiffs, and through its global tiered structure and

reporting system.

     **i.   Defendant Newmont Mining Company sets up the Newmont Enterprise's
human rights policies, standards and procedures, including its security
operations.**

245.    At all relevant times herein Defendant NMC has set and continues to set the

policies, standards, guidelines and procedures for the entire Newmont enterprise. These include

several policies that govern the areas of human rights, security, community health and safety,

58

community relationships, land acquisition and involuntary displacement, and relationships with contractors. These policies dictate the requirements and procedures that all entities in the Newmont Enterprise must follow.

246.   Up until 2013, NMC's human rights and security policies were set by NMC's Social Responsibility Policy, and its accompanying social responsibility standards, which included standards on security and human rights and land access, acquisition and resettlement. On information and belief, in 2013 the Social Responsibility Policy became the Sustainability and Stakeholder Engagement Policy, which is still in effect today, though continuously updated. This policy continues to dictate the Newmont Enterprise's human rights, and land acquisition and involuntary resettlement standards.

247.   The current "global standard" on human rights lays out requirements for planning and design, implementation and management, and performance monitoring. Among other things it requires that each site "regularly communicate how it is managing human rights issues to … the corporate S&ER [Stakeholder and External Relations] team." Similarly, the Land Acquisition and Involuntary Resettlement Standard, which is dated from March 2014, "sets the minimum requirements for land acquisition and involuntary resettlement."

248.   Through NMC's accompanying Health and Safety Policies, NMC also controlled entities' relationships with contractors. According to Newmont's 2012 Sustainability Report, NMC's Health and Safety Standards had a standard on "contractor selection and management," which was meant to provide a "systematic approach to selecting, orienting and monitoring contractor performance, and to ensure that contractors and contract personnel comply with the Management System and contract terms and conditions." On information and belief, NMC continues to set a standard for contractor selection and management.

59

249.    As another demonstration of its control, in 2013 Defendant Newmont Mining Corporation required "all operations managers to set and meet Sustainability and External Relations targets which cover community relations."

250.    As outlined above and further outlined below, despite having policies and standards to ensure the protection of Plaintiffs' human rights, these policies have not been enforced. The harassment and intimidation campaign against Plaintiffs is wholly inconsistent with the fundamental principles of the sustainability framework.

**ii.    NMC enforces its sustainability framework and global polices and standards throughout the Newmont Enterprise through a global structure which is set and mainly controlled by NMC.**

251.    NMC has set up a structure to implement its global standards and policies which further shows NMC's control over all elements of and entities in the Newmont Enterprise.

252.    At the corporate level NMC has set up "functional departments" on issues such as "sustainability and external relations," "legal," and "health, safety and security," which "directly manage[] material risks and opportunities and integrate[] sustainability strategy throughout the business." These departments have teams/staff at each tier of the Enterprise (corporate, regional, and local) that work together to implement NMC's policies and standards in these areas. These departments are ultimately directed by NMC employees in the U.S.

**iii.    NMC controls and/or has the ability to control the Enterprise's security operations, including Minera Yanacocha's security operations.**

253.    Security for the entire Newmont enterprise is also controlled from the highest levels of the corporation, through NMC's senior or global security director.  In 2011, 2012 and, on information and belief, up until February 2014, the position of senior/global security director, also known as "Senior Director, Corporate Security," was held by Lee Langston. From February 2014 – October 2014, Otto Sloane held the position of acting global security director. On information and

belief this position continues to exist, or its duties are incorporated into a different position.

254.    Langston, as NMC's senior security director, oversaw Newmont's security operations globally – by, for example, reviewing site level security plans, and traveling to mine and project sites, including Conga. Langston would report to NMC's Vice President, Health, Safety and Security, and receive reports from regional security directors, and security staff on the ground.

255.    NMC also maintains control over security operations through its global security team. In 2011 and 2012, the global security team included the senior security director and the regional security directors. The global security team set the security deliverables for the Enterprise's projects from pre-construction to operations.

256.    Below the global security team are the regional security teams, which NMC also controls; they include a regional security director and the regional Senior Vice President. The regional Senior Vice President for South America has been and continues to be a NMC senior officer. On information and belief, the regional security director for South America (currently the security director for the Americas) reports to the Senior Vice President for South America, as well as NMC's Vice President of Health, Safety and Security.   In 2011 and 2012, the regional security director for South America would also report to NMC's senior security director.

257.    On information and belief, the regional security team is responsible for ensuring compliance of site security plans with NMC's security standards. The regional security team is also responsible for reviewing whether the deliverables set by the global security team are met, and managing internal and private security contracts, and MOUs with public security agencies.

258.    NMC also provides case-specific guidance through an internal, cross-functional Security and Social Acceptance Committee ("SSAC"). The SSAC "reviews specific cases [involving security issues] and provide[s] advice and solutions from a multi-disciplinary perspective."

61

259.    In addition to the specific individuals who have responsibility over security operations, on information and belief, NMC's senior security director, executives, senior officers and vice presidents are kept informed, and have knowledge, of security related incidents or concerns on the ground at mine sites and projects. On information and belief, they receive this information through updates from corporate communications in the United States which includes information from sources on the ground and relevant media mentioning Newmont mines and projects. On information and belief, these individuals are also involved in determining the response to significant threats.

260.    Newmont U.S.A. is also directly involved in supervising security matters for Peru. The current Security Director for the Americas, Otto Sloane, is employed by Newmont U.S.A. and is based in Nevada. He also holds the title of Regional Security Director for Minera Yanacocha.

261.    NMC's control extends to the local mine site and project level, through its reporting structure and policies, which require compliance with NMC standards. In addition to general managers, there is a security manager for Minera Yanacocha who reports to the regional security director.  Thus the security personnel at the project site are connected to NMC staff through reporting relationships.

262.    Following this structure, NMC staff have been directly responsible for elements of the Conga Mine Project security plans and responses. Lee Langston was significantly involved in security plans for the Conga Mine Project, and personally reviewed at least one such plan, and was also involved in the security response to the protests in 2011. From October - December 2011, Langston received email updates, sometimes multiple times a day, on the situation on the ground from the regional level, and communicated directly with the regional security director, the regional information office, and the Conga security manager.  His communication with personnel on the

ground show a high degree of oversight, such as a discussion of whether there was enough police support at a time that PNP were operating under an MOU with Minera Yanacocha. Langston also traveled to Peru during this time.

