# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

Civil Action No. 1:17-cv-01315-GAM

MÁXIMA ACUÑA-ATALAYA, et. al.
    *Plaintiffs*

            v.

NEWMONT MINING CORPORATION, et. al.
    *Defendants*

_____/

## DECLARATION OF PLAINTIFF MÁXIMA ACUÑA-ATALAYA IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

I, Máxima Acuña-Atalaya, declare as follows:

1.  I am a citizen of Peru and a resident of Tragadero Grande, Sorochuco, Cajamarca, Peru. My husband is Jaime Chaupe-Lozano, and we have two daughters, Ysidora Chaupe-Acuña and Jilda Chaupe-Acuña, and two sons, Daniel Chaupe-Acuña and Carlos Chaupe-Acuña. I have two minor grandchildren, M.S.C.C. and M.Y.C.C. My daughter Ysidora has a common law marriage to Elias Chavez-Rodriguez, my daughter Jilda has a common law marriage to Gener Heisen de la Cruz-Carlos, my son Daniel has a common law marriage to Maribel Gil-Briones and my son Carlos has a common law marriage. I am one of the plaintiffs in this matter bringing an action for equitable relief and damages on behalf of myself.

2.  Since 1994, my family and I have lived on a parcel of land known as Tragadero Grande. My husband and I purchased the right to possess the land that year. We lived there in peace as *campesinos* cultivating crops and raising livestock including sheep, guinea pigs,

chickens and cows. We would sell the products in the market and use the rest of our farming products to survive.

3. I first encountered Minera Yanacocha in Tragadero Grande around the end of the 2010 with my husband Jaime. The company destroyed our property and our crops. Since August 2011, Minera Yanacocha, the police and Securitas have repeatedly harassed, intimidated and attacked my family and myself, in order to force us to abandon Tragadero Grande. I am able to tell the difference between the individuals from Minera Yanacocha, Securitas and the police because of their uniforms. I am also able to recognize a few individuals from Securitas such as Johny Mendoza and I believe he has a leadership position in Securitas.

4. My husband and I have documentation supporting our right to possess Tragadero Grande but Minera Yanacocha and Newmont contest the ownership of the land. Even though we are still awaiting a final decision from Peru's courts determining who has the right to possess Tragadero Grande, my family and I have been attacked numerous times since August 2011 until the present. There have been many attacks, the following are some examples.

5. Since at least 2011 until the present, the Minera Yanacocha has controlled security checkpoints on the San Rafael, Agua Blanca, San Nicolas and Santa Rosa highways. It is necessary to pass one of these checkpoints to access my property and my house on Tragadero Grande. Right now the security checkpoints are monitored by Securitas. Since August 2011 until now, I have had trouble passing the security checkpoints. Almost every time I go to Tragadero Grande, I am unable to pass through the security checkpoint. I have the same problem when I try to leave Tragadero Grande. Various individuals from Securitas have prevented me from passing through the security

checkpoint without first detaining me for anytime from half an hour to many hours. The security personnel will often not let my visitors pass through the security checkpoint.

6. I often cannot use public transportation because the drivers of these public vans have received threats from Minera Yanacocha. The company told them that they cannot transport anyone from my family. As a result, over the years I have not been able to use public transportation because the drivers were too afraid to pass the security checkpoint. There have been other times when drivers try to take advantage of our situation and will charge a fee that is more expensive than the cost of public transportation. But sometimes the drivers do not take us and steal our money.

7. Not being able to use public transportation is a struggle for me because it is harder for to sell the crops we grow on Tragadero Grande. This is one of our only options for economic income and it is extremely difficult because I work as a farmer. I also sell artisanal weavings and crops that I am able to buy in other markets but we have limited funds.

8. Around August 2011, I was at our house in Tragadero Grande with my husband, children, son-in-law, and daughter-in-law. Earlier that day the police were monitoring us from the nearby road while we were in our huts we used as housing. Later that day more police arrived and around an hour later, more police arrived with Minera Yanacocha employees.  The police formed a line on the road near our huts. We went outside to see what was happening and someone from Minera Yanacocha told us that they were there to evict us and that we were on Minera Yanacocha's property. We asked for a document showing an eviction order but they did not present us an official document.

9. The police set our huts on fire and destroyed them. Then the police and Minera Yanacocha destroyed a house we were building. The police and Minera Yanacocha also

destroyed the crops we had planted and took away all of our possessions including our

clothing, furniture, lamps, farming tools and our animals. We were left with nothing.

10. The police and Minera Yanacocha were always at Tragadero Grande. The police started

hitting me with their sticks and punching me all over my arms and legs. The police hit

Daniel, my husband, Ysidora, Elias and Carlos. My daughter Jilda tried to help me, and

four police officers hit her on the head with large sticks. She lost consciousness. After

she was knocked unconscious, a Minera Yanacocha employee went to check her and said

that she was dead. I was afraid and I did not know what to think or how to react.

11.  After, Securitas, the police, Minera Yanacocha and the prosecutor arrived at Tragadero

Grande. The prosecutor would not help us and he was there to help Minera Yanacocha.

The prosecutor told us that we should just abandon our property, give it to the company

and go somewhere else.

12. I traveled with my daughter to Cajamarca, three hours away, to get medical treatment. It

was difficult for us to get there because of our injuries. We could not get any treatment

there because the doctors wanted us to file a criminal complaint in our district first and

we had to travel to Celendin province because that is where our injuries occurred. When

we were in Celendin we filed a criminal complaint against Minera Yanacocha.

13. Attached at the end of this declaration as Exhibit A is a true and correct copy of the

medical examination I received at the request of the criminal prosecutor's office of

Celendín in August 2011 after the police beat me with sticks.

14. When we filed the complaint at the prosecutor's office, a prosecutor was there with an

engineer and a lawyer from Minera Yanacocha. The prosecutor's office never moved

forward with our criminal complaint. In total, Minera Yanacocha's attempt to evict us

lasted four days.

15. After this incident, Minera Yanacocha filed a criminal complaint against my husband, my daughter Ysidora, my son-in-law Elias and me, falsely accusing us of attacking Minera Yanacocha employees and usurping the property of Minera Yanacocha. Because of this criminal complaint, my family and I have endured multiple criminal trials even though there was never any proof. For each hearing with the lower Court in Celendin, we had to borrow money to travel there from Sorochuco because we could not use public transportation because Minera Yanacocha threatened the drivers. We also had to sell animals to cover trial costs.

16. Eventually in May 2017, the Supreme Court in Lima agreed that there was no evidence that my family and I attacked the Minera Yanacocha employees. Even though this was a favorable outcome, my family has suffered much economic loss and we are in debt.

17. I have endured other forms of intimidation by Minera Yanacocha, the police and Securitas. In 2012, Securitas and the police arrived in trucks at Tragadero Grande when I was at our house with my daughter-in-law. They killed six of our sheep, which we kept on Tragadero Grande near our house. I was frustrated because I did not have a camera to take a photo of what was happening. I was also very upset because they were causing my family pain and suffering, and I felt bad for my children because this was an economic loss. I cried near the lagoons and I asked the Lord for strength.

18. Since August 2012, Minera Yanacocha employees have shined lights towards our house on Tragadero Grande. From around August 2012 until around February 2013, a bus from Minera Yanacocha shined lights at the house for 24 hours at a time, every day. Since around June 2015 until sometime in 2017, the Minera Yanacocha shined lights towards our house throughout the evening until the morning.

19. Around January 2014, I received a threatening call from an unknown person who said that I should leave Tragadero Grande or else I would die. Roughly two hours later, while my daughter and I were tending to the crops, two police entered and told me that I should not be raising crops because Tragadero Grande is not my property. Then a group of police entered our house telling my daughter and me that we had to leave immediately.

20. There have been countless times when the police entered our house in Tragadero Grande and told us that we had to leave.

21. Around May 2014, I was traveling with three visitors in a public van who wanted to see the lagoons near our house. We took transportation provided by the company Tarillo and were stopped at the Minera Yanacocha security checkpoint on the San Nicolas highway.  The police and Securitas called Minera Yanacocha and they arrived. Securitas and police tried to take me out of the van. I called my daughter and my lawyers about what had happened, and the police, Minera Yanacocha, and Securitas were listening to my conversation. They tried to pull off my clothes and they were yanking my arms. I was detained there for four hours and my visitors returned to Cajamarca. Afterwards I was able to travel to Tragadero Grande.

22. Around July 2014, I went to the lagoons near our house with a delegation from Denver, my daughter-in-law, my son-in-law and a young child. We arrived at the Minera Yanacocha security checkpoint on the Santa Rosa highway from Celendin and Securitas would not let us pass. It was difficult because the child was hungry and was cold. We got out of the car and walked around the mountain to get back on the road. Securitas then followed us in a black truck to the house and filmed the exterior of the house all day

from the road. When we left the house some hours later, we went back to the car near the security checkpoint and Securitas followed us again and continued filming.

23. Sometime in 2015, I was at our house in Tragadero Grande with my son. That morning, about five men from Securitas, two or three Minera Yanacocha employees and ten to twelve people from Chigur Mayo entered Tragadero Grande without our consent. The men were holding rocks in their hands and threatened my son and me. They told me that we were on Minera Yanacocha's property. One of the men from Securitas, Johny Mendoza, also threw a rock at me but I moved out of the way before it could hit me. I called the head of the police asking if any policemen had been sent to Tragadero Grande and I was told that the police were not supposed to enter Tragadero Grande. Afterwards, someone from Securitas told me that Johny Mendoza ordered them to enter the property.

24. Sometime in 2015, Minera Yanacocha came and entered the grounds of our house without our consent and threatened me. One man from Minera Yanacocha told me that if I stayed at the house, I was not going to live. Because of this, I feared for my life.

25. In January 2015, the police and/or Securitas broke into our house at least one time when I was there. I was afraid about what would happen to me.

26. Around February and March 2015, Minera Yanacocha entered Tragadero Grande without our consent. I was at our house. Minera Yanacocha destroyed our quinoa crops by removing them from the field about fifty meters away from our house. They left us without anything, without any food to eat.

27. Around May 2015, one of our dogs was on Tragadero Grande next to the highway by our house. Minera Yanacocha employees started throwing rocks at our dog. One of the

rocks hit the dog's eye and he lost sight in that eye. I found my dog blinded in one eye. I was sad and distressed about our dog.

28. Around June 2015, Minera Yanacocha built a corral for their alpacas. The corral is actually located on Tragadero Grande without our consent. Since the construction of the corral, Minera Yanacocha turns on lights at the corral during the night, and the lights shine at our house.

29. Around July 2015, Minera Yanacocha entered Tragadero Grande without our consent when I was there with my daughter-in-law. They destroyed our potato crops. They left us without any food and without the crops we were cultivating to sell at a market.

30. Around December 2015, Minera Yanacocha constructed a tower that has a camera at the top. Since December 2015 until the present, the camera has been pointed in the direction of my family's house in Tragadero Grande without our consent. The camera tower is roughly 100 meters from our house. I feel intimidated by the tower because the company is constantly monitoring my family and me.

31. From roughly 2011 until roughly 2017, Minera Yanacocha issued various radio programs against us that said false things. The radio program is called La Beta Habla Cajamarca and Minera Yanacocha controls it. I have listened to the program and it has said that I do not own Tragadero Grande, that I am trying to gather people to invade Minera Yanacocha, and that I own different properties in Peru. All of these accusations are false. Additionally they have insulted me in the radio program.

32. Around September 2016, I was at Tragadero Grande with my husband. Minera Yanacocha employees, Securitas and locals entered Tragadero Grande without our consent. There were roughly fifty people total. The Securitas employees were armed. My husband and I went to ask them why they were there and they divided into three groups.

One group was Securitas and they detained my husband and me. The other two groups destroyed our potato crops. Securitas then physically attacked me.  One man hit me in the right hand with the corner of a shield and I fell down. Later they seized my jacket and ripped it. They ripped my blouse and threw it and I was practically disrobed. They also hit my neck, arms, breasts and head. They left me bruised with scratches on my body. They were taking photos of me exposed when I was on the ground. I felt pain in my head and my heart, and I could not breathe. I could not move my injured hand. After they left and my husband and I were unable to get any help because we ran out of credit on our cell phones. Hours later the police arrived, and I eventually went to a medical clinic in Cajamarca. I was hospitalized there for three days.

33. From around December 2016 until the present, Minera Yanacocha and Securitas have taken photos of my family and me throughout the day, almost every day when we are at Tragadero Grande. I am concerned about my privacy and I cannot live in peace. What makes the surveillance difficult is the fact that we have no private bathroom at our house. We used to have a latrine outside, but Minera Yanacocha destroyed it a few times in 2012 and 2014.  Because of this, we are exposed outside and I cannot use the bathroom without the presence of Securitas and Minera Yanacocha.

34. Around February 2017, I was at our house in Tragadero Grande with a little girl, the sister of my daughter-in-law and a friend. Our dog started barking in the morning and I got up and I saw around three men from Minera Yanacocha at the alpaca corral watching our house. They left and later around six people returned and four of them entered Tragadero Grande without our consent. They went to the part where we planted potatoes.  They stopped when they saw me arrive and they left. One of the men from Minera Yanacocha was taking photos. After I had breakfast more men returned. I ran to

them and they left once again. While I was running, a man and a woman from Minera Yanacocha ran behind me. I believe they wanted to capture me but they gave up. I was scared that I was going to be physically attacked again like the incident in September 2016.

35. The next day, I went to Cajamarca and my daughter-in-law stayed in the house. Employees from Minera Yanacocha returned and destroyed the crops that we had planted. My daughter-in-law called me to tell me what happened. I felt very sad because they destroyed all of the food that we had and I started to cry. Around this time my son Daniel was on his way to the house and he arrived at the Minera Yanacocha checkpoint at the San Nicolas highway. Securitas removed him from his motorcycle. His knee was injured and it is still affected today. After attacking him, Securitas detained him for roughly two hours. I was sad because Securitas was physically attacking my son.

36. Since 2016 until the present, Minera Yanacocha and Newmont have been pressuring my family and me into entering a dialogue and agreeing to sign a document that would sell Tragadero Grande to them. In June and July 2016, Javier Velarde contacted my father-in-law and brother-in-law trying to pressure us into having a dialogue with Newmont and Minera Yanacocha. I know it was Javier Velarde because that is how he identified himself to my father-in-law and brother-in-law. During a few calls, Velarde told my brother-in-law that we could not keep resisting a dialogue and that if we did, Minera Yanacocha would win the criminal trial against us.

37. Minera Yanacocha has contacted my family members about a dialogue various times, and each time it has been without the presence of any of my lawyers. I have been contacted by various people from Minera Yanacocha including Marleni Ortiz, Hector Zegarra, Carlos Mercado and a woman whose first name is Anita. They have told me

that they have been sent by their bosses Raul Farfan and Javier Velarde. Around July 2017, Hector Zegara and Carlos Mercado contacted my daughter and me about a dialogue. They offered to give scholarships to my grandchildren and to suspend all criminal complaints filed by Minera Yanacocha pending against my family members in exchange for Tragadero Grande. I do not trust them because they keep requesting a dialogue without contacting our lawyers and trying to get me to sign a document even though I can't read.

38. Experiencing consistent harassment and attacks from Minera Yanacocha, the police and Securitas for over six years has left me very traumatized. I feel bad that my children and grandchildren are suffering because of the attacks against my family. Aside from the destruction of our property, we have suffered physically and psychologically. It is very traumatic for me to recall all of the attacks against me. I fear for my life and the life of my family. All I want is to live on Tragadero Grande in peace with my family.

39. My health has also suffered. I have been hospitalized a few times because of the attacks against me by the police and Securitas. I have suffered much physical pain.

40. We have tried to stop the harassment and attacks through the Peruvian legal system. My lawyer in Cajamarca has filed roughly eight criminal complaints against Minera Yanacocha but the local prosecutors have never moved forward with investigating the complaints. All of the complaints have been dismissed.

41. I am also a beneficiary of Precautionary Measures granted by the Inter-American Commission on Human Rights in 2014. Even though I have Precautionary Measures, I do not feel as if they give me protection because attacks by Minera Yanacocha, the police and Securitas have continued.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my personal knowledge, information, and belief.

Signed in Cajamarca, Peru on September $\underline{05}$, 2017.

Name: MAXIMA ACUÑA ATAIAYA

Signature: _MAA_

### TRANSLATOR'S DECLARATION

I certify that I am fluent in English and Spanish, and have accurately translated, to the best of my ability, the content of the declaration of

_Máxima Auñia Atalaya_ from English to Spanish.

I swear that the foregoing is true and correct under penalty of perjury under the laws of the United States of America.

Signed in Cajamarca, Peru on September $\underline{5}$, 2017.

By: Maryum Jordan

Signature: _Mara_

# EXHIBIT 3

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

Civil Action No. 1:17-cv-01315-GAM

MÁXIMA ACUÑA-ATALAYA, et. al.
    *Plaintiffs*

        v.

NEWMONT MINING CORPORATION, et. al.
    *Defendants*

_____/

## DECLARATION OF PLAINTIFF DANIEL CHAUPE-ACUÑA IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

I, Daniel Chaupe-Acuña, declare as follows:

1. I am a citizen of Peru and a resident of Cajamarca, Peru. I am the son of Máxima Acuña-Atalaya and Jaime Chaupe-Lozano. I have two sisters Ysidora Chaupe-Acuña and Jilda Chaupe-Acuña and one brother, Carlos Chaupe-Acuña. My common law spouse is Maribel Gil-Briones. I am one of the plaintiffs in this matter bringing an action for equitable relief and damages on behalf of myself.

2. Since 1994, my family and I have lived peacefully on a parcel of land known as Tragadero Grande. My mother and father purchased the right to possess the land.

3. Since at least August 2011, Minera Yanacocha, Securitas and the police have repeatedly harassed, intimidated and attacked my family and myself, in order to force us to abandon Tragadero Grande. I am able to distinguish who is from Minera Yanacocha, Securitas or the Peruvian National Police (PNP) because of their uniforms.

4. My mother and father have documentation supporting their right to possess Tragadero Grande but Minera Yanacocha and Newmont contest the ownership of the land. Even though we are still awaiting a final decision from Peru's courts determining who has the

right to possess Tragadero Grande, my family and I have been attacked numerous times since August 2011. There have been many attacks.  The following are some examples.

5.  Since at least 2011, the Minera Yanacocha has controlled security checkpoints on the San Rafael, Agua Blanca, San Nicolas and Santa Rosa highways. It is necessary to pass one of these checkpoints to access my family's house on Tragadero Grande. Right now the security checkpoints are monitored by Securitas. Since August 2011, I have had trouble passing the security checkpoints. Almost every time I go to Tragadero Grande, I am unable to pass through the security checkpoint. I also have the same problem when I try to leave Tragadero Grande. Securitas have prevented me from passing through the security checkpoint without first detaining me for anytime from half an hour to many hours.  Often, Securitas will often not let my visitors pass through the security checkpoint.

6.  Nor am I often able to use public transportation to get to my family's house on Tragadero Grande. Minera Yanacocha employees have threatened drivers of public transportation to not provide transportation to anyone in my family and me. One of my friends told me about these threats in 2015.  Not being able to use public transportation is a struggle for me because it is harder for my family to sell any of the crops we grow on Tragadero Grande. This is one of our only options for economic income and it is extremely difficult because I am unable to find employment. I have been unemployed since 2011.

7.  Around August 2011, I was at our house in Tragadero Grande with my mother, father, wife, my siblings, brother-in-law and two cousins. Earlier that day the police were monitoring us from the nearby road roughly fifty meters away from us. Later that day more police arrived and around an hour later, more police arrived with Minera

Yanacocha employees.  The police formed a line on the road near our house. We went outside to see what was happening and someone from Minera Yanacocha told us that they were going to evict us.

8. The police and Minera Yanacocha destroyed the crops we had planted. They also destroyed a house we were building on Tragadero Grande.

9. After destroying the crops and house, the police started hitting my mother with their sticks and punching her all over her arms and legs. My sister Jilda went to go help her and the police hit her on the head with sticks. She lost consciousness. The police also hit my shoulders and I felt pain.

10. Minera Yanacocha's attempt to evict us lasted three more days. During the attempted eviction, the police, Minera Yanacocha and Securitas destroyed our crops and destroyed huts that we were using as housing.

11. After this incident, Minera Yanacocha filed a criminal complaint against my father, mother, sister Ysidora and brother-in-law Elias falsely accusing them of attacking Minera Yanacocha employees. Because of this criminal complaint, my family and I have endured multiple criminal trials even though there was never any proof. For each hearing with the lower court in Celendin, we had to borrow money to travel there from Sorochuco because we could not use public transportation because Minera Yanacocha threatened the drivers. We also had to sell animals to cover trial costs.

12. Eventually in May 2017, the Supreme Court in Lima agreed that there was no evidence that my family attacked the Minera Yanacocha employees. Even though this was a favorable outcome, my family has suffered much economic loss and we are in debt. We were not able to work during the trials.

13. Additionally, Minera Yanacocha has filed other criminal complaints against me but I do not remember the number. One complaint accused me of committing usurpation against Minera Yanacocha and another accused me of attacking Minera Yanacocha employees. These accusations are false.

14. I have also endured other forms of intimidation perpetrated by the Minera Yanacocha, Securitas and the police. Since August 2012, Minera Yanacocha employees have shined lights towards our house on Tragadero Grande during various times. From around August 2012 until around February 2013, a Minera Yanacocha bus shined lights at the house for 24 hours at a time, every day. Since around June 2015 until sometime in 2017, the Minera Yanacocha shined lights towards our house from its alpaca corral throughout the evening until the morning.

15. Around February 2014, the police entered Tragadero Grande without our consent. They entered the area fifty meters from our house where we were cultivating potatoes. The police then destroyed the potato crops, and they then told me that they would kill me like they would kill a guinea pig. They also insulted my family and me and said that we were small compared to them. I was afraid that they were going to harm me.

16. At the end of 2014 or the beginning of 2015, someone affiliated with Minera Yanacocha entered Tragadero Grande without our consent and stole our guinea pigs and destroyed a hut next to the house. I was away from the house at the time with my mother but my wife called me when they stole the guinea pigs. We were raising the guinea pigs as a source of economic income and I was upset that someone took our animals.

17. Sometime in 2015, I was at our house in Tragadero Grande with my mother. That morning, around five men from Securitas, two or three Minera Yanacocha employees and ten to twelve people from Chigur Mayo entered Tragadero Grande without our

consent. The men were holding rocks in their hands and threatened my mother and me. They told my mother that we were on Minera Yanacocha's property. One of the men also threw a rock at my mother but she moved out of the way so it did not hit her. My mother called the head of the police asking if any policemen had been sent to Tragadero Grande and she was told that the police were not supposed to enter Tragadero Grande. Afterwards, someone from Securitas told her that Johny Mendoza ordered them to enter the property.

18.  Around March 2015, I was at the house with my wife and around 200 Minera Yanacocha employees and around 100 Securitas personnel entered Tragadero Grande without our consent. The Minera Yanacocha employees were erecting posts to create a border. Maribel and I went to them to ask them why they were constructing the posts.  Then, a man from Securitas whom I believe is Johny Rojas threw a rock at Maribel and it hit her stomach. She started crying and Johny then ordered everyone to leave. After this, she had a large bruise on her stomach and was in pain for about a week. This attack left me distressed because my wife was injured.

19.  Around May 2015, Minera Yanacocha, Securitas and the police entered Tragadero Grande without our consent. I was at the house with my wife. They took fifteen of our guinea pigs from a special enclosure we had for them next to the house.

20.  That same month, Minera Yanacocha and Securitas entered Tragadero Grande without our consent. I was at the house with my wife. They destroyed the special enclosure we built for our guinea pigs.

21.  Later that month, one of our dogs was on Tragadero Grande next to the highway by our house. I was staying at Tragadero Grande. Minera Yanacocha employees started

throwing rocks at our dog and one of the rocks hit the dog's eye and he lost sight in that eye. I was distressed because my dog was injured.

22. Around June 2015, Minera Yanacocha built a corral for their alpacas. The corral is actually located on Tragadero Grande approximately 150 meters from the house.  Since the construction of the corral, Minera Yanacocha turns on lights at the corral during the night, and the lights shine at our house.

23. Around August 2015, roughly ten Minera Yanacocha employees and roughly fifty police entered Tragadero Grande without our consent. My wife was at the house alone while I was at the market. They destroyed a structure that we built for the guinea pigs. My wife went to ask the employees why they destroyed the guinea pig structure. An employee from Minera Yanacocha then threw a rock at her and the rock hit her back. My wife was in pain for four days and had a bruise. And I was also upset about how Minera Yanacocha left us without any food and how they attacked my wife.

24. Later that month, the police and Minera Yanacocha workers entered Tragadero Grande without our consent. I was at the house with my friends. The Minera Yanacocha employees destroyed various crops including potatoes, oca and mashua. They removed the crops from the ground.  While the workers were destroying the crops, the police were armed and they surrounded us blocking our movement. They threatened to hit us if we resisted. I also received a threat from one of the Minera Yanacocha workers who said that he was going to attack me in the Santa Rosa highway. I was scared that he was going to hurt me because we are alone in Tragadero Grande.

25. Around November 2015, men who were contracted by Minera Yanacocha entered Tragadero Grande without our consent. I was at our house with my wife. The men

started constructing an iron fence behind our house. I felt enclosed by the fence because the fence blocked a path towards Sorochuco that we used to walk with the animals.

26. During the same month, someone entered our house on Tragadero Grande and disrupted a stone pile that was arranged to support a newly improved mud wall. My wife and I were away from the house at the time but we believe it was someone from Minera Yanacocha, the police or Securitas because no one else would have access to our house.

27. Throughout November, I was staying at Tragadero Grande for the month with two friends and my wife. Every day, cars from Minera Yanacocha would stop by our house a few times each day, and the men in the cars would take photos of our house. The constant surveillance made me scared.

28. Around December 2015, Minera Yanacocha constructed a tower that has a camera at the top. Since December 2015 until the present, the camera has been pointed in the direction of my family's house in Tragadero Grande without our consent.  I feel intimidated by the tower because the company is constantly monitoring my family and me. We do not have privacy.

29. Around January 2016, Minera Yanacocha flew a drone over our house at Tragadero Grande. I felt intimidated by this surveillance because Minera Yanacocha knows what we are always doing.

30. That same month, I was planting seeds alone at Tragadero Grande alone when around 100-200 police entered the property with Minera Yanacocha employees without our consent. The police formed a circle around me, and starting hitting, pushing and shoving me. They hit me in the chest and stomach three or four times with sticks. While this was happening, Minera Yanacocha destroyed some crops close to the house.

