## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

MÁXIMA ACUÑA-ATALAYA;
DANIEL CHAUPE-ACUÑA;
JILDA CHAUPE-ACUÑA;
CARLOS CHAUPE-ACUÑA;
YSIDORA CHAUPE-ACUÑA, personally and
on behalf of her minor child M.S.C.C.;
ELIAS CHAVEZ-RODRIGUEZ, personally
and on behalf of his minor child M.S.C.C.;
M.S.C.C., a minor by his guardians YSIDORA
CHAUPE-ACUÑA and ELIAS CHAVEZ-
RODRIGUEZ;
MARIBEL HIL-BRIONES;

        *Plaintiffs,*

   v.

NEWMONT MINING CORPORATION,
NEWMONT SECOND CAPITAL
CORPORATION,
NEWMONT USA LIMITED., and
NEWMONT PERU LIMITED.

        *Defendants*

Civil Action No. 17-1315-GAM.

**PLAINTIFFS' BRIEF IN SUPPORT
OF MOTION FOR PRELIMINARY
INJUNCTION**

## TABLE OF CONTENTS

NATURE AND STAGE OF THE PROCEEDING ........................................................................1

SUMMARY OF ARGUMENT ...............................................................................................1

STATEMENT OF FACTS ....................................................................................................3

    I.    Plaintiffs have suffered abuses and are at imminent risk of further abuses....................................3

    II.    Defendants control Conga security and can stop the abuses against Plaintiffs. .....................7

ARGUMENT......................................................................................................................7

    I.    Plaintiffs are likely to succeed on the merits. ...........................................................8

        A.    Plaintiffs have suffered intentional torts..................................................8

        B.    Minera Yanacocha and/or Newmont Peru SRL are liable for the torts committed by their security personnel, who are their employees/agents. .................................9

        C.    Defendants are liable for the torts committed against Plaintiffs........................10

            1. Defendants are liable for the torts committed by Minera Yanacocha. ...............10

                a.    Minera Yanacocha is NMC's agent for security purposes. ..............................11

                b.    Minera Yanacocha is Newmont USA's agent for security purposes............................16

            2.    Newmont Peru Ltd. and its Peruvian branch Newmont Peru SRL are liable for intentional torts as manager of Minera Yanacocha. ........................................17

            3.    Defendants are directly liable for negligent supervision. ..................................18

    II.    Without a preliminary injunction, Plaintiffs will suffer irreparable harm. ..............................18

    III.    Protecting the Chaupes will not harm Newmont. ..................................................19

    IV.    Preliminary relief is in the public interest..........................................................19

    V.    The equities counsel against requiring Plaintiffs to post a bond.................................20

CONCLUSION..................................................................................................................20

i

# TABLE OF AUTHORITIES

**Cases**

*Ace & Co. v. BICC Cables Corp.,*
   Civil Action No. 00-667-SLR, 2002 U.S. Dist. LEXIS 16645 (D. Del. Aug. 13, 2002) .................. 11

*American Tel. & Tel. Co. v. Winback & Conserve Program, Inc.,*
   42 F.3d 1421 (3d Cir. 1994) ............................................................................................. 19

*Arnold v. Society for Sav. Bancorp,*
   678 A.2d 533 (Del. 1996) ................................................................................................. 9

*Atamian v. Ryan,*
   No. 03C-12-038, 2006 Del. Super. LEXIS 270 (Super. Ct. June 9, 2006) ......................... 8

*Bowoto v ChevronTexaco Corp.,*
   312 F. Supp. 2d 1229 (N.D. Cal. 2004) .................................................................... passim

*Brzoska v. Olson,*
   668 A.2d 1355 (Del. 1995) ............................................................................................... 8

*Doe v. Exxon Mobil Corp.,*
   573 F. Supp. 2d 16 (D.D.C. 2008) ...................................................................... 11, 12, 18

*Doe v. Wildey,*
   2012 Del. Super. LEXIS 136 (Del. Super. Ct. Mar. 19, 2012) ......................................... 9

*Fisher v. Townsends, Inc.,*
   695 A.2d 53 (Del. 1997) ................................................................................................... 9

*In re Packer Ave. Associates,*
   1 B.R. 286 (Bankr. E.D. Pa. 1979) ................................................................................. 11

*In re W. R. Grace & Co.,*
   316 Fed. Appx. 134 (3rd Cir. 2009) ............................................................................. 11

*In re W.R. Grace & Co.,*
   366 B.R. 302 (Bankr. D. Del. 2007) .............................................................................. 11

*Lee v. Picture People, Inc.,*
   2012 Del. Super. LEXIS 159 (Del. Super. Ct. Mar. 19, 2012) ......................................... 8

*Lony v. EI Du Pont de Nemours & Co.,*
   886 F. 2d 628 (3rd Cir. 1989) ........................................................................................ 20

*Mission Towers v. Grace,*
 2007 U.S. Dist. LEXIS 89913 (D. Del. Dec. 6, 2007) .......................................................... 11

*Phoenix Canada Oil Co. v. Texaco, Inc.,*
 842 F.2d 1466 (3d Cir. 1988) ........................................................................................... 10, 11

*Reilly v. City of Harrisburg,*
 858 F.3d 173 (3d Cir. 2017) .............................................................................................. 7, 8, 18

*Revel AC, Inc. v. IDEA Boardwalk LLC,*
 802 F.3d 558 (3d Cir. 2015) .................................................................................................. 19

*Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.,*
 549 U.S. 422 (2007) ................................................................................................................ 8

*Temple Univ. v. White,*
 941 F.2d 201 (3d Cir. 1991) ................................................................................................. 20

*Wilson v. Joma, Inc.,*
 537 A.2d 187 (Del. 1988) ...................................................................................................... 10

*Wolfson v. Lewis,*
 924 F. Supp. 1413 (E.D. Pa. 1996) .................................................................................... 18, 19

**Other Authorities**
 Wright and Miller, 11A Fed. Prac. & Proc. Civ. § 2954 (3d ed.) ......................................... 23

## NATURE AND STAGE OF THE PROCEEDING

Plaintiffs Máxima Acuña-Atalaya de Chaupe and her family have scratched out a subsistence living as farmers on Tragadero Grande, a small plot of land in the Peruvian Andes, for over twenty years. Defendants, Delaware corporations that head and form part of Newmont, a multinational mining enterprise, are attempting – through violence and intimidation – to force Plaintiffs from their farm. Defendants covet the land because they want gold. They hope to build a vast, open pit mine, the Conga project, in part on Tragadero Grande. Over the last six years, Defendants' agents have repeatedly invaded the Chaupes' farm and dug up Plaintiffs' crops, destroyed Plaintiffs' property, killed Plaintiffs' livestock, threatened Plaintiffs' lives or beaten Plaintiffs, once into unconsciousness. They have repeatedly detained Plaintiffs against their will as they tried to go to their farm. They blinded one of the Chaupes' dogs in one eye, and stabbed another.

