# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **MÁXIMA ACUÑA-ATALAYA,** *et al.* | : | |
| **Plaintiffs**, | : | |
| | : | |
| v. | : | **Civil Action** |
| | : | **No. 17-1315** |
| | : | |
| **NEWMONT MINING** | : | |
| **CORPORATION,** *et al.*, | : | |
| **Defendants**. | : | |

McHUGH, J.            April 11, 2018

## MEMORANDUM

This case arises out of a land dispute between indigenous subsistence farmers in Peru and the Peruvian subsidiary of a multi-national gold mining company headquartered in the United States. At the forefront is a rancorous struggle over the right to occupy the land in question, amid years-long litigation in Peruvian courts. Plaintiffs Máxima Acuña-Atalaya de Chaupe and her family complain of repeated invasions of their farm, alleging threats on their lives, assaults, and destruction of livestock and crops. They have brought this action in Delaware, seeking to hold the American parent companies responsible for actions taken by their subsidiary on the ground in Peru, contending that Peruvian courts are inadequate to protect them. Defendant Newmont Mining Corporation and its affiliates strongly contest the facts, and have moved to dismiss invoking *forum non conveniens* (FNC).

The ultimate question in the underlying dispute—how American corporations conduct their affairs in less developed nations—has profound moral implications. But the issues before me are legal and practical. On the record here, I conclude that this case is centered in Peru.

There are intense disputes over baseline facts for which the evidence is in Peru. There is ongoing litigation there, governed exclusively by Peruvian law, and some of the conduct Plaintiffs challenge here would appear to be permissible under that law. And though there are reasons to be concerned about the Peruvian judicial system, I cannot say that it is clearly inadequate as a forum. I will therefore grant Defendants' Motion, but mindful of some of the concerns Plaintiffs raise, address them by attaching conditions to dismissal.

## I. Relevant Facts

This is an unusual case brought by Peruvian citizens living in a remote, mountainous area against the U.S.-based Newmont Mining Corporation and affiliated entities, which are engaged in the business of mining gold around the world. The area in question was long thought to harbor gold, a suspicion that was confirmed by developmental drilling in the 1980s. In 1993, with the support of the Peruvian government, the International Finance Corporation, an affiliate of the World Bank, made a substantial loan to Newmont and a French-based partner for development of a mine. That mine opened and substantial amounts of gold were recovered, although the venture was affected by disputes between the companies forming the partnership and by environmental damage, resulting in litigation in both the United States and Peru. Local protests erupted, sometimes ending in violence, both as a reaction to the environmental toll exacted by the project and to a proposal to further expand the mining operation. It is that proposed expansion that gives rise to this case.

Plaintiffs Máxima Acuña-Atalaya de Chaupe and her family are indigenous campesinos residing in the Northern Andes region of Peru on a parcel of land in an area they refer to as

"Tragadero Grande."[1]  Máxima and her husband Jaime Chaupe Lozano represent that they

purchased possessory rights to that parcel from a family member in 1994.  At the time they made

that purchase, Tragadero Grande was part of communal land that belonged to the Campesino

Community of Sorochuco.  Over the next five years, a Peruvian mining company known as

Minas Conga underwent an extensive two-part process to acquire that communal land, which it

then sold to Defendants' subsidiary, Minera Yanacocha [hereinafter "Yanacocha"] in 2001.[2]

Step one involved acquiring the communal land, and Step two purchasing the possessory rights

of each individual member of the community.  After acquiring the communal land, Minas Conga

divided it into two units, and re-named these units to correspond with the two separate land titles,

which for our purposes will be referred to as the "Southern Parcel" and the "Northern Parcel."  It

then continued with the two-part process by negotiating with individual possessors, like the

Chaupes, to purchase their possessory rights.  There is a dispute over whether the Chaupes were

parties to Minas Conga's negotiations and ultimately sold their possessory rights to Tragadero

Grande, which now straddles both the Northern and Southern Parcels.  That issue is being

litigated in another case in Peru.

Meanwhile, the Chaupe family has a cottage on the Northern Parcel.  Defendants contend

that Plaintiffs illegally occupied the land in 2011.  *See* Defs.' P.I. Resp. Ex. 1A, ECF No. 38-1.

Plaintiffs counter that they have lived and farmed on that parcel since they purchased their

possessory rights in 1994.  But, according to Plaintiffs, beginning in 2011, security personnel

consisting of Yanacocha staff, the contracted Peruvian National Police (PNP), and the private

security company Securitas threatened, and continued their assault on various other family

---

[1] "Tragadero" means "throat" or "gullet" in Spanish.  Hence, the name "Tragadero Grande" derives from
the fact that the point where rainwater infiltrates the land is relatively large.  *See* Defs.' P.I. Resp. Ex. 1A,
ECF No. 38-1.
[2] Minas Conga ceased to exist sometime after that transfer.  Pls.' P.I. Mot. Ex. 16 at v., ECF No. 27-16.

members.  *Id.* at 4–5.  Plaintiffs allege that some combination of these entities physically attacked, destroyed the property of, and terrorized Plaintiffs.  Pls.' P.I. Mot. 4, ECF No. 28.  For example, Plaintiffs contend that in August 2011, Yanacocha security personnel destroyed their huts, removed crops they had planted, struck Plaintiff Máxima on her arms and legs with sticks, and knocked Plaintiff Jilda unconscious with the same sticks.  Plaintiffs further allege that the purpose of these attacks was to dispossess them of their portion of the land in order to facilitate the development of the proposed new gold mine, referred to as the Conga Project, operated by Defendants and their Peruvian subsidiary.

That project would represent a $4.8 billion expansion to Yanacocha's operations.  As proposed, the expansion would eradicate four mountain lakes, raising concerns that it would threaten the water supply serving over 200 communities in the region, particularly in light of earlier problems.  The Peruvian government initially approved the project over "broad community opposition" in 2010.  Compl. ¶¶ 55–56, ECF No. 1.  But about a year later, that widespread community opposition, coupled with public demonstrations, resulted in the government doubling back and suspending the operation.  In part as a result, Defendant Newmont Mining Corporation told the SEC in 2016 that "it does not anticipate being able to develop Conga for at least the next five years."  *Id.* ¶ 62.  But Plaintiffs allege that none of that has stopped the abuses and efforts to dispossess them.

They have therefore brought this action in Delaware against Newmont Mining Corporation and three of its subsidiaries:  Newmont Second Capital Corporation, Newmont USA Limited, and Newmont Peru Limited.  They contend that Defendants are aware of such abuses, and exercise sufficient control over Yanacocha and its operations in Peru to be able to stop them.  All of the Defendants are incorporated in Delaware and headquartered in Denver, Colorado.

