# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

MÁXIMA ACUÑA-ATALAYA; DANIEL   :
CHAUPE-ACUÑA; JILDA CHAUPE-ACUÑA; :
CARLOS CHAUPE-ACUÑA; YSIDORA   :    **CIVIL ACTION**
CHAUPE-ACUÑA, personally and on behalf   :    **No. 17-1315**
of her minor child; ELIAS CHAVEZ-    :
RODRIGUEZ, personally and on behalf   :
of her minor child; and MARIBEL HIL-   :
BRIONES,           :
            :
       **Plaintiffs,**   :
    **v.**         :
            :
**NEWMONT MINING CORPORATION,**   :
**NEWMONT SECOND CAPITAL**    :
**CORPORATION; NEWMONT USA**    :
**LIMITED; and NEWMONT PERU LIMITED,** :
            :
       **Defendants.**   :

---

**McHUGH, J.**                 **MARCH 10, 2020**
## MEMORANDUM OPINION

This case concerns a conflict over a tract of land in northern Peru between a family of indigenous *campesinos* residing on the land (Plaintiffs) and several Delaware-incorporated mining entities, collectively referred to as Newmont. Newmont owns a gold mining company operating in the region, and land on which Plaintiffs live and farm sits atop a gold deposit.

In 2017, Plaintiffs brought suit in the District of Delaware. In their Complaint, they contended that Newmont's agents had used violence and other illegal tactics to evict them from their land. Plaintiffs opted to proceed in these federal courts and not the courts of Peru because they believed the Peruvian courts were corrupt and would not fairly adjudicate their claims. After Plaintiffs filed suit, Newmont moved to dismiss on *forum non conveniens* grounds, arguing, among other things, that the sources of proof and the key witnesses were in Peru. I

granted Newmont's motion, with conditions, and Plaintiffs appealed. While the appeal was pending, a further political crisis arose in Peru, leading both its judiciary and Congress to declare states of emergency. As a result, the Court of Appeals vacated my Order dismissing Plaintiffs' Complaint and remanded for me to reevaluate whether Peru remained an adequate alternative forum in light of the instances of corruption identified following my dismissal.

The parties have submitted supplementary materials concerning those scandals for my consideration. Though the events described are again concerning, they do not suffice to supplant my previous conclusion that Peru is an adequate alternative forum under the appropriate *forum non conveniens* legal framework. Newmont's motion to dismiss therefore will be granted. However, because I remain concerned that Plaintiffs' ability to be fairly heard in Peru is compromised, I grant Newmont's motion subject to various conditions attached to the accompanying Order.

## I. Nature and stage of the proceedings

### A. The District of Delaware lawsuit

The facts relevant to Plaintiffs' decision to bring suit were detailed in my previous opinion. *See* ECF 92, at 2-5. I will restate them here, but only briefly. This case arises from a conflict over a tract of land in Cajamarca, Peru, a rural region in the northern Andes. Plaintiffs are *campesinos*—indigenous subsistence farmers residing on that land, which they refer to as "Tragadero Grande." Plaintiffs claim they purchased possessory rights to Tragadero Grande in 1994. ECF 1, ¶ 65. In the years following Plaintiffs' alleged purchase, Minas Conga, a Peruvian mining company, began negotiating with members of the community to acquire the land for a mining project. Minas Conga achieved some success in its negotiations with members of the community. But Plaintiffs insist they never sold or transferred the possessory rights they had in Tragadero Grande to Minas Conga or any other entity. Newmont, for its part, claims that Minas

Conga entered legitimate land-sale contracts for hundreds of acres in the region, including Tragadero Grande. Reconciling the parties' positions seems to turn on decades-old Spanish language real estate documents, the oral histories of the parties to the negotiations, and complex property law governing land held by *campesinos*. In any case, in 2001, Minas Conga transferred the property rights it alleges it acquired to Minera Yanacocha, a subsidiary of Newmont.

Conflict between the parties began in earnest in 2010. According to Plaintiffs, in late 2010, Newmont or its agents entered Tragadero Grande and destroyed Plaintiffs' property and crops. Then, the next year, Yanacocha staff, accompanied by members of the Peruvian National Police and a private security firm, sought to evict Plaintiffs from the land. In doing so, Plaintiffs allege that the entities attacked them and again destroyed their property. Plaintiffs further allege that the purpose of these attacks was to dispossess them of their portion of the land to facilitate the development of a gold mine operated by Newmont and its Peruvian subsidiary. Newmont concedes that it or its agents worked with the Peruvian National Police and other security officials to evict Plaintiffs from the land. But, according to Newmont, such measures were necessary "to protect [their] possessory interests under Peruvian law." ECF 15, at 3.

### B. The District Court opinion

Plaintiffs brought suit against Newmont in the federal district court in Delaware. Plaintiffs filed in Delaware and not Peru because they were convinced that the Peruvian courts, including the trial courts in Cajamarca, were corrupt and would not fairly adjudicate their case. After suit was filed, Newmont moved to dismiss the Complaint on *forum non conveniens* grounds. I granted Newmont's motion on April 11, 2018, concluding that Peru was an adequate alternative forum and that the relevant *forum non conveniens* criteria otherwise favored dismissal. *See Acuña-Atalaya v Newmont Mining Corp.*, 308 F. Supp. 3d 812, 819-20 (E.D. Pa. 2018) (all citations will be to the slip opinion, available at ECF 92).

In deciding whether *forum non conveniens* dismissal was appropriate, I employed the standard three-step analytical framework that the Court of Appeals prescribed in *Eurofins Pharma US Holdings v. BioAlliance Pharma SA*, 623 F.3d 147 (3d Cir. 2010):

- "First, the court must determine 'whether an adequate alternate forum' exists to entertain the case." ECF 92, at 9 (quoting *Eurofins Pharma*, 623 F.3d at 160).

- "If so, the court must next determine 'the appropriate amount of deference to be given the plaintiff's choice of forum.'" *Id.* (quoting *Eurofins Pharma*, 623 F.3d at 160).