263.    Involvement in the Enterprise's response to the protests in 2011 extended all the way up to the executive and senior officers of NMC. At least twelve NMC executives, senior officers, vice presidents and and/or senior personnel received updates from the situation on the ground, sometimes multiple times a day, and some, if not all, participated in calls with the South American RRT (Rapid Response Teams), and participated in daily planning meetings for the response to the protests.

264.    At the regional level, NMC dictated that Conga's security plans were to be carried out "in coordination with Newmont Regional Security Direction," in order to "ensure the Newmont and Yanacocha Security Standards Compliance."

265.    The regional security director for South America for the Newmont Enterprise also has oversight over at least some security contractors. Antonio Rios Pita, the regional security director for South America around 2011-13, who reported to the NMC senior security director in the U.S., was the coordinator for the relationship with the PNP working with Minera Yanacocha. According to security plans for Conga, the Conga Project security chief would also report to Pita, who was responsible in part for "ensur[ing] compliance with regional security standards at Conga."

266.    Pita was also the coordinator for the relationship with the PNP working for Minera Yanacocha under the MOU. According to a Conga security plan, the Regional Security Division had control over police support in Conga's Security Deliverables under contingency support. The Deliverables state that "police support will be requested exclusively through the Regional Security Division; hence, all police action or patrolling within the operations and property of Minera

63

Yanacocha must be authorized by the Division."

267.   NMC was also directly involved in security contracts. As stated above, during this time, the Senior Vice President, South American Operations from 2011 – November 2012, signed Minera Yanacocha's security contracts with the PNP and Securitas.

### iv.   NMC controls and/or has the ability to control the Enterprise, including Minera Yanacocha's human rights policies and activities.

268.   NMC's Sustainability and External Relations and (S&ER") group, formerly the Environmental and Social Responsibility ("ESR") group, has responsibility for the Newmont Enterprise's human rights and land acquisition and involuntary resettlement policies and activities. On information and belief this group is responsible for, among other things, "ensuring that the company's operations on the global level approach community relations and development in a consistent manner."

269.   On information and belief, until October 2011 the ESR group was led by NMC's Vice President, ESR. The Vice President, ESR, reported to NMC's Executive Vice President for Legal and External Affairs who reported directly to NMC's Chief Executive Officer. In October 2011, the Vice President, ESR position shifted to an Executive Vice President, External Relations and Sustainability, who reported directly to NMC's Chief Executive Officer.

270.   In 2013 the ESR department became the S&ER department, which focuses on environmental, social responsibility, external and government relations. Like the ESR department, the S&ER department has responsibility for implementing NMC's policies on these issues. The department is led by NMC's Executive Vice President, Sustainability and External Relations.

271.   As with the security operations, responsibility for S&ER, formerly ESR, flows down from the corporate level to the regional level, with oversight and control remaining at the corporate

level. At the regional level, oversight and overall responsibility lies with the regional Senior Vice

President, who is a NMC corporate officer.

**D. NMC had knowledge of and is involved in and/or overseeing the Defendants' response to Plaintiffs.**

272.    In addition to its general roles in overseeing security, social responsibility, and land

acquisition issues, Defendant NMC has also played a significant and direct role in overseeing and

coordinating the Newmont Enterprise's relationship with the Plaintiffs. NMC knew and/or should

have known about the attacks on Plaintiffs by Minera Yanacocha security personnel from, at least,

the incident in August 2011. On information and belief, from at least that day forward, instead of

respecting human rights, the Enterprise has waged a multi-year harassment and intimidation

campaign against the Plaintiffs, seeking to displace them from their home. NMC could have

prevented and/or stopped this campaign against Plaintiffs. Instead, NMC has ratified the conduct of

its entities, agents and/or employees carrying out this campaign, and, has become directly involved

in monitoring and/or overseeing the Enterprises' interactions with Plaintiffs.

273.    There can be little doubt that NMC, and all levels of the Newmont Enterprise, knew

and/or should have known about the pattern of abuses against Plaintiffs by their agents, including

Securitas and the PNP.

274.    Pursuant to NMC's global security and S&ER groups and reporting structure, senior

NMC officials would have or should have been informed of the attack on Plaintiffs by Minera

Yanacocha security personnel in August 2011, and subsequent attacks, harassment and intimidation

by Minera Yanacocha's security personnel and/or other Newmont employees/agents.

275.    On information and belief, senior NMC officials received information on the August

2011 attack, and subsequent interactions between Plaintiffs and Minera Yanacocha security

personnel, through the regional information office and/or the corporate communications office in

the U.S. As outlined above, local and regional organizations have publicized attacks against the Plaintiff since the incident in August 2011, and, on information and belief, this coverage would have been disseminated to executives, senior officers and corporate personnel. Moreover, the ongoing intimidation and harassment campaign against Plaintiffs has received continuous significant domestic and international news coverage, and, on information and belief, this coverage would likewise be disseminated among the Enterprise.

276.    From at least 2014, Defendant NMC has publicly acknowledged that it has been involved in handling the Enterprise's interactions with Plaintiffs, and has included mention of the Plaintiffs in its 2014-2016 Sustainability Reports, its 2014-2016 annual report on the Voluntary Principles and its 2016 10-K Report.

277.    In the fall of 2014, NMC acknowledged that it "began consulting with a number of international NGOs requesting guidance and support for a credible process to evaluate allegations associated with the land dispute."

278.    Since that time, NMC has dedicated a page on its website to Plaintiffs wherein Newmont posts frequent updates on its take on the situation on the ground, specifically in response to any public allegations of human rights abuses. These updates provide detailed information on the actions of Minera Yanacocha's security team, and invites readers to contact NMC with any comments or questions. From February 2015 to present, NMC has posted at least 20 documents, press releases and/or reports regarding Plaintiffs. Many of these documents are on Newmont letterhead, while some are Yanacocha press releases.

279.    NMC's commissioning of the RESOLVE mission in 2015 further confirmed NMC's control and supervision over security and land issues. It also confirmed the Newmont Enterprise's control over the Minera Yanacocha joint venture, because NMC initiated this mission without the

participation of Buenaventura. The RESOLVE mission was intended to examine "Minera Yanacocha's process of land acquisition, allegations of human rights violations perpetrated against Plaintiffs, and Minera Yanacocha's conformance to Newmont's own policies and international standards."