31. Around the end of January 2016, I was alone at Tragadero Grande and I left our house to see a neighbor in morning. When I returned in the afternoon, I found my dog injured 200 meters away from our house. Someone had stabbed my dog in the neck. I used the dog as security so my family would know if someone from Minera Yanacocha, the police or Securitas entered Tragadero Grande at night. Attached as Exhibit A are true copies of three photos taken of my dog shortly after he was stabbed and when he was being treated.

32. A few days later, in the morning around 100 Minera Yanacocha workers and around 200 Securitas entered Tragadero Grande without our consent. The Minera Yanacocha workers dug up the potatoes that my family and I had planted three months before and were ready to harvest. The workers told me that they had authorization to take the potatoes. I took photos and then called a friend. While the Minera Yanacocha workers were taking the potatoes, Securitas formed a circle around me. Johny Rojas from Securitas, was giving orders to everyone to take the potatoes and then ordered them to leave. Johny then threatened me saying "Yesterday they did it to your dog, today to your potatoes and tomorrow to you." Then everybody left with the potatoes and took them to the base camp on Minera Yanacocha's property which is near Tragadero Grande.

33. Around February 2016, Minera Yanacocha employees and their alpacas entered Tragadero Grande without our consent when I was there. There were roughly 100-150 workers. The alpaca ate our crops and after they were finished, everyone left.

34. That same month, Minera Yanacocha flew a drone over our house at Tragadero Grande. I felt intimidated by this surveillance because Minera Yanacocha knows what we are always doing.

35. That same month, MY workers were taking photos of me without my consent when I was on Tragadero Grande. They were on the road next to the property roughly 20 meters away from me.

36. Around March 2016, fifteen police, six or seven Securitas and twenty Minera Yanacocha employees entered Tragadero Grande without our consent. I was at our house with my wife. They planted posts to change the boundary lines of Tragadero Grande roughly thirty meters from our house. We went outside to see what was going on. When we encountered them, Johny Mendoza from Securitas threatened me. He told me that they would physically attack me at one of the security checkpoints.

37. That same month, a friend was staying with me at Tragadero Grande. When my friend went outside of the house to brush his teeth that morning, someone opened the fence built by Minera Yanacocha, and around 15-20 locals with plastic bags filled with grass and tools and around 50-60 Securitas employees armed with shields and sticks entered Tragadero Grande without our consent. At some point a few MY employees with yellow jackets entered. Then the local men started removing and destroying the crops. Securitas formed a line by the local men in front of the house. The MY employees were giving orders to the men who were digging up the land. I went up a hill behind the house. Then Securitas formed a circle around me and I put my hands up. Some engineers approached me to try to talk to me but I refused. A woman who stayed at the fence told me that she was a MY lawyer and also offered to talk to me. They were trying to tell me that Tragadero Grande was MY's land. While I was on the hill, around five men sprayed a line through Tragadero Grande dividing it in half and saying half of it was ours and the other half was Minera Yanacocha.

38. Around April 2016, MY workers entered with their alpaca onto Tragadero Grande without our consent. I was inside the house but then went outside to see what was going on because I saw the alpaca on the property. The alpaca were eating pasto, an herb that my family cultivates. When I went outside, the MY workers hid and I saw them running away. I then went to the house and there were MY workers standing next to Tragadero Grande with their cameras. Later that day, I received a call from the Comisario of Sorochuco telling me that MY filed a complaint against me falsely claiming that I attacked two MY workers.

39. Around the end of December 2016, I was on my way to Tragadero Grande on a motorcycle. A truck operated by Minera Yanacocha blocked my path and I fell on the side of the road. I was injured all over my body and had cuts on my leg. My motorcycle was also in bad shape.  The next day, Securitas entered Tragadero Grande without our consent. I was there and they destroyed our possessions and said that they wished those possessions were me. They also threatened me, and said: "We are going to find you in Santa Rosa and we are going to peel [your skin] like a guinea pig."

40. From around December 2016 until the present, Minera Yanacocha and Securitas have taken photos of my family and me throughout the day, almost every day when we are at Tragadero Grande. I am concerned about my privacy and I feel as if I lost my life.

41. Around February 2017, Minera Yancocha entered Tragadero Grande without our consent. I was at the property and the employees destroyed potato, oca, olluco and mashua crops that my family had planted three months before. The employees also destroyed a straw hut on the property. Someone from Minera Yanacocha filmed the incident. I was upset because we do not have economic resources and we depend on the crops for sustenance.

42. During the same month, I was driving on my motorcycle on the San Nicolas highway on the way to Tragadero Grande.  I reached Minera Yanacocha's security checkpoint and Securitas did not let me pass. They knocked me off my motorcycle and I fell to the ground with the motorcycle. Because of my fall, I injured by knee and my arm. I still feel pain in my knee. Securitas then detained me at the security checkpoint for roughly four hours. While they detained me, Minera Yanacocha entered Tragadero Grande without our consent and destroyed the potato crops we had planted. I believe Securitas detained me so Minera Yanacocha could destroy the crops.

43. I stayed at our house on Tragadero Grande for roughly a month with my wife in March 2017. When I was on my way to the house Securitas detained us at a security checkpoint at the San Nicolas highway for two hours and would not let us pass. When I was staying at Tragadero Grande, Securitas would drive by the house and take photos of our house all day. They were about fifty meters from our house. When I left Tragadero Grande, Securitas again detained me at a security checkpoint at Santa Rosa for about two hours.

44. Since 2016 until the present, Minera Yanacocha and Newmont have been pressuring my family and me into entering a dialogue and agreeing to sign a document that would give Tragadero Grande to them. Every time they contact my family about a dialogue it has been without the presence of any of my lawyers. Around July 2017, they contacted my mother and my sister about a dialogue and offered to give scholarships to my niece and nephew.

45. Experiencing consistent harassment and attacks from Minera Yanacocha, the police and Securitas for over six years has left me very traumatized. I always fear for my safety and the safety of my family, especially my wife who is pregnant. I am worried about becoming a father when we are suffering from these attacks and are in a serious financial

situation because Minera Yanacocha, Securitas and the police have destroyed our crops and stolen or killed our animals many times.

46. My health has also suffered. Even though I have been physically attacked by Securitas at least two times this year, I have not been able to obtain medical treatment because our house in Tragadero Grande is a seven hour walk to the closest city that would have medical treatment available. When I am injured, I am unable to walk that distance nor can I take public transportation because the drivers are too afraid to take me anywhere due to Minera Yanacocha's threatening them to not give transportation to anyone in my family and me.

47. We have tried to stop the harassment and attacks through the Peruvian legal system. My lawyer in Cajamarca has filed roughly eight criminal complaints against Minera Yanacocha but the local prosecutors have never moved forward with investigating the complaints.

48. I am also a beneficiary of Precautionary Measures granted by the Inter-American Commission on Human Rights in 2014. Even though I have Precautionary Measures, I do not feel as if they have helped because attacks by Minera Yanacocha, the police and Securitas have continued.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct to the best of my personal knowledge, information, and belief.

Signed in Cajamarca, Peru on September ⎷6⎹, 2017.

Name: *DANIEL CHAUPE ACUÑA*
Signature:

## TRANSLATOR'S DECLARATION

I certify that I am fluent in English and Spanish, and have accurately translated, to

the best of my ability, the content of the declaration of

_Daniel Chaupe Auña_ from English to Spanish.

I swear that the foregoing is true and correct under penalty of perjury under the laws of the

United States of America.

Signed in Cajamarca, Peru on September ⎷6⎹, 2017.

By: *Maryum Jordan*
Signature:

# EXHIBIT 3A







# EXHIBIT 4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

Civil Action No. 1:17-cv-01315-GAM

MÁXIMA ACUÑA-ATALAYA, et. al.
    *Plaintiffs*

                v.

NEWMONT MINING CORPORATION, et. al.
    *Defendants*

_____/

**DECLARATION OF PLAINTIFF CARLOS CHAUPE-ACUÑA IN SUPPORT**
**OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

I, Carlos Chaupe-Acuña, declare as follows:

1.  I am a citizen of Peru and a resident of Cajamarca, Peru. I am the son of Máxima Acuña-Atalaya and Jaime Chaupe-Lozano. I have two sisters Ysidora Chaupe-Acuña and Jilda Chaupe-Acuña and one brother, Daniel Chaupe-Acuña. My common law spouse is Flor Edina Vaca-Telles. I am one of the plaintiffs in this matter bringing an action for equitable relief and damages on behalf of myself.

2.  Since I was born in 1995, my family and I have lived peacefully on a parcel of land known as Tragadero Grande. My mother and father purchased the right to possess the land. My family cultivated crops and raised livestock.

3.  Since at least August 2011, Minera Yanacocha, Securitas and the Peruvian National Police (PNP) have repeatedly harassed, intimidated and attacked my family and myself, in order to force us to abandon Tragadero Grande. I am able to distinguish who is from Minera Yanacocha, Securitas or the PNP because each of these groups has distinct uniforms.

4. My mother and father have documentation supporting their right to possess Tragadero Grande but Minera Yanacocha and Newmont contest the ownership of the land. Even though we are still awaiting a final decision from Peru's courts determining who has the right to Tragadero Grande, my family and I have been attacked numerous times since August 2011. There have been many attacks, the following are some examples.

5. Since at least 2011, the Minera Yanacocha has controlled security checkpoints on the San Rafael, Agua Blanca, San Nicolas and Santa Rosa highways. It is necessary to pass one of these checkpoints to access my family's house on Tragadero Grande. Right now the security checkpoints are monitored by Securitas. Almost every time I go to Tragadero Grande, I am unable to pass through the security checkpoint. I also have the same problem when I try to leave Tragadero Grande. Various people from Securitas have prevented me from passing through the security checkpoint without first detaining me for anytime from half an hour to many hours.  Securitas will often not let my visitors pass through the security checkpoint.

6. Nor am I often able to use public transportation to get to my family's house on Tragadero Grande. There have been times when I tried to board a public van but the driver will not take me. Other times drivers have refused to take us because they have been detained at the security checkpoints by Securitas. Not being able to use public transportation is a struggle for me because it is harder for my family to sell any of the crops we grow on Tragadero Grande. This is one of our only options for economic income and it is extremely difficult because I am unable to find employment. I cannot work because I have to help my family take care of our property in Tragadero Grande.

7. Around August 2011, I was at our house in Tragadero Grande with my mother, father, my siblings, brother-in-law, sister-in-law and two cousins. Earlier that day the police

were monitoring us while we were in our huts that we used as housing. Later that day more police arrived and around an hour later, more police arrived with Minera Yanacocha employees.  The police formed a line on the road near our house. We went outside to see what was happening and someone from Minera Yanacocha told us that they wanted to evict us.

8. The police and Minera Yanacocha destroyed the crops we had planted. They also destroyed a house we were building on Tragadero Grande.

9. After destroying the crops and house, the police started hitting my mother with their sticks and punching her all over her arms and legs. My sister Jilda went to go help her and the police hit her on the head with sticks. She lost consciousness. Three police officers also hit me on the back of my neck and my arms with their sticks.

10. Minera Yanacocha's attempt to evict us lasted four days.

11. After this incident, Minera Yanacocha filed a criminal complaint against my father, mother, sister Ysidora and brother-in-law Elias falsely accusing them of attacking Minera Yanacocha employees. Because of this criminal complaint, my family and I have endured multiple criminal trials even though there was never any proof. For each hearing with the lower Court in Celendin, we had to borrow money to travel there from Sorochuco because we could not use public transportation because Minera Yanacocha threatened the drivers. We also had to sell animals to cover trial costs.

12. Eventually in May 2017, the Supreme Court in Lima agreed that there was no evidence that my family attacked the Minera Yanacocha employees. Even though this was a favorable outcome, my family has suffered much economic loss and we are in debt.

13. Additionally, Minera Yanacocha filed a complaint against me in 2011 but it was dismissed because I was a minor.

14. I have endured other forms of intimidation perpetrated by Minera Yanacocha, the police and Securitas. Since August 2012, Minera Yanacocha employees have shined lights towards our house on Tragadero Grande during various times. From around August 2012 until around February 2013, a Minera Yanacocha bus shined lights at the house for 24 hours at a time, every day. Since around June 2015 until sometime in 2017, Minera Yanacocha shined lights towards our house from its alpaca corral throughout the evening until the morning. This has caused me fear because I feel as if they are constantly monitoring us.

15. Around March 2015, I was in the Sorochuco area on my way to Tragadero Grande when I encountered Minera Yanacocha employees and the police. They threatened me saying that they would kill my family, and that we needed to disappear. I was distressed and feared for my safety.

16. Around June 2015, Minera Yanacocha built a corral for their alpacas. The corral is actually located on Tragadero Grande without our consent. Since the construction of the corral, Minera Yanacocha has turned on lights at the corral during the night, and the lights shine at our house.

17. Around November 2015, men who were contracted by Minera Yanacocha entered Tragadero Grande without our consent. The men started constructing an iron fence behind our house along the border of Tragadero Grande and Minera Yanacocha's property. I feel enclosed by the fence because it blocks most of the access to our house.

18. From around December 2016 until the present, Minera Yanacocha and Securitas have taken photos of my family and me throughout the day, almost every day when we are at Tragadero Grande. I am concerned about my privacy and I am afraid about the surveillance. A difficult aspect of the surveillance is the fact that we have no private

bathroom at our house. We used to have a latrine outside, but Minera Yanacocha destroyed it a few times in 2012 and 2014.  Because of this, I have to use the open space outside of our house as a bathroom and it is very exposed.

19. Around February 2017, I left Sorochuco for Tragadero Grande. I arrived at the Minera Yanacocha security checkpoint on the Agua Blanca highway. Securitas asked me where I was from and they detained me for around three hours.

20. Around March 2017, during the nights, the employees of Minera Yanacocha were monitoring us with their cameras and they knew when we were entering and when we were leaving Tragadero Grande.

21. Around May 2017, I was on my way to Tragadero Grande and Securitas detained me at the Agua Blanca security checkpoint. At first they did not let me pass but they eventually did when I tried to call a radio station to share what was happening. I was detained for almost two hours.

22. Since 2016 until the present, Minera Yanacocha and Newmont have been pressuring my family and me into entering a dialogue and agreeing to sign a document that would give Tragadero Grande to them. In June and July 2016, Javier Velarde called my paternal grandfather and paternal uncle trying to pressure us into having a dialogue with Newmont and Minera Yanacocha. I know it was Javier Velarde because that is how he identified himself to my grandfather and uncle. During a few calls, Velarde told my uncle that we could not keep resisting a dialogue and that if we did, Minera Yanacocha would win the criminal trial against us.

23. Minera Yanacocha has contacted my family members about a dialogue various times, and each time it has been without the presence of any of my lawyers. Around July 2017, they contacted my mother and my sister about a dialogue and offered to give

scholarships to my relatives in exchange for Tragadero Grande. They also offered to suspend all pending criminal complaints Minera Yanacocha filed against my family members in exchange for Tragadero Grande. I am afraid that Minera Yanacocha and Newmont are trying to manipulate us because they keep requesting a dialogue without contacting our lawyers and trying to get my parents to sign a document even though they are illiterate.

24. Experiencing consistent harassment and attacks from Minera Yanacocha, the police and Securitas for over six years has left me very traumatized. I am always afraid for my safety. It is difficult for me to see my family suffer.

25. My health has also suffered. I suffer from headaches and pains in my arms from when I was hit by the police in August 2011.

26. We have tried to stop the harassment and attacks through the Peruvian legal system. My lawyer in Cajamarca has filed roughly eight criminal complaints against Minera Yanacocha but the local prosecutors have never moved forward with investigating the complaints.

27. I am also a beneficiary of Precautionary Measures granted by the Inter-American Commission on Human Rights in 2014. Even though I have Precautionary Measures, I do not feel as if they have helped because attacks by Minera Yanacocha, the police and Securitas have continued.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my personal knowledge, information, and belief.

Signed in Cajamarca, Peru on September $\underline{05}$, 2017.

Name: Carlos Enrique . Chaupe Acuña
Signature:

## TRANSLATOR'S DECLARATION

I certify that I am fluent in English and Spanish, and have accurately translated, to the best of my ability, the content of the declaration of

Carlos Enrique Chaupe Acuña from English to Spanish.

I swear that the foregoing is true and correct under penalty of perjury under the laws of the United States of America.

Signed in Cajamarca, Peru on September $\underline{5}$, 2017.

By: Maryum Jordan
Signature:

# EXHIBIT 5

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

Civil Action No. 1:17-cv-01315-GAM

MÁXIMA ACUÑA-ATALAYA, et. al.
   *Plaintiffs*

            v.

NEWMONT MINING CORPORATION, et. al.
   *Defendants*

_____/

## DECLARATION OF PLAINTIFF JILDA CHAUPE-ACUÑA IN SUPPORT
## OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

I, Jilda Chaupe-Acuña, declare as follows:

1. I am a citizen of Peru and a resident of Cajamarca, Peru. I am the daughter of Máxima Acuña-Atalaya and Jaime Chaupe-Lozano. I have one sister, Ysidora Chaupe-Acuña, and two brothers, Daniel Chaupe-Acuña and Carlos Chaupe-Acuña. My common law spouse is Gener Heisen de la Cruz-Carlos, and we have one child- a minor daughter named M.Y.C.C. I am one of the plaintiffs in this matter bringing an action for equitable relief and damages on behalf of myself.

2. Since 1994, my family and I have lived peacefully on a parcel of land known as Tragadero Grande. My mother and father purchased the right to possess the land. We lived as farmers cultivating crops and sold them in markets. We also took care of livestock and would sell milk from our cows and eggs from our chickens. While my father worked at our farm, my mother would weave clothes and blankets to sell.

3. Since at least August 2011, the Minera Yanacocha, the police and Securitas have repeatedly harassed, intimidated and attacked my family and myself, in order to force us to abandon Tragadero Grande. I am able to distinguish who is from Minera Yanacocha,

Securitas or the Peruvian National Police (PNP) because of the uniforms they wear. Security personnel from Securitas wear uniforms that have the Securitas name and the PNP wear police uniforms.

4.  My mother and father have documentation supporting their right to possess Tragadero Grande but Minera Yanacocha and Newmont contest the ownership of the land. Even though we are still awaiting a final decision from Peru's courts determining who has the right to possess Tragadero Grande, my family and I have been attacked numerous times since August 2011. There have been many attacks, the following are some examples.

5.  Since at least 2011 until the present, Minera Yanacocha has controlled security checkpoints on the San Rafael, San Nicolas, Agua Blanca and Santa Rosa highways. It is necessary to pass one of these checkpoints to access my family's house on Tragadero Grande. Right now the security checkpoints are monitored by Securitas but there have been times in the past when members of the PNP or Minera Yanacocha have been there as well. Since August 2011, I have had trouble passing the security checkpoints. Almost every time I visit Tragadero Grande, I am unable to pass through the security checkpoint. Since roughly August 2011 until roughly August 2016, I visited Tragadero Grande at least two times each year. I was unable to spend more time there with my family because of my school schedule.

6.  I have the same problem when I try to leave Tragadero Grande. Various individuals from Minera Yanacocha, the PNP and Securitas have often prevented me from passing through the security checkpoint without first detaining me for anytime from half an hour to many hours. Minera Yanacocha, the police and Securitas will often not let my visitors pass through the security checkpoint. But recently, only Securitas has been operating the security checkpoints and Securitas still gives me trouble when I try to pass through.

7.  Nor am I often able to use public transportation to get to my family's house on Tragadero Grande. Minera Yanacocha employees have threatened drivers of public transportation to not provide transportation to anyone in my family and me. In 2016, one of the drivers told me that Minera Yanacocha threatened him about not providing transportation to anyone in my family, and if he did he would lose his job. Not being able to use public transportation is a struggle for me because it is harder for my family to sell any of the crops we grow. This is one of our only options for economic income and it is extremely difficult because I am unable to find employment. I have been unemployed since 2011.

8.  Around August 2011, I was at our house in Tragadero Grande with my mother, father, my siblings, brother-in-law, sister-in-law and two cousins. Earlier that day the police were monitoring us from the nearby road, roughly fifty meters away from us. Later that day more police arrived and around an hour later, more police arrived with Minera Yanacocha employees. The police formed a line on the road near our house. We went outside to see what was happening and someone from Minera Yanacocha told us that they had an eviction order against us.

9.  The police and Minera Yanacocha destroyed the crops we had planted. They also destroyed a house we were building on Tragadero Grande.

10. After destroying the crops and house, the police started hitting my mother with their sticks and punching her all over her arms and legs. I went to go help her and someone from the police hit me on the head with his stick. I lost consciousness.

11. Minera Yanacocha's attempt to evict us lasted four days. I was not there all of that time because I had to travel to Cajamarca with my mother to see a doctor. When we tried to pass a Minera Yanacocha security checkpoint in San Nicolas highway to go to

Cajamarca, we encountered Minera Yanacocha employees, Securitas and the police. We

were detained there for roughly half an hour before they let us pass.

12. After this incident, Minera Yanacocha filed a criminal complaint against my father,

mother, sister Ysidora and brother-in-law Elias falsely accusing them of attacking Minera

Yanacocha employees. Because of this criminal complaint, my family and I have endured

multiple criminal trials even though there was never any proof. For each hearing with the

lower Court in Celendin, we had to borrow money to travel there from Sorochuco

because we could not use public transportation because Minera Yanacocha threatened

the drivers. We also had to sell animals to cover trial costs.

13. Additionally, Minera Yanacocha has filed other criminal complaints against my siblings,

brother-in-law and sister-in-law.

14. I have also endured other forms of intimidation perpetrated by Minera Yanacocha,

Securitas and the police. Since around August 2012, Minera Yanacocha employees have

shined lights towards our house on Tragadero Grande various times. From around

August 2012 until around February 2013, a bus from Minera Yanacocha shined lights at

the house for 24 hours at a time, every day. I know the bus was from Minera Yanacocha

because it had the company's flag. Since around June 2015 until sometime in 2017,

Minera Yanacocha shined lights from its alpaca corral towards our house throughout the

evening until the morning. Because of this, I feel as if Minera Yanacocha is constantly

monitoring me.

15. Around December 2015, Minera Yanacocha constructed a tower that has a camera at the

top.  The tower is roughly 100-150 meters from my family's house. Since December

2015 until the present, the camera has been pointed in the direction of my family's house

without our consent. Because of the camera tower I am afraid Minera Yanacocha knows

about all of our activities and when we are going to and leaving from Tragadero Grande. I am also concerned that Minera Yanacocha always knows when we are away from Tragadero Grande, and that Minera Yanacocha employees, the police and Securitas can destroy our property when we are gone.

16. Since 2011 until the present, Minera Yanacocha, the police and Securitas have destroyed my family's crops and stole our livestock many times. These incidents have been so numerous. But every time they destroy my family's crops or steal our livestock, we suffer financially because we depend on the crops and livestock as a source of income. My infant daughter who is four months old and I depend on my family's income.

17. Since 2016 until the present, Minera Yanacocha and Newmont have been pressuring my family and me into entering a dialogue and agreeing to sign a document. In June and July 2016, Javier Velarde contacted my paternal grandfather and paternal uncle trying to pressure us into having a dialogue with Newmont and Minera Yanacocha. I know it was Javier Velarde because that is how he identified himself to my grandfather and uncle, and he told them that he works for Newmont South America. During a few calls, Velarde told my uncle that we could not keep resisting a dialogue and that if we did, Minera Yanacocha would win the criminal trial against us.

18. Minera Yanacocha contacted my family members about a dialogue various times, and each time it has been without the presence of any of my lawyers. I am afraid that Minera Yanacocha and Newmont are trying to manipulate us because they keep requesting a dialogue without contacting our lawyers and trying to get my parents to sign a document even though they are illiterate.

19. Experiencing consistent harassment and attacks from Minera Yanacocha, the police and Securitas for over six years has left me very traumatized. I always fear for my safety and

the safety of my family, especially my daughter who is four months old. I have trouble sleeping at night and have had many nightmares about the attacks I have experienced. Minera Yanacocha, the police and Securitas have showed no sign that the harassment and attacks will end anytime soon. I have not been able to visit Tragadero Grande since August 2016 because of my pregnancy and the birth of my daughter. I am too afraid to take her to Tragadero Grande when she is so young.

20. My health has also suffered. Apart from losing my consciousness during the attack in August 2011, I have suffered from headaches and other issues because of this injury.

21. We have tried to stop the harassment and attacks through the Peruvian legal system. My lawyer in Cajamarca has filed roughly eight criminal complaints against Minera Yanacocha but the local prosecutors have never moved forward with investigating the complaints.

22. I am also a beneficiary of Precautionary Measures granted by the Inter-American Commission on Human Rights in 2014. Even though I have Precautionary Measures, I do not feel as if they have helped because attacks by Minera Yanacocha, the police and Securitas have continued.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my personal knowledge, information, and belief.

Signed in Cajamarca, Peru on September 05 , 2017.

Name: Jilda   CHOupe   Acuña
Signature:

## TRANSLATOR'S DECLARATION

I certify that I am fluent in English and Spanish, and have accurately translated, to the best of my ability, the content of the declaration of

Jilda Chaupe Acuña _____ from English to Spanish.

I swear that the foregoing is true and correct under penalty of perjury under the laws of the United States of America.

Signed in Cajamarca, Peru on September 5 , 2017.

By: Maryum   Jordan
Signature:

# EXHIBIT 6

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

Civil Action No. 1:17-cv-01315-GAM

MÁXIMA ACUÑA-ATALAYA, et. al.
     *Plaintiffs*

              v.

NEWMONT MINING CORPORATION, et. al.
     *Defendants*

_____/

### DECLARATION OF PLAINTIFF YSIDORA CHAUPE-ACUÑA IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

I, Ysidora Chaupe-Acuña, declare as follows on behalf of myself and my son M.S.C.C., who is a minor:

1. I am a citizen of Peru and a resident of Cajamarca, Peru. I am the daughter of Máxima Acuña-Atalaya and Jaime Chaupe-Lozano. I have one sister, Jilda Chaupe-Acuña, and two brothers, Daniel Chaupe-Acuña and Carlos Chaupe-Acuña. My common law spouse is Elias Chavez-Rodriguez, and we have one child- a minor son named M.S.C.C. I am one of the plaintiffs in this matter bringing an action for equitable relief and damages on behalf of my son and myself.

2. Since 1994, my family and I have lived peacefully on a parcel of land known as Tragadero Grande. My mother and father purchased the right to possess the land. We live as farmers cultivating crops and selling products from our livestock and woven artisanal goods.