Plaintiffs filed this suit on September 15, 2017, seeking relief for the physical attacks, emotional distress and property destruction. Defendants, however, were undeterred. Just four weeks later, Defendants' agents yet again destroyed Plaintiffs' crops. And Defendants have made it clear that they will not stop the harassment. The Chaupes therefore seek a preliminary injunction to halt Defendants' ongoing campaign to intimidate them into abandoning their farm.

Defendants have moved to dismiss (D.I. 12, 14), but, except with respect to Máxima's toddler grandchild, Defendants challenge only whether this is the proper forum; they do *not* contest the sufficiency of Plaintiffs' allegations or otherwise challenge Plaintiffs' claims on the merits.

## SUMMARY OF ARGUMENT

Defendants Newmont Mining Corporation, Newmont USA Ltd., and Newmont Peru Ltd. (together "Newmont"), are responsible for a pattern of intimidation against the Chaupe family. This Court should not let Newmont continue to terrorize the Chaupes while this case is being litigated.

The Chaupes easily meet the standard for a preliminary injunction. The evidence shows they

1

can win on the merits, and that absent interim relief, they will suffer irreparable harm. Accordingly, the Court must balance the equities, considering those two factors, as well as any harm to Defendants (there is none), and the public interest (which heavily favors stopping the violence). The equities clearly favor Plaintiffs.

I.      Plaintiffs can win on the merits. They have suffered a host of intentional torts, including battery, assault, intentional infliction of emotional distress (IIED), and conversion.

Defendants are liable for these torts. First, they were committed by the security personnel of Newmont's joint venture, Minera Yanacocha (MY), which is Defendants' agent. Newmont plans to build the Conga mine through MY, and Defendants control MY's security practices for Conga.

Defendant Newmont Mining Corporation (NMC), which heads the Newmont global mining enterprise, controls MY's security through NMC's worldwide security program. That program is structured in three tiers – corporate, regional and site level – with ultimate oversight and control at the corporate NMC level. And NMC is actively involved in the Chaupe matter.

Newmont U.S.A. Ltd. is liable because it employs the Regional Security Director, who is responsible for security for South American operations, and thus controls Conga's security.

Defendant Newmont Peru Ltd. publicly identifies as – and operates as – one entity with Newmont Peru S.R.L., its Peruvian branch and the Manager of Minera Yanacocha. Because they are one entity, Newmont Peru Ltd. is effectively MY's Manager or, at minimum, has control over the Manager and therefore controls MY's daily operations, including security.

Collectively, and independently, these Defendants have the ability to stop MY's security personnel from abusing and harassing Plaintiffs.

Second, given Defendants' control over MY security, and that they have long known about the abuses of the Chaupes and done nothing to stop it, their supervision was and is, at *best*, negligent.

II.     Absent preliminary relief, the Chaupes will suffer irreparable harm. Defendants and their

2

agents have waged their intimidation campaign for over six years, and show no sign of relenting. On the contrary, Defendants claim that Tragadero Grande is actually MY's and that they have the *right* to invade the Chaupes' farm. Plaintiffs have unsuccessfully tried to stop the abuse for years through proceedings in Peru. The Inter-American Commission of Human Rights has issued precautionary measures to protect the Chaupes, but that has not dissuaded Defendants either. Nor has the filing of this suit. Plaintiffs need a preliminary injunction to assure their safety.

III.    Defendants will suffer no harm if ordered to temporarily stop harassing the Chaupes. Newmont has suspended the Conga project until at least 2021. Refraining from violence and intimidation is not a cognizable injury. MY's claim to own Plaintiffs' farm is currently being litigated in Peru. Defendants do not need to invade Tragadero Grande, threaten Plaintiffs or destroy their livelihood to press that claim. Land disputes should be decided in court, not through intimidation.

IV.    Preventing violence, intimidation and harassment, particularly when designed to moot an ongoing court case, is in the public interest.

V.    The court should not require Plaintiffs to post a bond, since they are indigent and Defendants cannot show that interim relief will harm them.

In sum, the Court should protect the Chaupes from immediate economic hardship, distress and serious physical injury while this case is being litigated.

## STATEMENT OF FACTS

### I.    Plaintiffs have suffered abuses and are at imminent risk of further abuses.

Plaintiffs are indigenous subsistence farmers who live in the Cajamarca region of Peru. In 1994, Plaintiff Máxima, along with her husband Jaime, purchased the right to possess Tragadero Grande. Ex. 1 ¶2.[1] From the time they bought that right until now, Máxima and Jaime have continuously lived on and farmed this twenty-five acre parcel with the other Plaintiffs, their

_____

[1] All Exhibits are attached to the Declaration of Maryum Jordan.

immediate family. Ex. 1 ¶2; Ex. 3 ¶2; Ex. 4 ¶2; Ex. 5 ¶2; Ex. 6 ¶2; Ex. 7 ¶2; Ex. 8 ¶2.

Plaintiffs' farm is isolated, and surrounded by land and roads owned by MY. To access their farm, Plaintiffs must pass through MY checkpoints. Ex. 1 ¶¶5-7; Ex. 3 ¶¶5-6; Ex. 4 ¶¶5-6; Ex. 5 ¶¶5-7; Ex. 6 ¶5; Ex. 7 ¶¶5-6; Ex. 8 ¶¶5, 27.

Plaintiffs' farm is on or adjacent to MY's proposed Conga mine. Defendants contest Plaintiffs' right to possess Tragadero Grande, claiming that MY bought the land. That dispute is currently being litigated in Peru. No court in Peru has resolved the matter. Ex. 1 ¶4; Ex. 3 ¶4; Ex. 4 ¶4; Ex. 5 ¶4; Ex. 6 ¶4; Ex. 7 ¶4; Ex. 8 ¶4. And that issue is not before this Court.