Plaintiffs aver that they chose to sue in the United States because justice cannot be had for them in Peru, given Yanacocha's influence over the government and judiciary.

Defendants contend that Plaintiffs overstate the extent of Defendants' direct involvement with and control over Yanacocha and its security personnel overseas. They strongly dispute Plaintiffs' factual account, alleging that Plaintiffs "omitted key facts and created or exaggerated others." Defs.' P.I. Resp. 2, ECF No. 37. Specifically, Defendants dispute that Plaintiffs occupied any portion of Tragadero Grande at any point between 2001 and 2011. According to Defendants, Yanacocha has been engaged in preliminary mining activities on the land since 2001, including by placing checkpoints to control access, but did not encounter Plaintiffs until May 2011. Defendants stress that the most prominent incident occurred in August 2011, and reject Plaintiffs' factual account. Defendants also assert that Yanacocha's actions are legally necessary to protect their possessory rights to the portion they occupy while the years-long litigation over who has legal right continues.[3] Nonetheless, Yanacocha decided to not interfere with Plaintiffs' activities in the portion of the Northern Parcel Plaintiffs now occupy. Defendants contend that they did not attempt to dislodge Plaintiffs until Plaintiffs sought to expand their occupancy. In addition, Yanacocha has purportedly established a procedure to allow Plaintiffs access through Yanacocha's checkpoints, and has provided Plaintiffs the direct phone number of high-ranking Yanacocha executives whom they can call for immediate authorization of entry.

---

[3] Under Peruvian law, one avenue to prevent loss of title in an ownership dispute where "adverse possession" is the issue is to engage in "self-help" activities such as ejectment of those occupying the land. The parties, through their competing legal experts, dispute whether such action is *required* for the party seeking to preserve ownership, but agree that such a legal right exists. Needless to say, the possibility for physical confrontation looms large.

## II. Procedural Posture

Plaintiffs seek both injunctive relief and damages.  Defendants move to dismiss, arguing that Delaware is an inconvenient forum because the relevant evidence, witnesses, and actors essential to adjudicating this case are in Peru.  In their response to this Motion, Plaintiffs urge that I first address their motion for preliminary injunction, which, in part, asks that I order Defendants and their agents to cease the alleged harassment of Plaintiffs, bar Defendants and their subsidiaries from entering Tragadero Grande[4] without Plaintiffs' permission, and bar them from attempts to communicate with Plaintiffs except through counsel.

As an initial matter, I note that a district court has the power to address FNC at the outset of the case.  *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422 (2007).  I hesitate to address the petition for injunctive relief before resolving venue, because the injunction requested is one that might alter the status quo, rather than merely preserve it.  That is so because I cannot definitively determine whether prohibiting Defendants' subsidiary from engaging in what they contend are lawful self-help remedies would prejudice their rights under Peruvian law.  Furthermore, because there is litigation currently pending in Peru, any order I enter will necessarily impact that litigation.

The leading case where an injunction was issued despite a pending FNC motion is *Republic of the Philippines v. Marcos*, 862 F.2d 1355 (9th Cir. 1988).  There, Ferdinand Marcos, the former President of the Republic of the Philippines, left the Philippines when he realized his regime was nearing its end.  *Republic of Philippines v. Marcos*, 818 F.2d 1473, 1475 (9th Cir. 1987), *on reh'g*, 862 F.2d 1355.  The United States government immediately recognized his successor, and when the Marcoses arrived in Hawaii with numerous crates of currency, jewels,

---

[4] On its face, Plaintiffs' prayer for relief would seem to seek to bar Defendants and affiliated entities from the entire area, including parcels over which Plaintiffs have asserted no claim.

precious metals and the like, the United States Customs Service impounded them. *Id.* At the same time, other assets allegedly belonging to the Marcos family were turning up around the world. *Id.* The Republic of the Philippines launched civil suits in several countries to recover or freeze specific assets it regarded as property of the Philippines. *Id.* In the United States action, the district judge granted the Republic's motion for preliminarily injunction, despite the pending FNC motion, in order to prevent the assets from being transferred. The Ninth Circuit affirmed, because "it was imperative for the district court to preserve the status quo lest the defendants prevent resolution of the case by putting their property beyond the reach of the court." *Republic of Philippines*, 862 F.2d at 1364. It also bears mention that the party seeking the injunction was the newly recognized government of the Philippines.

The situation here is different. Indeed, if Defendants' version is true and Yanacocha has to engage in these possessory defenses in order to continue its activities on the portion of the land it now occupies, a preliminary injunction risks altering the merits of the underlying land dispute before the court in Peru. *See* Defs.' P.I. Resp. 4, ECF No. 37 (stating that "the owner must take action, known as a 'possessory defense,' within 15 days of learning of the trespass"). According to the defense, uprooting crops and displacing newly erected structures is something that they must do or risk their legal rights. Although Plaintiffs argue that Yanacocha need not exercise this defense and suggest that Defendants would be able to recover any lost land regardless, the competing experts make that issue a difficult one. In either case, the injunction sought would by definition change, not preserve, the situation on the ground in Peru, and thereby potentially impact the legal proceedings there.

Further, there are practical concerns about the requested relief that are also relevant to the discussion of whether Delaware is a convenient forum. Even assuming that neither party would

willfully act in contravention of an order from this court, I remain skeptical of the practical impact of an injunction from a federal judge in Delaware over the actions of third parties in Peru. That skepticism is especially warranted where, as here, Defendants represent that they have taken affirmative steps to protect the rights of the Plaintiffs, and had limited success. Indeed, Defendants have presented evidence that security personnel have been instructed to exercise the utmost restraint in carrying out these possessory defenses. In fact, nothing in the video evidence provided by either side shows the type of abuse asserted by Plaintiffs. Plaintiffs insist otherwise, contending that abuses similar to those alleged in their Complaint have continued even during this case. But if these additional abuses have continued to occur contrary to Yanacocha's instruction, and despite cameras placed by both parties and journalists documenting the various encounters, it underscores the limited ability of an American judge to influence local behavior. And, as discussed below, part of Plaintiffs' argument is that local courts have not implemented Peruvian appellate court rulings that were in their favor. To the extent that is true, an American court's order entered against Yanacocha's parent company here is unlikely to have greater effect.

Similar concerns exist with respect to another aspect of Plaintiffs' proposed injunction: Plaintiffs' allegations that they have faced significant difficulties when attempting to access their cottage as a result of Yanacocha's security checkpoints. Those allegations persist despite the fact that Defendants presented to the court established procedures for admitting Plaintiffs through those checkpoints, and a means of recourse if Yanacocha's instructions regarding access are being violated by the contracted security personnel on the ground.