- "Finally, the court must weigh 'the relevant public and private interest factors' . . . to determine whether, on balance, 'trial in the chosen forum would result in oppression or vexation to the defendant out of all proportion to the plaintiff's convenience.'" *Id.* (quoting *Eurofins Pharma*, 623 F.3d at 160).

In applying the *Eurofins* factors, I noted that defendants seeking dismissal on the basis of *forum non conveniens* bear the burden of persuasion at every stage of the analysis. *Id.* (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 (1981), and *Lacey v. Cessna Aircraft Co.*, 862 F.2d 38, 43-44 (3d Cir. 1988)).

As to the first *Eurofins* factor, I concluded that Peru was an adequate alternative forum because Newmont stipulated to service of process, consented to the jurisdiction of the Peruvian courts, and agreed to have that stipulation and consent be conditions of dismissal. *Id.* at 11. In addition, Plaintiffs conceded that Peruvian law recognized a cause of action for their claims and offered a remedy for the property damage and personal injuries alleged. *Id.*

In arguing that Peru was not an adequate forum, Plaintiffs alleged that corruption pervaded the Peruvian judiciary, compromising their ability to be fairly heard. I assessed the allegations of corruption offered by Plaintiffs, and concluded that "as to the first element of the [*Eurofins*] test, although Plaintiffs have shown cause for concern over Peruvian courts, I cannot say that they are 'clearly unsatisfactory' under *Piper*." *Id.* at 20. In particular, I assessed three

main arguments advanced by Plaintiffs, and found none sufficiently persuasive to conclude that Peru was an inadequate forum.

As to Plaintiffs' first argument, I discounted an older well-publicized story about a Newmont executive successfully pressuring a Peruvian Supreme Court judge to rule favorably in a case involving Newmont. *See id.* at 15-16. My conclusion was based on the fact that the event "occurred some 18 years ago, around the time when the regime of an infamously corrupt president . . . imploded," but that "the interim regime change and noted improvements since," both in the Peruvian judiciary and at Newmont, mitigated concerns about similar events recurring. *Id.*

Second, I analyzed evidence offered by Plaintiffs regarding Newmont's influence in the Peruvian lower courts. Plaintiffs' attorney in Peru testified to multiple examples of suspicious behavior in criminal proceedings involving Plaintiffs, including a trial court's refusal to accept some of Plaintiffs' evidence and the prosecutors receiving a copy of a judgment before the attorney did. *Id.* at 16-17. While I found the account "concerning," I noted that "such concern is mitigated by the fact that the judgment was overturned by the court of appeals on two occasions, and the Peruvian Supreme Court subsequently upheld that ruling." *Id.* at 17. Ultimately, I concluded that "Plaintiffs were ultimately protected by the very judicial system they ask me to deem inadequate." *Id.*

Finally, I investigated a particular episode evidencing Newmont's capture of the Peruvian lower courts. Plaintiffs asserted that, in criminal proceedings against them in Peru, Newmont's lawyer hand-delivered the guilty sentence to the Peruvian judge who, after issuing the sentence, admitted that Newmont had given an "economic benefit" to the prosecutor to bring the case against Plaintiffs. *Id.* at 17-18. Though I found this account "troubling," my concerns were

mitigated in part by the fact that Plaintiffs had achieved "success . . . in the appellate courts [of Peru]" in those same criminal proceedings. *Id.*

As to the second and third *Eurofins* factors, I concluded that, on balance, Newmont had met its burden of showing that the private and public interest factors weighed heavily in favor of the case being tried in Peru, and outweighed the reduced deference owed to Plaintiffs' choice of forum. ECF 92, at 22-28 (relying on the factors established in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947)). I acknowledged that the federal courts often defer to a plaintiff's choice of forum, but noted that these Plaintiffs' choice of forum was not due significant deference because the federal courts generally do not entitle foreign plaintiffs the same deference as to choice of forum as domestic citizens. And because the sources of proof and the key witnesses were largely located in and around Cajamarca, and Delaware had no particular stake in the litigation, the public and private factors favored dismissal.

I therefore granted Newmont's *forum non conveniens* motion and dismissed Plaintiffs' Complaint, allowing Plaintiffs to reinvoke the jurisdiction of this Court if the conditions of dismissal were not met.

### C. The Court of Appeals opinion

The Court of Appeals has issued a limited remand for this Court "to reconsider its prior determination that Peru is an adequate forum." *Acuña-Atalaya v Newmont Mining Corp.*, 765 Fed. App'x 811, 812 (3d Cir. 2019) (all citations will be to the slip opinion, available at ECF 96).[1] The remand is based upon events affecting the judiciary in Peru that occurred after I first ruled in April 2018. The Court of Appeals has requested that I evaluate whether these new

---

[1] I do not read the Court of Appeals' opinion to question my conclusions that, on balance, Newmont has met its burden of showing that the private and public interest factors outweigh any deference owed to Plaintiffs' choice of forum. *See* ECF 92, at 21-28.

developments change my conclusion that Peru is an adequate alternative forum. In doing so, the Court of Appeals has further specified that I reassess adequacy (the first *Eurofins* factor) by applying the following standard established by the Eleventh Circuit in *Leon v. Millon Air, Inc.*, 251 F.3d 1305, 1312 (11th Cir. 2001):

> While the Supreme Court has not yet spoken to particular burdens or standards associated with a plaintiff's assertion of unfair treatment in [the proposed alternative forum], the Eleventh Circuit has done so, offering a logical and persuasive approach: "defendants have the ultimate burden of persuasion, but only where the plaintiff has substantiated his allegations of serious corruption or delay. . . . [W]here the allegations are insubstantially supported, . . . a District Court may reject them without considering any evidence from the defendant. But where the plaintiff produces significant evidence documenting the partiality or delay (in years) typically associated with the adjudication of similar claims and these conditions are so severe as to call the adequacy of the forum into doubt, then the defendant has the burden to persuade the District Court that the facts are otherwise."