280.     In April 2016, Plaintiff Máxima won the Goldman Environmental Prize. In response to the award, NMC put out a statement criticizing the Goldman Foundation.

281.     NMC executives – including the NMC CEO; NMC Executive Vice President for Sustainability and External Relations; and NMC Vice President, External Relations and Social Responsibility – have also spoken publicly to their stakeholders about the allegations raised by the Plaintiffs.

282.     NMC officials have also, as noted above, been directly involved in efforts to pressure the Plaintiffs into a "dialogue" that would result in transferring Tragadero Grande to Newmont.

283.     At the same time, the highest levels of NMC have been briefed on the Chaupe matter and are overseeing NMC's response. According to a letter from the Chair of Newmont's Board of Directors' Safety and Sustainability Committee in Newmont's 2016 Sustainability Report, the Committee received updates on Plaintiffs at each meeting. In addition, the entire board and Committee were briefed by management prior to the public release of the RESOLVE report. It is within the Committee's responsibilities to advise management on how to respond to and handle matters like those raised by Plaintiffs.

284.     In addition, the SSAC that was created in 2016 discussed developments the Chaupe matter. On information and belief, the discussions by the Board and the SSAC would have been in addition to the efforts undertaken by the global security department and S&ER department.

**E. NMC has failed to end or remedy the abuses against Plaintiffs.**

285.    Since 2011, despite its ability to do so, NMC has taken no effective steps to eliminate abuses against Plaintiffs; to implement or enforce an effective code of conduct for employees and security personnel; to discipline, penalize or remove individuals who committed human rights abuses; nor to reduce or terminate its reliance on private and public security forces when these personnel engaged in foreseeable human rights violations.

286.    NMC has also failed to properly supervise its agents, officers and security personnel. NMC has created global standards and teams and groups within the Enterprise to implement its human rights, security and additional sustainability policies. NMC has control and oversight over human rights and security issues, like those that have arisen in the intimidation and harassment campaign against Plaintiffs, through their global three tiered system that governs security and S&ER, including their global security and S&ER team. NMC has the ability to stop the harassment and intimidation of Plaintiffs as described herein.

287.    Yet, despite these systems, and NMC's knowledge and involvement in handling the Chaupe matter, the abuses against Plaintiffs are ongoing.

288.    NMC has failed to follow its own security and human rights procedures, which, among other things, require NMC to investigate and terminate contracts where credible human rights violations are alleged.

289.    NMC has failed to ensure that the security personnel and Newmont employees in Conga do not harass, attack, and intimidate Plaintiffs. NMC has had the ability to control the security response at and near Tragadero Grande to ensure safe passage of Plaintiffs.

290.    By allowing the conduct to continue unabated NMC has ratified and approved the conduct of the security personnel, and other personnel involved in the response, including their

68

efforts to displace the family.

291.     Moreover, on information and belief, NMC is encouraging and participating in the decisions to continue to send employees and security personnel onto Tragadero Grande to harass and intimidate Plaintiffs, despite knowledge that sending vast numbers of armed security personnel onto the land has led to the abuses alleged herein and creates a constant threatening environment.

### F. Newmont USA controls and/or has the ability to control Minera Yanacocha's security operations.

292.     While NMC controls the overall strategy and actions of the Newmont Enterprise in relation to the Plaintiffs, Newmont USA also directly exercises supervision over Minera Yanacocha.

293.     Newmont's Security Director for the Americas is employed by Newmont USA and based in Nevada. In this role, he is responsible for security operations at NMC's South American projects and operations. He also holds the title of regional security director for Minera Yanacocha.

294.     As set out above, as regional security director responsible for Minera Yanacocha, Sloane would be involved in the on-the-ground security operations at Conga, including reviewing security plans and receiving direct reports from Minera Yanacocha's security manager. The regional security department – which he oversees – is responsible for ensuring Minera Yanacocha's security plans and operations comply with NMC security standards. This department is responsible for managing internal and private security contractors, as well as the contracts with the PNP. On information and belief, Sloane and his staff oversee Securitas and the PNP, when they were working as employees and/or agents of Minera Yanacocha.

295.     As regional security director, Sloane would also act as a liaison between the site level and corporate executives, senior officers and personnel. In this role, Sloane would be responsible for ensuring that the relevant personnel were properly informed about the Chaupe matter, and allegations of attacks, harassment and intimidation implicating Minera Yanacocha's security

personnel.

296.    Newmont USA, specifically the regional security director for the Americas and any supporting personnel, also failed to fulfill its duties to ensure that Minera Yanacocha complied with the law. Sloane and his team should have taken proper recourse to prevent the ongoing harassment and abuse committed by security personnel against Plaintiffs. Sloane and his team should have ensured that proper investigations, due diligence, social and risk assessments were carried out.

297.    On information and belief, the security director for the Americas and the regional security team would be involved in any decision to send security personnel to Tragadero Grande. Additionally, on information and belief, this team would be involved in decisions surrounding staffing security personnel at the check points near Tragadero Grande, and would have the ability to control their treatment of the family at these checkpoints.

298.    Thus Newmont USA, through Sloane, would have or should have had the ability to put an end to the intimidation and harassment campaign being waged carried out by Minera Yanacocha's security personnel.

**G. Minera Yanacocha is Defendant NMC's agent and/or alter ego.**

299.    At all relevant times, Minera Yanacocha has been and is NMC's agent.

300.    Minera Yanacocha is governed by an Executive Committee of six members appointed by Yanacocha's partners. As of 2015, the Executive Committee was made up of three members from NMC and three from Buenaventura, and with the same representation for alternate members.

301.    The President and CEO of NMC has been the Chairman of the Minera Yanacocha Executive Committee, and has the right to cast the deciding vote in the event of a deadlock among the Committee. Thus NMC directly controls Minera Yanacocha.

70

302.     Under the Yanacocha By-Laws, NMC, through its 51.3% share can unilaterally make decisions on "Major corporate events," which only require an affirmative vote of at least 51% of voting shares. "Major corporate events" is defined as the following: an increase or decrease in Yanacocha's capital; the issuance of any debentures; any sale of an asset whose book value is at least 50% of the paid-in capital relating to such asset; any amendment to the Yanacocha By-Laws to change its business form; the merger, consolidation, dissolution or liquidation of Yanacocha; or any other amendment of the Yanacocha By-Laws.