3. Since at least August 2011, Minera Yanacocha, Securitas and the police have repeatedly harassed, intimidated and attacked my family and myself, in order to force us to abandon

Tragadero Grande. I am able to recognize them because of their uniforms and where they work. Minera Yanacocha workers normally enter Tragadero Grande from their alpaca corral and they have distinct uniforms. Securitas operate the security checkpoints and they have uniforms that have the logo with Securitas. I also recognize the police uniforms because they have the national police label on them.

4.   My mother and father have documentation supporting their right to possess Tragadero Grande but Newmont and Minera Yanacocha contest the ownership of the land. One reason why they want to evict us from Tragadero Grande is because the land has gold. Even though we are still awaiting a decision from Peru's courts determining who has the right to possess Tragadero Grande, my family and I have been attacked numerous times since August 2011 until the present. There have been many attacks but the following are examples.

5.   Since at least 2011, the Minera Yanacocha controls security checkpoints on the San Rafael, San Nicolas, Agua Blanca and Santa Rosa highways. It is necessary to pass one of these checkpoints to access my family's house on Tragadero Grande. Almost every time I go to Tragadero Grande, my son and I are unable to pass through the security checkpoint. Securitas almost never permits us to pass through the security checkpoint without first detaining us for anytime from half an hour to many hours. Securitas also will often not let my visitors pass through the security checkpoint. Nor am I often able to use public transportation to get to my family's house on Tragadero Grande. Securitas has threatened drivers of public transportation to not provide transportation to anyone in my family and me. I have spoken to a driver, Alan Mestanza, who told me someone from Securitas told him that he could not drive anyone in my family and if he did, he would lose work and would not be able to pass the security checkpoints. Not being able

to use public transportation is a struggle for me because it is harder for my family to sell the crops we grow on Tragadero Grande. This is one of our only options for economic income and it is extremely difficult because I am not working. I have not been working since 2016.

6. From August 2011 until the present, I have endured various forms of intimidation perpetrated by Minera Yanacocha. Around August 2011, Minera Yanacocha, Securitas and the police tried to forcibly evict my family and myself. I was at Tragadero Grande with my mother, father, siblings, husband and cousins.  Minera Yanacocha, Securitas and the police destroyed our huts that we used as housing, took all of our possessions and our animals. The police attacked my mother, my sister, my cousins and me. The police hit me on the shoulders and the head with their sticks and I was in a lot of pain. After the attack, Minera Yanacocha filed a criminal complaint against my father, mother, husband and me falsely accusing us of attacking Minera Yanacocha employees. Because of this criminal complaint, my family and I have endured multiple criminal trials even though there was never any proof. For each hearing with the lower Court in Celendin, we had to borrow money to travel there from Sorochuco because we could not use public transportation because the Securitas and Minera Yanacocha threatened the drivers. We also had to sell animals to cover trial costs.

7.  During a second trial with the lower court in Celendin in 2013, the judge, Olga Vicuña, issued a sentence that ordered me to pay civil reparation to Minera Yanacocha and spend 4 years in prison. Right before she issued the sentence, the lawyer for Minera Yanacocha arrived and gave the judge a document. Afterwards, Judge Vicuña gave us the same document and it was the guilty sentence.

8. Shortly after being given the document, my mother fainted and then Judge Vicuña apologized for the outcome of the trial. She told me that the company gave an "economic benefit" to the prosecutor to bring the case against us. But she did not know the amount.  Eventually in May 2017, the Supreme Court in Lima agreed that there was no evidence that my family and I attacked the Minera Yanacocha employees. Even though this was a favorable outcome, my family has suffered much economic loss and we are in debt.

9. I have also endured other forms of intimidation. Since August 2012, Minera Yanacocha has shined lights towards our house on Tragadero Grande various times. From around August 2012 until around February 2013, a Minera Yanacocha bus shined lights at the house for 24 hours at a time, every day. Since around June 2015 until around June 2017, the Minera Yanacocha have shined reflectors from their alpaca corral towards our house throughout the evening until the morning.

10. Around April 2014, the police, Securitas and employees of Minera Yanacocha entered Tragadero Grande without our consent. I was at our house with my mother and father. The employees of Minera Yanacocha destroyed the structure of our house while the police and Securitas guarded them. They yelled at us and told that we had to leave because they were going to destroy our house. I was afraid that they were going to physically attack us.

11. Around December 2015, Minera Yanacocha constructed a tower that has a camera at the top. Since December 2015 until the present, the camera has been pointed in the direction of my family's house in Tragadero Grande without our consent.  This has affected my ability to sleep because the camera is always monitoring us. I am afraid that Minera Yanacocha can see when we are alone especially when there are only women at

the house. I am afraid that they might come and kill or rape us. I am also afraid that they

will see when I am there alone with my son who is two years old. When I have to use the

bathroom, I have to go outside and leave him in the house and I am afraid that they will

take him.

12. Around February 2017, I was in Celendin when I received a call from my brother Daniel.

He told me that Minera Yancocha was on Tragadero Grande again without our consent.

I then left Celendin for Tragadero Grande bringing food and had to pass Minera

Yanacocha's security checkpoint on the Santa Rosa highway. When I arrived at the

checkpoint, Securitas removed me from the public van by yelling and ordering us to

leave the van. When I got out of the van, they forcibly removed the food that I was

carrying on my back and they pushed me. I almost fell but I was able to grab a cement

wall to prevent the fall. The men from Securitas told me that I could not enter Tragadero

Grande. They also said that I could not pass because my parents were working as

farmers on Minera Yanacocha's property. They said that I could never return and that

there was nothing for me at Tragadero Grande. After about two hours of detention, I

was able to pass the checkpoint but I had to walk to our house and carry all of the food I

brought.

13. Around May 2017, the Supreme Court in Lima issued a resolution concluding that there

was no proof that my parents, husband and I attacked Minera Yanacocha's employees in

August 2011. Although the resolution was favorable to my family and me, Minera

Yanacocha's radio program in Sorochuco claimed that news about the favorable

outcome for my family was false, and that we are invading Minera Yancocha's land. This

public radio program has affected my family's reputation in Cajamarca.

14.  From around December 2016 until the present, Minera Yanacocha and Securitas have taken photos of my family and me throughout the day, almost every day when we are at Tragadero Grande. I am concerned about my privacy at Tragadero Grande and also when I am in Cajamarca. I feel that I am always being followed. The surveillance in Tragadero Grande is difficult because we have no private bathroom.  We used to have a latrine outside, but Minera Yanacoha destroyed it a few times in 2012 and 2014.  Because of this, I have to use the open space outside of our house as a bathroom. It is very exposed and I am afraid they are watching me.

15. Since 2016 until the present, Minera Yanacocha and Newmont have pressured my family and me into entering a dialogue and agreeing to sign a document that would give Tragadero Grande to them. In June and July 2016, Javier Velarde my paternal grandfather and paternal uncle trying to pressure us into having a dialogue with Minera Yanacocha and Newmont. During a few calls, Velarde told my uncle that we could not keep resisting a dialogue and that if we did, Minera Yanacocha would win the criminal trial against us.

16. Minera Yanacocha has called me personally three times and went to Tragadero Grande when I was there in December 2016 to pressure me about having a dialogue with the company without the presence of any of my lawyers. Someone from Securitas and Raul Farfan, Hector Zegarra, Javier Velarde, Carlos Mercado, and Ricardo Lanata from Minera Yanacocha were there. In February 2017, Raul Farfan called me when I was in Celendin and offered my son a scholarship and they offered another parcel of property in Peru in exchange for Tragadero Grande.

17. Experiencing consistent harassment and attacks from Minera Yanacocha, the police and Securitas for over six years has left me very traumatized. I fear for the safety of my son

who is young and has suffered from the surveillance and detentions at the security checkpoints.  I have trouble eating because of my fear.

18. We have tried to stop the harassment and attacks through the Peruvian legal system. My lawyer in Cajamarca has filed various criminal complaints against Minera Yanacocha but the local prosecutors have never moved forward with investigating the complaints. I remember that in 2016, Minera Yanacocha entered Tragadero Grande and destroyed our potato crops. Daniel was there, and my family called the authorities, police and prosecutor to denounce Minera Yanacocha. But after my family filed the complaint, the authorities did not do anything and claimed that nothing happened to us. Around May 2016, Minera Yanacocha workers destroyed our crops in Tragadero Grande. My family filed a complaint against Minera Yanacocha with the prosecutor but the prosecutor's office never conducted an investigation.

19. I am also a beneficiary of Precautionary Measures granted by the Inter-American Commission on Human Rights in 2014. But I do not feel as if I have received any protection and the attacks from Minera Yanacocha, the police and Securitas continue.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my personal knowledge, information, and belief.

Signed in Cajamarca, Peru on September _06_, 2017.

Name: YSIDORA CHAUPE ACUÑA
Signature:

## TRANSLATOR'S DECLARATION

I certify that I am fluent in English and Spanish, and have accurately translated, to the best of my ability, the content of the declaration of

Ysidora Chaupe Auña _____ from English to Spanish.

I swear that the foregoing is true and correct under penalty of perjury under the laws of the United States of America.

Signed in Cajamarca, Peru on September _6_, 2017.

By: Maryum Jordan
Signature:

# EXHIBIT 7

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

Civil Action No. 1:17-cv-01315-GAM

MÁXIMA ACUÑA-ATALAYA, et. al.
  *Plaintiffs*

     v.

NEWMONT MINING CORPORATION, et. al.
  *Defendants*

_____/

## DECLARATION OF PLAINTIFF ELIAS CHAVEZ-RODRIGUEZ IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

I, Elias Chavez-Rodriguez, declare as follows on behalf of myself and my minor son M.S.C.C.:

1.  I am a citizen of Peru and a resident of Cajamarca, Peru. I am the son of Jesus Chavez-Chacon and Maria Sara Rodriguez-Arce. My common law spouse is Ysidora Chaupe-Acuña, and we have one child- a minor son named M.S.C.C. I am the son-in-law of Máxima Acuña-Atalaya and Jaime Chaupe-Lozano. I am one of the plaintiffs in this matter bringing an action for equitable relief and damages on behalf of my son and myself.

2.  Since 2010, I have lived peacefully with my wife's family on a parcel of land known as Tragadero Grande. My mother-in-law and father-in-law purchased the right to possess the land. We lived as farmers cultivating crops and selling livestock.

3.  Since August 2011, Minera Yanacocha, Securitas and the police have harassed, intimidated and attacked my family and myself, in order to force us to abandon Tragadero Grande. I am able to distinguish employees from Minera Yanacocha,

Securitas and the police because of their uniforms and where they work. Securitas wear a brown uniform that has the Securitas logo, Minera Yanacocha employees wear a uniform that has the Minera Yanacocha logo and the police wear police uniforms.

4. My mother-in-law and father-in-law have documentation supporting their right to possess Tragadero Grande but Minera Yanacocha and Newmont contest the ownership of the land. Even though we are still awaiting a final decision from Peru's courts determining who has the right to possess Tragadero Grande, my family and I have been attacked numerous times since August 2011 until the present. There have been so many attacks. The following are some examples.

5. Since at least 2011 until the present, Minera Yanacocha has controlled security checkpoints on the San Rafael, San Nicolas and Agua Blanca and Santa Rosa highways. It is necessary to pass one of these checkpoints to access my family's house on Tragadero Grande. Every time I go to Tragadero Grande, my son and I are unable to pass through the security checkpoint. Securitas almost never permit us to pass through the security checkpoint without first detaining my son and me for anytime from half an hour to many hours. Almost every time I pass one of the security checkpoints, Securitas will insult me and tell me that I am a problem for Minera Yanacocha.

6. Securitas will often not let my visitors pass through the security checkpoint. My son and I often cannot use public transportation to get to my family's house on Tragadero Grande. Minera Yanacocha has threatened drivers of public transportation to not provide transportation to anyone in my family and me. Not being able to use public transportation is a struggle for me because it is harder for my family to sell any of the crops we grow on Tragadero Grande. This is one of our only options for economic income and it is extremely difficult because we have debts.

7. From August 2011 until the present, I have endured various forms of intimidation perpetrated by Minera Yanacocha. In August 2011, Minera Yanacocha, the police and Securitas tried to forcibly evict my family and myself. My mother-in-law and sister-in-law, Jilda, were beaten by the police. The police also beat my arms, legs, back, and ribs with sticks.

8. After this attempted eviction, Minera Yanacocha filed a criminal complaint against my father-in-law, mother-in-law, wife and me falsely accusing us of attacking Minera Yanacocha employees. Because of this criminal complaint, my family and I have endured multiple criminal trials even though there was never any proof. For each hearing with the lower Court in Celendin, we had to borrow money to travel there from Sorochuco because we could not use public transportation. We also had to sell animals to cover trial costs.

9. In May 2017, the Supreme Court in Lima agreed that there was no evidence that my family and I attacked the Minera Yanacocha employees. Even though this was a favorable outcome, my family has suffered much economic loss and thus we have debts.

10. Additionally, Minera Yanacocha has filed various unjustified criminal complaints against me since 2011 until 2016. I do not remember the number but the complaints have falsely accused me of usurping Minera Yanacocha's property. These complaints are still pending against me.

11. Since 2011, Minera Yanacocha has operated a television program, Turbo Max, and a radio program, Radio Beta that have said false things about me. These programs are on every day and they are full of pro-Minera Yanacocha propaganda. The programs have said that I am a bad caretaker and I cannot take care of my land. This has affected my reputation and my business. My business involves selling goods. Throughout the years

people have told me that they do not want to do any business with me because of what they have heard about me in the Minera Yanacocha programs. My business made more money before 2011 when these programs began.

12. Since August 2012, Minera Yanacocha has shined lights towards our house on Tragadero Grande various times. From August 2012 until February 2013, a Minera Yanacocha bus shined lights at the house for 24 hours at a time, every day. From June 2015 until around June 2017, Minera Yanacocha had reflectors pointed towards our house throughout the evening until the morning. I am constantly afraid that we will be attacked.

13. Around February 2014, Securitas and Minera Yanacocha entered Tragadero Grande without our consent. I arrived after they destroyed our potato crops which were fifty meters from our house. This left us without any food and I was upset.

14. Around April 2014, Minera Yanacocha entered Tragadero Grande without our consent. They entered our house and they took our food and took all of our possessions. After taking out everything, they destroyed the structure of our house by removing the wood that we had to support the house. I felt afraid.

15. Around July 2014, I was with my mother-in-law and a delegation of activists from Denver. We were traveling to Tragadero Grande on the Santa Rosa highway and we reached the checkpoint operated by Minera Yanacocha. Securitas did not let us pass. Eventually we walked to Tragadero Grande and Securitas followed us in a black truck and filmed the exterior of our house all day from the road near the house. Hours later, we left the house to go back to the security check point and Securitas followed us again with their cameras.

16. Around March 2015, Minera Yanacocha and Securitas entered Tragadero Grande without our consent.  We went outside to see what was happening. They destroyed our quinoa crops. We were left without any food or crops to sell as a source of income.

17. Around July 2015, Minera Yanacocha and Securitas entered Tragadero Grande without our consent and destroyed our potato crops located roughly fifty meters from our house. We were left without any food to sell at a market.

18. Around December 2015, Minera Yanacocha constructed a tower that has a camera at the top. Since December 2015 until the present, the camera has been pointed in the direction of my family's house in Tragadero Grande without our consent.  I feel as if I am constantly monitored.

19. Around February 2017, Minera Yanacocha and Securitas entered Tragadero Grande without our consent. I was there with my mother-in-law and my son, M.S.C.C., and my wife. They destroyed our potato crops by removing them from the ground. After they destroyed our crops they left. We were left without any crops to use as food or to sell at the market.

20. Around June 2017, Minera Yanacocha and Securitas entered Tragadero Grande without our consent. I was at our house. We were inside the house when they arrived and we went outside to see what was happening. Minera Yanacocha and Securitas destroyed our potato crops which are about fifty meters from the house. They also threatened us and told us that they were going to treat us badly like they did to the potatoes. I was afraid that I was going to be physically attacked. We took photos of what happened and we filed a complaint with the authorities in Celendin but they never took any action.

21.  From around December 2016 until the present, Minera Yanacocha and Securitas have taken photos of my family and me throughout the day, almost every day when we are at

Tragadero Grande. I am concerned about my privacy and feel as if I am constantly being monitored even though I am living peacefully on Tragadero Grande. The surveillance is hard because we have no private bathroom at our house. We used to have a latrine outside, but Minera Yanacocha destroyed it a few times in 2012 and 2014.  Because of this, I have to use the open space outside of our house as a bathroom and it is difficult because Minera Yanacocha and Securitas are always there.

22. Since around 2016 until the present, Minera Yanacocha and Newmont have pressured my family and me into entering a dialogue and agreeing to sign a document that would give Tragadero Grande to them. In June and July 2016, Javier Velarde called my wife's grandfather and uncle trying to see if they could pressure us into having a dialogue with Newmont and Minera Yanacocha. During a few calls, Velarde told my wife's uncle that we could not keep resisting a dialogue and that if we did, Minera Yanacocha would win the criminal trial against us.

23. Also, Minera Yanacocha has called my cell phone at least five times this year from June to August. Each time they have called me, someone from the company has told me that the company is seeking a dialogue and they want to discuss it with my family. They said that if I do not participate in a dialogue, I am going to lose money. I have felt threatened by these phone calls, and I changed my cell phone number so Minera Yanacocha cannot continue harassing me this way. Minera Yanacocha has also visited my family's house in the city of Cajamarca three or four times. During these visits they requested a dialogue even though my lawyers were not present. They have been coming to our family's house since June of this year.

24. Experiencing harassment from Minera Yanacocha, Securitas and the police for over six years has left me very traumatized. I always fear for my safety and the safety of my

family, especially my son who is two years old. My son M.S.C.C. has also suffered when he is at Tragadero Grande with me and has been detained and subjected to the surveillance by Minera Yanacocha and Securitas.

25. I have suffered physically from the trauma. I have trouble sleeping at night because I am worried about what will happen to my family and me.

26. We have tried to stop the harassment and attacks through the Peruvian legal system. My lawyer in Cajamarca has filed various criminal complaints against the Minera Yanacocha but the local prosecutors have never moved forward with investigating the complaints.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct to the best of my personal knowledge, information, and belief.

Signed in Cajamarca, Peru on September ___6___, 2017.

Name:  ELIAS ABRAHAM CHAVEZ RODRIGUEZ

Signature:

TRANSLATOR'S DECLARATION

I certify that I am fluent in English and Spanish, and have accurately translated, to

the best of my ability, the content of the declaration of

Elias Abraham Chavez Rodriguez from English to Spanish.

I swear that the foregoing is true and correct under penalty of perjury under the laws of the

United States of America.

Signed in Cajamarca, Peru on September ___6___, 2017.

By: Maryum Jordan

Signature:

# EXHIBIT 8

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

Civil Action No. 1:17-cv-01315-GAM

MÁXIMA ACUÑA-ATALAYA, et. al.
    *Plaintiffs*

              v.

NEWMONT MINING CORPORATION, et. al.
    *Defendants*

_____/

## DECLARATION OF PLAINTIFF MARIBEL GIL-BRIONES IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

I, Maribel Gil-Briones, declare as follows:

1.  I am a citizen of Peru and I live in Cajamarca, Peru. I am the daughter of Marseallano Gil-Pisco and Maria Briones-Zambrano.  My common law spouse is Daniel Chaupe-Acuña. I am the daughter-in-law of Máxima Acuña-Atalaya and Jaime Chaupe-Lozano. I am one of the plaintiffs in this matter bringing an action for equitable relief and damages on behalf of myself.

2.  Since 2011, I have lived peacefully with my husband's family on a parcel of land known as Tragadero Grande. My mother-in-law and father-in-law purchased the right to possess the land. We lived as farmers cultivating crops and taking care of livestock.

3.  Since August 2011, Minera Yanacocha, Securitas and the police have repeatedly harassed, intimidated and attacked my family and myself, in order to force us to abandon Tragadero Grande. I am able to distinguish between people from Minera Yanacocha, Securitas and the police by their uniforms, which have the name of the company or organization.

4. My mother-in-law and father-in-law have documentation supporting their right to possess Tragadero Grande but Minera Yanacocha and Newmont contest the ownership of the land. Even though we are still awaiting a final decision from Peru's courts determining who has the right to possess Tragadero Grande, my family and I have been attacked numerous times since August 2011. There have been many attacks. There are some incidents that are emblematic for me.

5. Since at least 2011 until the present, Minera Yanacocha has operated security checkpoints on the San Rafael, San Nicolas, Agua Blanca and Santa Rosa highways. It is necessary to pass one of these checkpoints to access my family's house on Tragadero Grande. Securitas works at the checkpoints and the police are present from time to time. Almost every time I visit Tragadero Grande, I have trouble passing through the security checkpoint. Securitas almost never permits me to pass through the security checkpoint without first detaining me for anytime from half an hour to many hours. Securitas will often not let my visitors pass through the security checkpoints. Nor am I often able to use public transportation to get to my family's house on Tragadero Grande. Minera Yanacocha has threatened drivers of public transportation to not provide transportation to anyone in my family and me. The drivers are too afraid to drive my family and me. Not being able to use public transportation is a struggle for me because it is harder for my family to sell any of the crops we grow on Tragadero Grande. This is one of our only options for economic income and it is extremely difficult because I am unable to find employment. I have never been able to find work.

6. Around August 2011, I was at our house in Tragadero Grande with my husband and his family including his parents, siblings and cousins. Earlier that day the police were monitoring us from the nearby road. Later that day more police arrived and around an

hour later, more police arrived with Minera Yanacocha employees. The police formed a line on the road near our house. We went outside to see what was happening and someone from Minera Yanacocha told us that they had an eviction order against us.

7.  The police and Minera Yanacocha destroyed the crops we had planted. They also destroyed a house we were building on Tragadero Grande.

8.  After destroying the crops and house, the police started hitting my mother-in-law with their sticks and punching her all over her arms and legs. My sister-in-law Jhilda went to go help her and someone from the police hit her on the head with his stick. She lost consciousness. The police also hit me with sticks.

9.  Minera Yanacocha's attempt to evict us lasted three more days. All told, the police, Minera Yanacocha and Securitas destroyed more of our crops and huts that we were using as housing.

10. The police tried to take our cows but they were unable to untie them from where we kept them.

11. After this incident, Minera Yanacocha filed a criminal complaint against my father-in-law, mother-in-law, my sister-in-law and her husband falsely accusing them of attacking Minera Yanacocha employees. Because of this criminal complaint, my family and I have endured multiple criminal trials even though there was never any proof. For each hearing with the lower Court in Celendin, we had to borrow money to travel there from Sorochuco because we could not use public transportation due to Minera Yanacocha threatening the drivers. We also had to sell animals to cover trial costs.

12.  Eventually, in May 2017, the Supreme Court in Lima agreed that there was no evidence that my family attacked the Minera Yanacocha employees. Even though this was a favorable outcome, my family has suffered much economic loss and we are in debt. We

were not able to work so we had to borrow money from relatives during the trials. Additionally, Minera Yanacocha has filed various criminal complaints against my family throughout the years.

13. I have endured other forms of intimidation perpetrated by Minera Yanacocha, Securitas and the police. In 2012, Securitas arrived in trucks at Tragadero Grande when I was at our house with my mother-in-law. They killed six of our sheep, which we kept on Tragadero Grande near our house. After this incident I was afraid and upset because we were raising the sheep to gain income.

14. Since August 2012, Minera Yanacocha has shined lights towards our house on Tragadero Grande at different times. From August 2012 until February 2013, a bus shined lights at the house for twenty-four hours at a time, every day. Since June 2015 until sometime in 2017, Minera Yanacocha turns on lights at their alpaca corral that shine in the direction of our house throughout the evening until the morning. Because of this, I am constantly afraid that we will be attacked and that Minera Yanacocha will enter the house.

15. At the end of 2014 or the beginning of 2015, someone affiliated with Minera Yanacocha entered Tragadero Grande without our consent and stole our guinea pigs and destroyed a hut next to the house.  We were raising the guinea pigs as a source of economic income and I was upset that someone took our animals.

16. Around March 2015, Minera Yanacocha attacked us various times. One time, Minera Yanacocha entered Tragadero Grande without our consent. I was at our house. Minera Yanacocha destroyed our quinoa crops by removing them from the field fifty meters away from our house where we were cultivating them. Minera Yanacocha's actions left us without any food or crops to sell as a source of income.

17. Another time in March 2015, I was at the house with Daniel and around 200 Minera Yanacocha employees and around 100 Securitas personnel entered Tragadero Grande without our consent. The Minera Yanacocha employees were erecting posts to create a border. Daniel and I went to them to ask them why they were constructing the posts. Then, a man from Securitas whom I believe is Johny Rojas threw a rock at me which hit my stomach. The rock was about 4 inches long. I started crying and Johny then ordered everyone to leave. After this, I had a large bruise on my stomach and I was in pain for about a week. I was very afraid and distressed after I was attacked.

18. Around April 2015, I was traveling with a group of lawyers from Grufides to Tragadero Grande. Minera Yanacocha employees detained us at the security checkpoint at Agua Blanca for the whole day. I was afraid that they would not let us pass and was upset that they caused this difficulty.

19. Around May 2015, the police arrived on a bus and entered Tragadero Grande without our consent and brought ten dogs with them. I was at the house with my mother-in-law. The dogs ate thirty rabbits that we were raising as livestock and kept in a structure specifically for them next to our house. I was upset that we lost the rabbits that we wanted to use as a source of income.

20. During the same month, Minera Yanacocha, Securitas and the police entered Tragadero Grande without our consent. I was at the house with my husband. They took fifteen of our guinea pigs from a special enclosure we had for them next to the house. We were raising the guinea pigs as a source of income.

21. Later that month, one of our dogs was on Tragadero Grande next to the highway by our house. I was staying at Tragadero Grande. Minera Yanacocha employees started throwing rocks at our dog and one of the rocks hit the dog's eye and he lost sight in that

eye. I was sad and distressed that Minera Yanacocha would attack our dog in that manner.

22. Around July 2015, Minera Yanacocha entered Tragadero Grande without our consent when I was there. They destroyed our potato crops. They left us without any food and without the crops we were cultivating to sell at a market.

23. Around August 2015, about ten Minera Yanacocha employees and fifty police entered Tragadero Grande without our consent. I was there alone while my husband was at the market. They destroyed a structure that we built for the guinea pigs. I went to see why they were on Tragadero Grande and asked why they destroyed the structure. An employee from Minera Yanacocha then threw a rock at me and it hit me in the back. I was in pain for four days and had a bruise. I was traumatized from this attack against me. I was also upset about how Minera Yanacocha left us without any food.

24. Around November 2015, men who were contracted by Minera Yanacocha entered Tragadero Grande without our consent. I was at our house with my husband. The men started constructing an iron fence behind our house. I felt enclosed by the fence because the fence blocked a path towards Sorochuco that we used to walk with the animals.