Newmont suspended the Conga project in 2011 at the Peruvian government's request, given widespread community opposition. Ex. 9 at 21. Newmont told the SEC in 2016 that it "does not anticipate being able to develop Conga for at least the next five years." *Id.*

Nonetheless, Defendants refuse to wait for the land dispute to be adjudicated by a Peruvian court. Instead, Defendants are trying to force Plaintiffs from their farm. Ex. 1 ¶3; Ex. 3 ¶3; Ex. 4 ¶3; Ex. 5 ¶3; Ex. 6 ¶3; Ex. 7 ¶3; Ex. 8 ¶3. Since at least August 2011, Defendants, through their agents Minera Yanacocha security, have threatened, physically attacked, destroyed the property of and terrorized Plaintiffs. Ex. 1 ¶¶8-11, 17-35; Ex. 3 ¶¶8-10, 14-43; Ex. 4 ¶¶7-10, 14-21; Ex. 5 ¶¶8-11, 14-16; Ex. 6 ¶¶6-14; Ex. 7 ¶¶7-21; Ex. 8 ¶¶6-10, 13-32, 35. The security personnel include MY staff, and contracted security: the Peruvian National Police (PNP) until January 2016, and the private security company Securitas. *See* Ex. 16 at 8, 15; Ex. 33 at 44.

Over the last six years, Defendants' agents have physically attacked Plaintiffs at least nine times. Ex. 1 ¶¶10, 21, 32; Ex. 1A; Ex. 2; Ex. 3 ¶¶9, 30, 39, 42; Ex. 4 ¶¶9, 15; Ex. 5 ¶10; Ex. 6 ¶¶6, 12; Ex. 7 ¶7; Ex. 8 ¶¶6-8, 17, 23. The first such attack occurred in August 2011, when Defendants' agents beat Plaintiffs Máxima, Ysidora, Jilda, Daniel, Carlos, Elias and Maribel. Ex. 1 ¶10; Ex. 1A; Ex. 2; Ex. 3 ¶9; Ex. 4 ¶9; Ex. 5 ¶10; Ex. 6 ¶6; Ex. 7 ¶7; Ex. 8 ¶¶6-8. They hit Jilda in the head with

sticks, knocking her unconscious. Ex. 1 ¶10; Ex. 3 ¶9; Ex. 4 ¶9; 5 ¶10; Ex. 7 ¶3; Ex. 8 ¶8.

Defendants' agents have threatened to kill or harm Plaintiffs at least nine times. Ex. 1 ¶¶19, 23, 24; Ex. 3 ¶¶17, 24, 32,36, 39; Ex. 4 ¶15; Ex. 7 ¶20; Ex. 8 ¶27. For example, around March 2015, they told Carlos they would kill his family and that they needed to disappear. Ex. 4 ¶15.

Defendants' agents have also invaded Plaintiffs' farm and destroyed or stole Plaintiffs' property and livestock at least nineteen times, including digging up crops on which they depend for food and a meager income. Ex. 1 ¶¶9, 17, 19, 20, 23-26, 29, 32, 35; Ex. 3 ¶¶8-10, 15, 16, 19, 20, 23-24, 26, 30, 32-33, 37-38, 41-42; Ex. 4 ¶¶7-10; Ex. 5 ¶¶8-11, 16; Ex. 6 ¶¶6, 10, 14, 18; Ex. 7 ¶¶13, 14, 16, 17, 19, 20; Ex. 8 ¶¶5-9, 13, 15, 16, 19-23, 26, 30. They destroyed Plaintiffs' latrine, leaving them no option but an exposed outdoor space. Ex. 1 ¶33; Ex. 4 ¶18; Ex. 6 ¶14; Ex. 7 ¶21; Ex. 8 ¶29. They have killed Plaintiffs' sheep and other animals. Ex. 1 ¶17; Ex. 8 ¶¶13, 19.

Defendants' agents also threaten or detain Plaintiffs almost every time they pass one of MY's checkpoints to enter or leave Tragadero Grande. Ex. 1 ¶¶5-7; Ex. 3 ¶¶5, 6, 39, 42, 43; Ex. 4 ¶¶5, 19, 21; Ex. 5 ¶¶5, 6, 11; Ex. 6 ¶¶5, 12, 17; Ex. 7 ¶¶5, 15; Ex. 8 ¶¶5, 18, 28, 31. They often follow Plaintiffs and film and photograph them, have erected a tower with a camera pointed at Plaintiffs' house, entered Plaintiffs' house at least three times to intimidate them, and blinded one of Plaintiffs' pet dogs in one eye and stabbed another. Ex. 1 ¶¶20, 24, 25, 27, 30; Ex. 3 ¶¶21, 27, 28, 31, 32, 35, 43; Ex. 3A; Ex. 4 ¶¶18, 20; Ex. 5 ¶15; Ex. 6 ¶¶11, 14; Ex. 7 ¶¶15, 21, 18; Ex. 8 ¶¶21, 25, 29, 31, 35.

Defendants' agents have also targeted Plaintiffs at places other than Tragadero Grande or MY's checkpoints. They have threatened, filed false criminal complaints against, spread false rumors about and even attempted to extort Plaintiffs under the guise of a so-called good faith dialogue. Ex. 1 ¶¶15, 16, 31, 37; Ex. 3 ¶¶11, 13, 38, 44; Ex. 4 ¶¶11-13, 22, 23; Ex. 5 ¶¶12, 13, 17, 18; Ex. 6 ¶¶6-8, 13, 15, 16; Ex. 7 ¶¶8-11, 22, 23; Ex. 8 ¶¶11, 12, 33, 34.

This has caused the Chaupes severe economic hardship and trauma. Plaintiffs constantly fear

for their ability to make a living, and for their lives. Ex. 1 ¶¶7, 38; Ex. 3 ¶¶4, 45; Ex. 4 ¶¶6, 24; Ex. 5 ¶¶7, 19; Ex. 6 ¶¶5, 17; Ex. 7 ¶¶6, 24, 25; Ex. 8 ¶¶13-17, 19, 20, 22-23, 25-26, 28, 30, 35.

Minera Yanacocha has admitted in a human rights report NMC commissioned that it has subjected the Chaupes to forced eviction attempts and destroyed their crops and buildings. Ex. 16 at 33. MY conducts these invasions with swarms of men armed with batons, creating an intimidating and dangerous environment for Plaintiffs. Ex. 3 ¶¶18, 30, 32, 37. The invasions have forced a few Plaintiffs, at times, to attempt to protect their property and crops. NMC's human rights report found that "the human rights of members of the family have been at risk since the first Tragadero Grande eviction attempt in May 2011." Ex. 16 at 35.

The Inter-American Commission on Human Rights has also recognized that Plaintiffs "have been the object of continuous acts of harassment and threats, with the intent to allegedly dislodge them from the land where they live." Ex. 44 ¶24. Thus in 2014 the Commission granted Plaintiffs Precautionary Measures, which require States to adopt measures to protect the grantees from human rights violations in "urgent situations presenting a risk of irreparable harm to persons." These measures remain in effect but the Peruvian government has not adequately protected the Plaintiffs.