For these reasons, I will not decide the pending motion for an injunction before first considering whether Delaware is an appropriate forum, which requires further consideration of many of the same practical considerations reviewed above.

## III.  Analysis

FNC is a discretionary tool that empowers a district court "to dismiss an action on the ground that a court abroad is the more appropriate and convenient forum for adjudicating the controversy." *Sinochem*, 549 U.S. at 425. To decide whether FNC dismissal is appropriate, district courts engage in a three-step analysis. First, the court must determine "whether an adequate alternate forum" exists to entertain the case. *Eurofins Pharma US Holdings v. BioAlliance Pharma SA*, 623 F.3d 147, 160 (3d Cir. 2010). If so, the court must next determine "the appropriate amount of deference to be given the plaintiff's choice of forum." *Id.* Finally, the court must weigh "the relevant public and private interest factors"—discussed below—to determine whether, on balance, "trial in the chosen forum would result in oppression or vexation to the defendant out of all proportion to the plaintiff's convenience." *Id.* If so, or if the chosen forum is "inappropriate" in light of the court's own "administrative and legal problems," the court "may, in its discretion," dismiss the case. *Windt v. Qwest Commc'ns Int'l, Inc.*, 529 F.3d 183, 189 (3d Cir. 2008) (citing *Koster v. (Am.) Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 524 (1947)). Defendants seeking dismissal on the basis of FNC bear the burden of persuasion at every stage of this analysis, *Lacey v. Cessna Aircraft Co.*, 862 F.2d 38, 43–44 (3d Cir. 1988) (*Lacey I*), against the backdrop of a generally "strong presumption" in favor of the plaintiff's choice of forum, *see Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 (1981).[5]

---

[5] Plaintiffs argue that, under *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938), Delaware FNC law, which describes Defendants' burden as "heavy," should govern, as opposed to the federal standard I am applying. Both parties requested that I allow supplemental briefing on this issue if it is material. I did not grant that request because I am not convinced that the Delaware standard would warrant a different result, especially given the Delaware Supreme Court's recent ruling in *Martinez v. E.I. DuPont de Nemours & Company*, 86 A.3d 1102, 1104 (Del. 2014), which specifically held that "where [. . .] the plaintiff in the case is a citizen of a foreign state whose law is at issue, and where [. . .] the injury in the case occurred in that foreign state, and the case turns on unsettled issues of foreign law, a trial court may permissibly exercise its discretion under *Cryo–Maid* to weigh appropriately the defendant's interest in obtaining an

As an initial matter, it must be noted that what is at issue here is not the ultimate legal question of the parties' rights with respect to Tragadero Grande. Indeed, the case before me is ancillary to that fundamental underlying dispute. Unlike some other cases filed in American courts seeking damages for past unlawful acts of American corporations overseas, Plaintiffs here seek detailed injunctive relief affecting an ongoing dispute, even as Peruvian courts attempt to resolve that dispute. Moreover, this action does not focus on the broader impact of Newmont's mining activities in Peru, such as pollution of the watershed or treatment of workers; it focuses on multiple discrete encounters replete with complex factual disputes, many of which involve third parties, including local authorities. And, as noted above, some of the challenged conduct— clearing crops, destroying structures—is characterized as a permissible remedy under Peruvian law. Thus, the specialized nature of this case has unique implications for whether Delaware is a convenient forum.

As to these highly specific issues, the parties present competing accounts and, in support of both this Motion and Plaintiffs' Preliminary Injunction motion, have submitted extensive documentation. I am therefore "thrust into the merits of the underlying dispute," *Van Cauwenberghe v. Biard*, 486 U.S. 517, 528 (1988), and have necessarily availed myself of the full scope of all of these submissions, from affidavits submitted specifically for the FNC motion to all evidence pertaining to the motion for preliminary injunction. [6] Because it is necessary to

authoritative ruling from the relevant foreign courts on the legal issue on which its liability hinges, as distinguished from a predictive, non-authoritative ruling by our courts."

[6] Defendants objected to evidence submitted by Plaintiffs in support of their opposition to Defendants' FNC Motion on the basis that such evidence was inadmissible under the Federal Rules of Evidence. *See* Defs.' Ev. Obj., ECF No. 55. But in considering an FNC motion, I am not aware of any precedent that limits my scope of review to evidence admissible under the Federal Rules, nor have Defendants cited any. In fact, several courts in the Third and other Circuits have reached the opposite conclusion. *See, e.g.*, *Kisano Trade & Invest Ltd. v. Lemster*, 2013 WL 594017, at *3 (W.D. Pa. 2013), *aff'd*, 737 F.3d 869 (3d Cir. 2013); *Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1134, 1144 n.4 (C.D. Cal. 2005), *aff'd*

"'generally become[ ] entangled in the merits' to the extent required to 'scrutinize the substance of the dispute'" on an FNC motion, *Path to Riches, LLC ex rel. M.M.T. Diagnostics (2014), Ltd. v. CardioLync, Inc.*, 2018 WL 993752, at *3 (D. Del. 2018) (quoting *Van Cauwenberghe*, 486 U.S. at 528), I consider evidence from that broader record.

## A. Adequacy of the Peruvian Court System

In many respects, this is the critical issue. The adequacy of an alternative forum is determined by a defendant's amenability to process in that forum and a plaintiff's opportunity for redress there. The Supreme Court has observed that it is the "rare circumstance[] . . . where the remedy offered by the other forum is clearly unsatisfactory." *See Piper*, 454 U.S. at 254 n.22. Defendants have met their burden to demonstrate that an adequate alternative forum exists in Peru because, for the purposes of this action only, Defendants have stipulated to service of process, consented to jurisdiction in Peru, and agreed to have those be conditions of dismissal. In addition, Plaintiffs conceded that Peruvian law recognizes a cause of action and offers a remedy for the property damage and personal injuries alleged here.