ECF 96, at 7-8 (first bracketed text added).[2]

In practical terms, *Leon* endorses a three-step analysis when a district court is evaluating whether a proposed alternative forum is adequate under the first *Eurofins* factor:

*1. Defendant's Initial Burden.* At the outset, the defendant must show that "there exists an alternative forum," a requirement "[o]rdinarily . . . satisfied when the defendant is 'amenable to process' in the other jurisdiction." *Id.* at 7 (citing *Piper Aircraft*, 454 U.S. at 254 n.22). To satisfy this step, a court can require a defendant to stipulate to service of process and consent to jurisdiction in the alternative forum, as I did in my initial dismissal. ECF 92, at 22.

*2. Plaintiff's Burden of Production.* If there exists an "alternative forum," then the burden shifts to the plaintiff to produce "significant evidence" demonstrating that "the remedy

---

[2] *Leon* offers a workable template for addressing the adequacy of the alternative forum. As such, it can be understood as a refinement of the step-one analysis articulated in *Eurofins*. In any event, because the Court of Appeals has requested that I employ *Leon*'s methodology on remand, it represents the law of the case. *See Christianson v. Cold Indus. Operating Corp.*, 486 U.S. 800, 816 (1988); *Minard Run Oil Co. v. U.S. Forest Service*, 549 Fed. App'x 93, 98 (3d Cir. 2013).

offered by the other forum is clearly unsatisfactory." ECF 96, at 7 (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 n.22 (1981)). To demonstrate a clearly unsatisfactory forum, the plaintiff must do more than simply show that "the law applicable in the alternative forum is less favorable to the plaintiff's chance of recovery." *Id.* (citing *Piper Aircraft*, 454 U.S. at 250). Indeed, "an adequate forum need not be a perfect forum," and "some inconvenience to litigants does not indicate that a forum is inadequate." *Leon v. Millon Air, Inc.*, 251 F.3d 1305, 1311-12 (11th Cir. 2001) (internal quotations omitted). Instead, the plaintiff must produce "significant evidence" that one or more of the following factors (or related factors) is the case:

- **The alternative forum is incapable in fact or in law of producing a remedy**. ECF 96, at 7 (noting that "the other forum may not be an adequate alternative . . . where the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all" (citing *Piper Aircraft*, 454 U.S. at 254)).

- **The alternative forum is partial to defendants or will treat the plaintiff unfairly**. *Id.* (noting that "the other forum may not be an adequate alternative . . . where the plaintiff 'will be . . . treated unfairly'" (citing *Piper Aircraft*, 454 U.S. at 254-55)).

- **The alternative forum is slow or inefficient in adjudicating similar claims**. *Id.* (noting that the alternative forum may be inadequate when "delay (in years) typically associated with the adjudication of similar claims" (citing *Leon*, 251 F.3d at 1312)).

*3. Defendant's Burden of Persuasion.* If the plaintiff produces significant evidence that the alternative forum is "clearly unsatisfactory," then "the defendant has the burden to persuade the District Court that the facts are otherwise." *Id.* at 7-8; ECF 92, at 9 ("Defendants seeking dismissal on the basis of [*forum non conveniens*] bear the burden of persuasion at every stage of this analysis."). But "where [plaintiffs'] allegations are insubstantially supported, . . . a District Court may reject them without considering any evidence from the defendant." *Id.*

As to the changed situation in Peru, the Court of Appeals observed that "there have been significant factual developments post-dating [the District Court's] dismissal that cast its ruling in a different light." ECF 96, at 4. The panel aptly observed that those later scandals, discussed in

detail below, could call into question various judicial reforms I relied upon in my initial opinion.[3]  It is thus necessary to reopen the inquiry into the adequacy of the Peruvian courts.

### D.  The significant factual developments post-dating this Court's dismissal

The significant factual developments post-dating my dismissal collect in two categories: first, the discovery, through wiretapped recordings of phone conversations, of significant corruption among senior members of the Peruvian judiciary; and, second, the political clash between Peru's legislative and executive branches, followed by subsequent legislative elections. I discuss each in turn.

*1. The White Collars of the Port case and the resulting states of emergency.*  In December 2017, local authorities were investigating drug trafficking and organized crime in the Port of Callao, Peru's main commercial seaport, located just outside Lima.  ECF 101, ¶ 4.  As part of the investigation, the authorities wiretapped and recorded conversations among various suspects. ECF 101, ¶ 4.  Among other things, the recorded phone conversations revealed an expansive network of corruption involving high-level Peruvian judges and judicial officials, including the President of the Superior Court of Justice of Callao, the President of the Second Transitory Criminal Chamber of the Supreme Court, and three members of the National Magistrates Council, the body responsible for selecting and appointing judges and prosecutors at all levels of the judiciary.  ECF 101, ¶ 4; ECF 108, ¶ III.8.[4]

---

[3] The Court of Appeals noted that the recent disclosures of corruption could "undermine confidence that [the appellate courts of Peru] can serve as a protection against Newmont's alleged capture of the lower courts."  ECF 96, at 6.  The panel also suggested that "while the publicity around the recent scandal has not centered on Cajamarca trial courts," historic allegations of corruption perpetuated by Newmont may be more likely to recur "in the context of a judicial system permeated by corruption problems than it would in the absence of such problems."  *Id.*

[4] *See* Rebecca Tan, *Leaked calls reveal systemic corruption in Peru's judiciary, sparking flurry of resignations*, Washington Post (July 20, 2018), https://www.washingtonpost.com/news/worldviews/wp/2018/07/20/leaked-calls-revealsystemic-corruption-in-perus-judiciary-sparking-flurry-of-resignations.

The audio files were released to the public on July 7, 2018, and the fallout was dramatic. The Executive Judicial Council—the governing body of the judicial branch—declared the Court of Appeals of Callao to be in a state of emergency, which by the terms of the decree lasted for sixty days. ECF 101, ¶ 8. The judiciary's internal disciplinary body, known as OCMA, suspended the President of the Callao appeals court, together with four other judges linked to the scandal, and deactivated the Second Provisional Criminal Chamber of the Supreme Court, the arm of the Supreme Court whose president was implicated in the audio files. ECF 101, ¶ 8. The following week, the Executive Judicial Council declared a "state of emergency" for the entire judicial branch, which lasted for 90 days. The National Council of the Judiciary suspended its selection processes for judges and prosecutors and, on July 16, 2018, provisionally suspended César Hinostroza from his position as a Supreme Court judge while investigations against him continued. ECF 101, ¶ 10. A fortnight after the audio records were released, the head of Peru's Supreme Court stepped down, even though he was not personally accused of any wrongdoing. ECF 101, ¶ 9.