303.     NMC can also unilaterally make decisions for "significant actions," which in some instances can be decided based on the consent of at least 51% of the partners.  The following are considered "significant action": a disposal or sale of more than 20% by value of Yanacocha's fixed assets; any planned shutdown or cessation of Yanacocha's mining activities that is planned to last for more than one year; any capital expenditure by Yanacocha exceeding US$20 million; any disposal or sale by Yanacocha of the mining rights covered by certain concessions; or the approval of the construction of a project in the area owned by Yanacocha (other than the Carachugo mine and processing facilities).

304.     NMC exerts significant control over Minera Yanacocha in the areas of security, human rights and environmental and social responsibility.

305.     NMC sets Minera Yanacocha's human rights, security and environmental and social responsibility policies and standards and retains control through its global security and environmental and social responsibility committees and reporting structures.

306.     NMC, through its global security committee, also sets the security deliverables for the Conga project, and reviewed its security plans.

307.     NMC has the right to control and/or is controlling and is participating in the use of

71

security personnel, contractors and the PNP against Plaintiffs.

308.     NMC has an extraordinary amount of communication with Minera Yanacocha and on matters relating to security, human rights and environmental and social responsibility. This is done through their global reporting system; global committees; and through the regional information office and corporate communications office, offices that send updates from the coverage and news coverage to relevant NMC personnel.

309.     Members of Minera Yanacocha's management team are Newmont employees, senior officers or senior vice presidents.

310.     Minera Yanacocha's General Manager and Corporate Affairs, Javier Velarde, is also a senior officer at NMC and the Vice President, General Manager (Peru) and Corporate Affairs. He also previously served as Regional Vice President, Legal and Corporate Affairs for Yanacocha, Deputy Director of External Affairs and Communications, Yanacocha and Legal and External Affairs Director, Yanacocha. According to the NMC website, when Mr. Velarde joined Yanacocha in 2011 he was "joining Newmont."

311.     Currently, Minera Yanacocha's Senior Regional Vice President, South America Operations, is a NMC senior officer and Senior Vice President, South America.

312.     Minera Yanacocha's Business Group Executive, David Portugal, is Newmont's Regional Chief Financial Officer, South America.

313.     In addition, Minera Yanacocha's Business Group Executive, David Portugal, and Regional Legal Director, Christian Schroder, are alternate members on Minera Yanacocha's Executive Committee and are listed as NMC representatives.

314.     NMC controls hiring for Minera Yanacocha. The "work for us page" on the Minera Yanacocha website describes NMC, stating "our corporation operates in 5 continents and we have

approximately 34,000 employees." The email to contact is: reclutam@newmont.com.

315.    Minera Yanacocha employees also have @newmont.com email addresses.

316.    Buenaventura's 2016 20-F filing with the Securities Exchange Commission also shows Newmont's direct control over the Conga project, and Minera Yanacocha.  The filing states: "Newmont Mining will not proceed with the full development of the Conga project without social acceptance, solid project economics and, potentially, another partner to help defray costs and risk."

317.    The Conga project and Minera Yanacocha are highly important to NMC's overall operations, and Minera Yanacocha's operations benefit NMC, as both the majority owner and parent company of the manager, Newmont Peru S.R.L.. Newmont's inability to access Plaintiffs' land at the Tragadero Grande threatens the future of the Conga project, and NMC's profits and investments.

318.    Other aspects of control include the fact that Minera Yanacocha's credit risk "is managed on a group basis by Newmont according to its policies." Newmont provides an "umbrella/excess program" insurance coverage for Minera Yanacocha through "Newmont Mining's master worldwide insurance program and addresses claims that the Primary Program cannot, or will not, cover."

### H. Minera Yanacocha is an agent and/or alter ego of Defendant Newmont USA Ltd for the purposes of security matters.

319.    Minera Yanacocha also acts as an agent and/or alter ego of Defendant Newmont USA, especially in the realm of security.

320.    Newmont's Security Director for the Americas, Otto Sloane, who is employed by Newmont USA and based in Nevada, has significant control and the right to control Minera Yanacocha's security matters.

321.    On information and belief, Newmont USA employs additional personnel who

oversee and have the right to control aspects of Minera Yanacocha's security matters.

322.    Newmont's Security Director for the Americas receives direct reports from Minera

Yanacocha personnel working on security, including the Security Manager.

323.    On information and belief, Newmont's Security Director for the Americas was the

point of contact with the PNP, from October 2014 until the contract was terminated at the end of

2015.

324.    On information and belief, Newmont's Security Director for the Americas is

responsible for security staffing for Conga, including the control and coordination.

325.    Newmont's Security Director for the Americas also has the role of Regional Security

Director on Minera Yanacocha's management team.

## I.    Defendant Newmont Second Capital Corporation, Defendant Newmont USA Ltd., and Newmont Peru S.R.L. are NMC's agents and/or alter egos; collectively all entities are a single enterprise.

326.    At all times relevant to this action, Defendant Newmont USA Ltd., Defendant

Newmont Second Capital Corporation, Defendant Newmont Peru Ltd. and Newmont Peru S.R.L.

are agents and/or alter egos of NMC.

327.    All five entities are directly or indirectly wholly owned by NMC, and are operated for

the financial benefit of NMC.

328.    On information and belief, Newmont Second Capital Corporation is a shell company

and alter ego of NMC operated exclusively for the financial benefit of NMC.

329.    Defendant Newmont Second Capital Corporation was incorporated in 1987, and is

an indirectly held wholly owned subsidiary of NMC.

330.    On Newmont Second Capital Corporation's Annual Franchise Tax Report with the

State of Delaware for 2016, it lists NMC's address as its principal place of business. As its Officer,

74

the Report only lists Logan Hennessy, who is a senior officer at NMC with the title, Vice President, Associate General Counsel and Corporate Secretary. As its director the Report only lists Stephen Paul Gottesfeld, who is on NMC's Executive Management Team and holds the position of Executive Vice President and General Counsel. On information and belief, Newmont Second Capital Corporation does not have any employees.

331.     In addition to its interest in Minera Yanacocha, Defendant Newmont Second Capital holds Newmont Mines Limited, a Delaware corporation wholly owned by NMC.