25. Around December 2015, Minera Yanacocha constructed a tower that has a camera at the top. Since December 2015 until the present, the camera has been pointed in the direction of my family's house in Tragadero Grande without our consent.  The camera tower is roughly 100 meters from our house. I feel intimidated by the tower because the company is constantly monitoring my family and me and I have no privacy.

26. Around February 2016, Minera Yanacocha and Securitas entered Tragadero Grande without our consent and destroyed our crops at least a few times when my husband was at our house. We were left without any food.

27. Around March 2016, around fifteen police, six or seven Securitas and twenty Minera Yanacocha employees entered Tragadero Grande without our consent. I was at our house with my husband. They planted posts to change the boundary lines of Tragadero Grande roughly thirty meters from our house. We went outside to see what was going on. When we encountered them, Johny Mendoza from Securitas threatened my husband. Johny told him that they would physically attack him at one of the security checkpoints and that my husband would then have to go to jail.

28. Around May 2016, I accompanied two lawyers from the organization Grufides to Tragadero Grande. Securitas detained us for roughly an hour at the San Nicolas highway security checkpoint. Even though I told a man from Securitas that I lived at Tragadero Grande, he would not let us pass. We then tried entering Tragadero Grande at another security checkpoint at Agua Blanca. Another man from Securitas detained us for roughly two hours and would not let us pass with the car we were using. We then had to walk an hour and a half to my family's house. I felt distressed because we were trying to bring food to the house and we were unable to take all of the food when we walked there. After walking to the house with most of the food we had to return to the car and walk another hour and a half to bring the rest of the food to the house.

29. From around December 2016 until the present, Minera Yanacocha and Securitas have taken photos of my family and me throughout the day, almost every day when we are at Tragadero Grande. I am concerned about my privacy and feel as if I am constantly being monitored even though I am living peacefully on Tragadero Grande. I am unable to enjoy the privacy of my family life. What makes the surveillance worse is the fact that we have no private bathroom at our house. We used to have a latrine outside, but Minera Yanacocha destroyed it a few times in 2012 and 2014.  Because of this, I have to use the

open space outside of our house as a bathroom. It is very exposed and I feel humiliated because I feel constantly watched by Minera Yanacocha and their security personnel.

30. Around February 2017, Minera Yanacocha entered Tragadero Grande without our consent. I was at the house with my sister who is twelve years old. Minera Yanacocha arrived in the night while we were resting and our dogs started barking. We were afraid to go outside and see what was happening. The next morning we saw that our potato crops were destroyed and Minera Yanacocha left us without any food.

31. I stayed at our house on Tragadero Grande for roughly a month with my husband in March 2017. When I was on my way to the house Securitas detained us at a security checkpoint at the San Nicolas highway for two hours and would not let us pass. When I was staying at Tragadero Grande, Securitas would drive by the house and take photos of our house all day. They were about fifty meters from our house. When I left Tragadero Grande, Securitas again detained me at a security checkpoint at Santa Rosa for two hours.

32. I last visited Tragadero Grande a few months ago for one day. While I was there Securitas monitored me and took photos and asked for my identification. I have not been to Tragadero Grande since then because I am pregnant and concerned about the safety of the baby.

33. Since 2016 until the present, Minera Yanacocha and Newmont have pressured my family and me into entering a dialogue and agreeing to sign a document that would sell Tragadero Grande to them. In June and July 2016, Javier Velarde who identified himself as an employee of Newmont South America contacted my husband's grandfather and uncle trying to pressure us into having a dialogue with Minera Yanacocha and Newmont. During a few calls, Velarde told my husband's uncle that we could not keep resisting a

dialogue and that if we did, Minera Yanacocha would win the criminal trial against my family.

34. Minera Yanacocha contacted my family various times, and each time it has been without the presence of any of my lawyers. In July 2017, they offered to give scholarships to a few of my relatives and to suspend all criminal complaints pending against my family in exchange for Tragadero Grande. I am afraid that Minera Yanacocha and Newmont are trying to manipulate us because they keep requesting a dialogue without contacting us through our lawyers and trying to get my mother-in-law and father-in-law to sign a document even though they are illiterate.

35. Experiencing consistent harassment and attacks from Minera Yanacocha, the police and Securitas for over six years has left me very traumatized. I am scared of being constantly monitored by Minera Yanacocha, Securitas and the police. When I am at Tragadero Grande I cannot sleep because I am afraid we will be attacked during the night. It is difficult for us to eat any meals when we are at Tragadero Grande because we are constantly worrying about an attack.

36. We have tried to stop the harassment and attacks through the Peruvian legal system. My lawyer in Cajamarca has filed criminal complaints against Minera Yanacocha but the local prosecutors have never moved forward with investigating the complaints.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my personal knowledge, information, and belief.

Signed in Cajamarca, Peru on September ⊥, 2017.

Name: *MARIBEL GIL Briones*
Signature: _____

## TRANSLATOR'S DECLARATION

I certify that I am fluent in English and Spanish, and have accuratelytranslated, to the best of my ability, the content of thedeclaration of

*Maribel Gil Briones* _____ from English to Spanish.

I swear that the foregoing is true and correct under penalty of perjury under the laws of the United States of America.

Signed in Cajamarca, Peru on September 4, 2017.

By: *Maryum Jordan*
Signature: _____

# EXHIBIT 9

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D. C. 20549

## Form 10-K

(Mark One)

☒     ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the Fiscal Year Ended December 31, 2016

or

☐     TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____

Commission File Number: 001-31240

# NEWMONT.

**NEWMONT MINING CORPORATION**
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| Delaware | 84-1611629 |
| (State or Other Jurisdiction of | (I.R.S. Employer |
| Incorporation or Organization) | Identification No.) |
| | 80111 |
| 6363 South Fiddler's Green Circle | (Zip Code) |
| Greenwood Village, Colorado | |
| (Address of Principal Executive Offices) | |

Registrant's telephone number, including area code (303) 863-7414

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Common Stock, $1.60 par value | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☒   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Exchange Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| | | | | |
|---|---|---|---|---|
| Large accelerated filer | ☒ | | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | (Do not check if a smaller reporting company.) | Smaller reporting company | ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☒

At June 30, 2016, the aggregate market value of the registrant's voting and non-voting common equity held by non-affiliates of the registrant was $20,723,861,389 based on the closing sale price as reported on the New York Stock Exchange. There were 531,149,818 shares of common stock outstanding on February 14, 2017.

DOCUMENTS INCORPORATED BY REFERENCE

Portions of Registrant's definitive Proxy Statement submitted to the Registrant's stockholders in connection with our 2017 Annual Stockholders Meeting to be held on April 20, 2017, are incorporated by reference into Part III of this report.

## PART I

**ITEM 1.    BUSINESS (dollars in millions, except per share, per ounce and per pound amounts)**

**Introduction**

Newmont Mining Corporation is primarily a gold producer with significant operations and/or assets in the United States, Australia, Peru, Ghana and Suriname. At December 31, 2016, Newmont had attributable proven and probable gold reserves of 68.5 million ounces and an aggregate land position of approximately 23,000 square miles (59,000 square kilometers). Newmont is also engaged in the production of copper, principally through Boddington in Australia and Phoenix in the United States. Newmont Mining Corporation's original predecessor corporation was incorporated in 1921 under the laws of Delaware.

On November 2, 2016, Newmont completed the sale of its 48.5% economic interest in PT Newmont Nusa Tenggara ("PTNNT"), which operated the Batu Hijau copper and gold mine ("Batu Hijau") in Indonesia (the "Batu Hijau Transaction"). As a result, Newmont presents Batu Hijau as a discontinued operation for all periods presented. In the following discussion, we present and discuss our continuing operations unless otherwise indicated. For additional information regarding our discontinued operations, see Note 3 to the Consolidated Financial Statements and the discussion in our Results of Consolidated Operations in Item 7.

Newmont's corporate headquarters are in Greenwood Village, Colorado, USA. In this report, "Newmont," the "Company," "our" and "we" refer to Newmont Mining Corporation together with our affiliates and subsidiaries, unless the context otherwise requires. References to "A$" refer to Australian currency.

Newmont's *Sales* and long-lived assets for continuing operations are geographically distributed as follows:

|  | Sales | | | Long-Lived Assets | | |
|---|---|---|---|---|---|---|
|  | 2016 | 2015 | 2014 | 2016 | 2015 | 2014 |
| United States | 39 % | 33 % | 30 % | 45 % | 43 % | 38 % |
| Australia | 32 % | 32 % | 30 % | 19 % | 18 % | 19 % |
| Ghana | 15 % | 15 % | 17 % | 16 % | 16 % | 17 % |
| Peru | 12 % | 18 % | 18 % | 14 % | 19 % | 23 % |
| Suriname | 2 % | — % | — % | 6 % | 4 % | 2 % |
| Other | — % | 2 % | 5 % | — % | — % | 1 % |

**Segment Information**

Our regions include North America, South America, Asia Pacific, and Africa. Our North America segment consists primarily of Carlin, Phoenix, Twin Creeks and Long Canyon in the state of Nevada and Cripple Creek &Victor ("CC&V") in the state of Colorado, in the United States. Our South America segment consists primarily of Yanacocha in Peru and Merian in Suriname. Our Asia Pacific segment consists primarily of Boddington, Tanami and Kalgoorlie in Australia. Our Africa segment consists primarily of Ahafo and Akyem in Ghana. See Item 1A, Risk Factors, below, and Note 5 to the Consolidated Financial Statements for information relating to our operating segments, domestic and export sales and lack of dependence on a limited number of customers.

**Products**

References in this report to "attributable gold ounces" or "attributable copper pounds" mean that portion of gold or copper produced, sold or included in proven and probable reserves based on our proportionate ownership, unless otherwise noted.

*Gold*

*General.* We had consolidated gold production from continuing operations of 5.2 million ounces (4.9 million attributable ounces) in 2016, 5.0 million ounces (4.6 million attributable ounces) in 2015 and 5.2 million ounces (4.7 million attributable ounces) in 2014. Of our 2016 consolidated gold production, approximately 39% came from North America, 14% from South America, 31% from Asia Pacific and 16% from Africa.

For 2016, 2015 and 2014, 96%, 95% and 95%, respectively, of our *Sales* were attributable to gold. Most of our *Sales* come from the sale of refined gold. The end product at our gold operations, however, is generally doré bars. Doré is an alloy consisting primarily of gold but also containing silver and other metals. Doré is sent to refiners to produce bullion that meets the required market standard

3

- Risk of loss due to inability to access our properties or operations;

- Disadvantages relating to submission to the jurisdiction of foreign courts or arbitration panels or enforcement or appeals of judgments at foreign courts or arbitration panels against a sovereign nation within its own territory; and

- Other risks arising out of foreign sovereignty over the areas in which our operations are conducted, including risks inherent in contracts with government owned entities such as unilateral cancellation or renegotiation of contracts, licenses or other mining rights.

Consequently, our exploration, development and production activities may be affected by these and other factors, many of which are beyond our control, some of which could materially adversely affect our financial position or results of operations.

***Our operations at Yanacocha and the development of our Conga Project in Peru are subject to political and social unrest risks.***

During the last several years, Minera Yanacocha S.R.L. ("Yanacocha"), in which we own a 51.35% interest, and whose properties include the mining operations at Yanacocha and the Conga Project in Peru, has been the target of local political and community protests, some of which blocked the road between the Yanacocha mine and Conga project complexes and the City of Cajamarca in Peru and resulted in vandalism and equipment damage. We cannot predict whether similar or more significant incidents will occur in the future. The recurrence of significant political or community opposition or protests could continue to adversely affect the Conga Project's development and the continued operation of Yanacocha.

Construction activities on our Conga Project were suspended on November 30, 2011, at the request of Peru's central government following increasing protests in Cajamarca by anti-mining activists led by the regional president. At the request of the Peruvian central government, the environmental impact assessment prepared in connection with the project, which was previously approved by the central government in October 2010, was reviewed by independent experts in an effort to resolve allegations around the environmental viability of Conga. This review concluded that the environmental impact assessment complied with international standards and provided some recommendations to improve water management. Yanacocha has focused on the construction of water reservoirs prior to the development of other project facilities. However, development of Conga is contingent upon generating acceptable project returns and getting local community and government support. Under the current social and political environment, the Company does not anticipate being able to develop Conga for at least the next five years. As a result of the uncertainty surrounding Conga, the Company has allocated its development capital to other projects in recent years. Should the Company be unable to develop the Conga Project, the Company may have to consider other alternatives for the project which may result in an impairment.

The Central Government of Peru continued to support responsible mining as a vehicle for the growth and future development of Peru in 2016. However, we are unable to predict whether the Central government will continue to take similar positions in the future. The regional government of Cajamarca and other political parties actively opposed the Conga Project in the past. We are unable to predict the positions that will be taken in the future and whether such positions or changes in law will affect Yanacocha or Conga. Such changes may include increased labor regulations, environmental and other regulatory requirements, and additional taxes and royalties, as well as future protests, community demands and road blockages. We cannot predict future positions of either the Central or regional government on foreign investment, mining concessions, land tenure or other regulation. Any change in government positions or laws on these issues could adversely affect the assets and operations of Yanacocha or Conga, which could have a material adverse effect on our results of operations and financial position. Additionally, the inability to develop Conga or operate at Yanacocha could have an adverse impact on our growth and production in the region.

In addition, in early 2015, the Peruvian government agency responsible for certain environmental regulations, the Ministry of the Environment ("MINAM"), issued proposed water quality criteria for designated beneficial uses which apply to mining companies, including Yanacocha. These criteria would modify the in-stream water quality criteria pursuant to which Yanacocha has been designing water treatment processes and infrastructure. In 2015, MINAM issued the final regulation that modified the water quality standards and extended the compliance deadline. This law provides 60 days to notify whether the Company is able to comply with the new standards and one year to submit a modification to the previously approved Environmental Impact Assessment. The submittal will be presented in February 2017. A total of up to four years are allowed for permitting, detailed engineering, and construction of water treatment facilities required for compliance with the new water quality standards. Yanacocha is currently assessing treatment options in connection with the new water quality standards. Those treatment options may result in increased costs. If Yanacocha is unsuccessful in designing, constructing and implementing effective treatment options in the next four years, it could result in potential

fines and penalties relating to potential intermittent non-compliant exceedances. These impacts may adversely impact the future cost, production and financial performance of our operations in Peru.

### *Our Merian operation in Suriname is subject to political and economic risks.*

We have an investment in Suriname. The current president and others, including a number of members of the current administration, have been named defendants in a trial in connection with the deaths of certain political conspirators in a 1982 coup. Those proceedings were previously halted based upon an executive order. However, in January 2017, a court in Suriname directed that the trial be recommenced. That ruling is currently subject to appeal.  We cannot predict the outcome of the pending appeal or the trial. However, these proceedings could result in civil and political instability, and heighten the risk of abrupt changes in the government and national policy impacting foreign investment and operators.

Operations in Suriname are governed by a mineral agreement with the government that establishes the terms and conditions under which Merian operations and development are conducted. No assurances can be made that the government will not request changes to the agreement in the future. While the government is generally considered by the Company to be mining friendly, it is possible that the current or future government may adopt substantially different policies, make changes in taxation treatment or regulations, take arbitrary action which might halt operations, increase costs, or otherwise impact mining and exploration rights and/or permits, any of which could have a material and adverse effect on the Company's future cash flows, earnings, results of operations and/or financial condition.

The government of Suriname exercised its option to participate in a fully-funded 25 percent equity ownership stake in Merian in November 2013. Suriname manages its participation through Staatsolie Maatschappij Suriname N.V. ("Staatsolie"), a Surinamese corporation that is wholly owned by the government. The Company can make no assurances that Staatsolie will have sufficient funds or borrowing ability in order to make their capital commitments in accordance with the terms of the partnership agreement. See the risk factor under the heading "*Future funding requirements may affect our business*" later in this section.

Artisanal and illegal miners have been active on, or adjacent to, the Merian mine in recent years. Illegal mining, which involves trespass into the development or operating area of the mine, is both a security and safety issue, which may present a security threat to property and human life. See the risk factor under the heading "*Civil disturbances, criminal activities, including illegal mining, and artisanal mining, occurs on or adjacent to certain of our properties, which can disrupt business and expose the Company to liability*" later in this section for addition information.

### *Our business depends on good relations with our employees.*

Production at our mines is dependent upon the efforts of our employees and, consequently, our maintenance of good relationships with our employees. Due to union activities or other employee actions, we could experience labor disputes, work stoppages or other disruptions in production that could adversely affect us. At December 31, 2016, various unions represented approximately 27% of our employee work force worldwide. Following the expiration of the collective bargaining agreements with the workforce in Ghana in 2014, the 2014 wage negotiations with the union in connection with the collective bargaining process concluded in late 2015 through arbitration after a prolonged negotiation, and 2015 wage negotiations concluded in March 2016 after a prolonged negotiation. Negotiations relating to 2016 wages remain ongoing. The labor agreement in Peru will expire in February 2019, and the collective labor agreement in Nevada will expire in January 2019. A failure to successfully enter into new contracts could result in future labor disputes, work stoppages or other disruptions in production that could adversely affect our operations and financial performance. Suriname has a history of collective labor activity. While employees at the Merian mine are not currently unionized, we can provide no assurance that collective bargaining activity will not occur in the future. Any such unionization could result in similar risks as described above. There can be no assurance that any future disputes at the Company's operations or projects will be resolved without disruptions.

### *Our Company and the mining industry are facing continued geotechnical challenges, which could adversely impact our production and profitability.*

Newmont and the mining industry are facing continued geotechnical challenges due to the older age of certain of our mines and a trend toward mining deeper pits and more complex deposits. This leads to higher pit walls, more complex underground environments and increased exposure to geotechnical instability and hydrological impacts. As our operations are maturing, the open pits at many of our sites are getting deeper and we have experienced certain geotechnical failures at some of our mines, including, without limitation, at our operations in Australia, Nevada, Ghana, Peru and Colorado. For example in 2016, pit failures at the Silverstar pit of the Carlin operation resulted in temporary shutdowns and have impacted expected production. See also the risk factor

given the unpredictability of the timing, nature and scope of information technology disruptions, we could potentially be subject to production downtimes, operational delays, the compromising of confidential or otherwise protected information, destruction or corruption of data, security breaches, other manipulation or improper use of our systems and networks or financial losses from remedial actions, any of which could have a material adverse effect on our cash flows, competitive position, financial condition or results of operations.

We could also be adversely affected by system or network disruptions if new or upgraded information technology systems are defective, not installed properly or not properly integrated into our operations. Various measures have been implemented to manage our risks related to the system implementation and modification, but system modification failures could have a material adverse effect on our business, financial position and results of operations and could, if not successfully implemented, adversely impact the effectiveness of our internal controls over financial reporting.

### *The occurrence of events for which we are not insured may affect our cash flow and overall profitability.*

We maintain insurance policies that mitigate against certain risks related to our operations. This insurance is maintained in amounts that we believe are reasonable depending upon the circumstances surrounding each identified risk. However, we may elect not to have insurance for certain risks because of the high premiums associated with insuring those risks or for various other reasons; in other cases, insurance may not be available for certain risks. Some concern always exists with respect to investments in parts of the world where civil unrest, war, nationalist movements, political violence or economic crises are possible. These countries may also pose heightened risks of expropriation of assets, business interruption, increased taxation or unilateral modification of concessions and contracts. We do not maintain insurance policies against political risk. Occurrence of events for which we are not insured may affect our results of operations and financial position.

### *We rely on contractors to conduct a significant portion of our operations and construction projects.*

A significant portion of our operations and construction projects are currently conducted in whole or in part by contractors. As a result, our operations are subject to a number of risks, some of which are outside our control, including:

- Negotiating agreements with contractors on acceptable terms;

- The inability to replace a contractor and its operating equipment in the event that either party terminates the agreement;

- Reduced control over those aspects of operations which are the responsibility of the contractor;

- Failure of a contractor to perform under its agreement;

- Interruption of operations or increased costs in the event that a contractor ceases its business due to insolvency or other unforeseen events;

- Failure of a contractor to comply with applicable legal and regulatory requirements, to the extent it is responsible for such compliance; and

- Problems of a contractor with managing its workforce, labor unrest or other employment issues.

In addition, we may incur liability to third parties as a result of the actions of our contractors. The occurrence of one or more of these risks could adversely affect our results of operations and financial position.

### *We are subject to litigation and may be subject to additional litigation in the future.*

We are currently, and may in the future become, subject to litigation, arbitration or other legal proceedings with other parties. If decided adversely to Newmont, these legal proceedings, or others that could be brought against us in the future, could have a material adverse effect on our financial position or prospects. For a more detailed discussion of pending litigation, see Note 29 to our Consolidated Financial Statements.

In the event of a dispute arising at our foreign operations, we may be subject to the exclusive jurisdiction of foreign courts or arbitral panels, or may not be successful in subjecting foreign persons to the jurisdiction of courts or arbitral panels in the United

States. Our inability to enforce our rights and the enforcement of rights on a prejudicial basis by foreign courts or arbitral panels could have an adverse effect on our results of operations and financial position.

*Title to some of our properties may be defective or challenged.*

Although we have conducted title reviews of our properties, title review does not preclude third parties from challenging our title or related property rights. While we believe that we have satisfactory title to our properties, some titles may be defective or subject to challenge. For example, at our Conga project in Peru, we continue to seek resolution to a land dispute with local residents. In addition, certain of our Australian properties could be subject to native title or traditional landowner claims, and our ability to use these properties is dependent on agreements with traditional owners of the properties. A determination of defective title or restrictions in connection with a challenge to title rights could impact our ability to develop and operate at certain properties, which could have an adverse effect on our results of operations and financial position. For more information regarding native title or traditional landowner claims, see the discussion under the Asia Pacific Section of Item 2, Properties, in this report.

*Civil disturbances, criminal activities, including illegal mining, and artisanal mining, occurs on or adjacent to certain of our properties, which can disrupt business and expose the Company to liability.*

Civil disturbances and criminal activities such as trespass, illegal mining, sabotage, theft and vandalism may cause disruptions and could result in the suspension of operations and development at certain sites. Incidents of such activities have occasionally led to conflict with security personnel and/or police, which in some cases resulted in injuries including in Peru and Suriname. Although security measures have been implemented by the Company to protect employees, property and assets, such measures will not guarantee that such incidents will not continue to occur in the future, or result in harm to employees or trespassers, decrease operational efficiency or construction delays, increase community tensions or result in liabilities. The manner in which the Company's personnel, national police or other security forces respond to civil disturbances and criminal activities can give rise to additional risks where those responses are not conducted in a manner consistent with international and Newmont standards relating to the use of force and respect for human rights. Newmont takes seriously our obligation to respect and promote human rights, is a signatory to and active participant in the Voluntary Principles on Security and Human Rights, and has adopted a Sustainability and Stakeholder Engagement Policy and Human Rights Standard in-line with the UN Guiding Principles on Business and Human Rights due diligence processes. Nonetheless, although the Company has implemented a number of significant measures and safeguards which are intended to ensure that personnel understand and uphold these standards, the implementation of these measures will not guarantee that personnel, national police or other security forces will uphold these standards in every instance. The failure to conduct security operations in accordance with these standards can result in harm to employees, community members or trespassers, increase community tensions, reputational harm to Newmont or result in criminal and/or civil liability and/or financial damages or penalties.

Artisanal and illegal miners have been active on, or adjacent to, some of Newmont's African and South American properties, including recently at Suriname. Illegal mining, which involves trespass into the development or operating area of the mine, is both a security and safety issue, which may present a security threat to property and human life. The illegal miners from time to time have clashed with security staff and law enforcement personnel who have attempted to move them away from the facilities. Although, under certain circumstances, artisanal mining may be a legally sanctioned activity, artisanal mining is also associated with a number of negative impacts, including environmental degradation, poor working practices, erosion of civil society, human rights abuse and funding of conflict. The environmental, social, safety and health impacts of artisanal and illegal mining are frequently attributed to formal mining activity, and it is often assumed that artisanally-mined gold is channeled through large-scale mining operators, even though artisanal and large-scale miners may have separate supply chains. These misconceptions impact negatively on the reputation of the industry. The activities of the illegal miners could cause damage to Newmont's properties for which Newmont could potentially be held responsible. The presence of illegal miners could lead to exploration and project delays and disputes regarding the development or operation of commercial gold deposits. Illegal mining and theft could also result in lost gold production and reserves, mine and development stoppages, and have a material adverse effect on financial condition or results of operations or project development.

*Competition from other natural resource companies may harm our business.*

We compete with other natural resource companies to attract and retain key executives, skilled labor, contractors and other employees. We also compete with other natural resource companies for specialized equipment, components and supplies, such as drill rigs, necessary for exploration and development, as well as for rights to mine properties containing gold, copper and other minerals. We may be unable to continue to attract and retain skilled and experienced employees, to obtain the services of skilled personnel and contractors or specialized equipment or supplies, or to acquire additional rights to mine properties, which could have an adverse effect on our competitive position or adversely impact our results of operations.

# EXHIBIT 10



**Newmont Mining Corporation**
6363 South Fiddler's Green Circle
Greenwood Village, CO 80111
**T** 303.863.7414
**F** 303.837.5837
www.newmont.com

# Safety and Sustainability Committee Charter

The Board of Directors of Newmont Mining Corporation (the "Corporation") has established a Safety and Sustainability Committee (the "Committee") in furtherance of its commitments to adoption of best practices in promotion of a healthy and safe work environment, and environmentally sound and socially responsible mining and resource development. The Committee will be comprised of at least three independent directors appointed by the Board. In appointing members of the Committee, the Board will consider breadth of relevant experience and knowledge. The authority, structure, operations, purpose, responsibilities and specific duties of the Committee are described below:

## AUTHORITY

The Board of Directors has granted the Committee the authority herein provided, as well as the authority to investigate any activity of the Corporation and its subsidiaries relating to health, safety, loss prevention, sustainable development, environmental affairs, relations with communities and civil society, government relations and communications matters. The Committee has been, and shall be, granted unrestricted access to all information and all employees have been, and shall be, directed to cooperate as requested by members of the Committee. The Committee has the authority to retain, at the Corporation's expense, persons having special competencies to assist the Committee in fulfilling its responsibilities, including the sole authority to approve the fees and other terms of retention of such persons.

## STRUCTURE AND OPERATIONS

Committee members shall serve until their successors shall be duly designated and qualified. Any member may be removed at any time, with or without cause, by a majority of the Board then in office. Any vacancy in the Committee occurring for any cause may be filled by a majority of the Board then in office.