The Chaupes have also received other international attention. In 2016, Plaintiff Máxima was awarded the Goldman Prize, Ex. 54 ¶4, for her courage in withstanding Newmont's intimidation.

 In April 2016, the Superior Court of Cajamarca found that there was no basis for the preliminary injunction Minera Yanacocha sought barring the Chaupes from disturbing its possession, because the *Chaupes* possess the land. Ex. 42 at 8-9. And in May, 2017, Peru's Supreme Court, in rejecting criminal charges that the Chaupes usurped Minera Yanacocha's land, confirmed that MY cannot claim they are currently entitled to Tragadero Grande; the right to possession remains to be determined in civil proceedings.[2] Ex. 40 at 22.

_____

[2] Pursuant to Federal Rule of Evidence 201, Plaintiffs request that the Court take judicial notice of

Despite all of this, Plaintiffs face risk of future harm because they cannot find protection through the Peruvian courts. Plaintiffs have complained about Minera Yanacocha's attacks on their physical safety and property, but the local prosecutors have not taken sufficient action. Ex. 1 ¶¶11, 40; Ex. 3 ¶47; Ex. 4 ¶26; Ex. 5 ¶21; Ex. 6 ¶18; Ex. 7 ¶26; Ex. 8 ¶36.

Defendants continue to abuse the Chaupes. Ex. 1 ¶¶3, 41; Ex. 3 ¶¶3, 48; Ex. 4 ¶¶3, 27; Ex. 5 ¶¶3, 22; Ex. 6 ¶¶3, 19; Ex. 7 ¶3; Ex. 8 ¶12; Ex. 60. Indeed, less than a month after Plaintiffs filed their complaint in this action, Defendants' agents again invaded Tragadero Grande and destroyed the Chaupes' crops. Ex. 60 (paragraph entitled "SECOND").

## II.     Defendants control Conga security and can stop the abuses against Plaintiffs.

Defendants NMC and its subsidiaries Newmont USA Ltd. and Newmont Peru Ltd. are all Delaware corporations. NMC is the majority owner of MY, through NMC's subsidiary Newmont Second Capital Corporation. Ex. 9 at 21; Ex. 50 at 24. (Newmont Second Capital is a defendant, but not a subject of this motion; it is merely a shell.) Newmont USA Ltd. employs Newmont's Regional Security Director, who is responsible for security at Conga. Ex. 26 at 18:10-22; 136:1-5. Newmont Peru Ltd. is a single entity with Newmont Peru S.R.L., which is MY's manager "responsible for managing, conducting and controlling the day-to-day operations of Yanacocha." Ex. 33 at 49, 93.

Defendants control Conga's security. The facts showing this, and thus Defendants' liability, are detailed in the "ARGUMENT," within the framework of the governing legal standards.

## ARGUMENT

Plaintiffs satisfy the two threshold requirements for a preliminary injunction: they can succeed on the merits and absent preliminary relief, they will suffer irreparable harm. *Reilly v. City of Harrisburg*, 858 F.3d 173, 176, 179 (3d Cir. 2017). Accordingly, the Court must balance the equities, considering the two threshold factors, whether the preliminary injunction will harm Defendants, and

these Peruvian court decisions, attached as Exs. 39-42.

whether the preliminary injunction is in the public interest. *Id.* Preventing Defendants from committing violence and intimidating Plaintiffs will not harm them, and is surely in the public interest. While Plaintiffs need not show that all four factors favor relief, *id.*, they clearly do here.

**I.      Plaintiffs are likely to succeed on the merits.**

Plaintiffs need only show that they "*can* win on the merits." *Id.* at 179 (emphasis added). While Plaintiffs' chance of success must be "significantly better than negligible," Plaintiffs need *not* show that they are "more likely than not" to prevail. *Id.* And "the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be." *Id.* (internal quotation omitted).

Except with respect to a single Plaintiff, a toddler, Defendants' motions to dismiss do not challenge the legal bases for Plaintiffs' claims, or the sufficiency of Plaintiffs' allegations. Instead, they dispute whether this is a proper forum, a "non-merits" challenge. *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 432 (2007). Plaintiffs' allegations are amply supported, often through Defendants' own documents. That is enough to show Plaintiffs "can win," particularly in light of the fact that a preliminary injunction will protect Plaintiffs from very significant harms.

**A.      Plaintiffs have suffered intentional torts.**

The beatings inflicted on Plaintiffs Máxima, Ysidora, Jilda, Daniel, Carlos, Elias and Maribel constitute battery: "intentional, unpermitted contact[s] upon [Plaintiffs' person] which [wa]s harmful or offensive." *Brzoska v. Olson*, 668 A.2d 1355, 1360 (Del. 1995). Because the attacks and invasions placed them "in apprehension of imminent harmful or offensive physical contact," *Atamian v. Ryan*, No. 03C-12-038, 2006 Del. Super. LEXIS 270 (Super. Ct. June 9, 2006), they also constitute assault.

MY security has also intruded upon Plaintiffs' seclusion, by intentionally intruding into a private place where "the intrusion would be highly offensive to a reasonable person." *Lee v. Picture People, Inc.*, 2012 Del. Super. LEXIS 159, at *7 (Del. Super. Ct. Mar. 19, 2012). Conga security's multiple intrusions into Plaintiffs' farm, including entering the Chaupes' house, easily meet that test.

The Chaupes have conversion claims for the destruction of their crops and other property, and the killing of their livestock. Conversion requires only an "act of dominion wrongfully exerted over the property of another, in denial of his right, or inconsistent with it." *Arnold v. Society for Sav. Bancorp*, 678 A.2d 533, 536 (Del. 1996). The Chaupes had every right to farm the land – as they have since they bought possessory rights twenty years ago – while Newmont disputes ownership in the courts. Regardless, there is no justification for killing the Chaupes' animals.

Plaintiffs have IIED claims. The attacks and threats – indeed, the entire pattern of harassment – were "extreme and outrageous conduct" though which Defendants' agents "intentionally or recklessly cause[d] [the Chaupes] severe emotional distress." *Doe v. Wildey*, 2012 Del. Super. LEXIS 136, *15 (Del. Super. Ct. Mar. 19, 2012).[3]

### B. Minera Yanacocha and/or Newmont Peru SRL are liable for the torts committed by their security personnel, who are their employees/agents.

The abuses here were committed by Newmont security, including employees of MY or Newmont Peru SRL and their contractors, the PNP and Securitas. Because the invasions and harassment are MY and Newmont Peru S.R.L. policy, they are directly liable. D.I. 16 ¶ 9.