For their part, Plaintiffs argue that Defendants have not met their burden because first, they have not demonstrated that Peruvian courts have jurisdiction over all Defendants, and second, Defendants' improper influence over the Peruvian judiciary renders the forum

---

*sub nom. Mujica v. AirScan Inc.*, 771 F.3d 580 (9th Cir. 2014). Moreover, the Federal Rules of Civil Procedure expressly preclude the application of the Federal Rules of Evidence to one pivotal aspect of the FNC analysis: the adequacy of the alternative forum. *See* Fed. R. Civ. P. 44.1; *see also Wilmot v. Marriott Hurghada Mgmt., Inc.*, 2016 WL 2599092, at *4 (D. Del. 2016), *report and recommendation adopted*, 2016 WL 3457007 (D. Del. 2016) (citing Fed. R. Civ. P. 44.1 and stating, "In determining whether foreign law provides adequate relief, as an element of determining whether the [FNC] doctrine applies, a court may consider any relevant material or source, including testimony, whether submitted by a party or admissible under the Federal Rules of Evidence, and such determination shall be treated as a ruling on a question of law"), *aff'd*, 2017 WL 4570664 (3d Cir. 2017); *Base Metal Trading SA v. Russian Aluminum*, 253 F. Supp. 2d 681, 699 (S.D.N.Y. 2003) (taking the same approach and reaching the same conclusion), *aff'd*, 98 F. App'x 47 (2d Cir. 2004).

inadequate, relying primarily on *Eastman Kodak Company v. Kavlin*, 978 F. Supp. 1078, 1085–86 (S.D. Fla. 1997).[7]

### *1)   The Potential for Jurisdiction over Defendants in Peru*

Plaintiffs base their first contention on the declaration of Juan Carlos Ruiz Molleda, a Peruvian attorney specializing in, *inter alia*, human rights and access to justice and the law governing indigenous peoples. Pls.' FNC Resp. Ex. 17, ¶ 1, ECF No. 43-1. Ruiz is also the author of numerous publications and specialized legal articles in Peru and abroad. *Id.* Based on Article 2058 of the Peruvian Civil Code, Ruiz attests that "there is no guarantee" that a Peruvian civil court would exercise its jurisdiction" over this case, even if Defendants consent or stipulate to jurisdiction. *Id.* ¶¶ 4–14.

Defendants counter with their own expert declaration by Mario Castillo Freyre. Castillo is another Peruvian lawyer in the areas of civil law and arbitration who graduated from the same law school as Ruiz. Castillo Decl. Ex. 1, at 1–4, ECF No. 54-1. In addition to his private practice, Castillo is a professor and well-published scholar. *Id.* at 4. Castillo's analysis principally relies on language in the same article of the Peruvian Civil Code, the translation of which he includes in his affidavit:

> The Peruvian courts have competence to hear complaints arising from the exercise of patrimonial content actions even against persons domiciled in a foreign country, in the following cases:
> [. . .]

---

[7] Plaintiffs also argue that excessive delay in the Peruvian courts warrants denying this Motion, citing *Bhatnagar v. Surrendra Overseas Limited*, 52 F.3d 1220, 1227 (3d Cir. 1995). But the *Bhatnagar* Court did not conclude that a delay of any length rendered a forum inadequate. Rather, it recognized that delay "is an unfortunate but ubiquitous aspect of the legal process," and "our own courts" suffer from it. *Id.* at 1227. *Bhatnagar* merely stated that "at some point, . . . the prospect of judicial remedy becomes so temporally remote that it is no remedy at all." *Id.* Applying that standard, it had no difficulty finding delay intolerable when it approached 25 years. Here, although Plaintiffs point to a number of factors that might contribute to delay in any system, they fail to provide a benchmark for how much delay can be expected in this case. Without that, I cannot even begin to determine how to apply the *Bhatanagar* standard.

> 2. When actions related to obligations that must be executed in the territory of the Republic or that arise from executed contracts or of facts carried out in said territory are dealt. In the case of civil actions arisen from crimes or faults perpetrated or whose results have occurred in the Republic, this competence is considered exclusive.

Castillo Decl. 2 n.1, ECF No. 54. Castillo interprets that language to indicate that jurisdiction can be had if there is reasonable proximity—that is, if the alleged tortious acts and the results of the alleged harm occur in Peru. *Id.* ¶¶ 2–9. Castillo asserts that is the case here, since Yanacocha's actions in Peru form the basis of this suit. *Id.* In addition, Castillo points out that Molleda is wrong about the effect of consent or stipulation, because another aspect of Article 2058, referred to as "numeral 3[,]" allows jurisdiction to be asserted over foreign parties if they "expressly or tacitly submit to [the court's] jurisdiction." *Id.* ¶ 10.

Although Castillo's text-based argument is admittedly appealing, it does not account for how the statute might actually be applied. But there is no need to attempt to resolve this issue of Peruvian law, because Plaintiffs' concerns are unquestionably within my power to address, by making dismissal of this action not only contingent upon Defendants' consent to jurisdiction in Peru, but further upon on a Peruvian court actually ***accepting*** it.

### 2) Alleged Corruption in the Peruvian Judiciary

Plaintiffs' second contention is that corruption in the Peruvian judiciary renders Peru an inadequate forum. That contention can be broken into two theories, one alleging widespread corruption rendering the entire Peruvian judicial system inadequate, and another more narrow theory arguing that Peru is inadequate only as to these parties based upon specific evidence of judicial corruption pertaining to them.

A theory of generalized corruption has "not enjoyed a particularly impressive track record in our courts." *Wilmot v. Marriott Hurghada Mgmt., Inc.*, 2016 WL 2599092, at *5 (D. Del. 2016) (citing *Eastman Kodak*, 978 F. Supp. at 1084), *report and recommendation adopted*,

2016 WL 3457007 (D. Del. 2016), *aff'd*, 2017 WL 4570664 (3d Cir. 2017). Indeed, "absent at

least some particularized showing of wrongdoing, courts are hesitant" to deem an entire foreign

court system so corrupt that it cannot be considered an adequate forum. *Id.* Thus, I will consider

the general evidence Plaintiffs have submitted,[8] but only as background for the more

particularized allegations that Plaintiffs present to support the second theory.

The model case for evaluating such allegations is *Eastman Kodak*. The allegation there

was that Casa Kavlin, the former exclusive distributor for Kodak in Bolivia, brought criminal

charges against Carballo, who became Kodak's new distributor, in order to extort an

advantageous financial arrangement with Kodak. *Eastman Kodak*, 978 F. Supp. at 1080–81.