The reactions from the executive and legislative branches were likewise swift. Martín Vizcarra, the President of Peru, convened a special session of Congress where he presented a slate of proposed reforms. ECF 101, ¶ 14-15. Congress investigated possible offenses committed by the members of the National Magistrates Council, and recommended that all members be impeached for having committed major offenses to the Constitution, which the Congress unanimously approved. Peru's Congress declared a nine-month state of emergency for the Council and, thereafter, replaced it with a new entity called the National Board of Justice. ECF 101, ¶ 14-17. The Congress then impeached Hinostroza (the Supreme Court judge) and banned him from holding public office for ten years. Soon after he was impeached, Hinostroza

fled to Spain to avoid prosecution. Finally, Congress approved the proposal presented by the President to create a Council on Reforming the Justice System, which aimed to "promote and follow up on the reform of the justice system." ECF 101, ¶ 19-20.

The scandal and its aftermath did not stop there. The Executive Judicial Council, the judiciary's governing body, which had declared the judicial emergency, was itself declared in emergency after some of its members were implicated by the scandal. ECF 101, ¶¶ 21-23. Two more sitting Supreme Court judges were found to be involved, leading to ethics investigations that remain open. ECF 101, ¶ 13. The acting Attorney General, upon replacing her corrupted predecessor, declared the Prosecutor's Office to be in a state of emergency. ECF 101, ¶ 23; ECF 100, Ex. 17.

In all, as a direct result of the publications of the wiretapped phone conversations, various Peruvian governmental entities declared five times that various other Peruvian governmental entities were in states of emergency.

*2. The political clash between Peru's legislative and executive branches, and the subsequent legislative elections.* In addition to White Collars of the Port case and its aftermath, Plaintiffs filed three supplemental exhibits that "provide an update about events unfolding in Peru in response to attempted judicial corruption reforms," which, they argue, "confirm that Defendants cannot meet their burden to prove Peru is an adequate alternative forum for this case." Plaintiffs' Notice of Supplemental Evidence, ECF 124. Those exhibits include:

- October 2, 2019 (Washington Post)—**"Peru Shuts Congress, Triggers a Constitutional Crisis."**

- October 1, 2019 (Washington Post)—**"Peru's president dissolved Congress. Then Congress suspended the president."**

- October 1, 2019 (New York Times)—**"Who Leads Peru? Power Struggle Creates Worst Political Crisis in Decades."**

Broadly, each supplemental exhibit discusses events that occurred in Peru in late September involving a clash between Peru's executive and legislative branches. At bottom, the President of Peru (Martín Vizcarra) ordered the dissolution of Congress and, in response, Congress suspended Vizcarra and nominated his vice president, Mercedes Aráoz, as the new acting head of state. Those events have been reported widely in the American press. In addition to the articles offered by Plaintiffs, I have taken notice of various other articles describing the events:

- October 3, 2019 (New York Times)—**How a Political Crisis Seized Peru: Boom Times, Corruption and Chaos at the Top**—noting that the "turmoil that has roiled Peru for more than a year reached a turning point this week, when the president dissolved Congress and a rival briefly claimed to lead the nation. One Peruvian ex-president shot himself dead as the police arrived at his door. . . . The head of the opposition sits in jail, under investigation herself. And for about a day this week, the president and vice president both claimed to rightfully lead Peru."

- October 9, 2019 (Wall Street Journal)—**'God and Money': Graft in Peru Sparks Political Reckoning—**noting that President Vizcarra's dissolution of the opposition-controlled Congress was viewed by many "angry lawmakers" as a coup, but "many Peruvians saw it as a righteous act, like closing a rowdy red-light district."

- October 10, 2019 (New York Times)—**Peru Opposition Leader Keiko Fujimori Is Arrested in Corruption Inquiry**—noting that "Fujimori, a powerful Peruvian politician whose father ruled the country in the 1990s, was arrested in a money laundering investigation on Wednesday, calling into question the future of the political family and their right-wing populist movement" and that the "arrest came just days after the country's Supreme Court ordered her father, former President Alberto Fujimori, back to prison on a human rights abuse conviction, overruling the presidential pardon that had freed him in December."

- October 14, 2019 (Reuters)—**Peru Lawmaker Files Last-Ditch Legal Appeal Over Congress Closure**—noting that the "head of Peru's dissolved Congress presented a legal appeal to the country's top court . . . to suspend the closure of parliament on the grounds that President Martín Vizcarra had exceeded his constitutional powers."

Like the evidence submitted by Plaintiffs, the representative articles listed above describe years of corruption that have dogged all branches of the Peruvian government, culminating in the confrontation between Peru's executive and legislative branches.

I also have taken notice of two developments out of Peru that could pertain to the indices of corruption identified by Plaintiffs.  Late January, Peru held legislative elections after its Constitutional Court ruled that the President's dissolution of the Congress in September 2019 was legal.  The *New York Times*, for example, covered the election as follows:

- January 25, 2020—**Peruvians to Vote for New Congress as Country Seeks to Turn Page on Crisis**—"Peruvians will head to the polls on Sunday to choose a new Congress that will be in place for just over a year."

- January 26, 2020—**Peru Elects Deeply Split Congress With Right-Of-Center Tilt**—"Peruvians elected a fractured Congress with no clear leadership on Sunday, split among 10 parties with a center-right party grabbing the most seats."

- January 27, 2020—**'Stunning Defeat': Fujimori's Ghost Fades in Peru After Legislative Gamble**—"Peruvian President Martin Vizcarra took a gamble last year when he shuttered Congress after a bruising battle over a corruption crackdown."