332.     On information and belief, Defendant Newmont Peru Limited is a shell company and the alter ego of NMC operated exclusively for the financial benefit of NMC. On Newmont Peru Limited's Annual Franchise Tax Report with the State of Delaware for 2016, it lists NMC's address as its principal place of business. As its officer, the Report only lists Logan Hennessy, who is a senior officer at NMC with the title Vice President, Associate General Counsel and Corporate Secretary. As its Director, the Report only lists Stephen Paul Gottesfeld, who is on NMC's Executive Management Team and holds the position of Executive Vice President and General Counsel.

333.     Defendant Newmont Peru Limited's only assets are subsidiaries indirectly held by NMC. In addition to its 99.9997% interest in Newmont Peru S.R.L. it holds 100% of Newmont Investment Holdings LLC., which in turn holds the remaining .0003% of Newmont Peru S.R.L.

334.     NMC exerts significant control over the above-mentioned subsidiaries in the areas of security, human rights and sustainability.

335.     NMC sets the subsidiary defendants' human rights, security and sustainability (environmental and social responsibility) policies and standards and retains control through, among other ways, its global security and S&ER committees and reporting structures. Newmont staff

working for the regional entities: Newmont USA Ltd., Newmont Peru Ltd. and Newmont Peru S.R.L. in the areas of human rights, security and environmental and social responsibility are working to implement NMC's policies, standards and deliverables.

336.   NMC has the right to control and/or is controlling the conduct of its subsidiary corporate entities and their agents - including but not limited to Securitas, Minera Yanacocha personnel, contractors and the PNP - against Plaintiffs.

337.   NMC has an extraordinary amount of communication with its regional subsidiaries on matters relating to security, human rights and environmental and social responsibility.

338.   Six of seven Newmont USA officers/directors are NMC executives and/or senior officers. Stephen Gottesfeld, who is the NMC Executive Vice President and General Counsel and a Director for Newmont Second Capital Corporation and Newmont Peru Limited is also Director for Newmont USA Limited. Likewise, Logan Hennessey who is the NMC Vice President, Associate General Counsel and Corporate Secretary and an Officer for Newmont Second Capital Corporation and Newmont Peru Limited is the Secretary for Newmont USA Limited. Additional overlap with NMC includes the NMC Executive Vice President and Chief Financial Officer; Executive Vice President, Strategic Development; Executive Vice President and Chief Operating Officer; and Vice President, Finance and Treasurer.

339.   NMC's 10-K financial statements filed with the Securities and Exchange Commission include reporting for its subsidiaries.

**J.   Newmont Peru Ltd. and Newmont Peru S.R.L. are effectively one entity**

340.   Newmont Peru Ltd. is a holding company. It indirectly owns 100% of Newmont Peru S.R.L., and directly owns 99.9997%.

341.   In legal filings before a U.S. district court in 2003, Newmont's then-Vice President,

South America Operations declared that he was "the President and Managing Director of Newmont Peru Limited," and "employed by Newmont Peru through its Peruvian branch." On information and belief the Peruvian branch is Newmont Peru S.R.L. In fact, Minera Yanacocha's own bylaws refer to Newmont Peru S.R.L. as a branch of Newmont Peru, and confirm that at the time of this filing Santa Cruz was working carrying out duties for Newmont Peru S.R.L. The bylaws from 2003 state that "Newmont Peru Limited, Peru Branch, [was] … ratified as Manager of [Minera Yanacocha], and Mr. Carlos Santa Cruz … [was] ratified as Representative of the Manager."

342.     Buenaventura's 20-F filings also refer to Newmont Peru S.R.L. as a Peruvian Branch of Newmont Peru Limited: "[O]ur Yanacocha joint venture with NMC, a Delaware corporation, or 'Newmont Mining,' depends on Newmont Peru Limited, Peruvian Branch, or "Newmont Peru," to provide management and other expertise to the Yanacocha project."

343.     Newmont Peru S.R.L., and not Newmont Peru Ltd., files periodic reports with the Colorado Secretary of State as a foreign entity meaning that it considers itself "a foreign entity authorized to transact business or conduct activities in Colorado." Newmont Peru S.R.L.'s most recent filing was filed by David Portugal, who is listed on NMC materials as Regional CFO, South America, and it listed NMC's headquarters address as his address, which is also Newmont Peru S.R.L.'s principal office mailing address.

### K. Newmont Second Capital Corporation is Liable for Minera Yanacocha's actions as a partner in the Joint Venture.

344.     Minera Yanacocha has always been operated as a joint venture by its interested partners. Defendant Newmont Second Capital is the Newmont entity that holds the interest in the joint venture. As the majority partner in the venture, it is responsible for the venture's conduct.

345.     The partners of Minera Yanacocha refer to each other as "Partners," and describe it as a joint venture in public documents, and share a joint common purpose to "engage in the

77

exploration and exploitation of mining rights."

346.    Partners share in the profits and losses.

347.    Newmont Second Capital Corporation has, at least, joint control or the right of control.

### VII.    <u>PLAINTIFFS ARE UNABLE TO OBTAIN JUSTICE IN PERU.</u>

348.    Plaintiffs have unsuccessfully attempted to seek justice in Peru for the abuses they have suffered. Since 2011, Plaintiffs have filed at least eight criminal complaints against Minera Yanacocha for physical attacks against them, death threats, property destruction and breaking and entering into their house at Tragadero Grande. None of these complaints has resulted in any follow-up by the local prosecutor or any charges against Minera Yanacocha or its agents.

349.    On information and belief, Plaintiffs' appeals to Peruvian authorities to abate the abuses have failed in part because the Defendants are not subject to jurisdiction in Peru. Unless and until a judicial body such as this court orders the Defendants, which are citizens of this state, to abate the abuses against Plaintiffs, the abuses will continue. The Defendants have the power and the authority to put an end to these abuses; but they have failed to do so.

350.    Additionally, the Peruvian government's response to the Precautionary Measures granted by the Inter-American Commission on Human Rights on behalf of the Plaintiffs in 2014, demonstrates that it is not capable of protecting the Plaintiffs. In April 2016, the Peruvian government declared that law enforcement will travel to Tragadero Grande twice a month on motorcycles to verify the safety of the Plaintiffs. The visits will be unannounced. The police will also pay for the phone bills of Máxima, Daniel, and Ysidora so they can alert the police if there is an emergency. But even with these efforts, attacks against the Plaintiffs have continued as stated herein.