The Committee's chair shall be designated by the Board. A majority of the members of the Committee shall constitute a quorum for the transaction of business and the act of a majority of those present at any meeting at which there is a quorum shall be the act of the Committee. The chair of the Committee, in consultation with management and the other members of the Committee, shall set meeting agendas.

The Committee may form and delegate authority to subcommittees when appropriate.

## PURPOSE AND RESPONSIBILITES

The primary responsibility for management of health, safety, loss prevention, sustainable development, environmental affairs, community relations, government relations and communications issues relating to the Corporation, including compliance with laws and regulations, rests with the management of the Corporation.  The Committee's primary purposes are to: (1) provide advice, counsel and recommendations to management on (a) health, safety and loss prevention issues, and (b) issues relating to sustainable development, environmental affairs, community relations, government relations and communications; and (2) assist the Board in its oversight of (a) health, safety and loss prevention issues relating to the Corporation; (b) sustainable development, environmental affairs, relations with communities and civil society, government relations and communications issues relating to the Corporation; (c) the Corporation's compliance with regulations and policies that provide processes, procedures and standards to follow in accomplishing the Corporation's goals and objectives relating to (i) health, safety and loss prevention issues and (ii) sustainable development, environmental affairs, community relations, government relations and communications issues; and (d) management of risk related to thereto.

## SPECIFIC DUTIES

In discharging its responsibilities, the Committee is expected to do the following:

1. Review with management the Corporation's goals, policies and programs relative to health, safety and loss prevention, sustainable development, environmental affairs, community relations, government relations and communications issues.

2. Review with management the following items as they relate to health, safety, sustainable development, environmental affairs, community relations, government relations or communications matters:  (i) the Corporation's policies with respect to risk assessment and risk management; (ii) the Corporation's major risk exposures; (iii) the steps management has taken to monitor and control such exposures; (iv) the effect of relevant regulatory initiatives and trends; and (v) all material claims, demands and legal proceedings against the Corporation.

3. Review with management the Corporation's record of performance on health, safety and loss prevention matters, including innovation and benchmarking against peer performance, along with any proposed recommendations or actions based on the record of performance.

4. Make inquiries of management and make recommendations to the Board concerning the Corporation's compliance with applicable laws, rules, regulations and standards of corporate conduct relating to sustainability and employee health and safety, as the Committee determines appropriate.

5. Apprise the Board regularly of significant developments in the course of performing the above duties, including reviewing with the full Board any issues that arise with respect to the Corporation's compliance with legal or regulatory requirements.

6. Apprise the Audit Committee of the Board of significant changes in financial risk exposures or potential accruals for contingent liabilities or disclosure issues relating to health, safety, sustainable development, environmental affairs, community relations, government relations or communications matters.

7. Prepare reports or assessments from time to time, at the Committee's discretion, regarding the Corporation's or the Committee's activities.

8.  Provide oversight of the assessment of the Company's sustainability performance to be presented in a public report, and engage independent experts or advisors, to the extent it is deemed necessary by the Committee in connection therewith, who have recognized expertise in sustainability;

9.  Review public reporting relating to the Company's safety and sustainability performance.

10.  Perform such other duties and responsibilities as are consistent with the purpose of the Committee and as the Board or the Committee shall deem appropriate.

11.  Review and reassess the adequacy of this charter on a regular basis and submit any proposed revisions to the Board for consideration and approval.

*Approved by the Board of Directors on June 6, 2013*

# EXHIBIT 11



Our Voice – Blog    Resources    Newsroom    | Search

About Us    **Operations and Projects**    **Investor Relations**    **Sustainability**    **Careers**

NYSE: NEM    Stock Price: $38.39    Volume: 3,029,935    Gold Price: $1,286.78

# Policies and Standards

Home / About Us / Governance and Ethics / Policies and Standards

Code of Conduct    **Policies and Standards**    Board of Directors    Board and Committee Governance    Political Contributions    Supplier Code of Conduct

## Policies and Standards communicate the philosophy, rules and expectations of an organization.

As an important part of Newmont's internal governance process, new or revised Global Policies and Standards are reviewed and preliminarily approved by a Global Policies & Standards Committee. Following this preliminary approval, the documents are posted for comment by employees for a minimum of 14 days, after which they are finally approved by the Global Policies & Standards Committee. Policies are then submitted for further approval by Newmont's Executive Leadership Team and Board of Directors.

The scope of the Social and Environmental Standards is global, and they apply to all directors, officers and employees of Newmont Mining Corporation, its subsidiaries, and any other entities that it controls. A variance request process for existing or future conditions is in place for S&ER standards. The process provides an alternative mechanism for those instances where a Newmont site/operation cannot logistically or feasibly conform to a requirement established in a Standard due to special conditions or unique hardships.

### Policies                                                                                          CLOSE [ – ]

| | |
|---|---|
| 📄 Asset Value Protection Policy | 135 KB |
| 📄 Business Integrity Policy | 227 KB |
| 📄 Business Integrity Policy – Spanish | 172 KB |
| 📄 Business Integrity Policy – Dutch | 204 KB |
| 📄 Health and Safety Policy | 71 KB |
| 📄 Operations and Resource Development Policy | 66 KB |
| 📄 People Policy | 67 KB |
| 📄 Sustainability and Stakeholder Engagement Policy | 136 KB |

### Social and Environmental Standards                                                              CLOSE [ – ]

| | |
|---|---|
| 📄 Air Emissions Management Standard | 273 KB |
| 📄 Biodiversity Management Standard | 290 KB |
| 📄 Closure and Reclamation Management Standard | 273 KB |
| 📄 Community Investment and Development Standard | 272 KB |
| 📄 Cultural Resource Management Standard | 271 KB |
| 📄 Hazardous Materials Management Standard | 224 KB |
| 📄 Human Rights Standard | 285 KB |
| 📄 Indigenous Peoples Standard | 284 KB |

Ex. 11 Page 1 of 9

| | | |
|---|---|---|
| 📄 | Local Procurement and Employment Standard | 235 KB |
| 📄 | Social Baseline and Impact Assessment Standard | 274 KB |
| 📄 | Stakeholder Relationship Management Standard | 350 KB |
| 📄 | Tailing and Heap Leach Facility Management Standard | 324 KB |
| 📄 | Waste Management Standard | 298 KB |
| 📄 | Waste Rock and Ore Stockpile Management Standard | 293 KB |
| 📄 | Water Management Standard | 294 KB |

**About Us**

**Operations and Projects**

**Investor Relations**

**Sustainability**

**Careers**

Contact Us
Suppliers
Legal
Site Map

**Apply Now →**

Create an employment profile and search for jobs that meet your qualifications.

**Email Alerts →**

Register to have select updates about Newmont Mining Corporation delivered to your inbox

© 2017 Newmont Mining Corporation. All rights reserved.

Powered By Q4 Inc. 5.2.0.8

Connect with Us  /   RSS    YouTube    Twitter    Facebook    LinkedIn      Share   Print



## Sustainability & Stakeholder Engagement Policy

This Policy reflects Newmont's commitment to sustainable development. It requires all employees and contractors to comply with social, environmental, and political laws and regulations, as well as Newmont Standards. This Policy also establishes Newmont's commitment to transparently communicate with stakeholders, and to respect all cultures. This Policy addresses the key social and environmental risks that the business faces and outlines our commitments in these areas.

### Environmental Stewardship

**We commit to avoid, minimize, mitigate, and/or remediate our impacts on the environment and proactively manage risks.** We use fact- and science-based methodologies and leading best practices to demonstrate our environmental stewardship. Our guiding principles commit us to operate our facilities at all times in compliance with applicable laws and regulations and Newmont Standards; adhere to and update environmental standards that are protective of both human health and the environment at the facilities we build and operate; and develop closure and reclamation plans during the design phase, and implement those plans during operations to provide for long-term environmental stability and suitable post-mining beneficial land uses.

**We seek to maintain overall ecosystem health and resiliency in the areas where we operate, as local communities and our operations both rely on healthy and functioning ecosystems.** To that end, we are committed to integrating biodiversity and ecosystem services considerations into our business with the goal of achieving no net loss of biodiversity in our areas of influence. We believe that we can deliver sustainable conservation outcomes by utilizing the latest science and best practices for biodiversity management and by working in partnership with governments, civil society, and communities.

**We do not use mercury to mine or extract gold.** However, mercury is naturally present in ore at several of our operations. These mercury compounds (liquid or gaseous) are recovered in order to prevent the release of mercury into the environment. We require the use of Maximum Achievable Control Technology to capture point-source mercury air emissions. The collected mercury is permanently retired from circulation, not sold or given away. Permanent retirement means legal disposal using environmentally safe practices or placement in long-term, safe storage as defined in the US Mercury Export Ban Act.

**We require all of our gold processing facilities that use cyanide to be certified to the International Cyanide Management Code** (the Code), thereby demonstrating our commitment to safely and responsibly managing cyanide. The Code is comprised of nine principles intended to improve the lifecycle management of cyanide, reduce exposure of workers and surrounding communities from harmful levels of cyanide, minimize impacts to the environment, and enhance response actions to cyanide releases.

**We are committed to more efficiently managing our global energy consumption to reduce our carbon footprint while exploring and developing renewable energy and low-carbon fuel-switching opportunities.** We transparently report our independently verified energy use and greenhouse gas emissions. We manage climate change-related risk through adaptation to present and future-predicted physical impacts of climate change.

**We are committed to improving our operational water management and engaging proactively with stakeholders in regional water challenges and solutions.** We value water as a precious resource and seek to create a water stewardship legacy within our host countries and communities. We are implementing a Global Water Strategy to ensure proactive and long-term management of water-related challenges, including access to supply, management of extreme climatic events, evolving regulations, and balancing mine water use with agricultural, social, cultural, and ecological water uses.

**We are committed to managing our mining residuals in a manner that is protective of the environment and human health throughout the mining lifecycle.** Our aim is to manage mining residuals from a cradle-to-grave perspective by using principles of minimization, characterization, recycling and reuse, innovation, and implementation of best practices.

*Communities, Stakeholders, and External Engagement*

**We engage with local communities to build productive and healthy relationships and contribute to creating shared value.** We seek to establish and maintain transparent relationships built on mutual respect and trust with communities affected by our operations. Our guiding principles commit us to: build relationships that are founded on a commitment to each other's success; act with humility and a willingness to listen, and be committed to resolving differences and conflicts in a constructive and transparent manner; and seek mutually beneficial outcomes in our decision making such that we contribute to sustainable development.

**We respect the dignity, wellbeing and human rights of employees and the communities in which we live, as well as others affected by our operations.** Our actions and philosophies with regard to human rights are guided by the Organization for Economic Co-operation and Development (OECD) Guidelines and reflect the United Nations' (UN) Guiding Principles on Business and Human Rights due diligence processes. We are committed to implementing the Voluntary Principles on Security and Human Rights, and to understand and respect the cultural heritage, rights, and norms of local communities through proactive engagement and training of personnel.

**We are committed to ensuring that our sites are free from weapons.** No weapons of any kind will be brought onto Newmont property unless they are required by police or military in the execution of their lawful duties; by contractors where required by legislation to retain permits to operate; or in special circumstances by exception.

**We ensure that the rights and needs of landowners and local communities are assessed and addressed** prior to any activities involving land acquisition and resettlement. Land acquisition is conducted in compliance with applicable laws, regulations, and international best practice as defined by the International Finance Corporation (IFC) Performance Standards for resettlement, compensation, and/or livelihood restoration activities.

**We work to obtain free, prior, and informed consent of indigenous peoples** as reflected in the International Council on Mining and Metals (ICMM) Position Statement.

**We are committed to generating resources, sharing knowledge, building capacity, and contributing to meaningful partnerships to enhance positive development outcomes in the communities where we operate.** Local community economic development opportunities, employment, supply chain participation, and timely/fair payment of financial obligations are expectations accompanying the granting of access to mineral resources. We seek to meet reasonable expectations to create value for shareholders, employees, local communities, governments, and our business partners.

**We are committed to working with governments, municipalities, non-governmental organizations, multi-lateral organizations, local communities, the academic community, and our employees in a manner that is transparent and allows us to share ideas, plans, and opportunities to create shared value while resolving disagreements and misunderstandings in good faith.** We actively support the Extractive Industry Transparency Initiative (EITI) in the countries where we operate.

**We will work with appropriate government, community, and other stakeholders in situations where ASM or related activities are taking place** in our operating areas in violation of legal, safety, health, and environment standards and property protection norms. We will do this with respect for human rights in accordance with our public commitments, and with an aim to respect livelihoods and promote improved conditions for legal and registered small-scale mining activities.

**We engage with governments and other stakeholders** on a variety of issues, including worker health and safety, environmental protection, trade, economic development, infrastructure, transparency, rule of law, and other areas of public policy that contribute to our success. This engagement is in strict accordance with all applicable laws, EITI, and Newmont's Code of Conduct and Standards on integrity and ethical conduct. We do not contribute to political campaigns outside the US.

*Responsible Value Chain*

**We are committed to responsible mineral stewardship practices.** We recognize our responsibility to understand the physical and chemical characteristics and value stream impacts of the products we produce, and we contribute to their sound management. Through industry associations such as the World Gold Council (WGC) and ICMM, we support research of our products, their uses, and value streams to better understand potential positive and negative impacts on human health and the environment, and to identify mitigation measures. We agree to external verification that our products have been recovered or sourced in a manner that does not cause or benefit unlawful armed conflict or contribute to serious human rights abuses or breaches of international humanitarian law. Our mining methods and approach are consistent with our commitments through the WGC and our Conflict-Free Gold Standard. We encourage, or require where practical, our business partners and applicable supply chain stakeholders to adopt similar objectives.

*Legacy*

**We are committed to a positive legacy for future generations.** Through proactive engagement and partnerships with governments, communities, and other stakeholders, we seek to create a common vision of future land uses and sustainable economic development opportunities, while also developing safe and stable landforms demonstrating water stewardship, and restoring ecological values.

Gary J. Goldberg
President and Chief Executive Officer



# Sustainability and External Relations Standard

## HUMAN RIGHTS

## 1. PURPOSE AND OBJECTIVES

We recognize government's duty to protect human rights and our responsibility to respect[1] the human rights of our workforce and communities wherever we do business. In addition, we will identify opportunities to support and promote human rights. Implementation of this Global Standard will enable us to uphold international human rights standards, make informed decisions to manage risks to people and to our business, and implement our Sustainability and Stakeholder Engagement Policy.

This Standard is designed to complement and enhance our commitments put forth in the Indigenous Peoples Standard, Land Acquisition and Involuntary Resettlement Standard, Stakeholder Relationship Management Standard, Cultural Resource Management and the Social Baseline and Impact Assessment Standard by defining the minimum requirements to identify, prevent, mitigate, track and report on how we address risks to human rights associated with our operations. This Standard also defines the minimum requirements for supporting and promoting human rights and enabling remediation through legitimate processes where we identify that we have caused or contributed to adverse impacts.

## 2. REQUIREMENTS

### 2.1 Planning and Design

#### 2.1.1 Assessment

2.1.1.1 Sites shall respect the human rights of their workforce and take a risk based approach to the management of human rights acting in accordance with host country regulation, internationally recognized human rights frameworks (including the due diligence process in the UN Guiding Principles on Business and Human Rights) and existing Newmont Standards.

2.1.1.2 For: (i) existing operations or (ii) changes to existing operations unlikely to impact human rights, Sites shall integrate human rights considerations into their existing internal and external processes (including updates of Social Impact Assessments (SIAs), risk assessments and grievance mechanisms).

2.1.1.3 For: (i) new projects or (ii) changes to existing operations with the potential to impact human rights, Sites shall integrate a Human Rights Impact Assessment (HRIA) approach into their SIAs.

2.1.1.4 Sites may undertake a stand-alone HRIA if they determine it necessary in their operating context.

2.1.1.5 Sites shall maintain ongoing processes to identify changes in human rights risks including through: (i) engagement with external stakeholders, (ii) capturing human rights risks in the Site Risk Management System and updating them during quarterly reviews, and (iii) complaints/grievance mechanisms.

2.1.1.6 Assessments shall identify and assess actual and potential human rights impacts from: (i) Site's own activities and; (ii) Site's business relationships (including relationships with vendors, security forces and governments). Special attention shall be paid to identify and address the needs of vulnerable and/or marginalized community members who may be disproportionately affected by Sites activities.

---

[1] According to the UN Guiding Principles on Business and Human Rights, the corporate responsibility to respect human rights, means that business enterprises should act with due diligence to avoid infringing on the rights of others and address adverse impacts with which they are involved

2.1.1.7 Sites shall use individuals or teams with relevant skills, local knowledge and human rights expertise for their assessments. Where HRIAs will be carried out, they should be conducted by organizations/ individuals with demonstrable credibility.

2.1.1.8 Our workforce and external stakeholders, inclusive of affected communities, shall be provided with opportunities to express their views on potential human rights risks, impacts, and mitigation measures. Stakeholder concerns shall be documented and addressed during the assessment process and within the assessment reports in an open and transparent manner. Participation shall be designed so that the process is inclusive, accessible, free of manipulation and undertaken in a timely and culturally appropriate manner.

## 2.2     Implementation and Management

### 2.2.1   Human Rights Management Plans

2.2.1.1 Sites or regions (as appropriate) shall develop Human Rights Management Plans or incorporate the following areas into existing plans of relevance: (i) the measures Sites will take to address any human rights risks or impacts identified in the assessments, (ii) metrics and/or other measures to track Site's management of human rights risks or impacts, (iii) the function/department responsible and accountable for managing each human rights risk or impact, (iv) the human rights contact point for the region, (v) a tailored human rights training plan (including on the Voluntary Principles on Security and Human Rights), (vi) how complaint/grievance mechanisms will be used to identify trends in human rights complaints that may require changes to Site management systems, processes or activities, (vii) the resources required (time, human and financial) to implement the plan.

2.2.1.2 Sites or regions (as appropriate) shall form a cross-functional human rights working group which will provide oversight for the implementation of the Human Rights Management Plan.

2.2.1.3 The most senior Site based S&ER Manager will be accountable for implementing the Human Rights Management Plan. In addition, Sites shall have their Human Rights Management Plans signed off by the most senior Site based Manager and will share their Human Rights Management Plans with the most senior Regional manager and corporate S&ER team.

2.2.1.4 Sites shall undertake activities to support and promote human rights while recognizing these activities do not offset a failure to respect human rights throughout their operations.

### 2.2.2   Human Rights Due Diligence on Business Relationships

2.2.2.1 Sites or regions (as appropriate) shall involve representatives from S&ER, Supply Chain and Legal in the development of appropriate human rights clauses in standard contract templates.  These templates shall be used for new vendors and when contracts of existing vendors are up for renewal.

2.2.2.2 Human rights contract provisions shall include Newmont's commitment to human rights consistent with the Universal Declaration of Human Rights. Human rights provisions shall also include the requirement that Newmont be notified if a vendor becomes aware of any human rights issues related to its activities with Newmont.

2.2.2.3 In the event that Newmont becomes aware of a human rights issue in our supply chain, Newmont shall request that the relevant vendor conduct an investigation and develop an action plan for implementation to address the issue. Newmont shall notify the vendor that it may be subject to a variety of legal implications associated with such issue, including potential termination of the agreement in question.

**Sustainability and External Relations Standard**

**HUMAN RIGHTS**

2.2.3   Voluntary Principles on Security and Human Rights

2.2.3.1  In relation to interactions with public and private security forces and in accordance with Newmont's Security and Human Rights Global Standard (SEC-PS-005), Sites shall: (i) identify security issues and impacts, (ii) investigate and report allegations, (iii) provide training and awareness and; (iv) monitor and evaluate compliance with the Voluntary Principles on Security and Human Rights.

2.2.4   Site Based Grievance Mechanisms

2.2.4.1  In accordance with Newmont's Stakeholder Relationship Management Standard (NEM-SER-STA-016), Sites shall develop community complaint and/or grievance mechanisms consistent with the UN Guiding Principles on Business and Human Rights which should allow for the identification, tracking and resolution of complaints and grievances that relate to, or could escalate into, human rights issues. The existence of Site based mechanisms should not inhibit complainant's access to legal or judicial recourse processes.

2.2.4.2  Sites shall inform the corporate S&ER team of the following complaints/grievances/incidents and the means they are taking to address them: (i) where a complaint/grievance/incident is flagged as a human rights issue by the complainant or; (ii) where Sites determine that a complaint/grievance/incident has the potential or may be perceived to have a severe negative impact on human rights.

**2.3   Performance Monitoring**

2.3.1   Tracking and Updating

2.3.1.1  Sites shall monitor and evaluate the issues being raised through their complaint/grievance mechanisms quarterly to identify trends in human rights that may require changes to management systems, processes or activities.

2.3.1.2  Human Rights Assessment processes will be updated and validated no less than every five years or when risks to human rights significantly change, whichever is more frequent.

2.3.1.3  Human Rights Management Plans shall be updated on an on-going basis as risks and impacts change. Updated plans shall include: (i) an evaluation of responses to actual and potential human rights impacts (ii) the results of the evaluations of Site's human rights performance and; (iii) modifications to systems/processes/procedures to improve effectiveness. Sites shall include perspectives on the company's human rights performance including from affected stakeholders in these updates.

2.3.2   Communicating

2.3.2.1  Sites shall regularly communicate how it is managing human rights issues to: (i) affected stakeholders, (ii) employees, (iii) relevant external stakeholders, (iv) the corporate S&ER team

2.3.2.2  Sites shall provide information required for Newmont to fulfill its external reporting obligations under the Global Reporting Initiative, Dow Jones Sustainability Index and other relevant reporting frameworks, as requested by the corporate office.

# EXHIBIT 12



# Human Rights & Security Fact Sheet

## GUIDING PRINCIPLES

Newmont takes seriously our commitment to protect and promote human rights, while ensuring the safety and security of our employees, contractors, visitors, facilities, equipment and materials.

In addition to Newmont's Code of Business Ethics and Conduct, our security program is governed by our obligations under the Voluntary Principles on Security and Human Rights (VPSHR) and the United Nations Global Compact.

Along with our duty to protect our employees, contractors and visitors, these obligations include providing human rights training for public and private security personnel protecting our people and facilities from crime, physical assault and sabotage.

As a formal participant in the VPSHR, Newmont also provides an annual report on our efforts to implement and promote the VPSHR, and we have sponsored seminars and workshops for industry on how best to apply the Voluntary Principles. The VPSHR also provides a process for investigating reports of human rights abuses and the misuse of force.

## PUBLIC SECURITY PERSONNEL

Newmont has Memoranda of Understanding (MOUs) with public security agencies at some of our facilities to provide additional protection for our employees, contractors and facilities. Upholding human rights and detailing strict rules governing the use of force are specifically delineated in these MOUs.

These arrangements are sanctioned under prevailing laws and are governed by the appropriate regulatory authority. All public security personnel contracted by Newmont to work at or near our facilities must undergo human rights training to ensure that if the use of force is absolutely necessary, the response is appropriate and lawful based on the threats confronting them.

## PRIVATE SECURITY PERSONNEL

Where Newmont uses private security services, companies competing for those contracts must go through human rights screening and validation as part of the competitive bidding process. Our contracts with private security services specifically include Newmont's obligations under the VPSHR and outline sanctions for violating them, including immediate termination of contracts.

As is the case with our private and public security services, all in-house security personnel must undergo human rights training to ensure that if the use of force is absolutely necessary, the response is appropriate and lawful based on the threats confronting them.

## VPSHR IMPLEMENTATION

Newmont has identified Peru, Indonesia and Ghana as areas where the potential for security-related incidents with human rights implications are of greatest concern. These countries are the primary focus areas for Newmont's VPSHR efforts.

## STANDARDS

Our Security Management System includes standards governing Newmont's approach to security at our sites around the world.

Newmont Security Governance, Management and Performance Standards:

- Legal Requirements and Commitments
- Security and Human Rights
- Internal and External Audits
- Contractor Selection and Management
- Training and Competency
- Preventive and Corrective Actions
- Incident Investigation and Reporting
- Investigations and Case Management
- Systems, Documentation and Records Management
- Contingencies and Emergency Preparedness
- Workplace Inspections
- Planning, Goals and Targets
- Commitment, Leadership and Management
- Internal Communication and Consultation
- External Communication and Consultation
- Risk, Opportunity and Change Management
- Security Management Plans
- Asset Protection
- Access Control
- Areas Critical to Production
- Protection of High Risk Personnel
- Exploration Security
- Travel Security
- Security Intelligence
- Security of Explosives
- Security Control Centers

# EXHIBIT 13



**Beyond the Mine**
Our 2015 Social and Environmental Performance

# OUR PURPOSE IS TO CREATE VALUE AND IMPROVE LIVES THROUGH SUSTAINABLE AND RESPONSIBLE MINING



OVERVIEW ➡



ETHICS AND GOVERNANCE ➡



OUR PEOPLE ➡



ECONOMIC AND SOCIAL PERFORMANCE ➡



ENVIRONMENTAL STEWARDSHIP ➡



**Beyond the Mine**
Our 2015 Social and Environmental Performance

ETHICS AND GOVERNANCE

# HUMAN RIGHTS





Established TARGETS to accurately ASSESS THE SECURITY RISKS in our operating environments

**Case Study**

NEWMONT EARLY ADOPTER OF HUMAN RIGHTS REPORTING FRAMEWORK ➔



ENGAGED WITH STAKEHOLDERS to identify our MOST SALIENT HUMAN RIGHTS RISKS

Home / Ethics and Governance / Human Rights

## Approach

Mining activities – including access to land and water, labor policies, and use and engagement of private and public security forces – have the potential to impact human rights by infringing on the rights of workers, communities and indigenous peoples. However, strong governance and policy frameworks can be established to respect human rights and translate mining activities into socio-economic contributions that help alleviate poverty, reduce illiteracy, improve critical infrastructure, strengthen capacity and empower communities for self-determined development.

Newmont believes that upholding fundamental human rights and respecting customs, cultures and values are critical aspects of good business and fundamental to sustainable development. Our Code of Conduct commits us to respect and promote the human rights of all people, and our Sustainability and Stakeholder Engagement Policy includes an explicit statement that we will undertake human rights due diligence processes consistent with the United Nations (UN) Guiding Principles on Business and Human Rights (the Guiding Principles) and the Organization for Economic Co-operation and Development (OECD).

Supporting our commitment to respect human rights are our standards on Human Rights, Cultural Resources and Security Performance – which detail the minimum requirements and mechanisms for monitoring our performance related to human rights risks, protection of cultural heritage resources and the use of security forces at our operations.