They are also vicariously liable for the acts of their employees and of their agents, PNP and Securitas. Where a principal "assumes the right to control the time, manner and method of executing the work," "the fault of the agent, if acting within the scope of employment, will be imputed to the principal." *Fisher v. Townsends, Inc.*, 695 A.2d 53, 58-59 (Del. 1997). Defendants' declaration refers to MY's contracted security personnel as its "agents." D.I. 16 ¶¶9-10.

MY and the manager of its day-to-day operations, Newmont Peru S.R.L., obviously control the "time, manner and method" of their own employees' work. *Fisher*, 695 A.2d at 59. MY exercises similar control over Securitas personnel.[4] Ex. 20, 626-627; Ex. 36 at 34-36. . MY's contract with

---

[3] Defendants can also be held liable for other claims, including negligent supervision. *Infra* I.C.3.

[4] As the manager of the mine, Newmont Peru SRL (and Limited) share this control over Securitas

Securitas required Securitas personnel to give daily, detailed operation and incident reports to MY and to comply with a host of MY standards and procedures, subject to unannounced audits by MY and Newmont. Ex. 36 at 21, 35-37. And MY determined the number and type of personnel to be used, supplied their equipment, set the hiring requirements, and could dismiss Securitas personnel at its sole discretion. Ex. 36 at 22, 32, 35-36 38-39, 42, 54.[5] With this level of control, security personnel are MY and Newmont Peru S.R.L's agents.

And they were all acting within the scope of employment when they abused the Chaupes. Conduct is within the scope when undertaken with "to serve the master." *Wilson v. Joma, Inc.*, 537 A.2d 187, 189 (Del. 1988). Defendants admit that MY has "used its employees and its contracted security personnel at Securitas to exercise" what it claims to be its property right. D.I. 16 ¶9. MY has confirmed that its claimed "defense of possession" actions included eviction attempts and removal of family assets. Ex. 16 at 33. And when Securitas harasses Plaintiffs at MY checkpoints near Tragadero Grande, they are likewise doing MY's bidding. Ex. 16 at 17. Defendants' agents committed every tort at issue to secure control over Tragadero Grande.

### C.      Defendants are liable for the torts committed against Plaintiffs.

#### 1.   Defendants are liable for the torts committed by Minera Yanacocha.

A party is liable for its agents' acts. *Phoenix Canada Oil Co. v. Texaco, Inc.*, 842 F.2d 1466, 1477 (3d Cir. 1988). A subsidiary can be its parent's agent. *Id.* Since agency liability assumes the subsidiary's separate existence, "total domination or general alter ego criteria need not be proven." *Id.* Plaintiffs need only show that the agent was acting on behalf of the principal and that this relationship is relevant to the claim. *Id.* Thus, liability attaches where the parent "exerted control

_____

with MY. In fact, the Newmont Peru Ltd. Managing Director and President, who was the NMC Senior Vice President of South American Operations, negotiated the contract with Securitas on MY's behalf. (Ex. 27 at 16, 24; Ex. 30 ¶1; Ex. 36 at 12).
[5] MY exercised similar control over the PNP, Ex. 38 at 1-7, but because that contract expired, Plaintiffs focus on Securitas in this motion.

over the subsidiary in connection with the very conduct at issue." *Ace & Co. v. BICC Cables Corp.*, No. 00-667, 2002 U.S. Dist. LEXIS 16645, at *3 (D. Del. Aug. 13, 2002).

Courts applying these principles to facts similar to these have found agency. For example, *Doe v. Exxon Mobil Corp.,* 573 F. Supp. 2d 16, 31-32 (D.D.C. 2008), held that a jury could conclude a subsidiary was the agent of its parent with regard to security for the subsidiary's project, where the parent "exerted significant control over [the subsidiary's] security, particularly through [the parent's] Global Security division." And in *Bowoto v ChevronTexaco Corp.,* 312 F. Supp. 2d 1229, 1243-46 (N.D. Cal. 2004), the court, relying in part on *Phoenix Canada Oil Co.*, likewise found evidence supporting a finding that a U.S. oil company's foreign subsidiary was its agent where the subsidiary engaged the Nigerian military to provide security. This evidence included communications suggesting a close relationship regarding security, that the parent set security policies, that the parent and subsidiary shared officers and directors, the subsidiary's importance to the parent, and the parent holding the subsidiary out as a department of its own business. *Id.* In short, the parent "exercised more than the usual degree of [parental] direction and control" over security. *Id.* at 1246.

An agency relationship can also be created by "subsequent ratification" when a principal "knowing[ly] accept[s]" or fails to disavow unauthorized acts after they are committed. *Bowoto*, 312 F.Supp. 2d at 1247-8; *accord In re W. R. Grace & Co.*, 316 Fed. Appx. 134, 136 (3rd Cir. 2009). "Ratification creates the principal and agent relationship, regardless of whether the agent has prior authority." *In re W.R. Grace & Co.*, 366 B.R. 302, 305 (Bankr. D. Del. 2007), *aff'd Mission Towers v. Grace*, 2007 U.S. Dist. LEXIS 89913 (D. Del. Dec. 6, 2007). The principal cannot repudiate unauthorized conduct while at the same time retaining the benefits; accepting the benefits estops the principal from denying liability. *In re Packer Ave. Associates*, 1 B.R. 286, 292 (Bankr. E.D. Pa. 1979).

### a. **Minera Yanacocha is NMC's agent for security purposes.**

Newmont Mining Corporation controls and has the right to control MY's security program.

(i)     *NMC sets Minera Yanacocha's standards and policies.* The fact that the parent sets policies for the subsidiary is evidence of agency. *Bowoto,* 312. F. Supp. 2d at 1244. NMC requires MY to follow NMC's global standards and policies, including on human rights and security. These standards and policies "define minimum requirements," and "how work should be done and who should do it." Ex. 13 at 9, 13. Through these policies, NMC exerts "strict levels of control" over MY. Ex. 50 at 27.

NMC's standards govern all aspects of its projects' security, including NMC's subsidiaries' relationships with public and private security forces; contractor selection and management; training and competency; internal and external communication; security management plans; and security and human rights. Ex. 11 at 9; Ex. 12. NMC's global human rights standards require regular communication between NMC's Sustainability and External Relations (S&ER) team, which implements the global human rights program, and site level projects, including Conga. Ex. 11 at 9; Ex. 13 at 11-12. In fact, Conga's security plans were designed and implemented to comply with NMC standards. *See e.g.* Ex. 18 at 582, 591; Ex. 20 at 613, 626-627, Ex. 21 at 497; Ex. 22 at 677.