Specifically, Kodak presented several instances of Kavlin's attorney, Juan Carlos Zegarra, using

his judicial connections for this purpose. *Id.* First, Zegarra used his connections to have the case

assigned to favorable judges: in one case, Zegarra was the godfather of the judge's son, who was

conceived out of wedlock by way of an affair with Zegarra's sister; and in another, Zegarra was

once the judge's brother-in-law. *Id.* In each of those instances, it was alleged that Zegarra was

able to subject Carballo, other Kodak employees, and even a Chilean lawyer whose only act in

Peru was to help Carballo be released from prison lawfully, to significant abuses at the hands of

the Bolivian judicial system. *Id.* Most notably, Zegarra secured Carballo's pre-trial

imprisonment without bail in an infamous prison, where it is rumored that one would have to pay

for even the right to live in a jail cell. *Id.* Kodak supplemented these specific instances of

---

[8] The U.S. State Department has not deemed the Peruvian judiciary to be dysfunctional, but cautioned in
its 2016 Human Rights Report that there are allegations in the press and by non-governmental
organizations that judges have been corrupted and influenced by outsiders. A 2016 report from GAN
Integrity, a consulting and software firm that advises businesses on compliance issues, stated that Peru's
judicial system "carries a very high risk of corruption," based upon its review of various private and
public sources. Mr. Ruiz, one of Plaintiffs' attorney experts, describes systemic corruption, although it is
noteworthy that many of the instances cited were cases brought to light by the Peruvian government's
own investigation and prosecution of the officials involved.

corruption with general evidence about the state of the Bolivian judicial system, most notably statements by the Bolivian Minister of Justice's that the judicial system he supervised was "a collection agency and the penal system was an agent of [extortion]." *Id.* at 1085. Combined, these allegations led the court to have "serious doubts about Kodak's ability to operate in Bolivia free from the threat of prosecution, and even immediate imprisonment." *Id.* at 1087.

Here, Plaintiffs allege that Defendants similarly influenced the Peruvian judiciary, including in cases against Plaintiffs. Those allegations focus on three discrete episodes, documented by affidavits and news articles.

The first pertains to an incident that took place in 2000, when Defendant Newmont Second Capital Corporation was seeking control of Yanacocha during the Fujimori regime. In one well-publicized account, an audio recording surfaced of a then-Newmont executive reaching out to the ranking Peruvian National Intelligence Agency officer, Vladimoro Montesinos, for Montesinos's aid in ensuring that the Peruvian Supreme Court would rule in favor of Newmont. *See* Pls.' FNC Resp. Ex. 1, ¶ 9, ECF No. 43-1. The New York Times reported that Montesinos then tacitly pressured the judge who went on to break the Supreme Court's tie in favor of Newmont and company. *See* Jane Perlez and Lowell Bergman, *Tangled Strands in Fight Over Peru Gold Mine*, N.Y. Times (June 14, 2010), http://www.nytimes.com/2005/10/25/world/americas/tangled-strands-in-fight-over-peru-gold-mine.html. Newmont's attempts to influence the decision of Peru's Supreme Court appear to be well-documented, but according to the Newmont executive accused, he was reacting defensively to similar attempts by Newmont's French partners to influence the decision. *Peru – The Curse of Inca Gold*, Frontline/World (Oct. 2005), https://tinyurl.com/frontlineworld-thestory.

Regardless, the events in question occurred some 18 years ago, around the time when the regime of an infamously corrupt president, Alberto Fujimori, imploded. The interim regime change and noted improvements since render this a case where Plaintiffs cannot plausibly allege that the national government itself or high governmental officials are directly involved in the alleged misconduct and can dictate the outcome. *Compare HSBC USA, Inc. v. Prosegur Paraguay, S.A.*, 2004 WL 2210283 (S.D.N.Y. 2004); *Daventree Ltd. v. Republic of Azerbaijan*, 349 F. Supp. 2d 736 (S.D.N.Y. 2004); *Araya v. Nevsun Res. Ltd.*, 2017 BCCA 401 (CanLII). Further, both before and after Fujimori's regime, every federal court to consider the issue has found Peru to be an adequate forum. *See, e.g.*, *Torres v. S. Peru Copper Corp.,* 965 F. Supp. 899, 904 (S.D. Tex. 1996), *aff'd* 113 F.2d 540 (5th Cir. 1997); *Sudduth v. Occidental Peruana, Inc.*, 70 F. Supp. 2d 691, 697 (E.D. Tex. 1999); *Flores v. S. Peru Copper Corp.*, 253 F. Supp. 2d 510 (S.D.N.Y. 2002), *aff'd on other grounds*, 414 F.3d 233, 266 (2nd Cir. 2003); *Maxima International, S.A. v. Interocean Lines, Inc.*, 2017 WL 346826, *2 (S.D. Fla. 2017). Thus, an act of corruption involving a high official during that regime is not enough to now find the Peruvian court system inadequate.[9]

Second, Plaintiffs' attorney in Peru, Mirtha Esther Vásquez Chuquilín, asserts that the Peruvian legal system has been unresponsive to Plaintiffs' claims, but solicitous of Yanacocha's complaints. Ms. Vásquez submits that the prosecutor's office has not investigated their numerous complaints, and that one judge, who agreed to conduct an on-site inspection of Tragadero Grande, later cancelled the visit without notifying Plaintiffs. Pls.' FNC Resp. Ex. 19, ¶ 11–14, ECF No. 43-1. The defense counters that what Plaintiffs describe as unresponsiveness

---

[9] Fujimori was later sentenced to 25 years in prison for graft and human rights violations. It should be noted, however, that Fujimori's children remain moving forces in Peruvian politics, and he was recently the beneficiary of a controversial pardon. Mitra Taj, *Fujimora Family Pulls Peru back into Political Turmoil,* Reuters (Dec. 25, 2017), https://www.reuters.com/article/us-peru-fujimori-family/fujimori-family-pulls-peru-back-into-political-turmoil-idUSKBN1EJ0VX.

represents nothing more than local officials exercising prosecutorial and judicial discretion in deciding how to expend resources. Ms. Vasquez further alleges that, in August 2011, the prosecutor's office brought an aggravated usurpation claim against three of the Chaupes without any evidence. *Id.* ¶ 28. She then points to several irregularities she noticed during the proceeding, such as the prosecution insulting her and not focusing on strictly legal arguments, the court not accepting evidence she wanted to present, and, in the end, the prosecutors receiving a copy of the judgment before she did. *Id.* ¶¶ 28–32. This is concerning, but such concern is mitigated by the fact that the judgment was overturned by the court of appeals on two occasions, and the Peruvian Supreme Court subsequently upheld that ruling. *Id.* ¶ 3. In short, Plaintiffs were ultimately protected by the very judicial system they ask me to deem inadequate.

The third is an account from Plaintiff Ysidora Chaupe-Acuña, pertaining to a trial in 2013. There, she alleges that,

> right before [the Judge] issued the sentence, the lawyer for [Yanacocha] arrived and gave the judge a document. Afterwards, the [Judge] gave us the same document and it was the guilty sentence. Shortly after being given [that] document, . . . [the Judge] apologized for the outcome of the trial, . . . [and told me] that the company gave an 'economic benefit' to the prosecutor to bring the case against us.

Pls.' P.I. Mot. Ex. 6, ¶ 7–8, ECF No. 27-1.