I consider all these events in reevaluating the adequacy of Peru as an alternative judicial forum.[5]

---

[5] As I noted in my previous opinion, the Federal Rules of Civil Procedure provide that in assessing the adequacy of a foreign forum, "the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."  Fed. R. Civ. P. 44.1; *see also* ECF 92, at 10 n.6.  My consideration of the reporting published in various newspapers but not exhibited by either party falls within that general allowance and, as before, I have availed myself of the full scope of the parties' submissions and material publicly available.  Further, the general allowance detailed in Rule 44.1 accords with my ability to "take judicial notice at any stage of the proceeding of a fact not subject to reasonable dispute that is capable of accurate and ready determination by resort to a source whose accuracy cannot be reasonably questioned."  *Ieradi v. Mylan Labs., Inc.*, 230 F.3d 594, 600 n.3 (3d Cir. 2000).  To those ends, I have identified articles from major United States newspapers reporting the events in Peru and attempted to distill from them a common nucleus of facts.  I should note, though, that at least in the case of one newspaper, the difference in content between the newsroom and the editorial page is stark.  The editorial board at the *Wall Street Journal* published a piece last October in which the author opined that "Hugo Chávez['s] [coming] to power in 1999 on a pledge to root out corruption" and "Fidel Castro's Cuban revolution [that] derived much of its popular support from widespread disgust with the corruption of the Batista regime . . . . help[] [to] explain why the unconstitutional dissolution of the Peruvian Congress by President Martín Vizcarra last week has the region's democrats on edge."  Mary Anastasia O'Grady, Opinion, *The President of Peru Stages a Coup*, Wall Street Journal, Oct. 6, 2019 (accessed online).  The Journal's newsroom, for its part, took a different perspective.  It acknowledged that President Vizcarra's dissolution of the opposition-controlled Congress was viewed by many "angry lawmakers" as a coup, but further observed that "many Peruvians saw it as a righteous act, like closing a rowdy red-light district."  John Otis & Juan Montes, *'God and Money': Graft in Peru Sparks Political Reckoning*, Wall Street Journal, Oct. 9, 2019 (accessed online).  Newsrooms and editorial pages are, of course, held to different standards, and I have given the news reports greater weight.  Further, the *New York Times*, *Washington Post*, and *Wall Street Journal* are not the only news outlets covering the scandals in Peru and their aftermath.  *See, e.g.*, *Peru in turmoil after President Vizcarra dissolves Congress*, BBC News, Oct. 1, 2019 (accessed online); Mariana Sanchez, *Peru voters demand corruption-free gov't*, Al-Jazeera, Oct. 16, 2019 (accessed online).  Finally, various Peruvian newspapers, including *El Comercio*, *El Peruano*, and *La República*, along with myriad other Latin American publications, have covered the scandals and their aftermath relentlessly.

## II.     Discussion

Taking the record as a whole, for the reasons that follow, I conclude that Newmont has satisfied its ultimate burden to show that Peru is an adequate alternative forum.

### A.  Newmont has shown that Peru is an alternative forum

Newmont has shown that Peru "exists [as] an alternative forum."  ECF 96, at 7 (quoting *Piper Aircraft*, 454 U.S. at 254 n.22).  In my previous order, I imposed on Newmont various conditions of dismissal.  ECF 93.  I required that Newmont submit to the jurisdiction of the appropriate court in Peru and for that court to accept jurisdiction; to stipulate that any judgment entered in Peru qualifies as legally adequate under Delaware law; and to agree not to directly or indirectly raise objections to any of its agents testifying or providing evidence relevant to the claims asserted by Plaintiffs, whether such evidence is sought here or in Peru.  Newmont did not lodge objections to any of those conditions before, nor did it seek to litigate the imposition of those conditions on appeal.  ECF 126, at 3:1-14.  I will reimpose those conditions on Newmont now.  Because the existence of an alternative forum ordinarily is satisfied by defendant's agreement to submit to the jurisdiction of the foreign forum, *see Trotter v. 7R Holdings*, 873 F.3d 435, 442-43 (3d Cir. 2017), Newmont has demonstrated that Peru exists as an alternative forum.

### B.  Plaintiffs have produced enough evidence to credibly question whether Peru is a satisfactory forum

Because Newmont has demonstrated that Peru exists as an alternative forum, Plaintiffs must now produce "significant evidence" to demonstrate that "the remedy offered by the other forum is clearly unsatisfactory."  ECF 96, at 7 (citing *Piper*, 454 U.S. at 254 n.22).  To do so, Plaintiffs must demonstrate that Newmont's proposed alternative forum either cannot provide a remedy, is biased against them or for Newmont, or would be severely slow or inefficient in adjudicating their claims.  Given the posture of the case, it cannot be questioned that Plaintiffs

have satisfied their burden of production here. The Court of Appeals described the White Collars of the Port scandal and how evidence related to that scandal could "cast a different light" on my initial determination that Peru was an adequate forum. The Court of Appeals then supplemented the record with that evidence, ECF 96, at 8, and Plaintiffs have submitted detailed materials concerning those scandals. ECFs 100, 101. Further, evidence related to that scandal and related scandals has been made widely available in the public domain.

Plaintiffs highlight the White Collars of the Port case and its aftermath to question the *general* adequacy of the Peruvian courts. In their supplemental filing opposing Newmont's motion to dismiss, Plaintiffs contend that "[t]he rot infecting the Peruvian judiciary, which prompted Peru's President to lament the 'collapse' of the country's justice system, and Peruvian officials to declare states of emergency in four separate judicial bodies, precludes a finding that Peru's courts are *generally* adequate." ECF 99, at 10. Even Newmont, "for the most part, do[es] not take issue with [Plaintiffs'] general descriptions" of corruption. *See* Defs. Supp. Reply, at 6, ECF 107.

Plaintiffs also reassert the *specific* evidence of corruption perpetrated by Newmont that was before me in advance of my initial opinion. ECF 92, at 11-20 (detailing the alleged corruption in the Peruvian judiciary). Plaintiffs argue that even if this Court found the Peruvian courts to be generally adequate, "the crisis and the 'troubling' evidence of Newmont's own corruption preclude a finding that the local courts will fairly hear *these* Plaintiffs' claims against *these* Defendants." *Id.*

In total, Plaintiffs' submission of evidence of general and specific corruption, plus the supervening instances of significant corruption, is enough to satisfy Plaintiffs' burden to produce "significant evidence" that the alternative forum is "clearly unsatisfactory." *See* ECF 96, at 7.