351.    In February 2017, the Peruvian Minister of Justice and Human Rights, Marisol Perez

Tello, visited Plaintiff Máxima at Tragadero Grande. She publicly affirmed that Plaintiffs have suffered from psychological harm. She also stated that there is no doubt that Plaintiffs are in possession of Tragadero Grande and are living there. Tello also confirmed that the government was coordinating with the police on a protection plan for the Plaintiffs. But since Tello's visit, the Peruvian government has not adopted any additional specific measures to protect Plaintiffs.

352.    Additionally, Plaintiffs are unable to seek justice in Peru because of Defendants' improper influence over the Peruvian judiciary in Cajamarca. As stated herein, Defendants induced members of the Peruvian judiciary into bringing unsubstantiated criminal charges against Plaintiffs for aggravated usurpation.

## VIII.   CAUSES OF ACTION

### COUNT I: Battery

(Plaintiffs Máxima Acuña-Atalaya, Daniel Chaupe-Acuña, Ysidora Chaupe-Acuña, Jilda Chaupe-Acuña, Carlos Chaupe-Acuña, Maribel Hil-Briones and Elias Chavez-Rodriguez against all Defendants)

353.    Plaintiffs Máxima, Daniel, Ysidora, Jilda, Carlos, Maribel and Elias incorporate by reference all of the preceding paragraphs as if set forth herein.

354.    The acts described herein constitute battery, actionable under the laws of Delaware, Nevada, Peru and any other applicable jurisdiction.

355.    Defendants' agents intentionally made contact – including beating, groping, shoving and causing falls – with the bodies of Plaintiffs Máxima, Daniel, Ysidora, Jilda, Carlos, Maribel and Elias. The contact was harmful or offensive, and Plaintiffs did not consent to the contact.

356.    As a result of these acts, Plaintiffs Máxima, Daniel, Ysidora, Jilda, Carlos,

Maribel and Elias suffered physical and psychological abuse and agony.

## COUNT II: Assault

(Plaintiffs Máxima Acuña-Atalaya, Daniel Chaupe-Acuña, Ysidora Chaupe-Acuña, Jilda Chaupe-Acuña, Carlos Chaupe-Acuña, Maribel Hil-Briones and Elias Chavez-Rodriguez against all Defendants)

357.    Plaintiffs Máxima Máxima, Daniel, Ysidora, Jilda, Carlos, Maribel and Elias rate by reference all of the preceding paragraphs as if set forth herein.

358.    The acts described herein constitute assault, actionable under the laws of Delaware, Nevada, Peru and any other applicable jurisdiction.

359.    Defendants' agents acted with the intent of causing a harmful or offensive contact – including beating, groping, shoving, causing falls and threatening to commit bodily harm – to Máxima, Daniel, Ysidora, Jilda, Carlos, Maribel and Elias, or causing imminent apprehension of such contact and putting Máxima, Daniel, Ysidora, Jilda, Carlos, Maribel and Elias in imminent apprehension of such contact.

360.    As a result, Plaintiffs were placed in great fear for their lives and suffered psychological abuse.

## COUNT III: Intentional Infliction of Emotional Distress

(All Plaintiffs against all Defendants)

361.    All Plaintiffs incorporate by reference all of the preceding paragraphs as if set forth herein.

362.    The acts described herein constitute intentional infliction of emotional distress, actionable under the laws of Delaware, Nevada, Peru and any other applicable jurisdiction.

363.    Defendants' agents intentionally or recklessly caused Plaintiffs to suffer severe or

emotional distress by extreme and outrageous conduct. These extreme and outrageous acts include, but are not limited to, deliberately destroying Plaintiffs' personal property and crops, invading Plaintiffs' home, detaining Plaintiffs at security checkpoints, inhibiting Plaintiffs' travel to and from Tragadero Grande, observing the Plaintiffs around their home, stealing, killing or harming Plaintiffs' animals, threatening to kill or cause bodily harm to Plaintiffs and physically attacking Plaintiffs.

364.     At all relevant times, these acts of aggression were committed intentionally and/or recklessly for the purpose of intimidating the Plaintiffs to forcibly evict them from Tragadero Grande.

## COUNT IV: Intrusion on Plaintiffs' Physical Solitude

(All Plaintiffs against all Defendants)

365.     Plaintiffs incorporate by reference all of the preceding paragraphs as if set forth herein.

366.     The acts described herein constitute intrusion on plaintiffs' physical solitude, actionable under the laws of Delaware, Nevada, Peru and any other applicable jurisdiction.

367.     Defendants' agents intentionally intruded, physically or otherwise, upon the solitude or seclusion of Plaintiffs' private place or Plaintiffs' private affairs or concerns. The intrusion occurred without invitation or welcome, and is highly offensive to a reasonable person. These intrusions upon Plaintiffs' private place, private affairs or concerns include, but are not limited to, directing a camera tower towards Plaintiffs' house, flying a drone over Plaintiffs' house, following and monitoring Plaintiffs and taking photos or film of Plaintiffs when they are at their house.

## COUNT V: Negligence

(All Plaintiffs against all Defendants)

368.     Plaintiffs incorporate by reference all of the preceding paragraphs as if set forth herein.

369.     The acts described herein constitute negligence, actionable under the laws of Delaware, Nevada, Peru and any other applicable jurisdiction.

370.     All the facts recited herein demonstrate that the Defendants enabled and/or encouraged their agents to commit acts of violence and intimidation alleged in this complaint against Plaintiffs. Defendants failed to take reasonable care to prevent these injuries.

371.     Defendants owed a duty to Plaintiffs to exercise due care in their ventures. Defendants breached their duty of care by engaging in business activities with security personnel, agents of Defendants, who they knew or should have known, engaged in human rights abuses. Defendants knew or should have known that Securitas and the PNP had a reputation for committing violence abuses against locals in Cajamarca. Defendants therefore knew or were substantially certain that those security personnel would continue to engage in abuses. Defendants also took responsibility at the highest levels for implementation of security policies for the entire corporate enterprise. Defendants also violated their own internal security and human rights policies and practices.