Our global Human Rights Standard and strategy provide guidance to our regions and sites to integrate human rights considerations into our stakeholder engagement and other business activities. All sites must maintain processes to identify human rights risks on an ongoing basis. For existing operations – or changes to existing operations that have a low risk to impact human rights – we integrate human rights considerations into existing processes, such as social impact assessments (SIA) or environmental and social impact assessments (ESIA), and employ operational-level grievance mechanisms to assess impacts and identify mitigation actions. For new projects – or changes to existing operations that have a higher potential to impact human rights – sites must integrate human rights impact assessment (HRIA) approaches into their SIAs or complete standalone HRIAs.

© Newmont Mining Corporation. All rights reserved.

Institutionalizing the standard, we engaged with a target group of external stakeholders to review it and test-piloted it two of our operating regions, Ghana and Peru. The review and pilots provided valuable feedback to ensure the standard was fit for purpose and implementable at the site level.

Newmont recognizes that all communities have a fundamental right to preserve their culture and heritage. We strive to engage early and often with communities to identify, protect and manage sites having cultural or heritage significance to local stakeholders. Our Cultural Resource Management Standard requires every site to develop a cultural resources management plan that includes a study of both physical and cultural heritage resources as well as intangible ones, such as traditions and livelihoods.

We voluntarily commit to the 10 principles set forth in the UN Global Compact (UNGC) and include contract provisions for suppliers related to the Universal Declaration of Human Rights. We participate in the UNGC Human Rights Working Group and Task Force on Business Engagement with Indigenous Peoples. To strengthen our approach to better understanding human rights issues over the longer term, we commit to report our human rights performance in accordance with the UN Guiding Principles Reporting Framework. As a member of the International Council on Mining and Metals (ICMM), we work toward advancing the industry's approach to human rights.

We employ three primary mechanisms to monitor and track our human rights performance – our internal grievance process, external operational-level complaints and grievances (C&G) mechanism and registers and the Ethics Solutions Tool. Our C&G mechanism – which is required at all sites – aims to address stakeholder concerns in a timely and effective manner to avoid conflict and build trust. The Ethics Solutions Tool provides both our workforce and our external stakeholders a confidential channel to report any concern about compliance with our Code of Conduct, including potential human rights issues.

Our executive leadership team is ultimately accountable for establishing the policies and standards that guide our human rights performance with oversight and strategic development provided by our Board of Directors. Regional vice presidents, as well as general managers at each operation, are responsible for ensuring sites operate in a manner that respects human rights and for ensuring our operations comply with all laws, regulations, policies and standards related to human rights. Our cross-functional human rights working groups at the corporate, regional (as appropriate) and site levels are responsible for monitoring implementation of the human rights management plans. All sites have established working groups or have integrated human rights responsibilities into existing working groups. These groups serve to establish functional accountability for human rights risk management.

We are integrating due diligence on human rights risks into our risk management process to ensure Company leaders receive regular updates and reports on key risks, and to ensure the Board's Safety and Sustainability Committee regularly reviews those risk areas within its committee charter. Senior management and the Safety and Sustainability Committee regularly review and discuss human rights topics, such as compliance with global standards, training and escalated complaints – including land disputes, security forces, community interactions and others – with potential human rights implications.

## Security Forces

Due to potential security risks, we employ private security teams at our operations in Ghana, Indonesia and Peru and our Merian project in Suriname. Newmont is committed to respecting and promoting human rights while ensuring the safety and security of employees, contractors, visitors, facilities, equipment and materials. The right to security of person is one of our most salient human rights risks. We provide training on security and human rights to private security personnel working at our locations and to public security forces who may be coordinating with private security or providing law and order near or on our operations.

In addition to our Code of Conduct, our security approach is governed by our commitments under the Voluntary Principles on Security and Human Rights (VPSHR) and the UN Global Compact. Newmont is a formal participant in the VPSHR, and we commit to implement and promote the voluntary principles (VP) and annually report on our efforts. The VPs are designed to help companies in the extractive industries maintain safe and secure operations within a framework that respects human rights.

While we have standards and procedures and conduct extensive training to avoid security-related incidents with possible human rights implications, should such an incident occur, it must be recorded and, if found to be credible, reported to the appropriate external authorities as well as Newmont's executive leadership team and the Board. Our Incident Investigation and Reporting Standard details the requirements for security incident investigations. All incidents involving a potential violation of the VPs are reported to the VPSHR plenary.

Guiding our approach is our security strategy, key elements of which are:

- *Engagement* – working with NGOs, government groups, and embassies representing countries that are signatory members of the VPs, and engaging with community members to build and improve relationships;

- *Influence* – seeking opportunities to reduce the potential for conflict by promoting improved standards related to security providers, and encouraging governments where we operate to participate in the VPs;

- *Transparency* – publicizing our security contracts as well as our commitments to the VPs and responding to information requests from stakeholders in a timely manner; and

- *Training* – conducting briefings, workshops, seminars and formal training sessions for our private and public security teams that create awareness and understanding of the VPs and related human rights considerations.

© Newmont Mining Corporation. All rights reserved.

## 2015 Performance

In support of our human rights strategy, we worked on a number of fronts to better integrate human rights considerations into the business.

We implemented our Human Rights Standard in 2015, completed gap assessments against the standard at all sites, developed action plans and conducted training to support compliance with the standard. The gap analyses identified the need for sites to establish stakeholder engagement processes and implement risk management systems to better identify changes in human rights risks. All sites are working toward addressing these gaps. In 2015, two operating sites – Ahafo in Ghana and Yanacocha in Peru – completed human rights reviews. All sites are on schedule to be fully compliant with the standard by the end of 2016.

As early adopters of the UN Guiding Principles Reporting Framework, in 2015 we engaged internally across regions and functions and externally with human rights experts and key stakeholders to identify our top salient human rights risks. We held a cross-functional corporate workshop to identify an initial set of potential human rights issues, which was followed by sessions with regional and site teams to determine the severity and likelihood for each issue. Out of the 26 potential human rights issues initially identified, we found that all are important but seven are considered our most salient human rights risks, and we discuss each one in more detail throughout this report. To learn more about our performance and how we manage and address these risks, click on the human rights issue below:

### Salient Issues



Shift – one of the organizations that facilitated the development of the Reporting Framework – worked closely with us on implementation of the Reporting Framework.

We improved our complaints and grievances (C&G) mechanism and processes by implementing a systematic categorization for all complaints and grievances registered and began initial work to employ a more consistent method to identify and categorize those C&Gs that are either registered as human rights issues or have the potential to be human rights related issues.

During 2015, a total of 24 grievances or allegations related to human rights were reported; 23 were resolved during the year; and none were addressed from a prior reporting period. These matters can be reported to Newmont though various means including our site C&G registers, human resources department or online Ethics Solutions Tool. Details on these grievances or allegations are discussed in the following table.

**Grievances or allegations about human rights impacts filed, addressed and resolved in 2015**

| TYPE OF GRIEVANCE OR ALLEGATION | NUMBER OF HUMAN RIGHTS GRIEVANCES OR ALLEGATIONS | DESCRIPTION AND LOCATION BY COUNTRY |
|---|---|---|
| Discrimination in the workforce related to gender, race, age and/or sexual harassment | 5 | Nevada reported four allegations and Australia reported one allegation related to discrimination in the workplace. All five allegations were investigated using various means, including teams from human resources and members of senior management. The matter in Australia was investigated by the Australian Human Rights Commission (AHRC), which was not able to substantiate the claim. The four allegations in Nevada resulted in employee discipline, up to and including termination. |
| Child labor | 0 | We did not receive any grievances or allegations of child labor violations. |
| Forced and compulsory labor | 0 | We did not receive any grievances or allegations of forced or compulsory labor violations. |
| Land rights (non-indigenous) | 2 | In Ghana, a community member reported Newmont to the Ghanaian Commission on Human Rights and Administrative Justice alleging that we owed rent for land used to accommodate local police. We fully investigated the issue and reached a resolution with the complainant. The Commission determined the allegation was not a human rights violation.<br><br>In Peru, we continued to work toward resolution of a land dispute related to the family of Maxima Acuña de Chaupe. These efforts are described in more detail in this section. |
| Indigenous rights | 1 | No grievances were reported relating to indigenous land or resource use. However, at our Long Canyon project in Nevada, tribal monitors reported issues related to an employee. The matter was investigated, and Newmont worked with the U.S. Bureau of Land Management and tribal monitor to resolve the issue. |
| Security forces | 1 | In Ghana, we received an allegation that a security guard assaulted an employee. The allegation was fully investigated and found to be unsubstantiated. |
| Other | 15 | In Australia, there were 14 allegations of bullying in the workplace. After the allegations were investigated, three were found to be unsubstantiated, 10 led to disciplinary actions and one resulted in termination of employment.<br><br>In Ghana, during a community engagement activity, an employee alleged harassment by the traditional authority. Newmont took the necessary steps to ensure the employee's safety and wellbeing. |
| **Total** | **24** | |

At our Yanacocha operation in Peru, we continue to seek resolution to a complex land dispute with the Chaupe family. We brought in independent experts to conduct a fact-finding process, which is guided by an external advisory panel, to evaluate compliance with international best practices and assess allegations of human rights violations associated with the dispute. As part of this effort, the independent experts and Newmont engaged with a number of NGOs including Oxfam America, Latin American Mining Monitoring Programme and Amnesty International to provide status updates.

We define "significant investment agreements" as those agreements with governments that enable the development of a mine or advance exploration activities within the country. In 2015, Newmont entered into one significant investment agreement with the government of Ghana. However, this agreement did not include any human rights clauses.

We completed annual training based on security and human rights at our sites that employ private security personnel and those where public security forces are active in and around our operations. We recorded and addressed all complaints and grievances received related to human rights.



Our 2016 Social and Environmental Performance

# OUR PURPOSE IS TO CREATE VALUE AND IMPROVE LIVES THROUGH SUSTAINABLE AND RESPONSIBLE MINING



NEWMONT    **Beyond the Mine**  │  Our 2016 Social and Environmental Performance

# MESSAGE FROM THE SAFETY AND SUSTAINABILITY COMMITTEE CHAIR

Dear Stakeholder,

The Safety and Sustainability Committee evaluates, on behalf of Newmont's Board of Directors, management's efforts to build a healthier, safer and more environmentally sound and socially responsible business.

**The Company's resiliency in what was another year of market volatility is a testament to management's approach to delivering long-term value through sustainable and responsible mining.**

During 2016, Committee meetings involved detailed briefings on Newmont's efforts to address the material environmental and social risks and opportunities across the business. To better understand the key sustainability matters at each operation, Committee members regularly engaged with regional leadership, conducted in-depth reviews of each operating region at quarterly committee meetings, and visited Merian and Cripple Creek & Victor – two of Newmont's newest portfolio additions – to observe on-the-ground implementation of the Company's policies and standards.

Among the more significant matters the Committee reviewed during the year:

- *Safety* – The Committee commends everyone working on Newmont's behalf for a fatality-free year. In addition to receiving safety performance updates at each meeting, we reviewed the Company's work to sustain this performance through its Fatality Risk Management program and address repeat events and those that had the potential for serious consequences. We also reviewed and discussed the citations and orders issued by the U.S. Mine Safety and Health Administration related to alleged safety and health violations at Newmont's U.S.-based mines.

- *Human Rights* – At each meeting, we received updates on the **complex land dispute involving the Chaupe family in Peru**. Management briefed the Committee and the full Board prior to the publication of the independent report on the allegations of human rights violations and other issues associated with the dispute and Newmont's plan to address the report's findings. We also were briefed on the important work underway to manage human rights risks across the business, particularly in the Company's supply chain, security program and stakeholder engagement efforts.

- *Environment* – The Committee reviewed progress on the Company's water strategy and efforts to reduce fresh water use. Developments around climate change – including the Paris Climate Agreement and its potential impact on our costs and operations – elevated discussions on the strategy to accelerate energy conservation and emission reductions and prepare the business for a low-carbon economy. A particular focus of the Committee was around the closure plan for the Yanacocha operation in Peru and the increase in the Company's reclamation obligation, primarily due to higher estimated long-term water management costs, heap leach earthworks and related activities.

During the year, the Committee also discussed country risk and global efforts such as the cyanide management risk assessment; artisanal and small-scale mining strategy; workplace health exposure reduction plans; and implementation of a new integrated data management system that supports greater efficiency and more robust assurance.

In the coming year, the Committee will focus on Newmont's efforts to sustain its safety performance; meet energy, emissions and water use targets; update its tailings storage facility management approach to reflect the industry-wide review led by the International Council on Mining and Metals (ICMM); manage and report human rights risks; and develop an approach to demonstrate how the Company contributes to the United Nations Sustainable Development Goals. We also will be reviewing the revised closure plan for Yanacocha, which is expected to be submitted to Peruvian regulators in the second half of 2017.

The Company's resiliency in what was another year of market volatility is a testament to management's approach to delivering long-term value through sustainable and responsible mining.

Sincerely,

*Joseph A. Carrabba*

**Joseph A. Carrabba**
Chair, Safety and Sustainability Committee of the Board of Directors



## OUR APPROACH TO SUSTAINABILITY

As a core value, sustainability – serving as a catalyst for local economic development through transparent and respectful stakeholder engagement and as responsible stewards of the environment – is a deeply ingrained principle that guides our actions and supports our purpose to create value and improve lives through sustainable and responsible mining.

## Our Sustainability Strategy

**How sustainability fits into the mine lifecycle**



Our strategy is based on the premise that strong sustainability performance **throughout the mine lifecycle** delivers value for the business, our shareholders and stakeholders. Meeting the needs of the present without compromising the needs of the future requires that we understand and effectively manage our broad profile of social and environmental risks.

Our sustainability strategy is aligned to the three platforms of our business strategy:

### 1. Secure the gold franchise

Our business depends on securing legal licenses and social acceptance, which requires us to:

- Meet legal obligations and achieve minimum performance standards across all operations and projects;
- Effectively identify and manage environmental and social risks;
- Develop long-term positive relationships with host governments, communities and other key stakeholders;
- Employ robust systems and processes to accurately capture data and information; and
- Transparently and regularly report our performance.

### 2. Strengthen the portfolio

Building an industry leading portfolio of long-life, lower-cost assets requires discipline and rigor in assessing social and environmental challenges, risks and opportunities.

Whether pursuing opportunities in new jurisdictions or acquiring mature assets, we must evaluate key risks – including employment and infrastructure, social and environmental impacts, environmental legacies and reputational liabilities – in order to determine the value and viability of the opportunity.

When divesting non-core assets, buyer interest and asset valuations are likely to be greater if social and environmental risks and legacy issues have been effectively managed.

### 3. Enable the strategy

The third element of our business strategy requires effective management of both current and emerging threats and opportunities through:

- A clear direction and strategic intent;
- A framework for implementation and realistic plans;
- A motivated team with specialized skills;
- Leaders who visibly and consistently demonstrate their understanding and commitment; and
- **Ongoing, meaningful engagement** with our full range of stakeholders.

**Sustainability framework**



Implementation of our sustainability strategy requires a framework that connects all the required elements, beginning with the policies that serve as the framework's foundation, in order to deliver on our commitments:

### Strategic imperatives

Three strategic imperatives drive the programs necessary to deliver our sustainability strategy:

- *Performance* – We strive to deliver meaningful, measurable and sustainable results over the long term. In 2016, the Dow Jones Sustainability World Index (DJSI) named Newmont the mining sector leader for the second year in a row, and we achieved both Gold Class and Industry Mover distinctions in the **2017 Sustainability Yearbook**, which is based on the assessment used to determine the DJSI scores. We also ranked as the top mining company – and in the top 10 overall – in the S&P 500 for our environmental, social and governance (ESG) performance, according to Bloomberg's ESG disclosure score.

- *Social acceptance and reputation* – The support of host communities and other key stakeholders is crucial to our success. In 2016, Newmont was the first company in the extractive industry to publicly report against the UN Guiding Principles Reporting Framework, the first comprehensive guide for reporting on human rights risks. We also signed a comprehensive Cooperation Agreement with the Pamaka community in Suriname, and implemented a strategy to better manage risks and identify opportunities related to artisanal and small-scale mining activities.

- *Risk management* – Identifying and managing our risks and capitalizing on opportunities that deliver shared value to all our stakeholders are essential to achieving our goals. Our new **Integrated Management System (IMS)** is a critical tool to help drive efficiency and effectiveness in communicating, tracking and managing our risks, and the launch in 2016 of IMS's first phase was an important milestone in the system's implementation. During the year we also conducted comprehensive global risk assessments related to fatalities, cyanide management, suppliers and security forces; reviewed risks associated with regulatory changes; and participated in the International Council on Mining and Metals' (ICMM) global review of tailings storage facilities.

## Our Priorities

Understanding the issues that matter most to our stakeholders and our business helps us focus on key risks and opportunities, which in turn improves our reporting and performance.

We evaluate a number of factors to determine our priorities for this report. These include the issues that address our values, policies and overall strategy and the most significant impacts, threats and opportunities to our business. We also consider regulatory and voluntary commitments – such as the Paris Climate Agreement and the **United Nations Sustainable Development Goals (SDGs)** – that address current and future challenges for our industry and society as a whole.

Our priorities also reflect our **salient human rights issues**, which were determined by examining how our business activities can impact human rights across the supply chain and throughout the life of the mine.

Finally, ongoing and regular feedback from internal and external stakeholders is crucial to understanding the issues that are most important to the business and our stakeholders. In 2016, we engaged a third party to conduct a formal materiality assessment as a follow-up to the one we completed in 2013 and the internal materiality review performed in 2015. Nearly 50 internal and external stakeholders either completed an online survey or were interviewed about the relative importance of 28 sustainability issues.

The findings from this assessment, which followed the Global Reporting Initiative's (GRI) principles for defining report content, largely reaffirmed our priorities while providing an opportunity to fine-tune them. We previously included Stakeholder Engagement as a standalone priority, but have removed it going forward because it is an integral tool for managing all our priorities. We changed the name of one priority, Water Withdrawal to Water Management to reflect our broader approach, and added two new priorities, Ethics and Governance and Local Procurement, due to their importance to the business.

For purposes of this report, we group our priorities into four categories – Ethics and Governance, Our People, Economic and Social Performance, and Environmental Stewardship.

Our materiality process





## Our Priorities

| | | | |
|---|---|---|---|
| BIODIVERSITY | CLOSURE PLANNING | COMMUNITY HEALTH AND SAFETY | ECONOMIC PERFORMANCE |
| EMPLOYMENT | EMISSIONS | ENERGY AND CLIMATE CHANGE | ETHICS AND GOVERNANCE |
| GLOBAL INCLUSION AND DIVERSITY | HUMAN RIGHTS | INDIGENOUS RIGHTS | INDIRECT ECONOMIC IMPACTS |
| LABOR/MANAGEMENT RELATIONS | LAND USE | LOCAL COMMUNITY DEVELOPMENT | LOCAL EMPLOYMENT |
| LOCAL PROCUREMENT | MATERIALS AND WASTE MANAGEMENT | OCCUPATIONAL HEALTH AND SAFETY | SUPPLY CHAIN STEWARDSHIP |
| WATER MANAGEMENT | | | |

☐ ETHICS AND GOVERNANCE     ☐ OUR PEOPLE     ☐ ECONOMIC AND SOCIAL PERFORMANCE     ☐ ENVIRONMENTAL STEWARDSHIP

■ IMPORTANT TO NEWMONT     ☐ IMPORTANT TO EXTERNAL STAKEHOLDERS          LESS IMPORTANT  ▢▢▢  MORE IMPORTANT



Beyond the Mine – Our 2016 Social and Environmental Performance          © Newmont Mining Corporation. All rights reserved.

NEWMONT.    **Beyond the Mine** | Our 2016 Social and Environmental Performance



LEADERSHIP

Strong governance is the foundation for fulfilling our purpose to create value and improve lives through sustainable and responsible mining. Delivering on our sustainability commitments requires a sound framework with effective internal controls, policies and systems, as well as compensation practices that clearly link executive pay to performance metrics that matter to our stakeholders.

## Board of Directors

The mission of Newmont's Board of Directors (the "Board") is to oversee the Company's efforts to create enduring value for shareholders, employees and other stakeholders. The Board also plays a critical role in assessing major risks; ensuring high standards of ethical business conduct and compliance with applicable laws and regulations; and advising and approving the sustainability and overall business strategies.

We believe an inclusive and diverse Board that represents a broad range of backgrounds and experiences benefits the Company in many ways including enhanced governance and greater efficiencies. Three board members – including Board Chair Noreen Doyle – are women, and among the seven members who are men, one is Australian, one is Cuban and one is Ghanaian. All members of our Board have extensive experience working with international corporations and organizations.

Detailed information on Newmont's Board including experience, qualification criteria and commitment to inclusion and diversity is available in our **2017 Proxy Statement**.

Four Board committees provide oversight and guidance in key areas – **Audit**, **Leadership Development and Compensation**, **Corporate Governance and Nominating** and **Safety and Sustainability** – and each has a written charter defining members' roles and responsibilities.

The Safety and Sustainability Committee has primary responsibility for considering strategic sustainability matters, and reviews and approves Newmont's annual sustainability report. Joseph Carrabba serves as the committee's Chair, and members include Gregory Boyce and Jane Nelson, the latter of whom has a long and distinguished career advocating for sustainable business practices and is the Founding Director of the Corporate Social Responsibility Initiative at Harvard Kennedy School.

In 2016, Committee members met five times to **consider a number of matters** related to promoting a healthy and safe work environment and environmentally sound and socially responsible resource development. Each quarterly meeting also included an in-depth review on one of our four regions.

While Newmont's President and Chief Executive Officer visits each region at least once during the year, Board members also participate in site visits to observe and assess implementation of our policies and standards on the ground. As part of the Board planning cycle, one full Board site visit is scheduled each year, and in 2016 the Board visited our newly acquired Cripple Creek & Victor mine in Colorado. Directors may also request individual or smaller group visits to any operation or project. For example, during 2016, members of the Board visited the Merian mine to celebrate the mine's commercial production milestone.

More information about our Board committees, including functions and meeting frequency, is available in our **2017 Proxy Statement**.

## Executive Leaders

The primary responsibility for the day-to-day management of the Company and delivering on our strategy rests with Newmont's Chief Executive Officer and his executive leadership team (ELT). The ELT has business – as well as personal – objectives aligned with each pillar of the **business strategy**, including sustainability and external relations. Key roles are as follows:



**Gary Goldberg**
President and
Chief Executive Officer

Holds ultimate responsibility for Newmont's social, economic and environmental performance, and chairs quarterly health, safety and sustainability updates from global and regional team leaders.



**Nancy Buese**
Executive Vice President and
Chief Financial Officer

Oversees the efforts to drive long-term financial performance and effective risk management.



**Dr. Elaine Dorward-King**
Executive Vice President,
Sustainability and External Relations

Has primary responsibility for the Company's sustainability strategy, including overseeing the sustainability and external relations (S&ER) team members who implement the technical and strategic environmental, geopolitical, social and human rights programs.



**Randy Engel**
Executive Vice President,
Strategic Development

Is responsible for Newmont's strategy and business plan and optimizing the Company's portfolio through mergers, acquisitions and divestment opportunities.

Beyond the Mine – Our 2016 Social and Environmental Performance          © Newmont Mining Corporation. All rights reserved.



**Stephen P. Gottesfeld**
Executive Vice President
and General Counsel

Is responsible for Newmont's compliance with applicable laws and regulations, corporate governance, and ethics and compliance program.



**Scott Lawson**
Executive Vice President, Technical Services,
and Chief Technology Officer

Oversees Newmont's global supply chain as well as the functions responsible for delivering technology and innovation outcomes that drive sustainable competitive advantage and performance.



**William MacGowan**
Executive Vice President,
Human Resources

Leads Newmont's human resources function and drives efforts to attract, develop and retain talent, strengthen global inclusion and diversity, and ensure workforce rights.



**Tom Palmer**
Executive Vice President
and Chief Operating Officer

Along with the Senior Vice Presidents of Projects and Exploration, the Vice President of Health, Safety and Security, and the Regional Senior Vice Presidents, is charged with delivering leading health, safety, social, environmental and operational performance.

The ELT provides leadership, establishes priorities and delegates matters relating to sustainability to teams and individuals. The S&ER group plays a central role in developing and implementing management frameworks, supporting implementation of strategies and standards, and tracking and reporting on our performance on environmental and social matters. Other executives across functional areas also have responsibility for sustainability-related issues. For example, **general managers at each operation** are accountable for implementing policies and standards on the ground, and groups within the Company – including health and safety, security, human resources, supply chain and risk management – directly manage sustainability matters.

Executives are held accountable through Newmont's performance-based compensation structure, which is designed to promote sustained performance and mitigate excessive risk taking. To encourage sustained performance aligned with stockholder interests, stock-based long-term performance incentives represent the largest component of executive pay.

Our Corporate Performance Bonus program for executives, as well as for our regional and site operational leaders, includes annual targets that are designed to advance our strategic objectives. The health and safety targets – to lower accident rates and implement critical controls for top fatality and health risks – and the sustainability targets – related to metrics for water, closure and reclamation, complaints and grievances, as well as performance on the Dow Jones Sustainability Index – account for 25 percent of the total bonus target.

In 2016, the Company's **above-target performance** against the health, safety and sustainability metrics increased the overall weighting of these targets to around 30 percent of the total Corporate Performance Bonus payout.

Newmont holds an annual advisory vote on executive compensation to give shareholders an opportunity to approve, reject or abstain from voting on executive compensation programs and policies. More information on director and executive compensation and the process for communicating with the Board is reported in our **2017 Proxy Statement**.

**Sustainability governance at Newmont**



**NEWMONT.**   **Beyond the Mine** | Our 2016 Social and Environmental Performance



ETHICAL CONDUCT

## Approach

Demonstrating ethical behavior and complying with all laws, rules and regulations are essential to earning the trust of our stakeholders and creating and sustaining value. Strong governance, in combination with everyone who works on our behalf speaking up and taking accountability for their behavior, is crucial for preventing corruption, conflict, penalties, fines and reputational damage.

Integrity – behaving ethically and respecting each other and the customs, cultures and laws wherever we operate – and responsibility – delivering on our commitments, demonstrating leadership, speaking up and challenging the status quo – are two of our core values.

Our **Code of Conduct** (the "Code") states our commitment to high ethical standards, corporate responsibility and integrity. Our Board of Directors updates, reviews and ratifies the Code and re-evaluates it at least every three years.

For all employees, officers and Directors, partners, vendors and contractors, our Code defines applicable standards of behavior and details our expectations that they act ethically and adhere to the social, environmental and economic principles of sustainable development.