(ii)    *Global security program, reporting structure and internal communications.* NMC controls MY's security through its global security program and reporting structure. *See Exxon Mobil Corp.,* 573 F. Supp. 2d at 31. When the abuses against Plaintiffs began in 2011, NMC's global security program was led by NMC Senior Director Corporate Security (a.k.a. senior security director), Lee Langston, who played a significant role in Conga's security from NMC headquarters in the United States. Ex. 25 at 763; Ex. 26 at 28:14-16, 34:11-21, 264:4-9. Langston would receive reports from and work with Newmont's regional security directors to set security deliverables[6] for sites, including Conga. Ex. 25

---

[6] The security deliverables cover all aspects of project security and are targets that need to be met. There are deliverables on human rights obligations which include mandatory provisions to include in contracts with public security, and which apply to all security personnel, as well as deliverables on the use of force. (Ex. 26 at 36:10-16, 37:3-20, 45: 3-9, 49:5-8). Conga security documents show the importance of Newmont's security deliverables and their breadth, with deliverables on staffing and training; contingency plans, communications, patrols, and management of risks and opportunities. And the project's progress for security is assessed according to whether the deliverables are met. (*See*

at 763; Ex. 26 at 39:17-21, 138:2-9.

Langston also oversaw the implementation of Conga's security plans. He regularly communicated with the Regional Security Director for South America and the Minera Yanacocha Conga Security Principal Adviser (a.k.a. the Conga Security Manager); received updates (sometimes multiple per day) on Conga's security situation; reviewed Conga security plans; travelled to the Conga site to assess project security and communicated security concerns and recommendations to the NMC Senior Vice President of South American Operations, amongst others. Ex. 20 at 612, 626; Ex. 21 at 493; Exs. 22-25; Ex. 26 at 28:20-22, 34:11-21, 263:22-264:9. Langston and other NMC executives also participated in MY's response to protests at Conga in 2011, which involved daily communication with MY management and Newmont's regional security personnel about police presence, messaging and response strategy. *See* Exs. 23-25; 26 at 32:11-21, 33:8-17; Ex. 27 at 16, 24; Ex. 52 at 9. *See also Bowoto*, 312 F. Supp. 2d at 1243-44 (relying on similar parent-subsidiary communications regarding security measures).

Responsibility for security and human rights lies with senior NMC officials. NMC's CEO, for example, "holds ultimate responsibility" for Newmont's social performance. Ex. 13 at 11. NMC's Executive Vice President Sustainability & External Relations (Exec. VP S&ER) is responsible for implementing the sustainability strategy, which includes the human rights standards. And NMC's Vice President of Health, Safety and Security oversees the NMC senior security director and the regional security directors. *Id.* at 11; Ex. 26 at 19:6-11, 34:21-24.

NMC also controls site level security, and specifically the Conga site, through NMC's Security and Social Acceptance Committee (SSAC). The SSAC supports the implementation of NMC's security strategy and provides "strategic support" on the Chaupe matter. Ex. 14 at 2016:9.

At the highest levels of the corporation, NMC's Board of Directors and the Safety and

---

*e.g.* Ex. 18 for a report from Conga on security deliverables. *See also* Ex. 22).

Sustainability Committee (SSC) advise and assist NMC on security and human rights issues relating to NMC and its subsidiaries. Ex. 10. In 2016, the SSC and NMC Board were briefed on the Chaupe matter in the United States, and would have advised management on how to respond, as this is within their mandates. Ex. 13 at 7. The fact that the Board and SSC were briefed shows how important this matter is to NMC.

(iii)      *Public Responses to the Plaintiffs' allegations.* The *Bowoto* court found it significant that, in addressing a security incident, the subsidiary consulted the parent. 312 F. Supp. 2d at 1243-44. Here, there is more; evidence shows NMC has ultimate control over the Chaupe matter. NMC has taken a lead role in responding to the public outcry regarding the attacks on Plaintiffs. NMC not only has a page on its website dedicated to the Chaupes but uses "we" in public materials to discuss actions taken or steps they will take to resolve the matter, showing NMC's ownership of the issue. *See e.g.* Ex. 14 at 2015:7; 2016:9-10; Ex. 13 at 5, 7, 16-17; Ex. 15; Ex. 17.

NMC also commissioned an outside assessment by the non-profit RESOLVE to examine Plaintiffs' allegations. Ex. 16 at 1. NMC's response to the report also shows its continuing role in managing this matter. *See* Ex. 17 at 3. Before the report's release, an NMC Vice President sought to coordinate, through RESOLVE, a dialogue with Plaintiffs. This shows NMC's ability to control how the Chaupe matter is addressed.[7] Ex. 56; Ex. 58.

NMC's correspondence with the Goldman Foundation after it honored Maxima in 2016 confirms NMC's lead role in addressing the Chaupe issue. NMC sought to discuss "actions *we* [i.e. NMC] are taking" to resolve the Chaupe case. Ex. 54 ¶8, Ex. 54A at 7 (emphasis added). And when the Foundation declined an NMC Executive Vice President's request for a meeting unless NMC would publicly declare that it would not tolerate further harassment of the Plaintiffs, NMC's

---

[7] Plaintiffs' request for dialogue sent to NMC in December 2016 through counsel in this case went unanswered. Ex. 53; Ex. 53A.

Executive Vice President showed up at the Foundation's California office unannounced, and expressed Newmont's desire to have a dialogue with the Chaupes. Ex. 54 ¶¶10-11.  Here again, NMC's behavior reflects its control over how the Chaupe matter is resolved.

(iv)     *Overlap of personnel.* Senior NMC officials hold high-level positions at Minera Yanacocha. *See Bowoto*, 312 F. Supp. 2d at 1244-45. MY is governed by an Executive Committee, composed of representatives from NMC and Buenaventura Mining Company, owner of 43.65% of MY. Ex. 32 at 197-198, Ex. 33 at 40, 49. The President and CEO of NMC chairs the Committee, and if it is deadlocked, he casts the deciding vote. Ex. 33 at 49. MY's management committee includes two NMC senior officers and two other NMC representatives who are also alternates on the Executive Committee. Ex. 28 at 2-4; Ex. 46; Ex. 50 at 26.

(v)     *Importance of Conga to NMC.* Conga is critical to NMC. *See Bowoto*, 312 F. Supp. 2d at 1245. When NMC approved full funding, it predicted that Conga could "add as much as 50% of [NMC's] current gold and copper reserves over next 10 years." Ex. 29 at 1. Although the project is suspended, NMC has not stated that it will cease efforts to develop Conga in the future. Ex. 9 at 21.

NMC also presents itself as an international company with "significant" operations in Peru, Ex. 9 at 3, another indicator of importance relied upon in *Bowoto*. 312 F. Supp. 2d at 1245.