Even taking these facts at face value, it is noteworthy that it was the court that brought this instance of apparent corruption to Plaintiffs' attention. Thus, although the situation is troubling, it does not support a global finding that Peru is an inadequate forum for Plaintiffs, particularly in light of the success Plaintiffs experienced in the appellate courts.[10]

---

[10] As supplemental evidence, Plaintiffs submitted an article concerning corruption within the Peruvian government. That article reports an investigation into allegations that certain officials accepted bribes from Brazilian companies in exchange for public construction jobs. *See* Notice of Supp. Ev. Ex. 1, ECF No. 91. The implications for the Peruvian judiciary are not apparent.

More broadly, there is reason to question whether Yanacocha's influence over the Peruvian government is as strong as Plaintiffs assert. Action by the Peruvian government has led to Yanacocha suspending its Conga operation. The core premise of Plaintiffs' argument is that Defendants will go to any means to expand their mining operation, but in fact they have been stymied by the government's responsiveness to local opposition to such expansion. Further, Plaintiffs' Complaint acknowledges other ways in which the Peruvian government has been responsive to their situation. Plaintiffs state that the government "will travel to Tragadero Grande twice a month . . . to verify [their safety]," and that it "will also pay for [their] phone bills." Compl. ¶ 350, ECF No. 1. The Complaint also alleges that the Peruvian Minister of Justice and Human Rights publically affirmed that the "government was coordinating with the police on a protection plan" for the Plaintiffs. *Id.* ¶ 351. Finally, since at least 2015, the Peruvian National Police have not been involved with Yanacocha's exercises of its possessory defense against the Chaupes. *See* Defs.' P.I. Resp. 6, n. 4, ECF No. 37.

In addition to the fact that Defendants' influence was not enough to force through expansion of the mine over local opposition, it is far from clear on the record before me that Defendants are ruthlessly determined to exploit weaknesses in the Peruvian judiciary to trample Plaintiffs' rights. At the corporate level, Defendants have endorsed and adopted established human rights frameworks such as the United Nations Guiding Principles on Business and Human Rights and the Voluntary Principles on Security and Human Rights, in addition to a series of internal policies and standards. And beyond good intentions, Defendant Newmont has made some efforts to investigate alleged abuses by their subsidiary. Newmont funded an independent fact-finding mission in 2015 by Resolve, a non-profit, Washington-based dispute resolution organization with a 40-year history. Resolve reviewed earlier public inquiries dating back to

2009, which found in part that the growth and persistence of conflicts in Tragadero Grande was attributable to Yanacocha's inadequate grievance systems and over-reliance on state institutions and legal processes to resolve disputes. Further, the mission examined "the allegations of human rights violations perpetrated against the Chaupe family, and [Yanacocha's] conformance to Newmont's own policies and international standards." Pls.' P.I. Mot. Ex. 16, at v., ECF No. 27-2. Consistent with the findings in earlier studies, the Chaupes and Yanacocha both agreed that attempts to evict the Chaupes occurred without an opportunity for dialogue, and that there was no such opportunity until 2015. This led the mission team to conclude that the Chaupe family's human rights were at risk from the first encounter, and that a precautionary approach should have been taken prior to eviction. *Id.* at 36. After reviewing reports by key actors, including Yanacocha's security personnel, Yanacocha, and the Chaupe family, in addition to video footage and photographic records, the mission team "did not discover conclusive evidence that [Yanacocha] violated human rights of members of the Chaupe family. Specifically, [it found] no conclusive evidence relating to the use of force by police on August 11, 2011." *Id.* at 32.[11] Such private fact-finding is by no means controlling, and a court would be naïve not to consider the fact that such investigations can be self-serving. But given Resolve's apparent independence,[12] I find the effort itself somewhat relevant in determining whether the principal defendant here, Newmont, seeks to gain an *unlawful* advantage in Peruvian courts.

---

[11] Video submitted by the parties or otherwise accessible within the public domain does not show instances of violence against Plaintiffs. One video, however, appears to show local residents armed with machetes and clubs advancing toward a police line, and another shows what appears to be one of the Plaintiffs throwing a rock that strikes a Yanacocha representative on the head.

[12] It should be noted that a former executive of Newmont sits on the board of Resolve. But as a result of that, he took a leave of absence for the entire period of the Yanacocha fact finding mission. *Yanacocha Independent Fact Finding Mission*, Resolve.org, http://www.resolv.org/site-yiffm/faqs/ (last visited Apr. 10, 2016).

An additional factor bearing on whether Peruvian courts will function impartially is the admirable success Plaintiffs have had in focusing international public attention on this dispute, including now the attention of the federal judiciary in the United States. Among other things, the Inter-American Commission on Human Rights (IACHR) of the Organization of American States formally requested that the Peruvian government to adopt precautionary measures for numerous leaders of campesino communities, among them the Chaupe family. *PM 452 11 – Leaders of Campensino Communities and Campesino Patrols in Cajarmaca, Peru*, Organization of American States: Inter-American Commission on Human Rights (May 5, 2014), https://www. oas.org/en/iachr/decisions/precautionary.asp. Journalists and international human rights groups such as Amnesty International have visited the site of the dispute as observers, carrying letters of support. *Peru: Peruvian Authorities Put an End to the Criminalization of Defender Máxima Acuña*, Amnesty International (May 3, 2017), https://www.amnesty.org/en/latest/news/2017/ 05/peru-autoridades-peruanas-ponen-punto-final-a-la-criminalizacion-de-la-defensora-maxima-acuna/. In 2016, Plaintiff Máxima Acuña received the Goldman Environmental Prize from a United States foundation for her defense of her claim to the land. Major media outlets have praised her resilience. Anna Lekas Miller, *Meet the Badass Grandma Standing Up To Big Mining*, The Daily Beast Company LLC (Apr. 16, 2016), https://www.thedailybeast.com/meet-the-badass-grandma-standing-up-to-big-mining. This continued spotlight makes it less likely that judicial proceeding in Peru will be subject to untoward influences.

In summary, as to the first element of the test, although Plaintiffs have shown cause for concern over Peruvian courts, I cannot say that they are "clearly unsatisfactory" under *Piper*.