Newmont no doubt disagrees with the conclusions Plaintiffs draw from these facts, but that disagreement goes to Newmont's burden of persuasion, not Plaintiffs' burden of production, which I discuss next.

### C. Defendants have satisfied their burden of persuasion to show that Peru can fairly adjudicate Plaintiffs' legal claims

Having carefully considered these revelations, and, more importantly, Peru's response to them, I conclude that Newmont has carried its ultimate burden to establish Peru as an adequate alternative forum. In concluding that it has, my analysis proceeds in four parts. First, deeming an alternative forum inadequate remains the "rare circumstance," *see* ECF 96, at 7, and even with these recent developments, the Department of State has not declared Peru's legal system dysfunctional. Second, the Peruvian government swiftly prosecuted the main actors of the White Collars of the Port case and instigated further reforms in the wake of the scandal, demonstrating commitment to ensuring that such corruption does not repeat. Third, the White Collars of the Port case did not involve Cajamarca or the types of claims raised by Plaintiffs, and is geographically distant, thus discounting the probability that the scandals would cause Plaintiffs to receive an impartial hearing. Fourth, the specific instances of historic corruption perpetrated by Newmont are unlikely to recur.

*1. Deeming an alternative forum inadequate is an exceptional conclusion*. In ordering remand, the Court of Appeals has asked me to review newly available evidence only as it might affect my analysis at *Eurofins* step one, that is, whether Newmont has shown Peru to be an adequate alternative forum in light of supervening instances of corruption that came after my dismissal, none of which involved Newmont. ECF 96, at 8. The parties agree that my analysis on remand is so limited. ECF 99, at 8; ECF 107, at 3-4.

While the burden of satisfying that factor remains with Newmont, the Supreme Court has long held that it is the "rare circumstance[]" in which the alternative forum is deemed inadequate. *See Piper Aircraft*, 454 U.S. at 254 n.22; *see also* ECF 96, at 7 (noting that "in the rare circumstance . . . the other forum may not be an adequate alternative" (cleaned up)[6]). Moreover, as I observed in my initial opinion, theories of "generalized corruption" have "not enjoyed a particularly impressive track record," and Newmont had previously shown that Plaintiffs' allegations of specific corruption did not render the Peruvian forum unsatisfactory. ECF 92, at 13. The State Department periodically evaluates the legal systems of foreign nations, and has not downgraded Peru's judiciary since my earlier ruling or issued any advisory contradicting conclusions it drew before the White Collars of the Port case emerged. *See* ECF 126, at 41:11-42:9 (discussing 2016 and 2019 State Department Human Rights Reports).

*2. Newmont has shown the Peruvian forum to be generally adequate notwithstanding the serious scandals that have plagued the judiciary for the past two years.* Newmont has shown that Peru remains generally an adequate forum for several reasons. First, the Peruvian government aggressively pursued administrative, civil, and criminal sanctions for the principal actors involved in the White Collars of the Port case. The Callao appeals court judge was suspended, *see* ECF 101, ¶ 8, then arrested, *see* ECF 108, ¶ IV.8. All members of the National Magistrates Council were impeached and dismissed, ECF 101, ¶ 18, the Council was disbanded and replaced, *id.*, and at least one of the three members implicated in the phone recordings has been prohibited from leaving the country. ECF 108, ¶ IV.8. César Hinostroza, the Supreme Court judge caught on the recordings, was suspended from his post and ordered to remain in

---

[6] This opinion uses (cleaned up) to indicate that extraneous, nonsubstantive information—like brackets, internal quotation marks, alterations, and citations—has been omitted from quotations. *See, e.g.*, *United States v. Steward*, 880 F.3d 983, 986 n.3 (8th Cir. 2018); *United States v. Reyes*, 866 F.3d 316, 321 (5th Cir. 2017).

Peru. He thereafter left Peru but was captured in Spain, and awaits extradition. ECF 101, ¶ 12; ECF 108, ¶ IV.8.

Second, the Peruvian government has instituted a series of reforms to ensure similar instances of corruption do not recur. The National Magistrates Council was abolished and replaced with a new organization, the National Board of Justice. ECF 101, ¶ 14-17. Peru's Congress constituted the Board last year after President Vizcarra proposed it in his package of judicial reforms. Like the Council it replaced, the Board will appoint judges and prosecutors, among other positions. As of January 2020, the Board is fully staffed and has begun work.[7] According to its new president, the justice board will spend most of the next few months reviewing thousands of cases ruled on by the Magistrates Council concerning appointments, ratifications and disciplinary processes of judges and prosecutors. Plaintiffs argue that the "reform efforts implemented by the Peruvian government" to address the "structural problems" that made the corruption possible "are insufficient." ECF 99, at 6. But much of Plaintiffs' evidence centers on the corruption infecting the National Magistrates Council and the difficulty the National Board of Justice had in becoming fully staffed. *See, e.g.*, ECF 126, at 10:7-13:16. Both problems have since been rectified.

Third, the political instability resulting from the scandals seems to have calmed. Peru held legislative elections in late January and the political party targeted by the government for its ongoing role in corruption lost badly.[8] In *Leon*, the Eleventh Circuit case on which the Court of Appeals relied in ordering remand, the court declined to find Ecuador inadequate despite a

---

[7] *See National Board of Justice begins its task, reviewing court appointments*, Peruvian Times (Jan. 22, 2020) (accessed online).

[8] Marcelo Rochabrum, *'Stunning Defeat': Fujimori's Ghost Fades in Peru After Legislative Gamble*, Reuters (Jan. 27, 2020) (accessed online).