372.     Defendants knew or should have known that employees and/or contractors of Minera Yanacocha and/or Newmont Peru S.R.L. committed violent attacks against Plaintiffs. Defendants therefore knew or were substantially certain that these individuals would continue to abuse Plaintiffs. Defendants also took responsibility at the highest levels for implementation of security policies for the entire corporate enterprise.

373.     Defendants' breach of duty to Plaintiffs to exercise due care is the proximate cause of Plaintiffs' injuries to their persons, property and animals as described herein, because these injuries were the direct result of Defendants' engagement of abusive security personnel and failure to ensure that these personnel did not commit abuses against Plaintiffs.

## COUNT VI: Negligent Infliction of Emotional Distress

(Plaintiffs Máxima Acuña-Atalaya, Daniel Chaupe-Acuña, Ysidora Chaupe-Acuña, Jilda Chaupe-Acuña, Carlos Chaupe-Acuña, Maribel Hil-Briones and Elias Chavez-Rodriguez against all Defendants)

374.     Plaintiffs Máxima, Daniel, Ysidora, Jilda, Carlos, Maribel and Elias incorporate by reference all of the preceding paragraphs as if set forth herein.

375.     The acts described herein constitute negligent infliction of emotional distress, actionable under the laws of Delaware, Nevada, Peru and any other applicable jurisdiction.

376.     Defendants and their agents owed, and subsequently breached, a duty to Máxima, Daniel, Ysidora, Jilda, Carlos, Maribel and Elias. Defendants owed a duty to Máxima, Daniel, Ysidora, Jilda, Carlos, Maribel and Elias to exercise due care in their ventures. Defendants breached their duty of care by engaging in business activities with security personnel, agents of Defendants, who they knew or should have known, engaged in human rights abuses. Defendants knew or should have known that Securitas had a reputation for committing violence abuses against locals in Cajamarca. Defendants therefore knew or were substantially certain that those security personnel would continue to engage in abuses. Defendants also took responsibility at the highest levels for implementation of security policies for the entire corporate enterprise.

377.     Defendants knew or should have known that their agents committed violent attacks against Plaintiffs. Defendants therefore knew or were substantially certain that these agents would

continue to abuse Plaintiffs. Defendants also took responsibility at the highest levels for

implementation of security policies for the entire corporate enterprise. Defendants also took

responsibility at the highest levels for implementation of security policies for the entire corporate

enterprise. Defendants also violated their own internal security and human rights policies and

practices.

378.    The negligence of Defendants and/or their agents and/or their employees caused

Máxima, Daniel, Ysidora, Jilda, Carlos, Maribel and Elias fright while they were in the immediate

area of physical danger from that negligence, and they suffered physical harm – including beating,

groping, shoving and causing falls – as a result.

## COUNT VII: Negligent Hiring

(All Plaintiffs against all Defendants)

379.    Plaintiffs incorporate by reference all of the preceding paragraphs as if set forth

herein.

380.    The acts described herein constitute negligent hiring, actionable under the laws of

Delaware, Nevada, Peru and any other applicable jurisdiction.

381.    Defendants and/or their agents selected, hired, retained and/or contracted with the

private security Securitas and the Peruvian National Police to provide security for Minera

Yanacocha.

382.    Defendants had a duty to Plaintiffs to take care to employ the proper personnel for

security services. Defendants knew or should have known that Securitas and the PNP had a

reputation for committing violence abuses against locals in Cajamarca. Defendants therefore knew

or were substantially certain that those security personnel would continue to engage in abuses

against Plaintiffs. Defendants also took responsibility at the highest levels for implementation of

84

security policies for the entire corporate enterprise. Defendants also violated their own internal security and human rights policies and practices.

383.    Despite actual or constructive knowledge that Securitas and the PNP were improper options for security services, Defendants hired, retained, and/or contracted with Securitas and the PNP to provide security services.

384.    Defendants failed to exercise reasonable care in selecting, hiring, retaining and contracting Securitas and the PNP. Defendants breached their duty to Plaintiffs, who suffered harm and injury.

385.    As a direct and proximate result of Defendants' negligent hiring of Securitas and the PNP, Plaintiffs have suffered and continue to suffer injuries.

386.    The injuries caused by Securitas and the PNP include, but are not limited to, deliberately destroying Plaintiffs' personal property and crops, invading Plaintiffs' home, detaining Plaintiffs at security checkpoints, inhibiting Plaintiffs travel to and from Tragadero Grande, observing the Plaintiffs around their home, stealing, or harming Plaintiffs' animals, threatening to kill or cause bodily harm to Plaintiffs and physically attacking Plaintiffs.

## COUNT VIII: Negligent Supervision

(All Plaintiffs against all Defendants)

387.    Plaintiffs incorporate by reference all of the preceding paragraphs as if set forth herein.

388.    The acts described herein constitute negligent supervision, actionable under the laws of Delaware, Nevada, Peru and any other applicable jurisdiction.

389.    Defendants and/or their agents supervised the conduct of Securitas and the PNP.

390.    Defendants knew or should have known that Securitas and the PNP had a

85

reputation for committing violence abuses and/or improper surveillance against locals in Cajamarca. Defendants therefore knew or were substantially certain that those security personnel would continue to engage in abuses. Defendants also took responsibility at the highest levels for implementation of security policies for the entire corporate enterprise. Defendants also violated their own internal security and human rights policies and practices.

391.    Defendants were thus on notice that Securitas and the PNP had a practice of violently attacking and unlawfully monitoring people in Cajamarca including Plaintiffs. These violent qualities of Securitas and the PNP made them unfit to provide security services. Defendants had or should have known the necessity to exercise control over Securitas, the PNP, and Minera Yanacocha and/or Newmont Peru S.R.L., in order to prevent injuries of the type suffered by Plaintiffs.

392.    The injuries caused by Securitas and the PNP include, but are not limited to, deliberately destroying Plaintiffs' personal property and crops, invading Plaintiffs' home, detaining Plaintiffs at security checkpoints, inhibiting Plaintiffs travel to and from Tragadero Grande, observing the Plaintiffs around their home, stealing, or harming Plaintiffs' animals, threatening to kill or cause bodily harm to Plaintiffs and physically attacking Plaintiffs.

### COUNT IX: Malicious prosecution

(Plaintiffs Máxima Acuña-Atalaya, Elias Chavez-Rodriguez and Ysidora Chaupe-Acuña against all Defendants)

393.    Plaintiffs Máxima, Elias and Ysidora incorporate by reference all of the preceding paragraphs as if set forth herein.