**Code of Conduct**

**CODE OF CONDUCT**
Sets out expectations of behavior for Newmont employees, officers and directors, and for our contractors, vendors and other business partners when they are engaged in activities on our behalf

**POLICIES**
Broad encompassing statement of business intentions, aspirations and/or commitments

**STANDARDS**
Specifies minimum acceptable requirements for behaviors, decisions and/or performance

**GUIDELINES**
Provides a recommended approach for behaviors, decisions or performance

**PROCEDURES**
Defines specific work, how it should be done and who should do it

Six global policies state our intentions, aspirations and commitments across key aspects of our business.

- **Health and Safety**
- **Operations and Resource Development**
- **Asset Value Protection**
- **Business Integrity**
- **People**
- **Sustainability and Stakeholder Engagement**

These policies are supported by standards, guidelines and procedures, which define minimum requirements, recommended approaches and how work should be done and who should do it. Our Code and policies are published on our **website**.

Our **Business Integrity Policy** requires all those engaged in activities on our behalf to work honestly and in the best interests of the Company, to avoid corruption and bribery of any kind, and to ensure compliance with various relevant legal requirements. Supporting this policy are a number of standards including our Conflicts of Interest Standard, Gifts and Entertainment Standard, and our Anti-Corruption Standard, which addresses ethical conduct requirements and **Partnering Against Corruption Initiative (PACI)** principles not otherwise covered in our Code or other policies or standards.

When we receive information or credible allegations regarding unlawful conduct, our policy is to conduct a thorough investigation, take remedial steps if warranted and, when appropriate, communicate with authorities about the investigation and findings.

Our internal audit function conducts annual fraud risk assessments, which include assessing risks of commercial and government corruption throughout our operations. Along with regular in-person training sessions customized to the particular region, site or function, we also conduct annual online training that targets a larger percentage of employees.

While anyone can file an ethics report using our anonymous online **Ethics Solutions Tool**, we actively encourage employees to speak up and report any incidents where a possible Code of Conduct violation has occurred. We also input into the Tool cases that may have originated through other channels, such as human resources or security, if they have a component related to the Code. Cases are rated red, yellow or green, depending on the type of allegation and the roles of those implicated. Reports on cases are provided regularly to the Executive Vice President and General Counsel and quarterly to the Board of Directors' Audit Committee.

We engage with governments and other stakeholders on a variety of issues, including worker health and safety, environmental protection, trade, economic development, infrastructure, transparency, rule of law, and other areas of public policy that are important for our operations. This engagement is in strict accordance with all applicable laws, the **Extractive Industries Transparency Initiative (EITI)**, and Newmont's Code of Conduct, Business Integrity Policy and standards on ethical conduct, referred to above.

Our **Political Contributions Standard** details the rules and processes for making political contributions or otherwise engaging in the legislative or political process. This standard states our commitment to report our political contributions to our Board of Directors on a semi-annual basis and annually on our **website**. We do not make political contributions outside the United States.

## 2016 Performance

Our internal audit group updated the fraud risk assessments for each of our four operating regions, and identified the following risks related to corruption as significant or greater in terms of impact, with a probability of "likely" or greater:

- Employee receives payments (kickbacks or bribes) from a vendor in order to make or influence a decision in the vendor's favor; and

- Misappropriation of social responsibility funds used for community relations/compensation (e.g., foundations, land access, crop compensation, traditional authorities).

In April 2016, we publicly disclosed our investigation into certain business activities associated with the requirements of the U.S. Foreign Corrupt Practices Act and other applicable laws and regulations. As part of the investigation, we entered into agreements with the U.S. Securities and Exchange Committee and the U.S. Department of Justice tolling the statute of limitations related to the investigation, which means that the running of the statute of limitations is effectively paused for the period covered by the tolling agreements. As of December 31, 2016, the investigation was ongoing. Disclosures and updates on this matter are available on our **SEC filings site** on **newmont.com**.

To prevent future issues and mitigate these and other risks associated with potential unethical conduct, the Company has implemented a number of improvements and control measures in 2016 including:

- Hired experienced and qualified **site-based ethics and compliance managers** in every region considered to be a higher risk of corruption;

- Conducted anti-corruption training in Peru, Ghana, Indonesia and Suriname during the year, as well as numerous in-person training sessions with various teams, including our Board of Directors, and at corporate events, including our annual global leadership team meeting where ethics and compliance was a significant discussion topic;

- Expanded our 2016 annual ethics training program to all employees with a work-issued email and computer, growing the percentage of employees required to undergo training from around 22 percent in 2015 to 39 percent in 2016. This year's training focused on preventing corruption. Of the employee population eligible for training, participation remained steady compared to the previous year, with 99 percent of managers at operating sites completing the training;

- Initiated a third-party assessment of our global ethics program to evaluate the effectiveness of our Code, policies, standards and Ethics Solutions Tool, and identify gaps and other opportunities for improvement; and

- Implemented a **Supplier Code of Conduct**, which commits our suppliers to ethical, safe, and socially and environmentally responsible conduct and to managing their own supply chain accordingly.

Including issues raised at our Batu Hijau operation in Indonesia prior to its divestiture in November, a total of 357 new issues were raised through the **Ethics Solutions Tool** throughout 2016, and 65 cases were open at the beginning of the year. By year end, 402 of those matters were closed and 20 remained open. Of the cases closed in 2016, 59 percent (237) were not substantiated. Of the 41 percent (165) that were substantiated, 24 percent (40) resulted in a recommended change of business process, and 76 percent (125) resulted in human resource or management actions. These actions ranged from counseling to termination of the employees involved, including the termination of individuals from the senior management category. Beginning in 2016, Code violations were formally factored into performance review considerations of those disciplined. Cases were closed on average in 54 days.

Of the substantiated cases investigated by our ethics group, the vast majority (63 percent) arose from allegations of misconduct or inappropriate behavior that often involve issues between employees and their managers, followed next by allegations related to commercial issues, including conflicts of interest, misuse of company assets or services, and improper supplier or contractor activity. More than 40 individuals are no longer employed by the Company as the result of matters that were closed in our Ethics Solutions Tool in 2016.

Newmont's U.S. political contributions totaled $182,500 in 2016, a significant increase from 2015 reflecting the fact that 2016 was a presidential election year.

### Ethics matters addressed/substantiated



|  | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|
| Total substantiated cases | 74 | 105 | 114 | 102 | 165 |
| Total matters addressed | 199 | 224 | 237 | 246 | 402 |

## Future Focus

To further integrate integrity into the business, in 2017 we plan to take the findings from the assessment of our global ethics program and associated elements and develop action plans that address gaps and opportunities for improvement. Another key program for 2017 is continuing the work that site-based ethics managers are doing with the supply chain group related to the management of commercial and government corruption risk throughout the lifecycle of our supplier relationships.



**NEWMONT**   **Beyond the Mine**   │   Our 2016 Social and Environmental Performance

HUMAN RIGHTS

## Approach

Issues that were once framed as environmental, social or safety risks are increasingly being framed in human rights terms. Our activities throughout the mine lifecycle have the potential to impact the rights of workers, communities and indigenous peoples. While it is the duty of governments to protect human rights, we recognize our responsibility to respect fundamental human rights, mitigate risks, ensure those impacted by our activities have access to remedies, and help realize many human rights through positive contributions that strengthen capacity and empower communities.

Our commitment to respect the rights and dignity of all people is stated in our **Code of Conduct** and our **Sustainability and Stakeholder Engagement Policy**. A set of global standards aligns our commitment to addressing human rights with the United Nations (UN) Guiding Principles on Business and Human Rights (the Guiding Principles), of which the fundamental requirement is that we do no harm. Our **Supplier Code of Conduct** requires our suppliers and business partners to adhere to this commitment as well.

Our global **Human Rights Standard** and strategy help guide how we manage impacts, address grievances, and integrate human rights considerations into our stakeholder engagement and other business activities.

All sites must maintain processes to identify human rights risks on an ongoing basis. For existing operations – or changes to existing operations that have a low risk to impact human rights – we integrate human rights considerations into current processes, such as social impact assessments (SIA) or environmental and social impact assessments (ESIA). For new projects – or changes to existing operations that have a higher potential to impact human rights – sites must integrate human rights impact assessment (HRIA) approaches into their SIAs or complete standalone HRIAs.

Ongoing engagement with stakeholders potentially impacted by our operations helps identify and surface issues before they escalate. Stakeholders can file complaints and grievances through our site-based **complaints and grievances (C&G) mechanism and registers**, our online **Ethics Solutions Tool**, or a manager or human resources representative.

In 2015, we elevated our commitment to human rights by becoming one of the first six global companies – and the first in the mining industry – to adopt the UN Guiding Principles Reporting Framework (the "Reporting Framework"). As the first comprehensive guidance for companies to report on how they respect human rights in line with the Guiding Principles, the Reporting Framework is a crucial tool for improving our performance. An overview of our human rights journey and details about our global salient human rights issues are discussed in our **Guide to Respecting Human Rights**, and we disclose our human rights performance on an annual basis in this report.

We undertake a number of preventative measures around each of these salient issues, making necessary changes to our controls and monitoring changes. We also continually identify, monitor and manage a broader range of human rights risks and impacts. For example, our **global inclusion and diversity strategy** includes a focus on promoting gender equality in both our workforce and the communities where we operate.

As outlined in our **Reporting Framework index**, we discuss our approach to managing our salient issues throughout this report. Readers may also click on any of the salient human rights issues below for more information:

**Salient issues**



### Security

With the right to security of person as one of our salient human rights issues, the basis of our global security program is working alongside our host communities to protect people and assets and respect human rights.

Newmont conducts robust, evidence-based threat and vulnerability assessments at locations ranging from exploration sites, to office buildings. Where security threats are higher – at our operations in Ghana, Peru and Suriname – we employ or contract with on-site security personnel.

As a formal participant in the **Voluntary Principles on Security and Human Rights (VPSHR)**, we commit to implement a set of Voluntary Principles (VPs), which provide an operating framework that enables us to maintain the safety and security of our operations based on respect for human rights and fundamental freedoms.

All sites with on-site security personnel must use our VP implementation framework, which aligns with the following VP tools:

- *Stakeholder engagement* – **Training sessions**, workshops, community events and other engagement activities encourage VP implementation with host governments, raise public awareness of the VPs and help build relationships based on trust.

- *Risk assessments* – Our standardized workbook, which we use to effectively assess and manage security risks, aligns with the VPs, as well as our internal assurance process.

on the VPs including the principles of de-escalation, use of force and other relevant law enforcement codes.

- *Public security* – Our memoranda of understanding (MoU) with public security agencies in Ghana state our joint commitment to respect human rights when operating on Newmont property. Where we do not have MoUs in place, we pursue alternatives to formalize this commitment with the relevant public security organizations. We also encourage public security agencies to participate in our training, workshops, exercises and events pertaining to the VPs.

While we aim to avoid security-related incidents, should such an incident occur, it must be recorded and fully investigated. Events found to be credible are reported to the appropriate authorities as well as the VPSHR plenary, Newmont's executive leadership team and our Board of Directors.

# 2016 Performance

Since 2011, our Yanacocha operation in Peru has been working to resolve a complex land dispute with members of the Chaupe family, who allege human rights violations by Yanacocha. In 2016, the findings of an independent, fact-based examination of the issues associated with the dispute were published by RESOLVE – a nonprofit dedicated to multi-stakeholder consensus building. RESOLVE authored the report, which we commissioned, and an advisory group of experts with NGO, human rights and industry knowledge ensured the integrity and credibility of the review. The report concluded that our acquisition of the land in question was reasonable and that Yanacocha's actions did not violate human rights, and also helped the company identify four key areas where we have room for improvement:

- Human rights due diligence practices need to be improved and more systematically applied in conflict scenarios to account for rapidly changing conditions on the ground.

- Security-related risk assessments are being conducted at some level; however, root cause analysis and incident investigation processes and procedures need to be improved to better demonstrate alignment with the Voluntary Principles on Security and Human Rights (VPSHR).

- Conflict scenarios require more robust procedures including situational analyses focused on dispute resolution, negotiation and de-escalation approaches that can be implemented in parallel to legal mechanisms.

- Complaint and grievance mechanism processes should be reviewed and improved to be more responsive to allegations of human rights violations and abuses to ensure investigations are being initiated and documentation is being developed to demonstrate responses and actions where appropriate.

The full report, as well as our response to the report and our planned next steps to resolve the dispute, are publicly available on our **website**.

As at the end of the year, the dispute remained unresolved. Efforts to engage the family and promote opportunities for dialogue continued; however, on occasion Yanacocha conducted possessory defense actions, as required under Peruvian law, on its actively managed land holdings. These actions reduce the likelihood that mutually beneficial outcomes can be achieved, but we will continue efforts to resolve the dispute.

In support of our human rights strategy, we worked on a number of fronts to address challenges and improve our ability to manage human rights risks. Key activities during the year included:

- All operations, except those in Australia completed their human rights risk assessments in 2016. Our operations in Australia committed to complete their assessments in 2017.

- We conducted assessments that yielded a number of key learnings including the importance of initiating the assessment process as early as possible in the mine lifecycle and balancing the need for the reviews to be independent and objective while producing recommendations that resonate and are able to be integrated into business activities. Among the learnings at each site:

  ○ The Merian operation in Suriname conducted a standalone human rights impact assessment (HRIA) that identified a number of recommendations and actions. Several of the recommendations were addressed in the course of the assessment (which began in 2014), and additional actions around security teams, employee and community health, employment and training were included in the **Cooperation Agreement** signed between the Pamaka community and Newmont.

  ○ Our Yanacocha operation in Peru commenced work on a human rights impact assessment. Progress toward completing the assessment will continue into 2017 to ensure it allows for community participation and verification of the findings.

  ○ In Ghana, the Akyem operation incorporated human rights into their updated social impact assessment and Ahafo operations incorporated human rights indicators into their updated social baseline.

  ○ To better identify risks to people and the environment and not just the business, we integrated human rights considerations into the stakeholder, event and risk modules of our **Integrated Management System (IMS)**, and began training sites on the updated IMS, which will be fully operational by 2018. This will improve our ability to provide leaders and the Board's Safety and Sustainability Committee with up-to-date information on key risks and events having human rights considerations.

- We developed criteria in line with our salient human rights issues to better identify and categorize those complaints and grievances that have a human rights component.

- To address potential human rights risks and opportunities across the supplier lifecycle, we strengthened language in supplier contracts, implemented a **Supplier Code of Conduct**, and launched a **global Supplier Risk Management program**.

- During the year, 4,939 employees and 1,744 contractors participated in various modules of human rights training. Human rights topics were addressed in a variety of ways ranging from cross-cultural educational sessions, human resources and social responsibility inductions, and modules within annual refresher courses. Training sessions focused on human rights topics ranged from 30 minutes to 8 hours, depending on the site's risk profile and needs of the audience. This training is in addition to the specific training discussed below that our security employees and contractors and relevant external stakeholders undergo on the Voluntary Principles on Security and Human Rights.

During 2016, a total of nine grievances or allegations related to human rights were reported as being addressed for the year. The eight allegations related to discrimination in the workforce were submitted through and managed by our human resources function with support from other functions as necessary. Details on these grievances or allegations are discussed in the following table:

### Grievances or allegations about human rights impacts filed, addressed and resolved in 2016

| Type of grievance or allegation | Number of grievances or allegations | Description of grievance or allegation and location |
|---|---|---|
| Human rights–related complaints and grievances recorded in community registers | 0 | We did not receive any human rights–related complaints and grievances through our community complaints and grievances mechanisms. |

| Type of grievance or allegation | Number of grievances or allegations | Description of grievance or allegation and location |
|---|---|---|
| Discrimination in the workforce | 8 | In the United States, our Nevada operations reported three allegations related to gender, race, age and retaliation. These allegations were investigated by human resources and senior management and responsible individuals were disciplined up to and including termination, when appropriate. Our CC&V operation in Colorado reported one allegation related to a disability and this allegation was investigated by human resources and senior management and responsible individuals were disciplined up to and including termination when appropriate. |
|  |  | At our Boddington operation in Australia, four allegations were reported: three were allegations of racial discrimination and one was related to bullying. Two of the three racial allegation were investigated and found to be unsubstantiated. The bullying allegations resulted in mediation and a formal apology to the complainant. One racial allegation was complex, dealing with several complaints from an indigenous community group resulting in a formal written acknowledgment from, as well as an in-person meeting with, the Company to discuss the expressed concerns. |
| Child labor | 0 | We did not receive any grievances or allegations of child labor violations. |
| Forced and compulsory labor | 0 | We did not receive any grievances or allegations of forced or compulsory labor violations. |
| Land rights (non-indigenous) | 0 | We did not receive any grievances or allegations of land rights violations. |
| Security forces | 0 | We did not receive any grievances or allegations related to our security forces. |
| Other | 1 | Our Yanacocha operation received an allegation from a non-governmental organization regarding the Company's actions toward opposition to the Conga project. Newmont engaged with the organization and will continue to have and promote dialogue on this topic. |
| Total incidents | 9 |  |

## Security

Every site that employs private security personnel and those where public security agencies are active in and around our operations completed annual training based on the Voluntary Principles (VPs).

### Total number of participants in security training

| Region | Site/location | Employees | Private security contractors | Law enforcement personnel | Other external stakeholders | Percentage of security personnel trained | Cumulative hours of training |
|---|---|---|---|---|---|---|---|
| Africa | Ahafo, Akyem and Accra | 775 | 584 | 90 | 3 | 100% | 5,808 |
| South America | Yanacocha | 0 | 388 | 0 | 0 | 100% | 1,746 |
| Total |  | 775 | 972 | 90 | 3 | 100% | 7,554 |

Note: In Ghana, we conducted a four-hour training program with employees, private security contractors, law enforcement and military personnel and three NGO representatives. Yanacocha trained 388 private security contractors in four-and-a-half-hour long training modules. The figures for Yanacocha do not include an annual seminar on the VPSHR, which was attended by representatives from the national government, military and police staff, community members and local journalists.

In 2016, we refreshed our approach to build an even stronger security program and improve our implementation of the VPs. Key programs and activities during the year included the following:

- We met our global external target for all operating, project, exploration and office sites to complete security and human rights risk assessments using the standardized workbook based on the VPs. An independent auditor reviewed the assessments, and sites identified controls and developed action plans for all threats, with a particular focus on the threat of invasions and protests at our sites. This review also identified a number of key opportunities for improvement, including:
  - Tailoring training to job functions and ensuring training framework includes key learnings outcomes;
  - Expanding programs such as the Security/Community Integration Program (SCIP), which brings together community members and security personnel at our Yanacocha operation in Peru;
  - Developing consistent criteria and a more robust due diligence process for awarding and renewing private security contracts; and
  - Working within the VPSHR to create meaningful performance metrics and share excellence in implementing the VPs.
- We established an internal, cross-functional Security and Social Acceptance Committee (SSAC) to be more agile in how we approach and respond to security-related threats. A key function of this group is to review specific cases and provide advice and solutions from a multidisciplinary perspective. During the year, the group discussed developments in the land dispute with the Chaupe family and our security approach at Merian.
- In April, the Voluntary Principles Working Group in Peru, of which our Yanacocha operation is a co-founder, published **a five-year study** on promoting the VPs and improving their implementation. In addition, Yanacocha and the Peruvian Ministry of Justice hosted a VPSHR working group, where community members, government officials, embassies, NGOs, and other companies exchanged experiences on implementing the VPs. During the meeting, the Minister of Justice announced the government's willingness to be a signatory to the VPSHR; the working group is supporting the government with this effort.

Beyond the Mine – Our 2016 Social and Environmental Performance          © Newmont Mining Corporation. All rights reserved.

# Future Focus

In 2017, we will continue work to advance our human rights strategy.

Once fully operational in 2018, our updated Integrated Management System (IMS) will help facilitate a number of improvements, including:

- Enhanced analysis of site-level human rights information from our stakeholder engagement activities, which will allow us to manage, track and update our salient human rights issues as necessary;
- Improved monitoring, tracking and data collection on human rights through the introduction of complaint criteria related to our salient issues; and
- Greater ability to assess and manage risks related to human rights within our supply chain through our broader **Supplier Risk Management program**.

These improvements, as well as other efforts such as expanding human rights–related training to more employees in 2017, are expected to improve our understanding of our human rights risks and our ability to manage them, and, in turn, lead to more robust reporting in line with the UN Guiding Principles Reporting Framework.

## Security

Effectively managing the risks present in our operating environments is a key element of implementing the Voluntary Principles (VPs). We clarified our 2017 security target, and are updating our targets for 2018 and beyond to better align them with other efforts – such as our artisanal and small-scale mining strategy – and to be more meaningful in measuring the impact of implementing the VPs. We will disclose the updated targets in our 2017 sustainability report.

| Security targets | | | |
|---|---|---|---|
| **Years** | **Target definition** | **Target for sites** | **Target for Newmont** |
| **2017** | Security risk assessments pertaining to human rights are completed, issues and potential impacts identified, and, where necessary, mitigation strategies and controls are considered and required training is scheduled and provided | **100 PERCENT** of identified High and Extreme threats have action plans to reduce threats to a tolerable level | **100 PERCENT** of risk assessments have been completed and **100 PERCENT** of action plans have been subject to external review at sites in Ghana, Peru and Suriname |

Other key focus areas in 2017 include:

- Implement control management plans at sites for key security vulnerabilities identified in assessments;
- Continue to enhance our threat assessment process through third-party audits and quantifying the return on investments in our security program and approach; and
- Continue to integrate human rights into our security program by expanding training beyond security teams to employees, business partners and public security agencies.

NEWMONT    **Beyond the Mine**  |  Our 2016 Social and Environmental Performance



OUR WORKPLACE

## Approach

Our global workforce is the foundation of our business. We recognize our long-term success depends on fostering a work environment that promotes an inclusive culture where everyone has the opportunity to contribute, develop and work together to deliver our strategy.

These efforts are guided by our **Code of Conduct** and our global **People Policy**, which states our commitment to select and develop our employees and establish a work environment where everyone takes part in reaching our goals while feeling a sense of pride in working at Newmont.

Supporting these commitments are our global standards on Employment; Compensation and Benefits; Global Inclusion and Diversity; Labor Relations; Conduct and Non-Discrimination; and Talent and Performance Management.

Our human capital strategy ensures our talent management efforts support the execution of our overall business strategy. It focuses on leadership and talent development, employee value proposition, labor relations, growth and stability, and the next generation workforce.

Another key strategy element is global inclusion and diversity, which are core values and strategic priorities for Newmont. Our global inclusion and diversity strategy focuses on three key areas: integrating principles, practices and content into the workplace to encourage inclusive behaviors; increasing the representation of women, nationals, local and indigenous people (where applicable) and other diverse people throughout our workforce; and establishing community partnerships that support the development of a diverse talent pipeline and our values of inclusion and diversity.

We set diversity representation targets to help clarify our priorities and evaluate the effectiveness of our efforts. Feedback from employee surveys – as well as quarterly updates to the executive team and Board of Directors' Leadership Development and Compensation Committee and annual updates to the full Board – provide an opportunity to review our progress and adjust our approach as needed.

## 2016 Performance

**Employee survey results**



**96%**
feel that Newmont demonstrates its commitment to safety

**89%**
know how their work helps the Company meet its objectives

**86%**
were proud to work for Newmont

**80%**
said they were confident in Newmont's future

**79%**
agree that people of all backgrounds can succeed in my company

During the year, we conducted a global employee engagement survey that asked employees across our global operations for honest feedback about their attitudes and perceptions as members of the Newmont team. More than 10,000 employees shared their views on matters that help us understand levels of engagement, alignment with our strategy and values, and manager effectiveness. Findings from the survey include:

- Overall employee engagement remained strong – well above the industry benchmark – and increased from the previous survey conducted in 2014.

- Among the areas of highest engagement: 89 percent of employees felt they know how their work helps the Company meet its objectives; 86 percent were proud to work for Newmont; 80 percent said they were confident in Newmont's future; and 71 percent felt there was a clear direction from senior leadership.

- Opportunities for improvement were related to manager effectiveness at the local level and increasing our commitment to inclusive and trust-building behaviors. Action plans were developed and implemented to address improvement and maintain our areas of strength.

At the end of 2016, Newmont's global workforce comprised 10,804 employees and 9,312 contractors, a decline of around 25 percent compared to 2015. The decrease was largely due to the divestiture of our Batu Hijau operation in Indonesia, slightly offset by additions to our reporting from KCGM in Australia and Cripple Creek & Victor in the United States.

### Diversity and global inclusion

Results from our global employee survey indicate that a majority of employees believe people of all backgrounds can succeed at Newmont (79 percent); the Company demonstrates its commitment to inclusion (79 percent); and it is committed to diversity in the workplace (70 percent). However, female leaders recorded lower scores than their male counterparts, confirming that we have more work to do.

Beyond the Mine – Our 2016 Social and Environmental Performance        © Newmont Mining Corporation. All rights reserved.

Case 1:17-cv-01315-GAM   Document 27-1   Filed 11/01/17   Page 120 of 136 PageID #: 561

- We established additional employee-led, executive-sponsored business resource groups (BRGs), which foster the exchange of ideas and promote diversity of thought on important workplace matters. At the end of 2016, we had a total of 16 BRGs (up from zero in 2013), with every region having at least two. The newest BRGs include five Women and Allies networks – at Cripple Creek & Victor in Colorado, Yanacocha in Peru, and three in Ghana (one at each operating site and one at the regional office).

- Our **executive leadership team attended an unconscious bias training workshop,** and 350 employees in Nevada and all superintendents and managers in Australia participated in unconscious bias training to better understand the impact of conscious and unconscious bias in the workplace.

- At our headquarters, more than 100 employees who work and interact with our global workforce participated in an inclusive leadership workshop.

- In Australia, we piloted a mentoring program that focused on providing senior leadership mentors for diverse employees to help guide their career development.

- As a follow-up to our global employee survey, we engaged an external party to conduct internal interviews to better understand different perceptions about Newmont's progress in embedding a culture of inclusion and diversity. The findings will be used to inform our 2017 plans.

- We received a perfect score of 100 percent in the Human Rights Campaign (HRC) Foundation's 2017 **Corporate Equality Index (CEI)**, which rates large U.S. employers on their company policies and practices related to lesbian, gay, bisexual and transgender workplace equality.

- We engaged with industry peers and stakeholders to expand our understanding of inclusion and diversity and share best practices through sponsorships and active participation in events and forums including the Colorado Women in Leadership Symposium, the Women in Mining West Australia Summit, the Elko Women's Expo, and the Diversity in the Minerals, Metals, and Materials Professions Conference at Northwestern University.