(vi)     *NMC controls major aspects of Minera Yanacocha's operations.* As the majority owner of MY, NMC has the sole ability to make decisions over "major corporate events," and "significant actions."[8] Ex. 33 at 47-48. The decision to suspend Conga is Newmont's. Ex. 33 at 255.

(vii)     *Additional elements of control.* Minera Yanacocha employees are considered Newmont employees. They have @newmont.com emails, and NMC refers to MY staff as part of "Newmont." Ex. 28 at 3; Ex. 25 at 1079. MY describes itself as operating on five continents with approximately

_____

[8] "Major corporate events" include: an increase or decrease in MY's capital; issuing debentures; merger or dissolution of MY. "Significant action" includes: sale of more than 20% by value of Yanacocha's fixed assets; planned shutdown of MY's activities for over a year. Ex. 33 at 45-46.

34,000 employees. Ex. 48 at 2. In addition, NMC's worldwide insurance program provides excess coverage for claims MY's local insurance program cannot cover. Ex. 33 at 47.

* * *

The *Bowoto* factors, and others, show NMC's significant control over and involvement in Minera Yanacocha and Conga's security. This makes MY NMC's agent at least for security purposes, including dealing with the Plaintiffs. NMC has also ratified MY's conduct by not only failing to renounce the intimidation and harassment, but by publicly supporting it.

### b.  Minera Yanacocha is Newmont USA's agent for security purposes.

Newmont USA employs the Regional Security Director who controls Newmont security for North and South America, Ex. 26 at 18:12-19:2; 136:6-9,[9] including Minera Yanacocha.

Otto Sloane, a Newmont USA employee, has been the Regional Security Director since 2014. MY's Security Manager and the Intelligence Analyst for South America report directly to Sloane. Ex. 26, 19:6-14. According to Conga security plans, the Conga Security Manager, Conga Project Security Chief, Newmont Regional Security Liaison, Security Analyst, and Police Liaison Officer also report to the Regional Security Director, giving him oversight and control over Conga security. Ex. 19; Ex. 20 at 625; Ex. 22 at 674.

Newmont U.S.A.'s Regional Security Director also reviews and helps prepare Conga security plans, analyzing the progress of the project security according to the security deliverables set by NMC's global security team, identifying concerns, and proposing security strategy. *E.g.* Ex. 20 at 612; Ex. 22. The Director's responsibilities include or included: being the coordinator with the PNP;[10] "ensuring compliance with regional security standards at Conga," and "staff requirement

---

[9] This position, formally known as the Security Director for the Americas, combines the previously split roles of Regional Security Director for North America and that for South America. Ex. 26 at 18:12-19:2; 136:1-9.

[10] The MOU between MY and the PNP designated Sloane's predecessor as the coordinator with the PNP. Ex. 26 at 136:1-5; Ex. 38 at 7. Presumably Sloane filled this role when he took over.

(control and coordination)." Ex. 20 at 623, 638.

Newmont USA's Regional Security Director leads the South America regional security department, which oversees and directs Conga security. *E.g.* Ex. 22 at 674; Ex. 26 at 45:3-9, 21-24. And implementation must be coordinated with the regional team. Ex. 18 at 585; Ex. 20 at 613-615. The regional department manages private security contractors and contracts with public security agencies; for Conga, this means Securitas and PNP. Ex. 14 at 2016:11; *See also* Ex. 18 at 585, 593; Ex. 20 at 615. Conga security plans also provide that PNP support can only be requested through the regional security division and that "all police action or patrolling within the operations and property of MY must be authorized by the Division." Ex. 18 at 593. As head of security for South America, the Regional Security Director also controls Newmont Peru S.R.L.'s (and Newmont Peru Ltd.'s) security functions. Newmont Peru S.R.L., MY's Manager, controls daily operations, which would include security. *See* Ex. 32 at 195-196; Ex. 33 at 49; Ex. 26 at 27:7-14.

In sum, Newmont USA oversees and controls MY's security. Thus, MY is Newmont USA's agent for security purposes. Newmont USA has also ratified the mistreatment of the Chaupes.

### 2. Newmont Peru Ltd. and its Peruvian branch Newmont Peru SRL are liable for intentional torts as manager of Minera Yanacocha.

Newmont Peru Ltd. and Newmont Peru S.R.L. are effectively one entity. As one entity, Newmont Peru Ltd. is the manager of Minera Yanacocha, or Newmont Peru S.R.L.'s principal. Either way, Newmont Peru Ltd. is liable for MY's abuse of the Chaupes.

"The fact that a parent holds out to the public that a subsidiary is a department of its own business increases the likelihood that the parent will be held liable for the subsidiary's acts." *Bowoto*, 312 F. Supp. 2d at 1245 (internal citation omitted). Newmont Peru Ltd. and Newmont Peru S.R.L. portray themselves as one entity: Newmont Peru S.R.L. is referred to as "Newmont Peru Limited, Peru Branch." *E.g.* Ex. 32 at 200 (MY by-laws designating "Newmont Peru Limited, Peru Branch" as the Manager); Ex. 33 at 12. Similarly, Newmont Peru Ltd.'s Managing Director declared that he

was "employed by Newmont Peru through its Peruvian branch," and that "Newmont Peru [Ltd.]… operates in Peru through its Peruvian branch." Ex. 30 ¶ 1. At the same time, the Managing Director, Carlos Santa Cruz, was actively fulfilling Newmont Peru S.R.L. duties, as the designated representative of the Manager of MY. Ex. 32 at 200.[11]

Since the two entities are publicly described – and operate – as one entity, Newmont Peru Ltd. is the Manager, or at least the principal of the Manager, and liable for its actions. And since the Manager controls MY's day-to-day operations, it is liable for all of the attacks against the Chaupes.

### 3. Defendants are directly liable for negligent supervision.

Negligent supervision liability attaches where the defendant is negligent in supervising an activity or in permitting, or failing to prevent, tortious conduct by persons, whether agents or not, upon premises or with instrumentalities under the defendant's control. *Exxon Mobil Corp.*, 573 F. Supp. 2d at 29-30. Defendants oversaw and controlled Conga security and knew about the ongoing intimidation of the Chaupes, yet failed to ensure Conga security stopped harassing Plaintiffs and complied with the law and NMC's own standards. *See* Ex. 16 at 8, 34-39. That is at least negligence.

## II. Without a preliminary injunction, Plaintiffs will suffer irreparable harm.

Absent relief, the Chaupes are "more likely than not to suffer irreparable harm." *Reilly*, 858 F.3d at 179. The intimidation and violence Defendants have inflicted is irreparable injury. Indeed, in *Wolfson v. Lewis*, 924 F. Supp. 1413, 1434-35 (E.D. Pa. 1996), the court found irreparable harm where television reporters were surveilling a family's residence and otherwise harassing them, creating a risk to their safety. These harms are analogous to, but *less* serious than, the property destruction, invasions, detentions and beatings Plaintiffs face.