### B. Level of Deference to Plaintiffs' Choice of Forum

I must now decide how much deference Plaintiffs' choice of forum is due. The importance of this factor was also highlighted in *Eastman Kodak*, where, despite the fact that Kodak's allegations of corruption raised "serious doubts" as to the adequacy of Bolivia as a forum, "[the] case [came] down to the [full] deference being given to [Kodak's] choice of forum" as a domestic plaintiff. *See* 978 F. Supp. at 1087. Indeed, ordinarily there is a "strong presumption in favor of the plaintiff's choice of forum" and plaintiff's choice "should rarely be disturbed." *Piper*, 454 U.S. at 241. That presumption, however, "applies with less force when the plaintiff or real parties in interest are foreign." *Id.* at 255. Courts give foreign plaintiffs less deference not because of "xenophobia, but merely [out of] a reluctance to assume that the choice is a convenient one." *Lacey v. Cessna Aircraft Co.*, 932 F.2d 170, 179 (3d Cir. 1991) (*Lacey II*)(citing *Lony v. E.I. Du Pont de Nemours & Co.*, 886 F.2d 628, 634 (3d Cir. 1989)). This reluctance "can readily be overcome by a strong showing of convenience" by the plaintiff. *Id.*

Despite being foreign citizens, Plaintiffs argue that their forum choice is due full deference because 1) a United States-Peru treaty provides for national access to U.S. courts for Peruvians, and 2) the convenience of the United States is established by the problems with Peru discussed above.

I am not persuaded. As to the first point, there is binding precedent to the contrary. In *Kisano Trade & Invest Limited v. Lemster*, the Third Circuit specifically rejected an argument that a treaty with Israel providing Israeli citizens access to United States courts required greater deference to an Israeli citizen's choice of forum. 737 F.3d at 875 (3d Cir. 2013) (citing 14D Charles Alan Wright et al., Federal Practice and Procedure § 3828.2 (3d ed. 2007) ("[I]n practice, federal courts generally hold that [treaties promising equal access to courts] do not

entitle foreign plaintiffs to the same deference as United States citizens.")). The treaty here is similar, and does not entitle Plaintiffs to full deference on their choice of forum.

As to Plaintiffs' remaining points, I address two of their three concerns by predicating dismissal on certain conditions. As to jurisdiction in Peru, dismissal here will be predicted upon a Peruvian court accepting it. As to enforceability, I will make dismissal here contingent upon Defendants' stipulation that the judicial system in Peru qualifies as legally adequate for purposes of applying Delaware's standards for the recognition of foreign-country judgments. *See* 10 Del. Code. § 4803(b). As to the likelihood of a fair trial in Peru, although concerns exist, as set forth above, under the totality of the circumstances, I am not persuaded that Plaintiffs' fears of unfair treatment entitle them to additional deference as foreign Plaintiffs. I therefore afford them less than full deference.

### C. Balance of Private and Public Interests

Having concluded that Peru is an adequate alternative forum and assessed the level of deference to Plaintiffs' choice of forum, I move to the final step of the analysis, which requires that I examine the relevant private and public interests. Defendants' burden here is to show that the balance of these factors "tips decidedly in favor of trial in the foreign forum," outweighing the deference owed to Plaintiffs' chosen forum. *See Lacey II*, 932 F.2d at 180.

#### 1) Private Interest Factors Weigh Heavily in Favor of Peru

The relevant private interest factors are set forth in *Gilbert*:

[1] the relative ease of access to sources of proof; [2] availability of compulsory process for attendance of unwilling witnesses; [3] the cost obtaining attendance of willing witnesses; [4] the possibility of a view of the premises, if appropriate to the action; and [5] all other practical problems that make trial of a case easy, expeditious and inexpensive.

*Gilbert*, 330 U.S. at 508.

I conclude that these factors tilt decidedly in favor of Peru. As to the first factor, Peru is where much of the alleged conduct and all of the injuries took place, where most of the relevant witnesses—the Chaupes, Yanacocha, PNP, and Securitas—are all located, and where most of the documentary and physical evidence is located. As to the second factor, compulsory process is not available for some of these witnesses, including Securitas and the PNP. As to the third, given how many witnesses are located in Peru and how few are in the United States, the costs of obtaining attendance would be significant in Delaware when compared to trial in Peru. Regarding the fourth factor, though not absolutely necessary given modern technology, viewing the premises might be appropriate in this action, given the many allegations about what was done to and around the land. As to the final, catch-all factor, Defendants identify three salient points: (i) they will not be able to implead other potentially responsible parties, such as Securitas or PNP, since those parties do not have sufficient contacts with Delaware, (ii) translators for all the witnesses and documents will be costly, and (iii) there will be challenges to enforcing a United States judgment in Peru, similar to the issues regarding the enforceability of a Peruvian judgment in the United States.

Plaintiffs contend otherwise, advancing eight separate arguments, six of which concern the practical advantages of trying this case in Delaware, and the final two concerning legal challenges that may arise if trial is in Peru. Overall, these arguments are predicated on the notion that this case is likely to center on the conduct of Newmont executives in the United States. By framing the issue in that manner, Plaintiffs invite me to make a determination now as to the ultimate focus of this case. But that invitation reflects a misapprehension of the extent of my inquiry at this stage of the litigation, where "no discovery has taken place," and no answer has been filed. *See Lacey II*, 932 F.2d at 181. Indeed, I can, at most, "delineate the likely contours

of the case," but "cannot . . . determine what the ultimate focus of the trial will be." *Id.* And even if I could, the extensive evidence provided on this Motion and, more importantly, on Plaintiffs' own Motion for Preliminary Injunction, has focused almost exclusively on the events that took place in Peru, undercutting their argument that trial or discovery will feature Defendants' corporate conduct in this country more prominently.

As to the arguments themselves, Plaintiffs contend that there are key corporate witnesses in the U.S., and that Defendants overstate the costs of obtaining witnesses and translators, and the need to see Tragadero Grande. But because an overwhelming majority of the evidence and relevant witnesses appear to be in Peru, along with potential parties, I remain convinced that the private interests weigh heavily in favor of trying this case in Peru. Again, that conviction is bolstered by the fact that, thus far, much of the parties' factual disputes have centered on events in Peru.

The result is the same for Plaintiffs' legal concern about the enforceability of a Peruvian judgment in Delaware. Here, in an effort to make Delaware the center of the case, Plaintiffs simply ignore the reality of the injunctive relief they seek, which is specific protection from the actions of entities in Peru. As discussed above, given this aspect of the case, local administration is preferable, and enforceability of any judgement here is a concern I can effectively address.

The Plaintiffs' other legal challenges warrant a different response. First, they raise the possibility that Peruvian evidentiary rules could limit the use of foreign evidence. Second, they identify potential obstacles to proving their case, because the testimony of family members is uniformly deemed unreliable under Peruvian law. The former concern can be addressed by including in my dismissal order the condition that, if Plaintiffs seek the testimony of Defendants' representatives, Defendants may not object even if grounds for objection exist under Peruvian

law.  The latter concern, however, deals with the specific rules concerning testimony by Peruvian citizens.  I am not prepared as a judge sitting in another nation to conclude that a single such rule renders an entire court system inadequate, or to attach a condition presumptuously imposing American evidentiary rules on a foreign court.