"military coup" that had occurred just months before the district court's opinion and that had "overthrown the democratically elected president." 251 F.3d at 1313 n.3. The *Leon* Court reasoned that the coup was of little relevance to the forum-adequacy analysis because the litigants "were private parties only" and the case "implicate[d] no sovereign interests." *Id.* The court further noted that there was "some reason to believe that the Ecuadorian government has stabilized in the past year," and cited to a news report that "describe[ed] peaceful protests on [the] anniversary of [the] coup, without backing from the armed forces." *Id.* The circumstances in Peru seem more placid than the circumstances at play in *Leon*.

In all, the Peruvian government appears to have taken appropriate steps to address the scandals that have plagued the judiciary, and those steps suggest that corruption is not a feature of the judiciary or the current political regime. None of the declared states of emergency halted the normal adjudication of cases. All states of emergencies have since expired by their own terms, and the most relevant one (the judicial state of emergency) expired last year. As in *Leon*, the parties to this case and the subject matter involved "implicate no sovereign interests." Peru held legislative elections, and no major entity is challenging the results. As it stands, the Peruvian government appears imperfect, but functional.

*3. The White Collars of the Port case did not involve Cajamarca or the types of claims raised by Plaintiffs.* In *Leon*, the Court focused its forum-adequacy analysis on whether the defendants had persuaded the Court that the alleged corruption was the type "typically associated with the adjudication of similar claims [to plaintiffs' claims]" and "so severe as to call the adequacy of the forum into doubt." *Id.* at 1312. Here, most corruption constituting the White Collars of the Port case had nothing to do with the adjudication of cases. As Newmont demonstrates, the corruption mostly involved efforts by officials to trade their powers for certain

personal benefits. ECF 108, ¶¶ II.3.b, III.11. Newmont points out that the investigations resulting from the scandals have "uncovered only a few instances of corrupt actors who have manipulated or otherwise influenced the outcome of pending cases." ECF 107, at 8. Any such instance of case manipulation is no doubt serious, as Newmont concedes. *Id.* But such limited instances of corruption do not speak directly to whether these Plaintiffs can obtain a fair hearing in Peruvian courts, or suggest that the entire Peruvian judiciary is compromised. Plaintiffs argue that "[t]he scandal implicated the whole of Peru's judiciary, and there are surely more revelations to come." ECF 113, at 3. That may have been true when the scandal was fresh, but given the reforms instigated by the government that eventuality seems unlikely now.

*4. Newmont also has shown that the specific instances of corruption highlighted by Plaintiffs are unlikely to recur.* Finally, Newmont demonstrates that the corruption comprising the White Collars of the Port case does not make the historic allegations of corruption perpetuated by Newmont likely to occur again. Take, for instance, Newmont's alleged corruption of the Cajamarca judiciary in cases involving Plaintiffs. Plaintiffs have identified various instances of suspicious court behavior in criminal proceedings that they have participated in. Plaintiffs claim that a trial court refused to accept some of Plaintiffs' evidence. Plaintiffs also assert that, in criminal proceedings against them in Peru, Newmont's lawyer hand-delivered the guilty sentence to the Peruvian judge who, after issuing the sentence, admitted that Newmont had given an "economic benefit" to the prosecutor to bring the case against Plaintiffs. To support these allegations, Plaintiffs rely on sworn declarations. *See* ECF 99, at 7; Vasquez Decl., Ex. 19, ECF No. 43-1; Ysidora Chaupe Decl., Ex. 6, ECF No. 27-1.[9]

---

[9] Newmont seems to discount the veracity of sworn testimony, noting that Plaintiffs' "only 'evidence' consists of declarations from Plaintiffs' Peruvian counsel and one of the Plaintiffs." ECF 107, at 12. I am not as willing to do so. Testimony under oath, to which we attach the penalty of perjury, must be accorded substantial weight. In cases alleging fraud, testimony of this sort could form the bulk of the evidence. If Newmont or its agent had given the

To combat Plaintiffs' allegations, Newmont offers two forms of evidence. First, Newmont submits its own declarations, declaring Plaintiffs' assertions false. ECF 107, at 12-13. If all I had before me were competing declarations, then Newmont might not be able to carry its burden of persuasion on this issue. But Newmont offers additional evidence. Newmont demonstrates that, notwithstanding the supervening corruption scandals, Plaintiffs have succeeded within the very judicial system they ask me to deem inadequate. Plaintiffs have prevailed against Newmont before the Cajamarca trial court, the regional appeals court, and the Peruvian Supreme Court. ECF 107, at 13 (citing dockets). The Court of Appeals instructed this Court to determine whether "corruption in the appellate courts of Peru" could "undermine confidence that they can serve as protection against Newmont's alleged capture of the lower courts." ECF 96, at 6. It should not. As Newmont observes, Plaintiffs have received favorable decisions from every level of the Peruvian court system, including during the pendency of the White Collars of the Port scandal. ECF 108, ¶ II.3.c.

Plaintiffs also reassert as evidence Newmont's corruption of a Peruvian Supreme Court judge. In 2000, Newmont Second Capital Corporation and several other entities were seeking control of Yanacocha. The fight for control became tied up in the Peruvian courts. Lawrence Kurlander, a Cornell-trained lawyer who was then a Newmont executive, allegedly asked Vladimiro Montesinos, then head of Peru's secret police, to intervene with the Peruvian courts to ensure that Newmont's interests would be protected. *See* ECF 43-1, Ex. 1, ¶ 9. Montesinos subsequently pressured a Supreme Court judge to protect Newmont's interests and that judge

---

prosecutor an economic benefit to rule in its favor, which was thereafter disclosed by the judge, it is plausible that the only evidence would be a witness's testimony recounting the disclosure.

cast the decisive vote in Newmont's favor. ECF 92, at 11. Kurlander has conceded that he visited Montesinos on Newmont's behalf, but denies doing anything untoward.[10]

In my initial opinion, I concluded that such an episode was unlikely to recur. For one, the original corrupting happened two decades ago under the infamously corrupt Fujimori regime. *See id.* at 16. I recognized that the "interim regime change and noted improvements" in the ensuing decades made it unlikely that Newmont would try again to corrupt a court official. The Court of Appeals questioned whether the recent instances of corruption "call[ed] into question these 'noted improvements.'" ECF 96, at 5-6. It is true that some corruption can make other corruption more likely, but Newmont shows how Plaintiffs' evidence is lacking here. The corruption allegedly perpetuated by Kurlander and other Newmont executives involved the intelligence agencies of the executive branch. Since then, the dictatorial regime led by Fujimori ended, Fujimori himself has spent much of the last decade in prison, and recent national elections decimated whatever control his legacy political party may have had.