394.    The acts described herein constitute malicious prosecution, actionable under the laws of Delaware, Nevada, Peru and any other applicable jurisdiction.

395.    Defendants' agents initiated, with malice and without probable cause, criminal

proceedings against Plaintiffs Máxima, Elias and Ysidora for aggravated usurpation in August 2011. This case terminated in favor of Plaintiffs in May 2017. As a result of the legal proceedings, Plaintiffs Máxima, Elias and Ysidora suffered psychological trauma, economic harm and incurred legal expenses. Defendants and their agents knew that these charges were baseless.

396.    Defendants' agents improperly influenced the lower courts in Celendin to file charges and find against Plaintiffs Máxima, Elias and Ysidora through bribery and improper influence. Defendants' agents also filed this complaint for the improper purpose of intimidating Plaintiffs and forcibly evicting them from Tragadero Grande.

397.    Defendants' agents had no probable cause for their complaint, which was unsubstantiated. Thus, the highest court in Peru found in favor of Plaintiffs Máxima, Ysidora and Elias.

398.    On information and belief, Defendant Newmont Mining Corp. took responsibility at the highest levels for assuming any legal actions for the entire corporate enterprise.

### COUNT X: Abuse of process

((Plaintiffs Máxima Acuña-Atalaya, Elias Chavez-Rodriguez, Daniel Chaupe-Acuña and Ysidora Chaupe-Acuña against all Defendants)

399.    Plaintiffs Máxima, Elias, Daniel and Ysidora incorporate by reference all of the preceding paragraphs as if set forth herein.

400.    The acts described herein constitute abuse of process, actionable under the laws of Delaware, Nevada, Peru and any other applicable jurisdiction.

401.    In filing criminal charges against the Plaintiffs, Defendants' agents had an ulterior purpose and willfully used process not proper in the regular conduct of the proceedings. The objective of the proceedings was not legitimate in the use of the process, and Defendants used

coercion to obtain collateral advantage against Plaintiffs Máxima, Elias, Daniel and Ysidora. Defendants used the pending criminal charges they filed against Plaintiffs Máxima, Elias, Daniel and Ysidora as attempted leverage to force Plaintiffs into having a dialogue with Defendants as an effort to take Tragadero Grande from Plaintiffs.

402.     On information and belief, Defendant Newmont Mining Corp. took responsibility at the highest levels for assuming any legal actions for the entire corporate enterprise.

## COUNT XI: Trespass to Chattels

### (All Plaintiffs against all Defendants)

403.     Plaintiffs incorporate by reference all of the preceding paragraphs as if set forth herein.

404.     The acts described herein constitute trespass to chattels, actionable under the laws of Delaware, Nevada, Peru and any other applicable jurisdiction.

405.     Defendants' agents intentionally dispossessed Plaintiffs of their chattels and destroyed their chattels. This includes but is not limited to Defendants' agents destroying or stealing Plaintiffs' personal property, crops, and harming, killing or stealing Plaintiffs' animals.

## COUNT XII: Conversion

### (All Plaintiffs against all Defendants)

406.     Plaintiffs incorporate by reference all of the preceding paragraphs as if set forth herein.

407.     The acts described herein constitute conversion, actionable under the laws of Delaware, Nevada, Peru and any other applicable jurisdiction.

408.     Defendants' agents intentionally exercised dominion or control over Plaintiffs' chattels which so seriously interfered with Plaintiffs' right to control those chattels that Defendant

may justly be required to pay Plaintiffs their full value.

409.     This includes but is not limited to Defendants' agents destroying or stealing

Plaintiffs' personal property, crops, and harming, killing or stealing Plaintiffs' animals.

## COUNT XIII: Injunctive Relief

(All Plaintiffs against all Defendants)

410.     Plaintiffs incorporate by reference all of the proceeding paragraphs as if set forth

herein.

411.     Defendants' intentional and deliberate acts and omissions as set forth above have

caused Plaintiffs irreparable harm and are ongoing. In the absence of equitable or injunctive relief,

Defendants' ongoing acts and omissions will further irreparably harm Plaintiffs.

412.     Plaintiffs have no adequate remedy at law for these harms.

413.     The hardships Defendants are continuing to inflict through their harassment and

intimidation of Plaintiffs are extreme; Defendants would suffer no cognizable hardship if barred

from continuing to commit, permit, abet, or authorize illegal acts of harassment and intimidation.

414.     The public interest would not be disserved by an injunction or other equitable relief.

415.     Accordingly, Plaintiffs are entitled to equitable and injunctive relief to prevent future

abuses against and harassment and intimidation of Plaintiffs.

## IX.     PRAYER FOR RELIEF

416.     WHEREFORE, Plaintiffs respectfully request the Court to:

(a)  Enter judgment in favor of each of the Plaintiffs on all counts of the complaints;

(b)  Declare that Defendants have violated the laws of the various states, including

Delaware and Nevada; and/or the laws of Peru or any other relevant

jurisdictions;

(c)   Award each of the Plaintiffs damages, including compensatory and punitive

damages, according to proof, in amount greater than $75,000;

(d)   Grant each of the Plaintiffs equitable relief, enjoining Defendants and their

employees and/or agents from further engaging in abuses against Plaintiffs, or

such other equitable relief as appropriate.

Plaintiffs demand a trial by jury on all issues so triable.

Dates: September 15, 2017                                    Respectfully submitted,


_/s/_Misty A. Seemans
Misty A. Seemans, DE Bar # 5975
O.P.D. (Pro Bono; cooperating attorney with
EarthRights International)
820 North French Street
Third Floor
Wilmington, DE 19801
Tel: (302) 577-5126
Email: misty@earthrights.org

Marco Simons, _pro hac vice pending_
marco@earthrights.org
Rick Herz, _pro hac vice pending_
rick@earthrights.org
Marissa Vahlsing, _pro hac vice pending_
marissa@earthrights.org
Maryum Jordan, _pro hac vice pending_
maryum@earthrights.org
Tamara Morgenthau, _pro hac vice pending_
tamara@earthrights.org
EARTHRIGHTS INTERNATIONAL
1612 K Street NW, Suite 401
Washington, DC, 20006
Tel: (202) 466-5188

_Counsel for the Plaintiffs_