Work to increase the representation of women, nationals, local and indigenous people (where applicable) and other diverse people throughout our workforce included:

- Our site-based local and indigenous employment performance is discussed in greater detail in **Local Employment and Business Opportunities.**

- At the end of the year, representation of women among all employees increased from 11 percent in 2015 to 14.8 percent, primarily due to the divestiture of the Batu Hijau mine in Indonesia. We maintained strong representation by women on our executive leadership team and named **Noreen Doyle the Chair of our Board of Directors.**

- At the end of 2016, Ghanaian nationals represented 42 percent of our regional leadership team and 86 percent of managers. In Peru, 64 percent of the regional leadership team and 97 percent of managers were Peruvian nationals. Around 90 percent of our senior leaders (those at the Senior Director level and above) work in their country of nationality.

### Talent management and skills development

During the year, we refreshed our human capital strategy to address shifts in priorities and increase our focus on the needs of next generation workers. We also enhanced our global university strategy to strengthen relationships with universities around the world and invest in internships and rotational assignments.

Our employee engagement survey identified the opportunity to increase our focus on career development and provide more meaningful employee feedback. In 2016, we launched an online self-service Employee Profile tool. Connected to individual development plans, the tool allows employees to document their experience and career interests including mobility preferences, certifications, languages spoken and roles they would like to be considered for in the future.

Newmont strives to provide all employees feedback on their performance. The structure of that feedback varies among locations, job categories and workforce agreements. Of our total employee population, around 76 percent participated in a formal performance review process. Where no formal process for performance management exists, we follow local protocols to connect employee skills and competencies to business performance. We are working to improve our analysis and reporting on performance review data, so we can disclose both employee category and gender information in future reports.

We invested approximately $7.9 million in training and development programs that include on-the-job development and technical training for specific job functions, formal training and development programs and ongoing education opportunities through apprenticeships, tuition assistance, and scholarships to universities and technical schools.

During the year, we aligned our leadership development processes to our global employee engagement survey to increase people managers' focus on the engagement and retention of their team members. Through our High Performance Leadership program, nominated employees participated in a five-day customized program designed to develop key leadership skills and establish global cross-functional relationships to support leadership success.

The employee-initiated turnover rate increased to 5.0 percent during the year, compared to 3.2 percent in 2015.

## Future Focus

We will continue work to develop the next generation of Newmont mines and global leaders. Key milestones in implementing the strategy over the next year are as follows:

- We will assess our current programs and performance against the goals stated by the **Paradigm for Parity coalition**. Supported by Newmont President and CEO Gary Goldberg and led by business leaders, academics and board members – including Newmont Board members Noreen Doyle, Veronica Hagen and Jane Nelson – the coalition outlines specific actions to achieve full gender parity by 2030, with a near-term goal of women holding at least 30 percent of senior roles.

- We will continue to implement our strategy to recruit the next generation of Newmont team members through engagement with universities around the world and investments in internships and rotational assignments.

- We plan to introduce new leadership development offerings and focus on the effectiveness of all leadership and career development programs.

- We aim to incorporate more self-service tools that empower employees to manage their career development, benefits and other elements of their employment with Newmont.

- We will initiate work to integrate the relevant United Nations Sustainable Development Goals (SDGs) into our business. For the "gender equality" goal (SDG-5) – one of our five priority SDGs and where we have in place many existing systems and projects, such as our work with the **Women's Consultative Committee in Ghana** – we will work to set meaningful targets that align with and have the greatest impact on the goal. Recognizing the need for public-private partnerships in achieving the goals, we will also seek opportunities for collaboration both within our industry and across sectors.

- To reflect the sale of our operations in Indonesia, we revised our target to increase the enterprise-wide representation of women in the workforce to 15.3 percent by 2018.

© Newmont Mining Corporation. All rights reserved.

# EXHIBIT 14





# Annual Report to the Voluntary Principles on Security and Human Rights

25 August 2015



## **Table of Contents**

**A.     Commitment** .................................................................................................................**2**

Statement of Commitment ........................................................................................... 2

**B.     Policies, Procedures, and Related Activities** .....................................................**2**

Policies, Procedures and/or Guidelines ...................................................................... 2

Risk Assessments........................................................................................................ 3

Reporting of Security-Related Incidents with Human Rights Implications.................. 3

Relationships with Private and Public Security Services ............................................ 4

Addressing Security-Related Incidents with Human Rights Implications ................... 4

Promoting the Voluntary Principles ............................................................................. 5

**C.     Country Implementation** ..............................................................................................**6**

Peru.............................................................................................................................. 6

Indonesia ..................................................................................................................... 8

Ghana........................................................................................................................... 9

Suriname .................................................................................................................... 10

Stakeholder Engagement........................................................................................... 11

Considerations in the Selection and Arrangements with Public and Private Security Providers........... 12

Annual Training .......................................................................................................... 12

Progress Review of Voluntary Principal Implementation ....................................... 15

**D.     Lessons and Issues from 2014** .............................................................................**15**

**References**.............................................................................................................................**15**

**Cautionary Statement** ....................................................................................................**16**

Prepared by: Newmont Global Security

**NEWMONT.**

focusing on joint problem solving by work groups with representatives from the various stakeholders. The seminar and workshop addressed public and private security challenges for reducing risks of conflicts. The event provided security personnel with a clear understanding of their role within the Voluntary Principles framework.

Our Batu Hijau operation in Indonesia has reached out to the in-country teams for VPSHR. Each private and public security member has been issued with a plastic card which discusses human rights and general safety. The site also hosted three joint exercises involving Newmont Security, private security and police regency on VPSHR, two of these exercises also involved the community.

## C.   Country Implementation

Newmont has identified Peru, Indonesia, Ghana and Suriname as areas where the potential for security-related incidents with human rights implications are of greatest concern.

### Peru

Newmont is the majority partner and operator of Minera Yanacocha, a joint venture with Buenaventura and the IFC. Yanacocha is South America's largest gold mine and has been operating since 1993. The mine is at an altitude of roughly 12,000 feet and is located approximately twelve (12) miles by air and thirty-one (31) miles by road from the city of Cajamarca in northern Peru.  The city of Cajamarca has a population of approximately 250,000. In addition, there are over 156 small "caserios" or villages around the Yanacocha mining concession that are home to approximately 49,500 people. Aside from mining, the Cajamarca region is economically dependent on agriculture as an important source of revenue.



*Figure 1 - Minera Yanacocha Operation, Peru.*

Yanacocha is an open pit mining operation that produced an estimated 970,000 consolidated ounces of gold in 2014. The anticipated mine life extends to 2019. Direct employment by Yanacocha is approximately 1,832 people with 50% from local areas, another 49% from other areas of Peru. Contractors represent an additional 4,190 workers as of December 2014. The Security functional area at Yanacocha consists of 37 employees and 279 contractors with 154 government security personnel that routinely visit the site.

**NEWMONT.**

Newmont suspended construction of the Minas Conga Project at the end of November 2011 due to a violent protest, as explained in the annual report submitted in 2012. Construction of the mining and processing infrastructure for the Conga Project remains suspended as the team is focused on improving relationships with area stakeholders and implementing some water improvement projects to address stakeholder concerns over water.  The South America Regional Security department established a VPSHR Action Plan including roles and responsibilities for monitoring implementation and performance. The Action Plan includes the continuation of Security/Community integration programs within Newmont's area of influence, which contributes to reduced conflict.

The Conga Project is expected to eventually involve surface mining of a large copper porphyry deposit also containing gold that is located twenty-four kilometers northeast of our Yanacocha Operation. The Conga Area of Influence (AOI) includes thirty-two caserios or villages which are home to roughly 7,350 people. The Conga Project has a current workforce of approximately 57 employees and 493 contractors. The project employs a total of 37 security personnel with that is augmented by private security and government security regularly.

Although construction of the mining and processing infrastructure remained suspended throughout 2014, the Company continued construction of water storage reservoirs for the communities.  Construction of the reservoirs has not resulted in any major issues or protests and is expected to continue. Our approach to reservoir construction illustrates our commitment to the Voluntary Principles and other stakeholders relative to avoiding escalation of tense situations when possible.

Yanacocha continues to manage an ongoing land dispute dating back to 2011 with the extended family of a former land owner and this remains a priority for Newmont.  There has been ongoing engagement between the company and the family spanning legal proceedings, involvement of private security and the national police, and civil society campaigns.  A summary and chronology of the events related to the dispute with the Chaupe family can be found here and Newmont's contract with the Peruvian National Police is available here.  We will continue to engage in a transparent manner around this issue while respecting human rights to come to a mutually beneficial outcome.

According to the most current Heidelberg Institute Conflict Barometer[5], Peru maintained its rating of 3 (2013, p. 74). Nonetheless, a number of companies with projects in Peru continue to defer investment due to uncertainties with the social and political climate in many parts of the country.

The Company continues to drive progress with regards to broader implementation of the Voluntary Principles. Notably, Yanacocha is a cofounder of the Voluntary Principles Working

---

[5] The Conflict Barometer is a measure of political conflicts worldwide undertaken by the Heidelberg Institute for International Conflict Research (Analyzed Period: 01/01/13 – 12/31/13).

Group in Peru which is engaging with the government to become signatory to the Voluntary Principles. This group consists of international and national nonprofit organizations, the Peruvian Ministry of External Affairs, Embassies of the US, UK, Switzerland and Canada, and one other mining company (Anglo American). This partnership allows participants to share methods of promoting the Voluntary Principles among their respective audiences.

## Indonesia

Newmont has operated the Batu Hijau open pit mine since 2000 in the southwest corner of the island of Sumbawa in the West Nusa Tenggara province of Indonesia. It is a joint venture with Sumitomo Corporation and Indonesian investors. The processing facilities produce copper concentrate, which is then shipped to smelters via a port system constructed and managed by Newmont. In 2014, the mine produced 71,000 consolidated tonne's of copper and 76,000 consolidated ounces of gold. The anticipated mine life extends to 2036 for processing of stockpiles.

Batu Hijau employs about 6,469 direct employees and contractors, of which more than 90 percent are from the province of West Nusa Tenggara. Prior to mining, the area was comprised of only a few small villages of less than 500 people. Over time, the population has grown to about 31,000 in the 17 villages in the mine's direct area of influence. The majority of the population consists of subsistence farmers and fishermen.



*Figure 2 - Batu Hijau Operation, Indonesia*

There are 24 security professionals directly employed at the Batu Hijau mine, and 353 contracted personnel with 30 government security personnel regularly on site. Overall, Indonesia remained at a conflict intensity of three, according to the most recent Heidelberg Institute Conflict Barometer  (2013, p. 97).





# Annual Report to the Voluntary Principles on Security and Human Rights

February, 2016



## Table of Contents

**2016 Activities to promote the Voluntary Principles** ........................................................................ 2

Promoting and advancing implementation of the VPs internationally ............................................... 3

Progress Review of VPs Implementation ........................................................................................ 5

Risk Management ........................................................................................................................... 6

Public and Private Security - Annual Training ................................................................................. 6

Governance and Performance ........................................................................................................ 7

Stakeholder Engagement ............................................................................................................... 7

**Lessons and Issues from 2016** ...................................................................................................... 9

**Commitment to the Voluntary Principles** ...................................................................................... 11

Statement of Commitment ............................................................................................................ 11

**Policies, Procedures and Related Activities** ............................................................................... 11

Policies, Procedures and/or Guidelines ........................................................................................ 11

Third Party Risk Assessments ...................................................................................................... 12

Reporting of Security-Related Events with Human Rights Implications ......................................... 12

Relationships with Private Security and Public Security Forces ..................................................... 12

Addressing Security-Related Incidents with Human Rights Implications ........................................ 13

**Country Implementation** .............................................................................................................. 13

Peru ............................................................................................................................................. 14

Ghana .......................................................................................................................................... 14

Suriname ...................................................................................................................................... 15

Considerations in the Selection and Arrangements with Public and Private Security Providers ........... 15

**References** .................................................................................................................................... 16

**Cautionary Statement** ................................................................................................................. 17

Prepared by: Newmont Health, Safety and Security

NEWMONT.

## Lessons and Issues from 2016

**Security and Social Acceptance Committee**

A Security and Social Acceptance Committee (SSAC) was established in 2016 to support robust development and implementation of Newmont's security strategy and standards and procedures to ensure alignment with commitments to the VPs. The SSAC is made up of a rotating group of executives, and is staffed by security and social responsibility leaders. In accordance with its objective the group convened in 2016 and reviewed coordinated and improved outcomes with regard to:

- The Chaupe land dispute and the Independent Fact-Finding Report (RESOLVE 2016)
- The evaluation, due diligence and future operating plans for the private security contractor at Newmont's Merian mine Suriname

The committee has been able to deliver effective strategic support and both of the topics above will continue to be areas of focus for the committee.

**Peru**

Chaupe Land Dispute Update

Yanacocha continues to manage an ongoing land dispute dating back to 2011 with the extended family of a former land owner and this remains a priority for Newmont. This matter involves legal proceedings, involvement of private security and the national police, and civil society campaigns.  A summary and chronology of the events related to the dispute with the Chaupe family and updates on recent events can be found here.

Resolve Report

In May of 2015, following allegations of harassment against the Chaupes, Newmont commissioned RESOLVE – an independent nonprofit organization dedicated to multi-stakeholder consensus building – to establish an independent body empowered to objectively examine the situation and publicly disclose their findings. RESOLVE released the report developed by the Yanacocha Independent Fact Finding Mission [5](YIFFM), which is publicly available at: http://www.resolv.org/site-yiffm/files/2015/08/YIFFM-report_280916-Final.pdf.

Some of the key conclusions from the Mission were:

- The overall process of land acquisition by Conga/ Yanacocha was reasonable.
- Information about the 1996 and 97 sale of possessory rights for Tragadero Grande to Conga/ Yanacocha is complex and remains inconclusive.
- No conclusive evidence that Minera Yanacocha was involved in human rights abuses.

---

[5] For more information on the YIFFM visit http://www.resolv.org/site-yiffm/

NEWMONT.

- Minera Yanacocha's decisions on legal measures to protect its title, and associated security actions, did not carefully consider potential human rights impacts, or how they could be perceived as human rights problems.
- While Yanacocha's actions were generally aligned with the Voluntary Principles on Security and Human Rights, there are specific and material gaps in the Chaupe case.
- Despite company standards calling for dialogue in dispute resolution, this requirement was not fulfilled in the Chaupe case.

Newmont and Yanacocha have identified the following steps for addressing both the land dispute with Chaupe family and general areas for improvement. Yanacocha developed detailed action plans based on the phases described below:

- Step 1:   Intensify efforts to hold a good-faith dialogue with the Chaupe family to resolve the land dispute
- Step 2:   Establish detailed action plans and accountability for implementation of improvement areas – regularly report on progress and implementation
- Step 3:   Conduct monitoring/ reporting of performance improvements

Since the RESOLVE report publication, Newmont has worked in good faith to socialize the findings of the report and our action plan with stakeholders so we can chart a constructive path forward. Specific actions related to security and the VPs including systematic improvements, updated risk assessments procedures, investigation procedures, and specific internal awareness training have been completed.

**Suriname**

<u>Merian Security Arrangements</u>

An extensive review of the security arrangements at Merian in 2016 resulted in a number of recommendations that take into account the complex nature of the security environment and the learning's from the accidental shooting event, previously reported to the VPSHR in July 2015. The recommendations have been developed into an action plan which includes a re-negotiation of the security contract, specific performance expectations and criteria and, the implementation of a human-rights focused hybrid model. This model brings sensitive areas of security in-house, with remaining traditional perimeter guarding being outsourced, but closely monitored.

**NEWMONT.**

## Commitment to the Voluntary Principles

Newmont Mining Corporation ("the Company"), headquartered in Colorado, USA, is primarily a gold producer, with significant assets or active operations and development projects through subsidiaries in the United States, Australia, Peru, Ghana and Suriname. Gold, in the form of doré, is produced by most of the Company's operations, with some operations producing copper cathode or concentrate containing copper and gold.

Respecting and promoting human rights remains paramount to fostering strong community relationships and securing social acceptance for our operations, in a safe and responsible manner. This includes living up to our commitments through our participation in the United Nations Global Compact (2000)[6] and the VPSHR, as well as honoring the principles enshrined in the Universal Declaration of Human Rights (1948).

### Statement of Commitment

Newmont is committed to the continued implementation of the VPs, which underpin our values and are reflected in our annual sustainability report, (*Beyond the Mine* - Our Social and Environmental Performance). The Voluntary Principles continue to provide a valuable framework for guiding our approach to security arrangements at our operations to help ensure we respect human rights.

As a founding member of the International Council on Mining & Metals (ICMM), Newmont has publicly committed to the ICMM's Principles for Sustainable Development. Principle three commits our Company to "uphold fundamental human rights and respect for cultures, customs and values in dealings with employees and others who are affected by our activities." (2015)

## Policies, Procedures and Related Activities

### Policies, Procedures and/or Guidelines

Newmont strives to operate its business in a manner that is consistent with the principles articulated in the Universal Declaration of Human Rights. Newmont's security function published a global standard outlining the Company's intent to ensure the provision of security in accordance with the VPs.

In addition to this standard, each regional security function has responsibility for management of internal and private security forces, and for the development of and management of memoranda of understanding (MOU's) with any public security agencies. Consistent expectations for the provision of security are included in Newmont's global security standards, which were updated in 2014. Site-level security procedures with references to the VPs are also in place.

---

[6] Participant since 2004

**NEWMONT**.

An effective complaint and grievance program is an important tool for addressing community concerns. The corporate Sustainability and External Relations (S&ER) department  has implemented guidance on complaint and grievance mechanisms, as well as quarterly, internal reporting and measurement of company response time and resolution of complaints and grievances.

**Third Party Risk Assessments**

Third-party risk assessments may be completed prior to initiating exploration drilling or starting project development in those jurisdictions with higher potential for violence or human rights abuses. A similar approach may be utilized for higher risk locations encountered during due diligence evaluations for mergers or acquisitions.

The third-party risk assessments typically cover a wide range of issues, including:

- Local and national human rights contexts and dynamics (political, socio-economic, labor);
- Potential for conflict, violence, and illegal equipment transfers;
- Local and national security capabilities and human rights records;
- Governmental commitments to the rule of law, including the reliability, fairness, and efficiency of the legal system; and
- Identification of security risks.

Newmont's global, regional, operational, or projects security teams monitor risks identified in the third-party assessments. Plans and strategies are modified as needed to reflect changes in the nature or level of risk.

**Reporting of Security-Related Events with Human Rights Implications**

Our contracts with private security partners and MOU's with public security agencies require recording and reporting of security-related incidents that have potential human rights implications. Incidents involving the use of force by private security are reported internally and to local and federal authorities. Newmont requires that all security related events involving private and public security are fully investigated, recorded and corrective actions are completed. Security procedures have been developed and implemented by the regions and/ or sites to address these matters. The security procedures follow a standardized template, but are tailored to regional and/ or site specific conditions.

**Relationships with Private Security and Public Security Forces**

As part of Newmont's vendor selection process on private security firms, we complete a screening process that includes background checks on: past incidents and allegations; training with respect to human rights, proper use of force, and weapons; affiliations with illegal activity; and any involvement in activities with human rights implications.

Newmont includes references to the VPs in contracts with private security companies. Our contractual provision details our expectations that all employees from private security providers

**NEWMONT**.

will complete awareness training on Newmont's commitments to human rights, the principals of de-escalation, use of force and weapons, and relevant international codes for law enforcement.

Public security forces are invited to participate in briefings, workshops, exercises and events pertaining to the VPs and related human rights matters, along with private security agencies.

**Addressing Security-Related Incidents with Human Rights Implications**

All incidents involving allegations of human rights abuses and reports of inappropriate use of physical force by private or public security agencies are recorded and, if found to be credible, reported to the appropriate authorities for investigation. In accordance with Newmont's Standards on Global Security, incident investigation and reporting and the complementary Security Performance Standard, subpart Security and Human Rights, we require that an internal investigation is completed for all such cases and events. Regular auditing of these investigations and corrective action closure is completed by Newmont's Corporate Security function.

Additionally, Newmont's corporate S&ER function maintains standards that address complaint and grievance management, as well as other corresponding community relationship requirements. Newmont Stakeholder Relationship Management standard requires every site to develop procedures for the identification, tracking and collaborative resolution of complaints. The Company conducts an analysis of complaint and grievance statistics and trends to evaluate the effectiveness of response times and resolutions. In addition, complaints can be escalated to third party mediators, official agencies or through the judicial processes.

## Country Implementation

Newmont has identified Peru, Ghana and Suriname as areas where the potential for security-related incidents with human rights implications are of greatest concern. Guiding our approach to implementation are some key elements:

- Engagement – working with NGOs, government bodies and embassies, while engaging with community members to build and improve relationships.

- Risk Management – developing consistent approaches to undertaking site, regional and countrywide assessments that incorporate the requirements of the VPs.

- Influencing Public Security and managing Private Security – seeking opportunities to reduce the potential for conflict by promoting improved standards related to security providers and encouraging governments where we operate to participate in the VPs.

- Transparency – publicizing our security contracts, along with our commitments to the VPs, and responding to information requests from stakeholders in a timely manner. In addition, transitioning towards independent, NGO-led audits of our implementation efforts.

**NEWMONT**

## Peru

Newmont is the majority partner and operator of Minera Yanacocha, a joint venture with Buenaventura and the IFC. Yanacocha is South America's largest gold mine and has been operating since 1993. The mine is at an altitude of roughly 12,000 feet and is located approximately twelve (12) miles by air and thirty-one (31) miles by road from the city of Cajamarca in northern Peru. The city of Cajamarca has a population of approximately 250,000. In addition, there are more than 156 small "caserios" or villages around the Yanacocha mining concession that are home to approximately 49,500 people. Aside from mining, the Cajamarca region is economically dependent on agriculture as an important source of revenue.

Yanacocha is an open pit mining operation that produced an estimated 630,000 consolidated ounces of gold in 2016. Direct employment by Yanacocha is approximately 1,618 people, with 50 percent from local areas, another 49 percent from other areas of Peru. Contractors represent an additional 3,494 workers as of December 2016. The security function at Yanacocha consists of 11 employees and 340 contractors, along with 50 government security personnel that routinely visit the site.

Newmont suspended construction of the Conga Project at the end of November 2011 due to violent protests, as explained in the annual report submitted in 2012. Construction of the mining and processing infrastructure for the Conga Project remains suspended as the team is focused on improving relationships with area stakeholders and implementing some water improvement projects to address stakeholder concerns. Yanacocha's security department established a VPSHR Action Plan including roles and responsibilities for monitoring implementation and performance. The Action Plan includes the continuation of Security/ Community integration programs within Newmont's area of influence, which contributes to reduced conflict.

## Ghana

Newmont owns and operates the Ahafo mine, located in the Brong-Ahafo Region of Ghana, which is approximately three hundred (300) kilometers northwest of the capital city of Accra and forty (40) kilometers southeast of the regional capital in Sunyani. The Ahafo mine began operating in 2006 with an anticipated mine life that extends through 2021.

Ahafo is an open pit gold mine with associated milling and leaching facilities. It produced about 330,000 consolidated ounces of gold in 2016. The mine directly employs approximately 1,042 people, 97 percent of whom are Ghanaian. It also engages about 1,396 contractors, 95 percent of whom are Ghanaian. Ahafo was the first large-scale mine in the region. Prior to its start-up, the local economy was centered on small-scale commercial farming and subsistence agriculture. There are approximately 110,000 people living in the mine's direct area of influence. Ahafo employs four security professionals directly employed by Newmont and 368 private security contractors with 20 routine government security personnel assigned to Newmont's operations.

Newmont operates the Akyem mine located near New Abirem in the Eastern Region of Ghana. The mine produced about 440,000 ounces of gold in 2016. Akyem provides direct employment

to 787 employees, 95 percent of whom are Ghanaian. In addition, the operation engages roughly 619 contractors. Akyem employs five security professionals directly and 180 private security contractors. There were approximately 30 government security personnel present at or near the operation on an ongoing basis. The Akyem area of influence includes eight communities and approximately 40,000 inhabitants.

In addition to Newmont's operational mine sites in Ghana, the regional office is located in Accra where security personnel are also deployed. There are four employed security professionals and 27 private security contractors.

Ghana has not been assigned a conflict intensity rating according to the most recent Heidelberg Institute Conflict Barometer (2016). Nevertheless, Newmont continues to promote Ghana's participation in the VPs, including direct support of Ghana National Police Training.

**Suriname**

The Merian site is located 66 kilometers south of Moengo, Suriname. After two years of construction, first production from the operation occurred in October of 2016. The first ore grades align with Newmont's estimated annual gold production in the first five years of 400,000 - 500,000 ounces[7]. Suriname has not been assigned a conflict intensity rating, according to the most recent Heidelberg Institute Conflict Barometer (2016).

There are 12 security professionals directly employed at Merian, 96 contracted personnel and 26 public security personnel that were deployed at various times over the past year. As commercial production started in late 2016, Newmont successfully engaged with internal leadership and external stakeholders to improve the training, services and accountability of the private security company to ensure operations are properly aligned with the VPSHR metrics.

**Considerations in the Selection and Arrangements with Public and Private Security Providers**

The inclusion of specific references to the VPs, Universal Declaration of Human Rights, and use of force provisions in contracts with private security are intended to establish a system of transparency and accountability. Before entering agreements, due diligence is always conducted on the private/ public security on their previous track records on alleged or perceived human right records. Their background is investigated to know whether they discriminate against women or vulnerable groups. The Company also verifies whether the private security service provider has signed on to the VPs initiative, and elements of the VPs are included in their contract terms and ensure strict compliance.

Beginning in 2016 and in line with the Company's Human Rights Standard, contractual agreements will include the requirement that Newmont be notified if a private security provider becomes aware of any human rights issues related to its activities with Newmont. Joint training

---

[7] See Cautionary Statement

**NEWMONT**

sessions and exercises are regularly conducted to foster trust, communication, cooperation and coordination between the private and public security providers. The formal review and investigation process that has been established is designed to identify security related incidents with human rights implications so appropriate corrective actions are applied.

### References

Heidelburg Institute for International Conflict Research (HIIK). (2016). *Conflict Barometer 2016.*
        Retrieved January 12, 2017, from HIIK:
        http://www.hiik.de/en/konfliktbarometer/index.html

International Council on Mining & Metals. (2015). *10 Principals.* Retrieved February 02, 2015,
        from ICMM: http://www.icmm.com/our-work/sustainable-development-framework/10-
        principles

Newmont Mining Corporation. (2015). *Beyond the Mine - Our Social and Environmental
        Performance.* Retrieved from Newmont: http://sustainabilityreport.newmont.com/2015/

*The 10 Principals.* (2000, July). Retrieved from United Nations Global Compact:
        https://www.unglobalcompact.org/AboutTheGC/TheTenPrinciples/index.html

United Nations. (1948, December 10). *The Universal Declaration of Human Rights.* Retrieved
        from http://www.un.org/en/documents/udhr/index.shtml