_____

[11] In addition, while Newmont Peru Ltd.'s purported principal place of business is Colorado, it has not filed the required Statement of Foreign Entity Authority in Colorado, See Colo. Rev. Stat. § 7-90-801; Ex. 31 at 5-6. Yet, Newmont Peru S.R.L. has done so, Ex. 31 at 1-4, which is additional evidence that they operate as one entity.

That Newmont will continue to abuse the Chaupes is all but certain. Their harassment has continued unabated since 2011. Newmont was not deterred by this suit, nor by the Inter-American Commission's Precautionary Measures, nor by the Peruvian court rulings. Indeed, Newmont is unapologetic; insisting that invading Tragadero Grande is their "right." D.I. 16 ¶9. *See Wolfson*, 924 F. Supp. at 1435 (holding it "unlikely" defendants would desist where they presented no evidence they would do so and were "convinced that their conduct is protected by the First Amendment.")

### III.   Protecting the Chaupes will not harm Newmont.

Courts consider any "likely irreparable harm" to the defendant if preliminary relief is granted, *Revel AC, Inc. v. IDEA Boardwalk LLC*, 802 F.3d 558, 569 (3d Cir. 2015), but here there is none. Defendants will not be "harmed" if they have to stop detaining Plaintiffs against their will, destroying their crops, killing their livestock or intimidating and beating them. *See Wolfson*, 924 F. Supp. at 1435 (holding defendants "will not be irreparably harmed by an injunction narrowly tailored to preclude them from continuing their harassing conduct.")

Preliminary relief could not affect Conga; Newmont has suspended it until at least 2021. Newmont falsely claims it is entitled to invade Tragadero Grande to defend its "possession." D.I. ¶9. But the Superior Court of Cajamarca found the Chaupes possess Tragadero Grande. Ex. 42 at 8-9. Newmont may not exercise a self-help remedy when that court has held Newmont is not entitled to a remedy. *See id.* Regardless, MY is litigating its ownership claim in Peruvian courts; it does not need to invade Tragadero Grande to preserve its arguments. In any event, Defendants can hardly claim they will suffer injury if they cannot threaten and abuse Plaintiffs outside Tragadero Grande.

### IV.   Preliminary relief is in the public interest.

Where, as here, there is a likelihood of success on the merits and irreparable injury, the public interest will "almost always" favor plaintiffs. *AT&T v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994). This case is no exception. "Delaware is interested in ensuring

that businesses incorporated or operating within its borders abide by the law." *Lony v. EI Du Pont de Nemours & Co.*, 886 F. 2d 628, 642 (3rd Cir. 1989). Violence and intimidation are never in the public interest. That is particularly so where Defendants employ them to preempt ongoing litigation. The public has a strong interest in preventing Delaware corporations from further abusing Plaintiffs and forcing them to abandon their home before title can be adjudicated.

## V.     The equities counsel against requiring Plaintiffs to post a bond.

Although F.R.C.P. 65(c) often requires plaintiffs to post a bond, that "would be inappropriate" where there is no proof of likelihood of harm to defendants and where plaintiffs would face financial hardship. *Temple Univ. v. White*, 941 F.2d 201, 219-20 & n.26 (3d Cir. 1991). Courts recognize that a bond should be waived for indigent applicants. *See* Wright and Miller, 11A Fed. Prac. & Proc. Civ. § 2954 (3d ed.) at N. 24-26 (collecting cases). The Chaupes are indigent; they are filing *in forma pauperis* applications. Since an interim injunction would not harm Defendants, Section III, the Court should not require a bond, or should exercise its discretion to require a nominal bond. *Temple Univ.*, 941 F.2d at 220, n. 28.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court issue a preliminary injunction ordering Defendants to refrain from, and to order their agents and subagents, including but not limited to Minera Yanacocha, Securitas, and Newmont Peru SRL, to cease:

- physically or psychologically harassing Plaintiffs, including but not limited to through battery, assault, threats, invasion of privacy, destruction of crops, destruction of personal or real property, detention, surveillance, harming livestock or pets, or interfering with Plaintiffs' or their visitors' access to Tragadero Grande.
- entering Tragadero Grande without the consent of Plaintiffs or their attorneys, unless pursuant to court order.
- contacting Plaintiffs except through their counsel.

Dated:          November 1, 2017                    Respectfully submitted,

                                                    /s/Misty A. Seemans
                                                    Misty A. Seemans, DE Bar # 5975
                                                    O.P.D. (Pro Bono; cooperating attorney with
                                                    EarthRights International)
                                                    820 North French Street
                                                    Third Floor
                                                    Wilmington, DE 19801
                                                    Tel: (302) 577-5126
                                                    Email: misty@earthrights.org


                                                    Marco Simons,
                                                    marco@earthrights.org
                                                    Richard Herz,[12]
                                                    rick@earthrights.org
                                                    Marissa Vahlsing,
                                                    marissa@earthrights.org
                                                    Maryum Jordan,
                                                    maryum@earthrights.org
                                                    Tamara Morgenthau,
                                                    tamara@earthrights.org
                                                    Wyatt Gjullin,
                                                    wyatt@earthrights.org, *pro hac vice* pending

                                                    EARTHRIGHTS INTERNATIONAL
                                                    1612 K Street NW, Suite 401
                                                    Washington, DC, 20006
                                                    Tel: (202) 466-5188

                                                    *Counsel for the Plaintiffs*

---

[12] Based in CT; admitted in NY; does not practice in DC's courts.

## <u>CERTIFICATE OF SERVICE</u>

I, Misty A. Seemans, hereby certify that on November 1, 2017, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Elena C. Norman
> Robert M. Vrana
> Rodney Square
> 1000 North King Street
> Wilmington, Delaware 19801
> enorman@ycst.com
> rvrana@ycst.com
>
> *Attorneys for Defendants*

I further certify that on November 1, 2017, I caused the foregoing document to be served via electronic mail upon the above-listed counsel and on the following:

> Michael G. Romey, michael.romey@lw.com
> Monica R. Klosterman, monica.klosterman@lw.com
> Jamie L. Sprague, jamie.sprague@lw.com
> *Attorneys for Defendants.*

Dated:  November 1, 2017

> /s/ *Misty A. Seemans*
> Misty A. Seemans, DE Bar # 5975
> O.P.D. (Pro Bono; cooperating
> attorney with EarthRights
> International)
> 820 North French Street
> Third Floor
> Wilmington, DE 19801
> misty@earthrights.org

22