### 2)  *Public Interest Factors Weigh Heavily in Favor of Peru*

As to the public interest factors, I am likewise persuaded that those weigh heavily in favor of trial in Peru.  *Gilbert* identified the relevant factors here as:

> "Administrative difficulties follow for courts when litigation is piled up in congested centers instead of being handled at its origin.  Jury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation.  In cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach . . . .  There is a local interest in having localized controversies decided at home."

330 U.S. at 508–09.  Here, Defendants point to the alleged torts occurring in Peru, the Peruvian government's efforts to address this dispute thus far, and the case before the Peruvian judiciary concerning the underlying land dispute, to argue that Peru has an overwhelming interest in this matter, and Delaware virtually none in comparison.  Further, Defendants argue that jurors here should not be burdened, especially since Peruvian law will likely govern or at least play a significant role.  Finally, they contend that the congestion existing in Peruvian courts should not weigh heavily here, both in light of controlling precedent and because as a result of vacant judgeships this court is not without its own challenges.  I agree.  This case would pose administrative difficulties,[13] not the least of which is the likelihood that Peruvian law would

---

[13] Plaintiffs' argument  that the difficulties posed by the vacancies on this court "pale[] in comparison" to those affecting Peruvian courts may be well-founded, but short of implying a burden of the kind acknowledged in *Bhatnagar*, those difficulties do not carry dispositive weight.

govern many, if not all, of Plaintiffs' claims. And although I would not characterize Delaware's interest as "virtually none," it necessarily carries less weight than the interest of Peru.[14]

To determine this dispute's connection to Plaintiffs' preferred forum, I "consider the locus of the alleged culpable conduct, *often a disputed issue*, and the connection of that conduct" to Delaware. *See Lacey I*, 862 F.2d at 48 (citation omitted) (emphasis added). I emphasize "often a disputed issue" because that is precisely the case here: in Plaintiffs' view, the locus of the alleged culpable conduct is Delaware, where Defendants are incorporated, oversee the conduct of Yanacocha, knew of the alleged tortious conduct, and failed to put an end to it. Meanwhile, Defendants argue that the alleged culpable conduct took place in Peru, for the conduct at issue here is the alleged tortious conduct of Yanacocha's security personnel in Peru, more so than anything Defendants did or failed to do at the corporate level. As previously stated, Plaintiffs' own submissions underscore the degree to which Peru is at the center of this case. Further, Peru has demonstrated significant interest in this matter. *See* Compl. ¶¶ 60, 350–51. In contrast, Delaware's connection to this case is remote, especially since, even accepting that the alleged corporate conduct plays an equally prominent role, that conduct likely took place in Colorado, where Defendant is headquartered, as opposed to Delaware. *See* Hudgens Decl. ¶¶ 2– 5 ("None of [Newmont's] operations, employees, or records are located in Delaware."). Thus, separated from both Peru and Colorado by at least a thousand miles, Delaware can hardly be considered the locus of the alleged culpable conduct. *See Eurofins*, 623 F.3d at 163 ("[T]hough

---

[14] The legislative findings that accompanied the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-1, make clear that maintaining international confidence in the integrity of American business is in the national interest of the United States. The specter of disproportionate corporate influence raised by Plaintiffs here was also addressed by regulations promulgated by the Securities Exchange Commission under Section 1504 of the Dodd-Frank Wall Street Reform and Protection Act, 15 U.S.C. § 78m(q), requiring that companies that extract minerals disclose publicly any payments made to governments. But those reporting requirements were eliminated in the first legislation signed during the Trump Administration. Disclosure of Payments by Resource Extraction Issuers, Pub. L. No. 115-4, 131 Stat. 9 (Feb. 14, 2017). Suffice it to say that the absence of such a reporting requirement is felt in cases such as this.

Delaware has a significant interest in actively overseeing the conduct of those owing fiduciary duties to the shareholders of Delaware corporations, that interest is . . . insufficient to outweigh the locus of the alleged culpable conduct in this case.")

As to the difficulties posed by governing law in this case, *Piper* instructs that FNC "is designed in part to help courts avoid . . . complex exercises in comparative law." *See* 454 U.S. at 251. Thus, "where the court would be required to untangle problems in conflict of laws, and in law foreign to itself," the public interest factors point towards dismissal. *Id.* Here, both parties agree that, as a federal judge sitting in diversity in Delaware, I am to apply Delaware's choice of law rules to any dispute regarding applicable substantive law. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Delaware has adopted the Restatement (Second) of Conflicts, pursuant to which Defendants present a compelling case that Peruvian law would govern many of the claims here. *See* Defs.' FNC Mot. 20 (citing Restatement (Second) of Conflicts § 145(2) cmt. e ("When the injury occurred in a single, clearly ascertainable state and when the conduct which caused the injury also occurred there, that state will usually be the state of the applicable law with respect to most issues involving the tort.")). Their analysis is even more compelling in light of the Delaware Supreme Court's ruling in *Bell Helicopter Textron, Incorporated v. Arteaga*, 113 A.3d 1045, 1053 (Del. 2015), which held that in tort actions, the local law of the state of injury is presumed to apply if the plaintiff has "significant contact with the site other than the accident itself." There, the fact that a foreign Plaintiff resided in the forum where the injury occurred was held to meet the "significant contact" requirement, and the law of that forum, Mexico, was applied. *Id.* (citing § 145 cmt. f, which states that "when [the] conduct and injury occur in different states . . . the local law of the state where the injury occurred is most

likely to be applied when the decedent had a settled relationship to that state, either because he was domiciled or resided there or because he did business there").

Plaintiffs attempt to forestall such a conclusion by arguing that Defendants failed to identify a conflict between Peruvian and Delaware laws. But the possessory defense discussed above is one such conflict, and central to this case. Moreover, from a review of the submissions of the parties' legal experts, it is readily apparent that there will be multiple contested issues of Peruvian law.

On balance, Defendants have met their burden of showing that the private and public interest factors weigh heavily in favor of this case being tried in Peru, and outweigh the reduced deference owed to Plaintiffs' forum choice.

## IV. Conclusion

Defendants' FNC motion will therefore be granted, subject to the conditions set forth throughout this Memorandum and included in the accompanying order. Such dismissal will be without prejudice, allowing Plaintiffs to re-invoke the jurisdiction of this Court if the conditions of dismissal are not met.

_____ /s/ Gerald Austin McHugh
United States District Judge