Moreover, the circumstances here differ markedly from the actual corruption perpetrated by Kurlander and other executives in the late 1990s. After Kurlander visited Montesinos, Newmont *succeeded* in its attempt to acquire Yanacocha. Now, by contrast, action by *the Peruvian government* has led to Yanacocha *suspending* its mining operations in the region in

---

[10] A recording of Kurlander's conversation with Montesinos has been published, and Kurlander has conceded its authenticity. According to Kurlander, he first went to the United States government for assistance with Newmont's bid to acquire Yanacocha, but officials declined to intervene. Instead, according to Kurlander, the United States government encouraged him to visit Montesinos. Kurlander admits that he went to Montesinos to help Newmont "level the playing field," but denies ever paying him a bribe. According to Kurland, Newmont was "very confident that we would win on the merits, but that if there was inappropriate behavior, we couldn't win." Kurlander and Newmont were worried that the French government—their main adversary in their attempt to acquire Yanacocha— was acting improperly. Kurlander claims he "was not asking for anybody to intervene on our behalf," only "asking [the Peruvian government] to stop the French from doing what they were doing. Period." *See* Interview with Larry Kurlander, https://www.pbs.org/frontlineworld/stories/peru404/kurlander.html (transcript of interview that took place in May and September of 2005). For additional in-depth reporting, *see* Jane Perlez and Lowell Bergman, *Tangled Strands in Fight Over Peru Gold Mine*, N.Y. Times (June 14, 2010) (accessed online).

which Plaintiffs reside. Moreover, Plaintiffs have acknowledged various ways the Peruvian government has been responsive to their concerns. Plaintiffs state that the government "will travel to Tragadero Grande twice a month . . . to verify [their safety]," and that it "will also pay for [their] phone bills." ECF 1, ¶ 350. Plaintiffs also have acknowledged that the Peruvian Minister of Justice and Human Rights affirmed that the "government was coordinating with the police on a protection plan" for Plaintiffs. *Id.* ¶ 351. And since at least 2015, the Peruvian National Police have not been involved with Yanacocha's exercises of its possessory defense against Plaintiffs. *See* ECF 37, at 6 n.4. At argument, counsel for Plaintiffs acknowledged that Newmont was honoring its commitment to allow Plaintiffs access to the disputed land. ECF 126, at 6:8-7:5.

Newmont, to its credit, appears to have engaged in serious corporate reforms in its own right. Kurlander retired from the company in 2002, and Newmont has since developed a robust and rigorously enforced ethics and compliance program. Declaration of Nancy Lipson ¶¶ 2-4, ECF 109. That program prohibits the kind of corrupt conduct Kurlander and other Newmont executives allegedly engaged in twenty years ago, as well as the kind of conduct Plaintiffs allege will happen if these cases are heard in Peru. As I recognized in my initial opinion, Newmont has endorsed and adopted established human rights frameworks such as the United Nations Guiding Principles on Business and Human Rights and the Voluntary Principles on Security and Human Rights, in addition to a series of internal policies and standards. Newmont also has made efforts to investigate alleged abuses by their subsidiaries. *See* ECF 92, at 18-20. Further, if the kind of conduct Plaintiffs allege will happen if these cases are heard in Peru *does happen*, Newmont

executives could easily run afoul of certain United States laws, including the Foreign Corrupt Practices Act.[11]

For these reasons, I conclude that the recent developments in Peru do not disturb my initial conclusion that, under the appropriate *forum non conveniens* framework, Newmont has carried its burden to demonstrate that Peru is an adequate alternative judicial forum. Because the other *forum non conveniens* remain in favor of dismissing this case, I will grant Newmont's motion, subject to the various conditions attached to the Order.

## III.    Conclusion

On June 20, 2014, Judge Thomy Paul Padilla Mantilla held an oral hearing involving various of the Plaintiffs here for their alleged crime of "usurpation" against Yanacocha. According to a record of that hearing, upon its completion, a French national, apparently not affiliated with either party, approached the Judge as an outside observer with an admonition: "A fin de indicarme que sobre este proceso se encuentran los ojos del mundo," she said—the eyes of the world are watching how these proceedings unfold. *See* ECF 111, Ex. C, at 165, 192. As noted in my earlier opinion, Plaintiffs have generated intense interest in their cause, with all the salutary effects such public attention brings.

Corruption of courts by private actors is pernicious. But attempts to corrupt need not disable independent judiciaries from delivering equal justice under law. What is most pertinent here is the *response* in Peru from the public and other governmental institutions when the

---

[11] This is not simply hypothetical. Mr. Kurlander identified the Foreign Corrupt Practices Act as a piece of evidence in his favor for why he could not have bribed Peruvian officials. But Kurlander's argument is a tautology. Every criminal act is committed against the backdrop of some law prohibiting that act. It is thus no defense to an accusation of criminality that criminality was impossible because the law made it so. Nevertheless, Kurlander's awareness that the law *could* apply to the bribing of a foreign official—the same kind of bribery Plaintiffs are predicting could happen here—suggests that the Newmont executives were undoubtedly aware of various legal limits on their behavior. *See* Interview with Kurlander, *supra* note 10.

integrity of its judiciary was compromised. That response has shown a determination to restore the credibility of the courts, and there has been objectively observable progress in doing so. Newmont has satisfied me that the entire judiciary of Peru cannot be deemed inadequate, and further satisfied me that Plaintiffs here, citizens and natives of Peru, can be treated fairly by Peruvian courts in a dispute involving a United States corporation.

I will therefore grant Newmont's motion to dismiss, subject to the same conditions set forth in my earlier Order.

_____/s/ Gerald Austin McHugh_____
Gerald Austin McHugh
United States District Judge